**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Salvatore Graziano (admitted *pro hac vice*)
(salvatore@blbglaw.com)
Abe Alexander (admitted *pro hac vice*)
(abe.alexander@blbglaw.com)
Yando Peralta (admitted *pro hac vice*)
(yando.peralta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-554-1400
Fax: 212-554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
Lauren M. Cruz (Bar No. 299964)
(lauren.cruz@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Lead Counsel for Lead Plaintiff Indiana
Public Retirement System and the Class*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| JONNIE HOMYK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEMOCENTRYX, INC. AND THOMAS J. SCHALL,<br><br>Defendants. | Master File No. 4:21-cv-03343-JST<br><br>Case No. 4:21-cv-04357<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL CLASS ACTION |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................. 10

III.  PARTIES .................................................................................................... 10

IV.   SUMMARY OF THE FRAUD .................................................................. 11

    A.   Avacopan Was Key To ChemoCentryx's Survival, And The Focus Of Management And Investor Attention Throughout The Class Period .................. 11

    B.   Success In The ADVOCATE Trial Was Essential To ChemoCentryx's Ability To Obtain FDA Approval To Market Avacopan To A Broad Patient Population .......................................................................................... 16

    C.   During The Class Period, Defendants Touted ADVOCATE's Results, Sending The Stock Price Soaring ....................................................... 22

        1.   Defendants Touted ADVOCATE's Secondary Endpoint Results As Demonstrating That Avacopan Was Far Safer Than Steroid-Based Therapy ................................................................................... 26

        2.   Defendants Stated That Avacopan Achieved ADVOCATE's BVAS Primary Endpoint And Demonstrated Superior BVAS Remission Versus Prednisone ..................................................... 28

        3.   Defendants' Statements Touting ADVOCATE As "Eliminating" Steroids In The Avacopan Arm And Demonstrating Avacopan Could Replace Steroid-Based Treatment ................................... 30

        4.   Defendants Statements Concerning The Avacopan NDA And The Company's Interactions With The FDA ...................................... 32

    D.   In Truth, Defendants Concealed Serious Problems With ADVOCATE, Including Repeated FDA Warnings That The Trial Was Riddled With Grave Deficiencies ............................................................................... 33

        1.   Prior To And During The Class Period, The FDA Privately Warned ChemoCentryx That ADVOCATE Would Not, And Did Not, Support The Company's Claims About Avacopan's Safety And Efficacy ................................................................................ 34

            a.   ADVOCATE's Secondary Endpoint Results Did Not Support Defendants' Safety Claims……………………………... ................................. 35

            b.   Non-inferior Remission to Standard of Care Therapy Was Inadequate To Demonstrate Avacopan's Efficacy …………….. 37

c. ADVOCATE's Relapse Results Were Flawed and Did Not Support Avacopan's Efficacy ………………………………...39

d. Most Patients in the Avacopan Group Needed To Use Steroids To Treat Their Vasculitis, Confounding ADVOCATE's Results …..………………………………………40

e. Subgroup Data Undermined Defendants' Efficacy Claims ……..41

f. The FDA Would Likely Convene an Advisory Committee To Discuss Specific Fundamental Flaws in the Design, Conduct and Reporting of ADVOCATE......................................42

2. The ADVOCATE Results Did Not Support Defendants' Claims About Avacopan's Safety ..........................................................42

3. ADVOCATE's Supposedly Positive Remission Results Were The Product Of Deviations From The Prespecified Clinical Trial Protocol ............................................................................................50

4. Steroid Use, Including For The Treatment Of Vasculitis, Was Significant And Widespread Among Avacopan Patients .........................54

E. Defendants Took Advantage Of ChemoCentryx's Inflated Share Price To Conduct A Critical Securities Offering, While Dumping Their Own Stock .........59

1. Following The FDA's Dire Warnings About ADVOCATE, ChemoCentryx Holds Its Largest Public Securities Offering Since Its IPO .................................................................................................59

2. Defendant Schall's Insider Sales ....................................................61

F. The Truth Emerges ........................................................................................61

1. On May 4, 2021, The FDA Published Its Briefing Documents Ahead Of The Advisory Committee Meeting......................................61

2. On May 6, 2021, The FDA Held The Advisory Committee Meeting .............................................................................................73

G. Post-Class Period Events ...............................................................................79

V. ADDITIONAL SCIENTER ALLEGATIONS.................................................................81

VI. DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .....................................................87

A. Defendants' False And Misleading Statements And Omissions Concerning ADVOCATE's Safety Results.............................................................................88

1. ChemoCentryx's November 25, 2019 Announcement Of ADVOCATE's "Top Line" Results..................................................88

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

2.      December 4, 2019 Piper Jaffray Investor Conference ..............................92

3.      January 15, 2020 JP Morgan Investor Conference ....................................93

4.      ChemoCentryx's March 10, 2020 Earnings Announcement For
        The Fourth Quarter And Full Year 2019 ....................................................96

5.      ChemoCentryx's May 11, 2020 Earnings Announcement For The
        First Quarter 2020 ......................................................................................99

6.      ChemoCentryx's June 11, 2020 Prospectus Filed In Connection
        With The June 2020 Offering ...................................................................100

7.      ChemoCentryx's July 9, 2020 Press Release............................................102

8.      ChemoCentryx's August 10, 2020 Earnings Announcement For
        The Second Quarter 2020 .........................................................................103

9.      August 11, 2020 BTIG Investor Conference ...........................................105

10.     August 12, 2020 Canaccord Genuity Investor Conference .....................107

11.     September 15, 2020 H.C. Wainwright & Co. Investor Conference ........109

12.     September 17, 2020 Press Release............................................................111

13.     ChemoCentryx's November 9, 2020 Earnings Announcement For
        The Third Quarter 2020 ...........................................................................112

14.     January 13, 2021 JP Morgan Investor Conference ..................................114

15.     ChemoCentryx's March 1, 2021 Earnings Announcement For The
        Fourth Quarter And Full Year 2020..........................................................115

16.     March 9, 2021 H.C. Wainwright & Co. Investor Conference .................117

17.     ChemoCentryx's April 14, 2021 Virtual R&D Day Investor
        Conference ................................................................................................118

18.     ChemoCentryx's April 29, 2021 Earnings Announcement For The
        First Quarter 2021 ....................................................................................119

B.      Defendants' False And Misleading Statements And Omissions That
        Avacopan Achieved ADVOCATE's BVAS Primary Endpoint And
        Demonstrated Superior BVAS Remission Versus Prednisone ...........................121

        1.      ChemoCentryx's November 25, 2019 Announcement Of
                ADVOCATE's "Top Line" Results........................................................121

        2.      December 4, 2019 Piper Jaffray Investor Conference .............................122

3. January 15, 2020 JP Morgan Investor Conference ..................123

4. February 26, 2020 SVB Leerink Investor Conference ...........125

5. ChemoCentryx's March 10, 2020 Earnings Announcement For The Fourth Quarter And Full Year 2019 ..................126

6. ChemoCentryx's April 6, 2020 Proxy Statement ..................129

7. ChemoCentryx's May 11, 2020 Earnings Announcement For The First Quarter 2020 ..................130

8. ChemoCentryx's June 11, 2020 Prospectus Filed In Connection With The June 2020 Offering ..................132

9. ChemoCentryx's August 10, 2020 Earnings Announcement For The Second Quarter 2020 ..................133

10. August 11, 2020 BTIG Investor Conference ..................135

11. August 12, 2020 Canaccord Genuity Investor Conference ....................137

12. September 15, 2020 H.C. Wainwright Investor Conference ..................139

13. ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020 ..................141

14. January 13, 2021 JP Morgan Investor Conference ..................144

15. ChemoCentryx's March 1, 2021 Earnings Announcement For The Fourth Quarter And Full Year 2020..................146

16. March 9, 2021 H.C. Wainwright Investor Conference ...........147

17. ChemoCentryx's April 14, 2021 Virtual R&D Day Investor Conference ..................149

18. ChemoCentryx's April 29, 2021 Earnings Announcement For The First Quarter 2021 ..................151

C. Defendants' False And Misleading Statements And Omissions About ADVOCATE's Design And Avacopan's Ability To Replace Steroid Therapy ..................152

1. ChemoCentryx's November 25, 2019 Announcement Of ADVOCATE's "Top Line" Results..................152

2. December 4, 2019 Piper Jaffray Investor Conference ...........153

3. January 15, 2020 JP Morgan Investor Conference ..................154

4.     ChemoCentryx's March 10, 2020 Earnings Announcement For
       The Fourth Quarter And Full Year 2019 ..................................155

5.     ChemoCentryx's April 6, 2020 Proxy Statement ....................................156

6.     ChemoCentryx's May 11, 2020 Earnings Announcement For The
       First Quarter 2020 ..................................157

7.     ChemoCentryx's June 11, 2020 Prospectus Filed In Connection
       With The June 2020 Offering ..................................159

8.     ChemoCentryx's July 9, 2020 Press Release............................160

9.     ChemoCentryx's August 10, 2020 Earnings Announcement For
       The Second Quarter 2020 ..................................161

10.    August 11, 2020 BTIG Investor Conference ............................162

11.    August 12, 2020 Canaccord Genuity Investor Conference ....................164

12.    September 15, 2020 H.C. Wainwright Investor Conference ..................165

13.    ChemoCentryx's November 9, 2020 Earnings Announcement For
       The Third Quarter 2020 ..................................166

14.    ChemoCentryx's March 1, 2021 Earnings Announcement For The
       Fourth Quarter And Full Year 2020........................................167

15.    March 3, 2021 Raymond James Institutional Investors Conference .......169

16.    ChemoCentryx's April 29, 2021 Earnings Announcement For the
       First Quarter 2021 ..................................170

D.     Defendants' False And Misleading Statements And Omissions Concerning
       The Avacopan NDA And ChemoCentryx's Communications With The
       FDA............................................................................................171

       1.     ChemoCentryx's November 25, 2019 Announcement Of
              ADVOCATE's "Top Line" Results.........................................171

       2.     January 15, 2020 JP Morgan Investor Conference ..................172

       3.     ChemoCentryx's May 11, 2020 Earnings Announcement For The
              First Quarter 2020 ..................................174

       4.     ChemoCentryx's July 9, 2020 Press Release............................175

       5.     ChemoCentryx's August 10, 2020 Earnings Announcement For
              The Second Quarter 2020 ..................................176

       6.     August 11, 2020 BTIG Investor Conference ............................177

7. August 12, 2020 Canaccord Genuity Investor Conference ....................178

8. ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020 ...............................................180

9. January 13, 2021 JP Morgan Investor Conference ..................................181

VII. LOSS CAUSATION...........................................................................182

VIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR........................185

IX. THE PRESUMPTION OF RELIANCE .........................................186

X. CLASS ACTION ALLEGATIONS ..........................................187

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................189

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)...........................................189

COUNT II For Violations of Section 20(a) of the Exchange Act (Against Defendant Schall)...........................................190

COUNT III For Violations of Section 10(b) and Section 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder For Insider Trading  (Against Defendant Schall) ....................................................191

XII. PRAYER FOR RELIEF .........................................193

XIII. JURY DEMAND ..........................................193

Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "Indiana"), by and through its undersigned counsel ("Lead Counsel"), brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants ChemoCentryx, Inc. and its President and Chief Executive Officer ("CEO"), Thomas J. Schall ("Schall"), (collectively, the "Defendants"), on behalf of itself and all other similarly situated persons who purchased or otherwise acquired the common stock of ChemoCentryx, Inc. ("ChemoCentryx" or the "Company") between November 26, 2019 and May 6, 2021, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (1) ChemoCentryx's public filings with the SEC; (2) Defendants' additional public statements, including those made in press releases, at investor conferences, and on earnings calls; (3) research reports by securities and financial analysts concerning ChemoCentryx; (4) interviews of former ChemoCentryx employees; (5) economic analyses of securities movement and pricing data; (6) materials obtained from the United States Food and Drug Administration ("FDA") through the Freedom of Information Act ("FOIA"), including minutes of non-public meetings between the FDA and ChemoCentryx; and (7) publicly available information regarding ChemoCentryx, including reports and presentations published by the FDA. Lead Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

# I.   INTRODUCTION

1.   This case arises from false and misleading statements and omissions made by ChemoCentryx and its CEO, Defendant Thomas J. Schall, about the safety, efficacy, and application for FDA approval of the Company's single most important product: a proprietary

vasculitis drug called avacopan.  Current "standard of care" treatment for vasculitis, a rare immune disease, includes substantial steroid dosing, which, while effective, is associated with meaningful safety risks.  Defendants hailed avacopan as a far safer replacement for steroid-based therapy – a drug that would "change the treatment paradigm" for vasculitis by "mak[ing] steroids and their noxious side effects irrelevant."  As Defendants told investors, avacopan was poised to become the new, safer standard of vasculitis care, giving the drug "multi-billion dollar market potential."

2.    Throughout the Class Period, Defendants touted the results of ChemoCentryx's ADVOCATE study, the Company's key clinical trial of avacopan and the basis for its approval application to the FDA.  Defendants told investors that the ADVOCATE results confirmed avacopan's core value proposition and demonstrated that the drug was far safer, but no less effective, than steroid-based therapy.  Further, Defendants told investors that "all" of the Company's interactions with the FDA in connection with its New Drug Application ("NDA") for avacopan,[1] which was built on the ADVOCATE data, had been "straightforward and routine" and that the agency had raised no serious or unexpected issues that might jeopardize approval with the broad label ChemoCentryx sought.

3.    Unbeknownst to investors, however, Defendants' statements were false and misleading.  In private communications with ChemoCentryx, including at meetings Schall personally attended, the FDA repeatedly warned Defendants that the ADVOCATE results did not support their claims about avacopan's safety and efficacy.  At a private November 2016 meeting attended by Schall, for instance, the FDA told ChemoCentryx that while the Company had "argued that, as replacement for glucocorticoids [i.e., steroids], [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids[, ADVOCATE] *is likely not adequate to support such safety comparisons."*  Indeed, far from demonstrating

---

[1] As the FDA explains, a "New Drug Application" is "the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S. . . . The goal of the NDA are to provide enough information to permit the FDA [to decide, among other things,] [w]hether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks[,] and [w]hether the drug's proposed labeling [] is appropriate."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

avacopan's superior safety over standard of care treatment, ADVOCATE raised serious red flags about avacopan's liver safety, which Defendants failed to disclose.  The FDA also privately cast doubt on ADVOCATE's supposedly positive efficacy data, repeatedly warning ChemoCentryx that the trial's results at a critical timepoint failed to meet required criteria; moreover, Defendants failed to disclose that ChemoCentryx generated avacopan's supposedly positive efficacy results only by violating ADVOCATE's prespecified rules for evaluating efficacy.  Finally, contrary to Defendants' statements that ADVOCATE showed that avacopan could replace steroid-based standard of care, steroid use among avacopan patients, including for the purpose of treating and controlling their vasculitis, was widespread and highly significant.

4.     In June 2020, less than three months after a dismal private meeting with the FDA, at which the agency raised serious red flags about the newly-unblinded ADVOCATE data, Defendants took advantage of ChemoCentryx's inflated stock price to raise $325 million from public investors.  At the same time, Schall dumped more than $12 million in ChemoCentryx stock – almost as much as he had sold in the entire year and a half preceding the Class Period.  On May 4 and 6, 2021, investors finally learned the truth when, in connection with a meeting of outside experts convened by the FDA to review the avacopan NDA ("Advisory Committee" or "AdCom"), the FDA not only disclosed numerous "uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," but revealed, to investors' astonishment, that *"during the avacopan clinical development, including the phase 3 design stages, the Agency communicated many of the [same] concerns"* directly to ChemoCentryx.  In response to this news, ChemoCentryx stock plummeted by more than 80%, wiping out billions in shareholder value.

5.     ChemoCentryx is a specialty pharmaceutical company that developed avacopan to treat ANCA vasculitis, a rare autoimmune disease affecting the body's blood vessels.  As discussed above, Defendants told investors that avacopan was a far safer replacement for current steroid-based treatment, which, while highly effective, is associated with a variety of potential toxicities.  Defendants told the market that avacopan was poised to become the new standard of care for vasculitis and dominate a "multi-billion dollar market" for treatment of the disease.  Defendants

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1  stated that even if avacopan captured just 10% of the addressable patient population, it would
2  generate "$1 billion-plus revenue potential per year" in the United States alone.

3      6.    Both ChemoCentryx and its investors viewed avacopan's commercial prospects as
4  critical to the Company's future and a driver of its stock performance.  J.P. Morgan analysts
5  "predicated" their recommendation to buy ChemoCentryx stock "on [their] view of potential of
6  avacopan in ANCA-associated vasculitis (AAV) alone."  Canaccord Genuity analysts likewise
7  stated that avacopan "remains core to our investment thesis" in ChemoCentryx.

8      7.    Indeed, avacopan's success was essential to ChemoCentryx's very survival.
9  ChemoCentryx did not have a single drug on the market at the start of the Class Period and only
10  four drugs in its pipeline, of which avacopan was, by far, the most advanced and important.
11  Because it had no drugs on the market, ChemoCentryx generated no sales revenue and was
12  dependent, almost entirely, on investor capital to finance its operations.  Those operations had
13  become increasingly costly by the start of the Class Period, as ChemoCentryx ramped up multiple
14  development programs for its pipeline products.  Quarter after quarter, ChemoCentryx reported
15  increasing losses, and, by the start of the Class Period, the Company had an accumulated deficit
16  of approximately $430 million.  ChemoCentryx's ability to secure vital funding was contingent on
17  investor confidence in avacopan's commercial prospects, which Defendants had told investors
18  would finally allow the Company to become profitable.

19      8.    The ADVOCATE clinical trial was the most significant milestone for avacopan on
20  its path towards commercialization.  As Defendants explained, ADVOCATE was a large-scale
21  clinical trial of avacopan that "form[ed] the basis" of the drug's NDA.  Defendants told the public
22  that ADVOCATE compared patients taking avacopan to patients taking steroids, with patients in
23  both "arms" of the trial on a background of immunosuppressants.  Because avacopan's core value
24  proposition was to provide safer vasculitis treatment through the elimination of steroids,
25  Defendants emphasized that the trial "eliminate[d] corticosteroids" in the avacopan arm and that
26  "what we're testing [in ADVOCATE] is the elimination of steroids."

27      9.    ADVOCATE's "primary endpoint" – the central measure of success in the trial –
28  was remission of vasculitis at week 26 and maintenance of that remission at week 52 of the trial.

- 4 -
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

Defendants told investors that as long as avacopan patients fared no worse than those on steroids – i.e., were statistically "non-inferior" – the trial would have satisfactorily demonstrated avacopan's efficacy and that this was "enough to get an approval." Critically, ADVOCATE also evaluated avacopan's safety profile along a number of "key secondary endpoints," including decreased steroid toxicity (measured by the Glucocorticoid Toxicity Index, or "GTI," endpoint), enhanced quality of life (measured by two "quality of life" endpoints), and improved kidney function.[2] Because, again, avacopan's principal value driver was its supposed superior safety profile, these "key" secondary endpoints were as, if not more, significant to investors, health care providers, and payors as the primary efficacy endpoint of remission. Securities analysts noted, for instance, that results on these safety endpoints "may be more important for commercialization of avacopan" than the primary endpoint and would be a "key driver of uptake."

10.    At the start of the Class Period, Defendants announced the ADVOCATE results, hailing the study as validating avacopan's core value thesis as a safer replacement for traditional steroid-based therapy. Schall stated, for instance, that: (1) ADVOCATE's GTI results provided "irrefutable" and "definitive evidence statistically that [avacopan was] superior in reducing glucocorticoid-related toxicities using a newly-validated glucocorticoid toxicity index"; (2) "validated quality of life metrics also statistically improved for these patients"; (3) avacopan "led to a significant improvement in kidney function"; and (4) that avacopan "had fewer adverse events and fewer serious adverse events, a very acceptable safety profile." Defendants further touted ADVOCATE's efficacy results, telling investors that avacopan had achieved the requisite "non-inferior" vasculitis remission rate to steroids at the critical 26-week mark, that the drug had even achieved "superiority" at 52 weeks, and that avacopan patients experienced significantly fewer relapses of vasculitis. And Defendants told investors that, in ADVOCATE, avacopan had accomplished all of this without steroids, and, as such, ADVOCATE "resoundingly" showed that "steroids need not be used when avacopan is available." Further, Defendants told investors that "all" of the Company's interactions with the FDA in connection with the avacopan NDA and

---

[2] The kidney is a highly vascularized organ and, so, patients suffering from vasculitis often experience impairment of kidney function.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   clinical program had been "straightforward and routine," with "nothing extraordinary to report."

2   Defendants crowed that "with today's [ADVOCATE] data it is clear that the time of making

3   patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be

4   over" and that "given the breadth of these [ADVOCATE] results across [the] spectrum of total

5   burden of disease[, t]his may be the beginning of the era where steroids go by the way of dinosaur."

6       11.     Defendants' statements were untrue.  Unbeknownst to investors, the FDA had

7   repeatedly warned ChemoCentryx privately that serious flaws in ADVOCATE's design cast

8   significant doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to

9   secure approval of the drug with the broad label ChemoCentryx sought.  Indeed, at the end of the

10  Class Period, when the FDA first publicly revealed its serious concerns about ADVOCATE, the

11  agency went out of its way to highlight that it had repeatedly "communicated many of [those]

12  concerns" directly to Defendants even before the Class Period began.

13      12.     ***First***, contrary to Defendants' statements touting ADVOCATE's "validated"

14  secondary endpoints as demonstrating avacopan's superior safety profile, the FDA explained that

15  it had repeatedly ***"raised concerns about the proposed secondary endpoints"*** in its private

16  meetings with ChemoCentryx, including specifically the "use and interpretation of the

17  Glucocorticoid Toxicity Index, and health-related quality of life measurements," as well the

18  study's renal endpoints, which Defendants vociferously highlighted in support of their safety

19  claims.  For instance, directly contrary to Defendants' statements, minutes obtained by Lead

20  Plaintiff of a private November 2016 meeting with the FDA, attended by Schall, show that the

21  FDA warned ChemoCentryx that GTI's "validity for serving as surrogate markers of clinical

22  outcomes . . . is unclear," that ChemoCentryx had "not provided adequate data that [the quality of

23  life] endpoint is a validated measure in vasculitis," and that "[t]here does not appear to be adequate

24  data to support the use of these [renal] endpoints to support long-term outcomes in vasculitis."

25  The FDA reiterated these same concerns in a private March 2020 meeting (minutes of which Lead

26  Plaintiff also obtained), further pointing out that the reported results for these safety endpoints

27  were statistically unsound.   Moreover, while Defendants touted avacopan's safety profile,

28  troubling liver safety signals had emerged in the ADVOCATE data – signals that ChemoCentryx's

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

most senior medical executive repeatedly raised directly with Schall no later than March 2020.

13.    **Second**, while Defendants trumpeted avacopan's "non-inferior" remission rates compared with steroids at week-26, they failed to disclose to investors that the FDA had repeatedly warned ChemoCentryx that "the non-inferiority study design would ***not*** be sufficient to show that avacopan can replace steroids," as minutes of the agency's private meetings with ChemoCentryx, including those attended by Schall, make clear.    The FDA also warned ChemoCentryx on numerous occasions that the ADVOCATE data did not support Defendants' claims that avacopan patients experienced significantly fewer relapses than patients treated with standard of care therapy; indeed, the FDA told ChemoCentryx in November 2016, at a meeting Schall attended, that the Company's relapse analysis was "problematic from a statistical point of view" and that "interpretability of results will be challenging."    Moreover, as the FDA explained, Defendants' claim that avacopan had achieved superiority with respect to remission at week-52 was predicated on results generated in violation of ChemoCentryx's own rules for calculating those results.    And, even putting that aside, the FDA further explained that avacopan had failed to achieve "superiority" against the only subgroup of patients who had ***actually*** received standard of care treatment.

14.    **Third**, while ADVOCATE was supposed to compare avacopan to steroid treatment, in truth, large numbers of patients assigned to the avacopan arm in ADVOCATE used "non-study supplied" steroids in order to treat their vasculitis.    Indeed, steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms during critical parts of the study.    Further, to the astonishment of FDA Advisory Committee members, ChemoCentryx counted patients in the avacopan arm as having "responded" to the drug, even if they required significant steroid treatment to control their disease.

15.    On March 19, 2020, the FDA met privately with ChemoCentryx to review the newly-unblinded ADVOCATE data, reiterating the warnings discussed above.    Among other things, the FDA was clear with ChemoCentryx that, contrary to Defendants' statements, ADVOCATE failed to establish that "replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

patients."

16.     Less than three months later, while ChemoCentryx stock was soaring, inflated by Defendants' misstatements, the Company raised $325 million from public investors – cash ChemoCentryx desperately needed to stay afloat and fund its remaining drug pipeline.  At the same time, as discussed above, Schall dumped over 200,000 shares of ChemoCentryx stock – as much as he had sold in the entire 17 months preceding the 17-month Class Period ("Control Period") – for proceeds of over $12 million.

17.     Investors finally learned the truth on May 4 and 6, 2021, in connection with the critical meeting of the FDA Advisory Committee – a panel of outside experts convened by the agency to offer clinical and scientific guidance – organized to review the avacopan NDA and the ADVOCATE results.  On May 4, the FDA publicly released a set of materials, including a Briefing Book and accompanying slide presentations, discussing the ADVOCATE data, the history of the avacopan NDA, and summarizing ChemoCentryx's discussions with the agency (the "AdCom Materials").  In the AdCom Materials, the FDA highlighted serious problems undermining the soundness of ADVOCATE's secondary endpoint results, cast doubt on the adequacy of its efficacy results, and highlighted troubling adverse safety signals associated with avacopan.  Significantly, the FDA's disclosures essentially mirror minutes of ChemoCentryx's meetings with the FDA held long before.  Indeed, as discussed above, the FDA took the unusual step of pointing out in the AdCom Materials that it had repeatedly raised these same issues with ChemoCentryx time and again.

18.     In response to this news, ChemoCentryx's stock plummeted more than 45% in a single day, falling from $48.82 at the close of market on May 3, 2021 to $26.63 at the close of market on May 4, 2021.  Securities analysts called the FDA's disclosures "surprisingly critical" and "without a doubt concerning."  Analysts were also shocked that Defendants had apparently concealed from investors the FDA's highly negative feedback about ADVOCATE.  This aspect of the FDA's disclosures came "as a particular surprise" to SVB Leerink analysts, for instance, who stated in a May 4, 2021 report that "FDA briefing docs suggest that the agency has had reservations about various aspects of CCXI's proposed development plan for avacopan for some time."

Likewise, financial publication *The Motley Fool* stated that the AdCom Materials' message – namely that "the agency doesn't put much stock in the clinical results for the experimental drug" – ***"shouldn't have been much of a surprise to ChemoCentryx, though. The FDA stated that it previously informed the company about many of its concerns about the design of the late-stage study for avacopan."***

19.     Then, on May 6, the FDA held the AdCom Meeting and released additional meeting materials.  The AdCom Meeting revealed important details about the ADVOCATE results – including that ADVOCATE's supposed "superiority" results were the product of violations of the prespecified trial rules – and also allowed investors to appreciate the significance of the previously concealed facts discussed in the FDA Briefing Book, including the clinical import of the ADVOCATE results.  Ultimately, the AdCom Meeting revealed that the data did not support approval of avacopan with the broad label ChemoCentryx had sought.  On this news, ChemoCentryx common stock fell by approximately 62%, from $27.49 at the close of market on May 5, 2021 to $10.46 at the close of the market on May 7, 2021,[3] on record volume.

20.     In all, disclosures of the true facts concerning avacopan and ADVOCATE caused massive losses to investors, with ChemoCentryx shares ***falling nearly 79%*** from $48.82 at the close of trading on May 3, 2021 to $10.46 at the close of trading on May 7, 2021.

21.     On October 8, 2021, after the conclusion of the Class Period, the FDA confirmed that ADVOCATE failed to establish that avacopan could replace steroids in the treatment of vasculitis, approving the drug with a far more limited label than ChemoCentryx had hoped. Avacopan's label provides that the drug is approved only as "an adjunctive treatment of adult patients with severe active" vasculitis and "does ***not*** eliminate glucocorticoid use."  In other words, in contrast to Defendants' Class Period statements that ADVOCATE "resoundingly" provided "evidence that steroids need not be used when avacopan is available," avacopan is approved only for use as an adjunct to steroids.

22.     The FDA also refused to allow ChemoCentryx to include Defendants' safety claims

---

[3] Trading in ChemoCentryx stock was halted on May 6, 2021 and resumed on May 7.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

based on ADVOCATE's supposed secondary endpoint results in the avacopan label, including the claimed reduction in glucocorticoid-related toxicity, improvement in kidney function, and improvement in health-related quality of life metrics, which Defendants had touted throughout the Class Period.  In addition, the FDA required ChemoCentryx to include "warnings and precautions" for liver toxicity on the avacopan label.

23.     Ultimately, avacopan's narrow label, pursuant to which the drug was indicated only in adult patients with "severe active" ANCA vasculitis, dramatically reduced the size of the addressable population to which ChemoCentryx sought to market the drug.  Prior to the start of the Class Period, Defendants projected that avacopan could be marketed to all vasculitis patients, and that the drug could be prescribed to at least 40,000 patients in the U.S. alone.  With its more limited label, Schall stated that there were only 9,500 patients who "fit the profile outlined in our label."

## II.     **JURISDICTION AND VENUE**

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under the Exchange Act.

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, ChemoCentryx had its principal executive offices located in this District and conducts substantial business here.  In addition, many of the acts alleged herein occurred in this District.

27.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and markets.

## III.     **PARTIES**

28.     Lead Plaintiff Indiana is a pension fund operated for the benefit of over 460,000

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

members and retirees of public universities, schools, municipalities, and state agencies of the State of Indiana.  As of June 30, 2021, Indiana managed more than $38 billion in assets.  As reflected in its certification filed with the Court (ECF No. 18-2), Indiana purchased shares of ChemoCentryx common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

29.     ChemoCentryx is a biopharmaceutical company incorporated under the laws of the State of Delaware, with its corporate headquarters and principle place of business in Mountain View, California.  ChemoCentryx common stock trades on the NASDAQ stock exchange under the ticker symbol "CCXI."  As of March 31, 2021, ChemoCentryx had 69.7 million shares of common stock outstanding.

30.     Defendant Schall is a co-founder of ChemoCentryx and has been its President and Chief Executive Officer since the Company became publicly traded in 2012.  In its SEC filings, ChemoCentryx stated that it was "highly dependent on the services of" Defendant Schall and that "if we are not able to retain Dr. Schall . . . our business will suffer."  Defendant Schall signed and certified each of the Company's quarterly and annual SEC filings during the Class Period.  He also regularly made detailed, data-laden statements to investors and securities analysts about avacopan and the ADVOCATE trial.

## IV.     SUMMARY OF THE FRAUD

### A.     Avacopan Was Key To ChemoCentryx's Survival, And The Focus Of Management And Investor Attention Throughout The Class Period

31.     ChemoCentryx is a biopharmaceutical company focused on the development and commercialization of drugs designed to treat rare diseases, or "orphan drugs."  In the United States, an orphan drug is one that treats a condition or disease that affects fewer than 200,000 people.  Orphan drug manufacturers, like ChemoCentryx, receive lucrative government subsidies, tax breaks, exclusivity rights, and exemption from the Medicaid mandatory discount pricing established by the Affordable Care Act.  Patients pay nearly 1,400% more annually for orphan drug treatment than for "mainstream" care.

32.     Throughout the Class Period, ChemoCentryx had no approved drugs on the market.

- 11 -

Accordingly, the Company was heavily dependent on capital raised from investors to keep the Company afloat and to fund the research and development costs for its four pipeline drugs. The most important of these pipeline drugs during the Class Period – and the one that received the most attention from investors and analysts – was avacopan. Defendants presented avacopan to investors as a breakthrough therapy in the treatment of ANCA-associated vasculitis,[4] a rare, often fatal, autoimmune disease involving the overexpression of inflammatory signals in the body, which causes white blood cells called "neutrophils" to attack small blood vessels. As a result, the body's blood vessels become swollen and inflamed, causing a range of symptoms, from painful rashes to serious organ dysfunction, including severe kidney damage.

33.     ANCA-associated vasculitis is currently treated with a combination of corticosteroids (like prednisone) to reduce inflammation, and immunosuppressants (cyclophosphamide or rituximab) targeting the patient's overactive immune system. While effective, long-term steroid use can lead to significant safety risks for vasculitis patients. As Defendant Schall stated at a June 18, 2018 investor conference:

> Now, the steroid – this standard of care regimen itself is very noxious however, and while it gets people through the active vasculitis crisis, it creates its own illness and creates its own mortality. The biggest cause of first year death in ANCA vasculitis first year of diagnosis is from the therapy and it's not an inconsequential number of deaths. So, current standard of care is not safe.

34.     Similarly, in ChemoCentryx's March 10, 2020 Form 10-K filed with the SEC, Defendants reported:

> The multiple adverse effects of acute and chronic prednisone treatment often required in the treatment plan are major causes of both short-term and long-term morbidity including the increased infection risk. Glucocorticoid therapy-related adverse events contribute significantly to patient care costs, as well as to the diminution of quality of life for patients.

35.     Avacopan generated enormous investor excitement prior to and during the Class Period because Defendants hailed the drug as a "a new standard of care" for vasculitis that would

---

[4] "ANCA" is an acronym for "anti-neutrophilic cytoplasmic autoantibody."

eliminate the need for dangerous steroid treatment, and thus poised to dominate what ChemoCentryx characterized as a multi-billion-dollar market.   Minutes of ChemoCentryx's private July 14, 2016 meeting with the FDA, which Schall attended, state that the Company pitched avacopan to the agency as "a replacement for glucocorticoids" in the treatment of vasculitis.

36.     Similarly, in its statements to investors, ChemoCentryx billed avacopan as a replacement for toxic steroid therapy in vasculitis treatment.   For instance, during an August 8, 2017 earnings call with investors, Schall repeated that "[t]he data to-date suggest that **avacopan can make steroids and their noxious side effects irrelevant** in the treatment paradigm of ANCA vasculitis" and "with avacopan . . . we believe that we can make steroid therapy irrelevant in ANCA vasculitis."

37.     Schall likewise told investors that in ChemoCentryx's ADVOCATE study – the Company's key pivotal clinical trial of avacopan discussed further below – "**what we're testing is the elimination of steroids."**  And, in a press release announcing the ADVOCATE results, Schall told investors:

> Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients. . . . Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but **with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over**.

38.     Shortly thereafter, at a December 2019 Piper Jaffray conference, Schall again told investors:

> Does the ADVOCATE trial provide evidence that **steroids need not be used when avacopan is available?** I think in a word, yes, **resoundingly, yes**. I think that this may be the beginning given the breadth of these results across all of these spectrum of total burden of disease. **This may be the beginning of the era where steroids go by the way of dinosaur**.

39.     Again, during a September 15, 2020 investor conference call, Schall stated, "[W]ith avacopan, we wanted to get rid of the steroids and get rid of the steroid-induced illnesses which are many."

40.     Defendants told investors that, given its potential to transform the therapeutic

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

landscape for vasculitis patients, avacopan had "multi-billion dollar market potential," with **"$1 billion-plus revenue potential per year" in the United States alone,** even if the Company captured only 10% of the addressable U.S. population. *See* Figure 1, below.  Moreover, as discussed above, ChemoCentryx had no drugs on the market at the start of the Class Period, and, thus, generated no product revenue.  Avacopan's success was key to finally generating positive sales revenue for the Company.



**Figure 1.**

41.    By the start of the Class Period, avacopan was ChemoCentryx's most important asset.  Accordingly, throughout the Class Period, investors and analysts were intensely focused on avacopan and ChemoCentryx's statements about the drug.  Indeed, Schall acknowledged at a January 2020 investor conference that "[m]uch of the [investor] excitement has been focused on this wonderful molecule, this unique asset, formerly called CCX168, now called avacopan."  For instance, J.P. Morgan analysts "predicated" their "overweight"[5] rating of ChemoCentryx stock "on [their] view of potential of avacopan in ANCA-associated vasculitis (AAV) alone."  These analysts explained that avacopan was not only the most advanced drug in ChemoCentryx's pipeline, but

---

[5] An "overweight" rating means that the analyst believes the stock will outperform the stock of comparable issuers.

the most promising: "[A]vacopan is the clear frontrunner (phase 3) in the AAV development landscape at the current moment with most other development candidates in earlier stages of development (phase 1/2) . . . . In our discussions with physicians, it was highlighted that the pipeline for new options is sparse (avacopan cited as most intriguing / exciting in our conversations)." Likewise Canaccord Genuity analysts stated that "AAV remains core to our investment thesis and supports current valuation with opportunity for upside built into our estimates." Defendants understood the market was focused on avacopan, and, indeed, began almost every investor call and press release with a discussion of avacopan's latest clinical trial results, and routinely fielded questions from analysts about those results.

42.     As discussed above, while ChemoCentryx was developing four pipeline drugs, including avacopan, none of its drugs were approved for sale and, therefore, the Company generated no sales revenue. At the same time, ChemoCentryx's operations consumed cash at a rapidly accelerating pace as the Company ramped up multiple costly drug development programs. By the end of 2019, at the very start of the Class Period, ChemoCentryx's operating expenses had ***nearly doubled*** over the prior three years – jumping from less than $53 million to over $94 million – with research and development costs alone skyrocketing by ***over 85%***, from less than $38 million to over $70 million, as the Company's drug development programs grew.

43.     Because the Company had no product revenue – and, indeed, no revenue at all apart from licensing payments tied to the commercialization of avacopan – ChemoCentryx operated at a significant loss. In 2018, ChemoCentryx operated at a net loss of approximately $38 million; in 2019, on the cusp of the Class Period, ChemoCentryx's net loss grew to just under $56 million. By the end of 2019, ChemoCentryx had an accumulated deficit of $430 million. Moreover, as ChemoCentryx explained in its 2019 Form 10-K, the Company "expect[ed] to continue to incur net losses as we develop our drug candidates, expand clinical trials for our drug candidates currently in clinical development, expand our research and development activities, expand our systems and facilities, seek regulatory approvals and engage in commercialization preparation activities in anticipation of FDA approval of our drug candidates . . . . Significant capital is required to launch a product and many expenses are incurred before revenues are received."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

44.     Accordingly, ChemoCentryx was heavily dependent on capital raised from investors in order to keep the Company afloat and fund the research and development costs for its four drug candidates.  As ChemoCentryx stated in that same 2019 Form 10-K, ***"we expect to finance future cash needs primarily through public or private equity offerings***, debt financings, our credit facility, government grants and contracts and/or strategic collaborations. . . . If we are unable to obtain adequate financing when needed, we may have to delay, reduce the scope of or eliminate one or more of our clinical trials or research and development programs or our commercialization efforts."

45.     Indeed, as the Company's capital needs continued to grow just prior to, and during, the Class Period, ChemoCentryx held a $325 million public offering in June 2020, the largest in its history, as discussed further below.  As Defendants were well aware, in order to secure vital funding, investor confidence in avacopan, the Company's key developmental drug, was paramount.

**B.      Success In The ADVOCATE Trial Was Essential To ChemoCentryx's Ability To Obtain FDA Approval To Market Avacopan To A Broad Patient Population**

46.     In December 2016, ChemoCentryx launched its key "phase III" trial of avacopan for the treatment of ANCA-associated vasculitis, called ADVOCATE.  As Defendants acknowledged prior to the start of the Class Period, avacopan's success in ADVOCATE was essential to obtaining regulatory approval to market the drug with the broadest possible indication.

47.     By way of background, the FDA typically classifies clinical trials of new drugs into several phases: small phase I trials are conducted to evaluate the drug's safety in humans; larger phase II trials are conducted to evaluate efficacy; and still larger phase III trials, like ADVOCATE, are conducted to compare the experimental drug to competing therapies in terms of both safety and efficacy.  ADVOCATE was a "pivotal trial" of avacopan, which means that it was intended to provide evidence of safety and efficacy sufficient to support ChemoCentryx's application for approval of avacopan.  While the trial was ongoing, ChemoCentryx stated in SEC filings that, if successful, ADVOCATE would "form the basis of avacopan's registration for the treatment of AAV in Europe and in the United States."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

48.     ADVOCATE compared patients taking avacopan to patients taking what Defendants claimed was the "standard of care" regimen for treating vasculitis: a combination of steroids, to reduce inflammation, and immunosuppressants, targeting patients' overactive immune system.  Defendants told investors that while patients in both study arms would receive a "standard background" of immunosuppressants, the study would examine whether avacopan could replace steroid treatment, which would be "eliminate[d]" in the avacopan arm.  *See* Figure 2, below.  For instance, Defendants stated in a January 2017 press release announcing the initiation of ADVOCATE:

> The study comprises two arms: the therapeutic arm contains 30mg twice-daily oral doses of avacopan and ***eliminates corticosteroids***, and the control arm contains a placebo and maintains a standard regimen of high dose chronic steroids. All patients will also receive a standard background immunosuppressant, (either cyclophosphamide or rituximab).

49.     Prior to beginning a clinical trial, the trial sponsor must develop a study "protocol" – the trial's "rulebook" that, among other things, prespecifies the trial's "primary endpoint," i.e., the outcome measure(s) it will use to determine whether the trial was a success or failure.  In ADVOCATE, the primary endpoint was remission of vasculitis at 26 weeks and 52 weeks.  *See* Figure 2, below.  The ADVOCATE protocol defined "remission" as a score of zero using version 3 of the Birmingham Vasculitis Activity Score, or "BVAS."  BVAS is an instrument for assessing disease activity in vasculitis patients that measures disease symptoms across a variety of major body systems, including the cardiovascular, renal, and nervous systems.  Defendants told investors that ADVOCATE would be deemed a success if the rate of patients achieving BVAS remission in the avacopan arm was "non-inferior" to – i.e., no worse than – the remission rate in the steroid arm at both week 26 and 52 of the trial.  Schall told investors that "non-inferiority" was the appropriate measure of success because a key goal of the trial was to show that avacopan could replace steroids as a treatment for vasculitis:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

The BVAS primary endpoint statistical null hypothesis[6] is non-inferiority or NI at weeks 26 and 52. ***This is the appropriate null hypothesis*** and in fact the only one which pragmatically can be used. NI is the appropriate null hypothesis when a disruptive new therapy is contemplated to unseat an incumbent therapy that is known to have significant liabilities such as safety and that is certainly the case with the present ANCA regimen that includes chronic high doses of steroids.



**Figure 2.** ADVOCATE's trial design, which compared vasculitis remission in 166 patients taking avacopan to 165 patients taking the corticosteroid prednisone, with all patients on a background of immunosuppressants (cyclophosphamide or rituximab), at week 26 and week 52.

50.    Defendants also assured investors that demonstrating non-inferiority on the primary endpoints of BVAS remission would be sufficient to obtain FDA approval of avacopan with the label and indication ChemoCentryx sought in its NDA.  For instance, at an August 2019 earnings call, Schall, citing the FDA's prior approval of the immunosuppressant rituximab, stated that non-inferiority was ***"enough to get an approval."***

51.    ADVOCATE's primary endpoint was BVAS remission at both week 26 and 52 of

---

[6] The "null hypothesis" in a clinical trial is the hypothesis that the medical intervention (e.g., the drug or medical device) has no effect.  A clinical trial's goal is to assess, in a specific sense, the strength of the evidence against the null hypothesis.  From a statistical standpoint, a lower quantum of evidence is required to demonstrate that an intervention is non-inferior to the control than that required to demonstrate superiority.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the trial.  As Defendants explained, the week 26 endpoint was particularly important because standard of care therapy (against which avacopan was competing) induced maximum remission in patients at least that quickly after initiation of therapy.  On an August 2019 earnings call with investors, for instance, Schall explained:

> BVAS was designed to just look at the vasculitic crisis in its acute form.  For that reason as I mentioned, we're looking at – can we induce a so called BVAS remission by week 26, which is the comparison that we need to look at even though we think and we hope our drug should work faster than that, but 26 weeks is the standard of care regimen, and that's the traditional endpoint because it takes that long for standard of care to exert its maximum effect across a population and convince the observers that those people aren't in fact going to die.

52.   The ADVOCATE protocol also prespecified a number of "secondary endpoints," i.e., outcomes of interest that can be used to further assess and define a positive outcome on the primary endpoint.  ADVOCATE's secondary outcomes included the incidence of corticosteroid toxicity as measured using the Glucocorticoid Toxicity Index ("GTI"), change in quality of life, and time to relapse.   As Defendants stated in the January 2017 press release announcing ADVOCATE's launch:

> Primary endpoints will be measured by Birmingham Vasculitis Activity Score (BVAS), assessing disease remission at weeks 26 and 52. Other key endpoints include reduced time to remission, enhanced quality of life, and decreased corticosteroid-related toxicities.

53.   These secondary endpoints were even more important than the primary endpoint because, as the Company represented, the secondary endpoints would support that avacopan reduces the overall burden of disease for ANCA-vasculitis sufferers.  For example, during an August 9, 2018 earnings call, Schall stated that "[t]he most important part of landmark [trial] though is the treatment benefit we are attempting to render."  Schall explained that the treatment benefit was lowering the "total burden of disease and a huge diminishment in quality of life." Schall further reiterated the importance of the secondary endpoints during the Company's October 1, 2019 R&D Day: "[I]f we go beyond the acute vasculitis crisis, *reducing the total burden of disease in ANCA is truly the goal."*  Indeed, according to a Company-published investor presentation from November 4, 2019, the ***"[t]otality of data addressing total burden of disease is***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

*of high interest to patients, clinicians, and regulators in maximizing drug's potential."*

54.     The reason the secondary endpoints were so important was because they provided a more complete picture of avacopan's value as a full replacement for the steroid-based standard of care than BVAS.  For example, Schall stated on May 9, 2018 that "BVAS only specifically talks about signs and symptoms of active vasculitis. It doesn't capture other important metrics including, for example, safety and most particularly safety that might be associated with high doses of glucocorticoids."  Likewise, Schall stated on August 5, 2019 that ADVOCATE aims to "go far beyond the rather limited scope measured in the Birmingham Vasculitis Activity Score or BVAS, which solely measures active and acute vasculitis signs and symptoms, but does not measure if a patient is truly well."  Moreover, as Schall stated on the Company's November 4, 2019 investor call, "the BVAS score itself is limited because it only measures active and acute vasculitis signs and symptoms. It is not a true reflection of whether a patient is well and that is why our ADVOCATE trial aims to fill this gap by measuring a number of important secondary endpoints." As Schall explained, the secondary endpoints "relate to alleviating . . . the spectrum of the total burden of disease."  Therefore, he added, the secondary endpoints "will show that avacopan contributes to a meaningful benefit in other dimensions that are vital to patients and indeed to the healthcare system."  Again, on the Company's May 11, 2020 earnings call, Schall stated that "[o]verall, the ADVOCATE trial revealed a compelling value proposition for avacopan and ANCA in the form of an all-around ability to reduce the total burden of ANCA-related disease."  He further stated that "avacopan therapy significantly reduced the illnesses associated with the use of steroids, significantly improved kidney function over 52 weeks and actually improved quality of life, in contrast to the deterioration in quality of life in those patients on the steroid-containing standard of care" and as such, "[m]embers of the ANCA patient and clinician communities relate that [these] effects are unprecedented in the ANCA vasculitis field, bringing the hope for a new paradigm of therapy."

55.     Analysts and investors echoed the importance of the secondary endpoints.  For example, an analyst on the Company's October 1, 2019 earnings call who heard Defendant Schall say, "[R]educing the total burden of disease in ANCA is truly the goal," echoed that "the take

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

home message of today is obviously BVAS doesn't provide the whole picture and the importance of some secondary endpoints you mentioned."  H.C. Wainwright analysts told investors in their November 26, 2019 report that the avacopan results on the **safety endpoints "may be more important"** than the primary endpoints, adding "[t]he secondary endpoints' data thus far look compelling and may be more important for commercialization of avacopan."  "Based on physician feedback, ***the totality of data driven by safety is likely to be the key factor in adoption of avacopan*** (as well key renal secondary endpoints such as eGFR)," said J.P. Morgan analysts in their February 18, 2020 report, while telling investors that "the top-line results for ADVOCATE are viewed as treatment paradigm shifting ***(driven by the potential for safe long-term remission)*** and broad adoption is anticipated."

56.     Defendants told investors that the FDA had assured ChemoCentryx that these secondary endpoints were meaningful measures of clinical utility and could support avacopan's approval.  For instance, at the August 5, 2019 earnings call for the second quarter of 2019, Schall stated:

> [W]e are confident from discussions that regulators and other experts will also take into account key secondary endpoints which help to measure alleviating the total burden of disease.

57.     Thus, as Defendants repeatedly stressed, the goal of ADVOCATE was to demonstrate that avacopan was not only an effective vasculitis treatment, but was also far safer than standard of care steroid-based treatment.  As Schall explained during a September 15, 2020 investor conference call:

> What we tried to do with avacopan is address the total burden of disease across this spectrum rather than just trying to arrest the signs of active vasculitis which is what current therapy does and that's really its only goal. And we measure that in clinical trials with something called the Birmingham Vasculitis Activity Score or BVAS. But rather than just trying to do that with avacopan, ***we wanted to get rid of the steroids and get rid of the steroid-induced illnesses*** which are many and are not captured in the vasculitis index.

58.     Because ADVOCATE "form[ed] the basis" of ChemoCentryx's NDA to the FDA seeking approval to market avacopan, the trial was critically important to the Company's business.

For instance, Schall told investors that ADVOCATE was a "landmark," "very important trial," and "historic phase III trial"; that "our pivotal ADVOCATE trial [] represents the summit of a mountain of pharmacological and clinical work and data"; that it "opened the valve in our avacopan pipeline"; and that "[p]ositive data from the ADVOCATE trial will allow us to begin to compile full MAA and NDA dossiers." Accordingly, as Schall acknowledged on ChemoCentryx's May 6, 2019 earnings call, Defendants were well aware that "many patients, the clinical community and investors are looking forward with keen interest to the results of our pivotal ADVOCATE Phase III trial of avacopan in ANCA-associated vasculitis."

59.    Indeed, analysts stated that positive ADVOCATE results were a key driver of ChemoCentryx's stock performance. J.P. Morgan analysts reported on January 10, 2019 that "[t]he phase 3 ADVOCATE results will be a key catalyst to monitor in 2019," and parroted Defendants' statements that avacopan's ability to get "patients off steroids is game changing" and "physicians are 'self-activating' and excited about the potential for alternative therapies for AAV." In a February 11, 2019 report, Piper Jaffray analysts likewise urged investors to "Own [ChemoCentryx stock] for Phase III ADVOCATE data in 4Q:19." Likewise, in a November 4, 2019 report, SVB Leerink analysts told investors that "[i]f positive, ADVOCATE could be a gateway to a multitude of data catalysts expected in 2020 that may begin to unlock the true value of avacopan and the mechanism of C5a receptor (C5aR) inhibition." Likewise, in a September 16, 2019 report, these same analysts stated that ADVOCATE was "a key binary catalyst for the company" at "this critical juncture" and that the study's results, "ha[d] the potential to reverse and reignite investor sentiment in … Chemocentryx as a commercial company."

**C.    During The Class Period, Defendants Touted ADVOCATE's Results, Sending The Stock Price Soaring**

60.    The Class Period begins on November 26, 2019. The previous evening, after the market had closed, ChemoCentryx issued a press release announcing ADVOCATE's highly "positive" results, which, Defendants told investors, "exceed our expectations." In the press release, Defendants stated that, in ADVOCATE, avacopan had demonstrated highly significant safety benefits over steroid therapy as measured by the trial's "pre-specified secondary endpoints."

The press release stated that compared with patients taking steroids, patients taking avacopan experienced a "[s]ignificant reduction in glucocorticoid-related toxicity," as measured by the GTI endpoint; "[s]ignificant improvement in kidney function in patients with renal disease"; and "[i]mprovements in health-related quality of life metrics."  In the press release, Schall stated that the ADVOCATE results "demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy . . . . Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over."

61.     Further, ChemoCentryx's November 25 press release stated that avacopan had demonstrated non-inferiority versus prednisone with respect to the primary endpoint of BVAS remission at 26 weeks and superiority versus prednisone at week 52.

62.     On the same day, ChemoCentryx held an ADVOCATE Phase III Update Call for analysts and investors, during which Schall highlighted ADVOCATE as a "landmark study" that "will usher in a new era for ANCA vasculitis patients."  Schall stated that avacopan "exhibited strong evidence for reducing the total burden of disease in ANCA vasculitis as exemplified by avacopan therapy's decreased rates of glucocorticoid toxicities relative to the standard of care." Schall further trumpeted ADVOCATE's "quality of life" results as strong evidence of avacopan's safety benefits.  Schall stated that "avacopan therapy leads to improvement in health-related quality-of-life measurements using validated instruments and patient-reported outcomes."  Schall also stated that avacopan's safety profile was "very acceptable," touting the "lower incidences of AEs [adverse events] in the ANCA patient population."

63.     In addition, Schall said that avacopan "successfully achieved its two primary endpoints as measured by BVAS, B-V-A-S, or the Birmingham Vasculitis Activity Score; and also exhibited strong evidence for reducing the total burden of disease in ANCA vasculitis as exemplified by avacopan therapy's decreased rates of glucocorticoid toxicities relative to the standard of care."  Schall added that the primary endpoint of "sustained remission" rates was "quite

striking" and "highly statistically significant for superiority of avacopan at week 52 remission when compared to standard of care." He further stated that ADVOCATE successfully met one of its "pillars" of "reducing steroid-related or glucose corticoid-related [glucocorticoid-related] toxicities."

64.     During the same call, Defendant Schall stated that "the avacopan group [in ADVOCATE achieved remission] very rapidly without the steroid regimen." And when an analyst asked, "[a]re we at a point yet where we can say because of the superiority [of avacopan in ADVOCATE], don't use steroids in these patients," Defendant Schall stated that for the avacopan arm for the ADVOCATE study, "we simply took the steroids out of the mix" and ***"what we showed is that you do not need the chronic steroid regimen."***

65.     In response to this news, ChemoCentryx's stock price skyrocketed from $8.06 at the close of trading on November 25, 2019 to $30.73 at the close of trading on November 26, 2019, on the then-highest trading volume in the Company's history.



**Figure 3.** ChemoCentryx's stock price soared at the start of the Class Period, fueled by Defendants' statements concerning ADVOCATE and avacopan's progress towards commercialization.

66.     Analysts and market commentators likewise reacted enthusiastically to Defendants' statements touting the ADVOCATE results. For instance, in a November 26, 2019 report, H.C.

Wainwright analysts almost doubled their price target for ChemoCentryx stock, raising it to $40 from $23, and noting that "we have increased our probability of success (POS) for avacopan to 70% from 30% due to the positive data announced yesterday after the close." On February 18, 2020, J.P. Morgan analysts more than doubled their price target for ChemoCentryx stock, raising it from $28 to $60, noting that "the top-line results for ADVOCATE are viewed as treatment paradigm shifting (driven by the potential for safe long-term remission) and broad adoption is anticipated" and that "the recent run up in shares post ADVOCATE results . . . likely accurately reflect high probability-adjusted blockbuster potential of avacopan in AAV."

67.     Likewise, financial news service *RTTNews* reported in a November 26, 2019 article:

> Shares of ChemoCentryx Inc. (CCXI) skyrocketed in extended trading on Monday, following positive topline data from a phase III trial of Avacopan for the treatment of patients with anti-neutrophil cytoplasmic antibody-associated vasculitis (ANCA-associated vasculitis) . . . . The current standard of care for AAV, which involves courses of immuno-suppressants (Cyclophosphamide or Rituximab) combined with high dose steroid administration, is associated with significant safety issues. The pivotal trial, dubbed ADVOCATE, achieved both primary endpoints of clinical remission at weeks 26 and 52 with statistical superiority of Avacopan over the standard of care at 52 weeks. Avacopan also significantly reduced glucocorticoid toxicity and significantly improved kidney function compared to glucocorticoid-containing standard of care.

68.     And in a December 1, 2019 article titled, "ChemoCentryx soars on superior avacopan," *The Pharma Market Letter* reported:

> It is fair to say that top-line data from the ADVOCATE Phase III trial of avacopan have come as a surprise. Sentiment had turned against the complement factor C5a inhibitor after the failure of [a competitor's] similarly acting [drug] . . . . But the highly positive results . . . position the project as the therapy of choice in [ANCA] vasculitis. Some analysts peg the value of this market at $3 billion, and ChemoCentryx' stock is up 300% today, giving the company a weighty $1.7 billion valuation.  Investor reaction to this data seems to reflect an expectation that avacopan could become the new standard of care for the initial treatment of ANCA vasculitis.

69.     Throughout the Class Period, Defendants issued numerous statements that: (1) the ADVOCATE safety results – including the GTI, quality of life, and renal results – demonstrated that avacopan was safer than standard of care therapy and "significantly reduced glucocorticoid

toxicity," supporting the drug's core value proposition; (2) in ADVOCATE, avacopan had achieved non-inferiority versus prednisone with respect to BVAS remission at week 26 and superiority at week 52, satisfying the trial's primary endpoint; (3) that the ADVOCATE results demonstrated "that steroids need not be used when avacopan is available"; and (4) that FDA feedback on the avacopan NDA had been routine and that the agency's review was "going in a very straightforward routine manner."

          **1.**      **Defendants Touted ADVOCATE's Secondary Endpoint Results As Demonstrating That Avacopan Was Far Safer Than Steroid-Based Therapy**

      70.    As discussed above, Defendants told investors that avacopan's value was driven by its vastly superior safety profile relative to steroid-based standard of care therapy, and, as such, Defendants' statements about avacopan's safety were especially critical to investors.  Throughout the Class Period, Defendants repeatedly stated that the ADVOCATE results – particularly the GTI, quality of life, and renal results – demonstrated that avacopan was far safer than standard of care therapy.  For example:

- At a December 4, 2019 investor conference, Schall stated, "I think that evidence is irrefutable by any metric we looked at, the glucocorticoid toxicities were dramatically reduced, so superior for avacopan therapy. And again, that was a big deal. It's never been shown before in a clinical trial like that."

- At a January 15, 2020 investor conference, Schall stated that ADVOCATE provided ***"definitive evidence statistically that we were superior in reducing glucocorticoid-related toxicities using a newly-validated glucocorticoid toxicity index***, which is a very comprehensive assessment of toxicities across the body."

- In its May 11, 2020 Form 10-Q filed with the SEC, ChemoCentryx stated, "Reduction in overall burden of disease management and improvement in quality of life was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone."

- At an August 11, 2020 investor call, Schall stated, "Importantly, we also showed [in ADVOCATE] that in addition to being able to eliminate these daily steroids that did correlate with a reduction, ***a meaningful and significant reduction in glucocorticoid related illnesses and toxicities*** . . . . And then importantly ***validated quality of life metrics also statistically improved for these patients***. I don't think that's ever been seen that improvement in quality of life has ever been seen in a Phase III trial of ANCA vasculitis before.  So, ***a lot of stunning results that was the clinical basis of the NDA that went in***."

- At a September 15, 2020 investor conference, Schall stated, "[W]e also were able to reduce the number of prednisone and glucocorticoid-related toxicities" as measured by GTI, "a very meticulous systematic scoring system . . . . All of this adds up to the same message, if you're on avacopan therapy, you have far, far fewer steroid-related toxic events. And those are really significant kind of illnesses. So, to reduce this is huge. And probably the biggest thing that patients have on their mind."

- At that same September 15, 2020 investor conference, Schall further stated, "So, across this entire spectrum of the disease in ANCA vasculitis, avacopan therapy seemed to show superior results to the standard of care or certainly in aggregate, a superior profile of therapy *and it did so safely. We had fewer adverse events and fewer serious adverse events, a very acceptable safety profile to go forward we believe and apply for approval in this indication."*

- At a January 13, 2021 investor conference, Schall stated, "[L]et us be clear, the evidence from the ADVOCATE trial overall strongly indicates that avacopan has the potential to change the treatment paradigm in ANCA vasculitis . . . avacopan therapy was associated with statistically significant fewer steroid related toxicities.  Avacopan therapy also led to a significant improvement in kidney function versus the standard prednisone-based therapy. This is a finding of enormous patient benefit and large pharmacoeconomic implications. And finally patients themselves reported feeling and functioning better on avacopan than they did on the standard prednisone-based therapy."

71.     Defendants emphasized to investors that these results positioned avacopan favorably for FDA approval.  For instance, at a January 15, 2020 investor conference, Schall stated:

> So, we really did sweep the board here. In all of the total spectrum, the total burden of disease, *I think we've shown good evidence for clinical benefit. And that takes us to a new place both with regulators* and thinking about the utility of this molecule, now of course we have to file the NDA, of course we have to get the label, but I *think that it really does enhance the prospects for the value proposition for this particular drug in a very, very compelling way.*

72.     Defendant Schall also emphasized the empirical soundness of ADVOCATE's safety results, including the GTI and quality of life results, stating they were "validated" endpoints that provided "definitive evidence" of clinical benefit.  And, as discussed above, Defendants told investors that ChemoCentryx was "confident from discussions that regulators and other experts will also take into account key secondary endpoints which help to measure alleviating the total burden of disease."

73.     Securities analysts were greatly encouraged by Defendants' statements touting ADVOCATE's safety results.  For instance, H.C. Wainwright analysts issued a November 26,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

2019 report stating that the avacopan results on the safety endpoints "may be more important" than the primary endpoints, pointing to Defendant Schall's statements that "suggested the key secondary endpoints in ADVOCATE, including . . . Glucocorticoid Toxicity Index (GTI) . . . are more relevant considerations for practicing clinicians."  The analysts added "[t]he secondary endpoints' data thus far look compelling and may be more important for commercialization of avacopan."  Likewise, in a November 25, 2019 report, J.P. Morgan analysts raised their price target for ChemoCentryx stock based on the ADVOCATE data, emphasizing that, "[i]mportantly, the BVAS data were supported by statistically significant improvement on estimated glomerular filtration rate (eGFR) at 26 / 52 weeks [ADVOCATE's renal safety endpoint], and importantly, on Glucocorticoid Toxicity Index (which we believe will be a key driver of uptake, based on prior physician feedback)."  These same analysts stated in a February 18, 2020 report that "[b]ased on physician feedback, *the totality of data driven by safety is likely to be the key factor in adoption of avacopan* (as well key renal secondary endpoints such as eGFR)."  In that February 18, 2020 report, the J.P. Morgan analysts once again raised their price target, explaining:

> Indeed, the top-line results for ADVOCATE [in ANCA-associated vasculitis] are viewed as treatment paradigm shifting (driven by the potential for safe long-term remission) and broad adoption is anticipated. At current levels, given the recent run up in shares post ADVOCATE results, we believe shares likely accurately reflect high probability adjusted blockbuster potential of avacopan in AAV (we assume blockbuster potential in the US alone).

74.     SVB Leerink analysts similarly issued a February 26, 2020 report highlighting ADVOCATE's safety results as driving value: "In particular, we note the benefits seen across safety (i.e., compared to steroid use) and kidney health," including the "[h]ighly stat[istically] sig[nificant] benefit in this metric [GTI] further supports the value of avacopan in AAV, in our view."

### 2.     Defendants Stated That Avacopan Achieved ADVOCATE's BVAS Primary Endpoint And Demonstrated Superior BVAS Remission Versus Prednisone

75.     Throughout the Class Period, Defendants told investors that, in ADVOCATE, avacopan had achieved the study's prespecified primary endpoint and demonstrated non-inferiority versus prednisone with respect to BVAS remission at week 26 and superiority at week

52.  For instance:

- At a December 4, 2019 investor conference, Schall stated, "[W]hat we showed [in ADVOCATE] I think was we could get them through the vasculitic crisis, *we could induce them into a remission as measured by something called the Birmingham Vasculitis Activity Score*. We could get them there as well or better, numerically better, than the steroids at week 26, which is the first measured time point for that endpoint. And indeed, *we were superior to the standard of care at 52 weeks of sustained remission*. That's never been shown before and that was done with avacopan in the absence of these high chronic doses of steroids, so that was big deal."

- On ChemoCentryx's March 10, 2020 earnings call with investors, Schall stated that, in ADVOCATE, "avacopan is numerically superior and statistically non-inferior to the daily steroid containing active comparator at 26 weeks in achieving remission that is in stopping active vasculitis as measured by *the Birmingham Vasculitis Activity Score or BVAS* which *was the tool used for the primary efficacy endpoints used in this trial.* After 52 weeks of treatment, the avacopan therapy sustained remission at a rate of 65.7% compared to 54.9% in the active comparator arm. Not only was this numerically and statistically non-inferior to . . . standard of care but this result was *highly statistically significant for the superiority of avacopan in terms of sustained remission after one year.*"

- At an August 11, 2020 investor conference, Schall stated, "We brought people in to remission very well . . . with the avacopan therapy. In the absence of chronic glucocorticoids, in fact, we were superior to the active comparator, traditional standard of care glucocorticoid plus X over 52 weeks, and keeping people in a durable remission with avacopan."

76.     Defendants further asserted that ADVOCATE showed significantly fewer avacopan patients experienced relapse of BVAS symptoms than patients in the standard of care arm, further demonstrating avacopan's efficacy in treating vasculitis.  For instance:

- At an August 12, 2020 investor conference, Defendant Schall stated, "And of course, when we look at the fact that people also can look forward to fewer relapses, that was one of the interesting parts of the [ADVOCATE] data set. There were significantly fewer relapses on avacopan than on the standard of care. And again, when I say standard of care, that's best medical practice right now. Avacopan therapy carried 54% less risk of relapse over that trial versus the prednisone group. And so, for a patient to think that they have less risks, they're living in less dread of relapse and having to go back to a more noxious therapy, I think that really is super important."

- At a September 15, 2020 investor conference, Defendant Schall stated that "relapse risk throughout the trial was significantly less with avacopan" and there was a "statistically significant advantage to avacopan," noting again the "54% less risk of relapse throughout the trial."

- At a January 13, 2021 investor conference, Defendant Schall told investors that ADVOCATE's relapse results showed that avacopan was suitable for "maintenance" therapy - i.e., ongoing treatment after an initial infusion – stating that after continuous dosing, avacopan had "relapse curves" that were "amazingly different" than the standard of care, which was "real evidence" of avacopan's benefit.

77.    Analysts responded positively to Defendants' statements.  For instance, Canaccord Genuity analysts issued a December 30, 2019 report that a leading physician to whom they spoke "anticipate[d] using avacopan as part of his [standard of care] induction treatment regimen, due to the 26-week data that demonstrated similar efficacy using avacopan without the exposure to high-dose steroids."  Likewise, in a May 12, 2020 report, H.C. Wainwright analysts stated that the ADVOCATE data were impressive," as they showed "non-inferiority for the pre-specified statistical null hypothesis for the primary BVAS endpoints of vasculitis remission at week 26 and superiority for sustained remission at week 52."  Similarly, SVB Leerink analysts reported in September 2020 that the ADVOCATE "results were highly encouraging, as it suggests that avacopan in place of steroids does not compromise on efficacy."

### 3.    Defendants' Statements Touting ADVOCATE As "Eliminating" Steroids In The Avacopan Arm And Demonstrating Avacopan Could Replace Steroid-Based Treatment

78.    Defendants also told investors throughout the Class Period that, in ADVOCATE, avacopan patients had achieved remission without the use of steroids, which had been "eliminated" from the avacopan arm of the study.  Accordingly, Defendants told investors that avacopan had delivered on its promise to usher in an "era where steroids go by the way of dinosaur" and "make steroids and their noxious side effects irrelevant" in the treatment of vasculitis.

- At a December 4, 2019 investor conference, an analyst asked Defendants, "Does ADVOCATE support *replacing steroids with avacopan in AAV patients?"* Defendant Schall responded with a "resounding" yes: **"*Does the ADVOCATE trial provide evidence that steroids need not be used when avacopan is available*? I think in a word, yes, resoundingly, yes."**

- At a January 15, 2020 investor conference, Schall stated, ADVOCATE "is a double-blind, double-dummied study, where we have the active comparator standard of care control arm . . . [t]hat is prednisone, methylprednisone, but mostly prednisone, oral prednisone plus X, where X is either cyclophosphamide or rituximab. *And we compared that with avacopan*

*plus X, and we give them a dummy prednisone course. This is all kitted and protocolized. There's no discretion and this is what the protocol dictates."*

- On the Company's August 10, 2020 earnings call, Schall stated, "[P]atients on avacopan therapy performed very well in the second six months of the [ADVOCATE] trial. During this period, *avacopan was essentially a monotherapy* since the standard concomitant background therapies such as cyclophosphamide or rituximab have ceased. The data suggests that avacopan alone may suffice in controlling ANCA vasculitis over time."

- At an August 11, 2020 investor conference, Schall stated, "[I]f you talk to [vasculitis] patients and physicians, this steroid regimen, especially the chronic high-dose steroids, which are quite toxic is really something everyone would love to get rid of. . . . So on one arm [of ADVOCATE], we've had the standard the standard of care therapy, the so called active comparator of glucocorticoid plus X where X is either cyclophosphamide or rituximab, and *the other arm was no glucocorticoid*, it was avacopan plus the background X cyclophosphamide or rituximab."

- Likewise, at that August 11, 2020 investor conference, Schall stated, "[T]hat second six months segment of the trial, weeks 26 to 52, *avacopan was essentially used as monotherapy*. . . . That second six months, *all folks were getting was avacopan*, they weren't getting additional rituximab. They weren't getting additional cyclophosphamide, et cetera. And *they were beautifully maintaining remission*, with all of the other benefits I also alluded to."

- At a September 15, 2020 investor conference, Schall stated, *"[W]e wanted to get rid of the steroids* and get rid of the steroid-induced illnesses . . . . So, we designed this trial called the ADVOCATE trial, a pivotal Phase III trial in ANCA vasculitis. *Essentially, we took two arms in a double-blinded placebo-controlled double-dummy study and we gave one arm of avacopan with no steroid, no prednisone*. They still got X in background or we gave them the normal therapy prednisone plus X without avacopan."

79.    The market credited Defendants' statements that ADVOCATE effectively compared avacopan without steroids to steroid treatment and demonstrated that "steroids need not be used when avacopan is available." For instance, in a June 18, 2020 report, BTIG analysts trumpeted avacopan as "the first steroid-sparing agent in the treatment of AAV." These analysts reported commentary from physicians they had surveyed, who, based on Defendants' statements, hailed ADVOCATE as "the first trial ever to attempt at removing the use of steroids in treating AAV." The analysts reported that physicians "were particularly impressed by the achievement of non-inferiority (26 weeks) and statistical superiority (52 weeks) *without the use of steroids* . . . . In discussing the ADVOCATE results, words such as 'game-changer', 'incredible', and 'mind-boggling' were used with [physicians] emphasizing the *significance of steroid-sparing – without*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

*compromising on efficacy – as a key takeaway."*  Likewise, Wells Fargo analysts issued an August 11, 2020 report, in which they repeated Defendants' statements "highlight[ing] four value propositions for avacopan in AAV," including *"eliminating need for steroids"* and that "during the second 6 months of the 12-month pivotal ADVOCATE trial, *avacopan was used essentially as a monotherapy*, suggesting that avacopan may suffice in controlling AAV over time without the need for background RITUXAN or cyclophosphamide therapy."  Similarly, SVB Leerink analysts stated in a September 2020 report that the ADVOCATE "results were highly encouraging, as it suggests that avacopan in place of steroids does not compromise on efficacy."  And in an April 15, 2021 report, Wells Fargo analysts repeated Defendants' statements that in the second half of ADVOCATE, avacopan patients *"received no treatment other than avacopan,"* and, as such, results supposedly favoring avacopan during this period provided "evidence supporting" the drug's use as a "monotherapy."

> ### 4.   Defendants Statements Concerning The Avacopan NDA And The Company's Interactions With The FDA

80.   During the Class Period, Defendants repeatedly reassured investors that the FDA's review of the avacopan clinical program and NDA was proceeding successfully and that the agency had raised no serious or unexpected issues that might jeopardize approval.  For instance:

- On ChemoCentryx's November 9, 2020 earnings call, an analyst asked Defendants, "Did the FDA indicate any review issues and is there any update around the agency's view around at AdCom? It's a question that keeps coming up in our discussion."  Schall responded that "[a]ll of our interactions with the agency so far" were *"straightforward and expected"* and assured investors that he had "not seen, personally, anything unusual or anything that again we did not fundamentally anticipate and for which we've been, quite frankly, ready."

- At a January 13, 2021 investor conference, an analyst asked Defendants, "[A]re you preparing for an AdCom [Advisory Committee Meeting] and what is the latest communication from FDA on this topic?"  Schall assured investors that "FDA [has] not highlighted any particular issues that would have to be discussed at AdCom."

- At that same January 13, 2021 investor conference, an analyst asked Defendants, "[A]re you past the mid cycle review for the NDA?"[7]  Schall reassured investors, "Yes, we are.

---

[7] An applicant's mid-cycle review meeting with the FDA is essentially the halfway mark of an NDA review cycle.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

So, the – and ***the review process in our opinion is going in a very straightforward routine manner and I think the questions and answers we provided in a timely fashion are again quite expected for this kind of application. So, nothing extraordinary to report at this point."***

81.     Analysts and investors were reassured by Defendants' statements concerning the FDA's review of the avacopan clinical program and the progress of the NDA.  In a January 15, 2021 report, for instance, Wells Fargo analysts reiterated their "buy" rating and parroted Defendants' assurances, stating that ChemoCentryx "noted that it has completed the mid-cycle review meeting with FDA's Division of Rheumatology and Transplant Medicine, and ***characterized the [NDA] process as predictable and straightforward,*** with [a] reasonable amount of inquiries, ***all of which have been answered by the company in the appropriate time frame."*** Likewise, Canaccord Genuity analysts stated in a March 3, 2021 report that ChemoCentryx "noted that no topics of interest have been identified [for an Advisory Committee Meeting], and ***queries have been straightforward/unsurprising so far."***

*        *        *

82.     During the Class Period, the price of ChemoCentryx stock increased from $8.06 at the close of trading on November 25, 2019 to a high of $68.40 – a more than 700% increase.  As discussed above, analysts and investors credited Defendants' statements about the ADVOCATE results, the safety and efficacy of avacopan, and the progress of the avacopan NDA review.

83.     Unfortunately for investors, and as discussed in detail below, Defendants' statements were materially false and misleading.

**D.     In Truth, Defendants Concealed Serious Problems With ADVOCATE, Including Repeated FDA Warnings That The Trial Was Riddled With Grave Deficiencies**

84.     Unbeknownst to investors, Defendants' reporting of the ADVOCATE results were misleading and their statements concealed known serious defects pervading the trial's design. ***First***, contrary to Defendants' statements that ADVOCATE showed avacopan's safety and efficacy profile was superior to steroid-based standard of care and that the FDA's review of the avacopan NDA was "very straightforward and routine," the FDA had repeatedly warned ChemoCentryx in private meetings – both prior to and during the Class Period – that ADVOCATE

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

did not support these claims. **Second**, the ADVOCATE safety results Defendants vigorously touted – including the study's GTI, quality of life, and renal results – were clinically unsupported and statistically unsound; indeed, while Defendants touted avacopan's superior safety profile, ADVOCATE revealed a troubling adverse liver safety signal associated with avacopan. **Third**, while Defendants touted avacopan's remission results in ADVOCATE, they failed to disclose that these results were the product of flagrant violations of the clinical trial protocol. **Finally**, contrary to Defendants' statements that ADVOCATE's design "eliminated" steroids in the avacopan arm and the trial's results showed that avacopan could replace the steroid-based standard of care, in reality, steroid use among avacopan patients, including for the purpose of controlling their vasculitis, was widespread and highly significant. Moreover, in reporting the ADVOCATE results, ChemoCentryx counted such patients as having achieved remission on **avacopan**, notwithstanding their significant steroid use.

> 1.     **Prior To And During The Class Period, The FDA Privately Warned ChemoCentryx That ADVOCATE Would Not, And Did Not, Support The Company's Claims About Avacopan's Safety And Efficacy**

85.     Contrary to Defendants' public statements touting the ADVOCATE results and reassuring the market that the FDA's review of the avacopan NDA was "very straightforward and routine," the FDA had, on numerous occasions, privately warned ChemoCentryx that serious flaws in ADVOCATE's design cast significant doubt on the study's ability to adequately demonstrate avacopan's safety and efficacy and secure approval of the drug with the label ChemoCentryx sought. As the FDA explained at the end of the Class Period, "the review team has identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," and *"during the avacopan clinical development, including the phase 3 design stages, the Agency communicated many of the concerns with the design of"* ADVOCATE directly to ChemoCentryx, including at meetings Schall personally attended.

86.     Indeed, minutes of the FDA's private meetings with ChemoCentryx, which Lead Plaintiff obtained from the FDA through the FOIA, show that, in July 2016, the FDA told Schall and other attending ChemoCentryx executives that "the Agency did not agree with the sponsor's

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

proposed phase 3 study design."  The FDA repeated that same warning to Schall and others at a private November 2016 meeting, stating, "We do not agree with your [ADVOCATE] study design . . . . [Y]ou have argued that, as replacement for glucocorticoids, [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study is *likely not adequate to support such safety comparisons."*

87.     As investors ultimately learned only after the Class Period, the FDA had flagged a host of serious defects in ADVOCATE's design and its purported results.

a.     **ADVOCATE's Secondary Endpoint Results Did Not Support Defendants' Safety Claims**

88.     The FDA raised serious concerns about ChemoCentryx's use of ADVOCATE's secondary endpoint results – including GTI, quality of life, and renal improvement – to support its claims that avacopan was safer that steroid-based standard of care.  For instance, the FDA's AdCom Materials explain that, at the November 1, 2016 meeting, the FDA *"raised concerns about the proposed secondary endpoints"* which were primarily designed to evaluate avacopan's safety, including specifically *"rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."*

89.     Minutes of that November 2016 meeting reveal that the FDA warned Schall and other attending ChemoCentryx executives that, directly contrary to Defendants' public statements, GTI was not a sufficiently validated safety endpoint for use in ADVOCATE and that the Company would need to submit the endpoint to the agency through proper channels for validation if it wished to pursue it in the trial:

> We note that you have included the change from baseline over the first 26 weeks in the glucocorticoid-induced toxicity index (GTI) instrument as a secondary endpoint.[8] *We note that the instrument appears to include several biomarkers, whose validity for serving as surrogate markers of clinical outcomes* (direct measures of how patients function, feel, or survive) impacted by glucocorticoid use *is unclear* . . . . If you choose to pursue this endpoint [in ADVOCATE], the

---

[8] The FDA's observation that GTI was measured only during the first 26 weeks of the study is significant.  ChemoCentryx's analysis excluded the maintenance period following the conclusion of the prednisone taper in the comparator arm, biasing the analysis in avacopan's favor.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1
2

endpoint should be reviewed through the Clinical Outcome Assessment (COA) qualification program.

3

ChemoCentryx, however, simply ignored this directive.

4

5

6

7

90.     With respect to ADVOCATE's quality of life endpoints, the FDA told Schall and other Company executives at that same November 2016 meeting, "We have concerns regarding the inclusion of [the quality of life instruments] as secondary endpoints. ***You have not provided adequate data that either endpoint is a validated measure in vasculitis.***"

8

9

10

11

12

91.     Likewise, at the November 1, 2016 meeting, the FDA also warned Schall and other attendees that the renal function endpoints, which Defendants later vigorously touted, were unsupported.  According to the meeting minutes, the FDA stated, "You have included several markers of renal function . . . . ***There does not appear to be adequate data to support the use of these endpoints to support long-term outcomes in vasculitis.***"

13

14

15

16

17

18

19

20

21

22

23

24

25

92.     The FDA reiterated these warnings at a private March 19, 2020 meeting with ChemoCentryx following ADVOCATE's unblinding.  At this meeting, the FDA, again, cast significant doubt on the Company's assertions that ADVOCATE's secondary endpoint results demonstrated avacopan was safer than steroid-based standard of care therapy.  According to the meeting minutes, the FDA reaffirmed its "comments during our previous meetings . . . on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), [and quality of life endpoints, namely] SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L."  The FDA again expressed grave concerns about the "[s]upport for use of these endpoints within this population."  For instance, with respect to GTI, the "FDA," again, "explained that the clinical meaningfulness of GTI, as a novel instrument that captures biomarkers and other assessments without including direct patient input, ***has not been characterized.***"  The FDA also cautioned ChemoCentryx against ignoring the agency's guidance, pointing out that it was "not clear if [ChemoCentryx] implemented these [prior] recommendations."

26

27

28

93.     Also at the private March 19, 2020 meeting, the FDA warned ChemoCentryx that the results for these secondary endpoints, which Defendants were vigorously touting to investors, were statistically flawed and that Defendants' statements that these results were "statistically

significant" in favor of avacopan were misleading.  The FDA pointed out that, contrary to agency guidance, ChemoCentryx had failed to correct its reported results for "multiplicity," i.e., artificial inflation of the probability of observing a nominally "statistically significant" result as a consequence of testing multiple endpoints – discussed in detail further below.  Accordingly, the meeting minutes show that the FDA raised serious questions about "the interpretability of the results given these tests were not multiplicity controlled (i.e., no control for type 1 error inflation over multiple tests)."

94.    And, as at prior meetings, the FDA again emphasized that ADVOCATE did not demonstrate that avacopan was safer than standard of care treatment.  The FDA again told ChemoCentryx that ADVOCATE ***"was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients***.  Further, the Agency noted that there was limited long-term safety data of avacopan treatment."

95.    Notwithstanding these warnings, Defendants repeatedly told investors that ADVOCATE's "key" secondary endpoint results demonstrated avacopan was safer than standard of care therapy.

b.    **Non-inferior Remission to Standard of Care Therapy Was Inadequate To Demonstrate Avacopan's Efficacy**

96.    The agency privately warned ChemoCentryx on multiple occasions, including at the 2016 and 2020 meetings discussed above, that statistical non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead.  Accordingly, the FDA raised serious questions about whether ADVOCATE's results at the key week 26 timepoint were sufficient to demonstrate that avacopan could effectively replace steroid treatment.  In the AdCom Materials, the FDA explained, "[A]t Week 26, the proportion of patients in disease remission in the avacopan group (72.3%) was non-inferior to the prednisone group (70.1%) according to the Applicant's testing plan. However, superiority was not met. ***In pre-submission communications, FDA stated that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids*** as it

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   would be difficult to establish whether avacopan is effective or whether

2   rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms."

3   Notwithstanding these direct warnings, Defendants repeatedly touted ADVOCATE's critical week

4   26 results and told investors that the trial had demonstrated avacopan could replace steroids.

5          97.    Indeed, the FDA explained in the Adcom Materials that at a private July 14, 2016

6   meeting with ChemoCentryx, "[t]he Agency advised that ***the non-inferiority study design would***

7   ***not be sufficient to show that avacopan can replace steroids."*** Instead, "[t]he Agency indicated

8   that an assessment of remission based on BVAS 0 at Week 26, and sustained remission based on

9   BVAS 0 at Week 52 in a ***superiority*** design would be acceptable."

10         98.    Again, at a private November 1, 2016 meeting with ChemoCentryx, the FDA

11  "explained that the superiority analysis is critical to demonstrate efficacy and that a demonstration

12  of non-inferiority would not be sufficient, given previously expressed concerns with the non-

13  inferiority margin and interpretation of results from such an evaluation."[9]  Indeed, minutes of that

14  meeting show that the FDA told Schall and other attending ChemoCentryx executives, "We do not

15  agree with your [ADVOCATE] study design . . . . [W]e remain concerned regarding the ability to

16  use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of

17  your product [avacopan].  As previously stated, a non-inferiority study would not be sufficient to

18  show that [avacopan] can replace glucocorticoids."

19         99.    Likewise, minutes of ChemoCentryx's private March 19, 2020 meeting with the

20  FDA show that the agency reiterated this same message to Company executives for at least a third

21  time:

22

23  [9] When comparing proportions in statistical analysis, one may compute a "confidence interval,"
    which, in broad terms, provides a range of plausible "true" values for a test statistic given the
24  observed result.  A "non-inferiority margin" refers to a confidence interval of a specified width,
    such that a result within that interval satisfies the agreed criteria for declaring that the experimental
25  drug is no worse than the comparator.  Here, the FDA flagged from the outset of ADVOCATE
    that "no historical trials appropriate to estimate the contribution of glucocorticoids to the treatment
26  effect of glucocorticoids and cyclophosphamide or rituximab in the control arm," such that
    ChemoCentryx could prespecify an appropriate non-inferiority margin.  Accordingly, the FDA
27  insisted that avacopan demonstrate statistical superiority on the primary BVAS remission
    endpoints in order to support ChemoCentryx's claim that avacopan could replace prednisone.
28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

We refer you to our previous comments regarding the utility and interpretability of the non-inferiority comparisons and support for the selected margin. As such, *we do not agree with your statements in your SAP which indicate that you will conclude to have a successful study based on the NI comparison alone.*

100.    The AdCom Materials explained that at that same March 2020 meeting, "the Agency reiterated concerns on the complexity of [ADVOCATE's] study design and determining clinical meaningfulness."   In particular, the FDA specifically told ChemoCentryx that the ADVOCATE results did ***not*** demonstrate that avacopan could replace steroid-based treatment. The agency stated that ADVOCATE failed to clearly establish that "replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."  Likewise, the AdCom Materials explained that "[t]he [ADVOCATE] study *was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients.*"

c.    **ADVOCATE's Relapse Results Were Flawed and Did Not Support Avacopan's Efficacy**

101.    The FDA also cast doubt on Defendants' statements that ADVOCATE's "relapse" results demonstrated avacopan was at least as efficacious as steroid-based standard of care in achieving and maintaining remission.  The AdCom Materials state that at the FDA's November 1, 2016 meeting with ChemoCentryx, which Schall attended, ***"The Agency raised concerns about the proposed secondary endpoints, including relapses which conditions on a post-randomization variable*** and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

102.    As discussed further below, clinical trials rely on the process of "randomization" – the random assignment of patients to trial arms – to eliminate bias caused by confounding variables (e.g., the systematic assignment of "sicker" patients to one arm).  ADVOCATE patients, however, were not included in the relapse analysis on a randomized basis, but rather based on whether and when they achieved "remission."  Accordingly, as the AdCom Materials explain, "The advantages of randomization are eliminated [in the relapse analysis] because the treatment arms are no longer balanced with respect to possible confounders, leading to biased comparisons between treatment

- 39 -

arms and limiting the interpretability of these results."

103.    Minutes of ChemoCentryx's November 1, 2016 meeting with the FDA make clear that the FDA told ChemoCentryx its relapse analysis was "problematic from a statistical point of view because [the analysis is] conditioning on a post-randomization variable, such that comparisons will be between non-randomized groups and the interpretability of results will be challenging."   According to the minutes, the FDA later twice "reiterated" that ChemoCentryx's relapse analysis "would be considered exploratory" only, and did not provide empirically sound evidence of efficacy.   Nevertheless, Defendants, including Schall, repeatedly touted ADVOCATE's relapse results as strong evidence demonstrating avacopan's efficacy.

### d.    Most Patients in the Avacopan Group Needed To Use Steroids To Treat Their Vasculitis, Confounding ADVOCATE's Results

104.    While ADVOCATE was supposed to compare avacopan to steroid treatment, in truth, large numbers of patients assigned to the avacopan arm in ADVOCATE used "non-study supplied" steroids in order to control their vasculitis.   Indeed, *86%* of avacopan patients received steroids in the first six months of the study.   As the FDA explained, widespread steroid use in the avacopan arm further "complicated" interpretation of ADVOCATE's supposed success on the primary BVAS endpoints because, in reality, ADVOCATE did not actually compare avacopan to steroids.   The FDA raised this issue in its March 2020 meeting with ChemoCentryx, for instance, "not[ing] that the multiple interventions in the study . . . complicate the assessment of the efficacy of avacopan treatment."

105.    As the AdCom Materials made clear, widespread steroid use confounded the assessment of avacopan's efficacy during both the first and second halves of the study.   During the first half of ADVOCATE, "[i]nterpretation of the non-inferiority at Week 26 [was] further limited by the large number of patients in the avacopan arm (86%) who received non-study supplied glucocorticoids from Week 0 to 26."   While patients on the steroid arm received a greater cumulative dose of steroids, "the non-inferiority assessment [was] not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

106.   During the second half of the study, steroid use "was similar between the prednisone and avacopan groups"; in other words, as the FDA explained, "[T]he increased glucocorticoid use in the prednisone arm compared to the avacopan arm was limited to the period of the first 20 weeks of the study."

e.   **Subgroup Data Undermined Defendants' Efficacy Claims**

107.   As discussed above, standard of care therapy consists of steroids plus an immunosuppressant, such as cyclophosphamide or rituximab.  In ADVOCATE, some patients received cyclophosphamide and others received rituximab.  While ChemoCentryx asserted that avacopan was superior to standard of care therapy at week 52, avacopan was ***not*** superior to steroids plus cyclophosphamide.  Instead, avacopan demonstrated a treatment effect only against patients taking steroid plus rituximab.  As the FDA noted, however, rituximab patients were likely undertreated because they failed to receive standard of care maintenance therapy.[10]  In other words, avacopan failed to demonstrate superiority against the only group of patients who were actually receiving standard of care maintenance treatment – the patients taking cyclophosphamide.  As the FDA summarized, "The result of the subgroup analysis suggests the possibility that avacopan was efficacious only in the population who did not receive standard-of-care maintenance immunosuppression therapy and may be considered undertreated, raising questions about the adequacy of the comparisons and clinical meaningfulness of the avacopan effect at Week 52."

108.   During the Class Period, the FDA privately told ChemoCentryx that it was focused on this subgroup data – and specifically the fact that rituximab patients were not given maintenance therapy, while cyclophosphamide patients were.  At the March 2020 meeting between the FDA and ChemoCentryx, for instance, the agency sought, and received, the Company's confirmation that "patients who received induction treatment with rituximab did not receive maintenance therapy . . . while those who received cyclophosphamide for induction received azathioprine for maintenance therapy. . . . FDA asked the Sponsor to include this analysis in the NDA submission."

---

[10] Vasculitis patients receive an "induction" course of therapy to achieve initial disease remission, and then a course of "maintenance" therapy to maintain remission.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1

2

    f. **The FDA Would Likely Convene an Advisory Committee To Discuss Specific Fundamental Flaws in the Design, Conduct and Reporting of ADVOCATE**

3   109. At ChemoCentryx's March 2020 meeting with the FDA, the agency warned

4 Defendants that it believed an Advisory Committee Meeting might be necessary to evaluate the

5 ADVOCATE results in light of the multiple interventions in the study (including the use of steroids

6 in the avacopan arm), the unvalidated character of the study's secondary endpoints (assessing

7 safety), and the limited safety database, all of which "complicate the assessment of the efficacy of

8 avacopan treatment." These warnings were directly contrary to Defendants' statements – months

9 later – that "FDA [has] not highlighted any particular issues that would have to be discussed at

10 [the] AdCom [Meeting]." Instead, the FDA told ChemoCentryx:

11

> [T]he multiple interventions in the study (i.e., removing standard of care steroids in
12
> the first 6 months and addition of avacopan on top of standard of care in the second
> 6 months) complicate the assessment of the efficacy of avacopan treatment.
13
> Reduction of the glucocorticoid use may be supportive of efficacy of avacopan but
> would not be the primary basis to establish efficacy . . . . Further, it is not clear
14
> whether replacing potential toxicities of treatment with glucocorticoids with
> potential toxicities with avacopan treatment represents a clinical benefit to patients.
15
> Additionally, there is limited long term safety data with avacopan treatment.

16
> In light of the above considerations and the complexities of the clinical program,
17
> FDA indicated that external input may be required in the interpretation of the
> clinical benefits of the avacopan program.

18
    **2.** **The ADVOCATE Results Did Not Support Defendants' Claims About Avacopan's Safety**
19

20   110. As discussed above, Defendants repeatedly told investors that ADVOCATE's all-

21 important secondary endpoints – including GTI quality of life, and renal function – demonstrated

22 that avacopan was far safer than standard of care therapy, thus achieving a key goal of the study

23 and validating avacopan's core value proposition. For instance, Defendants stated that

24 ADVOCATE provided ***"definitive evidence statistically that we were superior in reducing***

25 ***glucocorticoid-related toxicities using a newly-validated glucocorticoid toxicity index***, which is

26 a very comprehensive assessment of toxicities across the body," and that ***"validated quality of life***

27 ***metrics also statistically improved for these patients***. I don't think that's ever been seen that

28 improvement in quality of life has ever been seen in a Phase III trial of ANCA vasculitis before."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

111.    However, unbeknownst to investors, and as discussed above, the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" beginning no later than November 1, 2016, including specifically ***rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements,*** and warning ChemoCentryx that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis."   Defendants nevertheless repeatedly touted the results of these secondary endpoints to investors.

112.    Moreover, as the FDA explained in the AdCom Materials, the ADVOCATE protocol called for patients assigned to the standard of care arm to receive large doses of steroids at the outset of the study, which were slowly tapered over the first half of the trial.  *See* Figure 2, above.  ChemoCentryx failed to assess GTI ***after*** patients on the standard of care arm completed this study-mandated "prednisone taper."  Accordingly, the FDA explained, "[D]ifferences in GTI between the treatment groups may reflect the study design which specified the prednisone doses to be used in the control group, rather than dosing glucocorticoids based on Investigator assessment of active disease . . . . [In ADVOCATE,] where differences in glucocorticoid use were pre-specified in the protocol, the GTI does not provide information beyond that of the cumulative glucocorticoid doses to further inform the effect of avacopan."  In other words, ADVOCATE's GTI results can tell one little about avacopan's real-world steroid sparing effect because GTI was measured only during the period when the study protocol required that patients in the comparator arm receive heavy doses of steroids, rather than during the period when physicians exercised independent judgment about the degree of steroid administration required to manage disease.

113.    Likewise, just as it had repeatedly warned in earlier private meetings with ChemoCentryx, the FDA stated in the AdCom Materials that "GTI is a novel instrument for which there is no regulatory precedent, and a minimally clinically important difference (MCID) has not been established in AAV."

114.    The FDA further explained in the AdCom Materials, just as it had in prior private meetings with ChemoCentryx, that GTI provided an assessment of safety that was skewed in avacopan's favor: "while the GTI is intended to evaluate the toxicities of glucocorticoids,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

avacopan does not impact the same mechanism of action, and may not be expected to have the same toxicities. Therefore, the assessment for only toxicities associated with the control treatment, in the absence of inclusion of assessment of toxicities of the investigational product, is biased as an assessment of overall safety."

115.    In addition, as discussed above, while Defendants claimed that avacopan had demonstrated "statistically significant" benefits across ADVOCATE's secondary endpoints – including GTI, quality of life, relapse, and renal function – in truth, almost none of these results were statistically significant.

116.    In clinical drug or device trials, a result must be statistically significant in order to attribute the observed effect to the drug or device being tested.  Standard scientific practice dictates that a result – a difference in proportions – is declared statistically significant if the "p-value" associated with that result is 0.05 or less.  The p-value represents the probability of observing a result as extreme as the one actually observed, if the drug or device did not, in fact, have the effect hypothesized.[11]  Thus, requiring a p-value of 0.05 means that a result is declared "significant" only if the chance of observing a result as extreme as the one observed (or more so) would be 5% or less if the drug did not actually have the hypothesized effect.

117.    A corollary to this is that the more endpoints that a clinical trial explores – the more times the experimenter "rolls the dice" – the greater the chances of observing a false positive result simply by random chance.  For instance, if, as discussed above, one accepts a threshold p-value of 0.05 for declaring statistical significance for each separate analysis run in a particular study, but then conducts 20 analyses, then at least one result will appear statistically significant when in reality it is merely coincidental.[12]

118.    This problem is known as "multiplicity," and both the FDA and standard scientific practice require that when multiple hypotheses are tested, the threshold for declaring statistical

---

[11] Somewhat more technically, a p-value represents the probability of observing the result obtained *if* the "null hypothesis" of no treatment effect were true.

[12] In other words, if the "false positive rate" for each analysis is 5%, but 20 analyses are run, then the *overall* false positive rate is 1: you are certain to have at least one result that is a false positive.

significance be adjusted higher to account for multiplicity.  FDA guidance provides, for instance, that "[w]hen there is more than one study endpoint, care must be taken to ensure that the evaluation of multiple hypotheses does not lead to inflation of the study's overall Type I error probability, called the study-wise Type I error probability, which is the chance of a false positive conclusion on any planned endpoint analysis."[13]  Agency guidance is clear that "[f]ailure to account for multiplicity when there are several clinical endpoints evaluated in a study can lead to false conclusions regarding the effects of the drug . . . . By inflating Type I error, multiplicity produces uncertainty in interpretation of the study results such that the strength of a finding becomes unclear, and conclusions about whether effectiveness has been demonstrated in the study become unreliable."  Accordingly, FDA guidance requires that sponsors control for multiplicity and recommends a variety of techniques for doing so.

119.    While ChemoCentryx analyzed 26 secondary endpoints in ADVOCATE at multiple different timepoints – "rolling the dice" many times over – the Company failed to adjust these results for multiplicity, as FDA guidance requires.  Accordingly, the FDA explained at the end of the Class Period that ADVOCATE's secondary endpoint results did not provide valid empirical support for any conclusions about avacopan's efficacy or safety:

> [ADVOCATE] evaluated multiple secondary endpoints; however, ***they were not adjusted for the multiplicity and thus should be considered purely exploratory***. When there is more than one study endpoint, care must be taken to ensure that the evaluation of multiple hypotheses does not lead to inflation of the study's overall Type I error probability. The inflation of the Type I error rate can be quite substantial if there are many comparisons.

*See* Figure 4, below.

120.    Indeed, as alleged above, the FDA had specifically warned Defendants more than a year earlier, at the agency's March 19, 2020 meeting with ChemoCentryx, that the Company's failure to correct its secondary endpoint results for multiple testing seriously impugned their empirical validity.  The meeting minutes show that the FDA stated:

> We note that we provided several other statistical comments during our previous meetings (e.g., the Preliminary Comments dated October 28, 2016) on secondary

---

[13] "Type I error probability" refers to the false positive rate.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L. ***It is not clear if you implemented these recommendations. Support for use of these endpoints within this population and the interpretability of the results given these tests were not multiplicity controlled (i.e., no control for type 1 error inflation over multiple tests) will be an additional review issue.***

121.    Notably, when the results of ADVOCATE's secondary endpoints are adjusted for multiplicity, results on only four of the 26 prespecified endpoints investigated are statistically significant in favor of avacopan.  Among other things, results on three of the four GTI endpoints, as well as results for all of the quality of life, relapse, renal, and Vasculitis Damage Index ("VDI") endpoints, are no longer statistically significant when corrected for multiple testing.

122.    In addition, while Defendants highlighted avacopan patients' supposedly lower incidence of relapse in ADVOCATE, ChemoCentryx not only failed to correct these reported results for multiplicity, it also failed to disclose the FDA's specific warnings, including at the private November 1, 2016 meeting, that these results were further unreliable because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."  As discussed above, clinical trials rely on the process of "randomization" – the random assignment of patients to trial arms – to eliminate bias caused by confounding variables.  ADVOCATE patients, however, were not included in the relapse analysis on a randomized basis, but rather based on whether and when they achieved "remission."  The FDA explained that:

> As a result, the subset of patients included in the analysis of these endpoints and the time those patients are at risk for relapse can no longer be assumed to be similar across treatment arms. The advantages of randomization are eliminated because the treatment arms are no longer balanced with respect to possible confounders, leading to biased comparisons between treatment arms and limiting the interpretability of these results.

For instance, if patients taking steroids achieve remission more quickly than patients taking avacopan, then the former are at systemically greater risk for relapse in the study than the latter because steroid patients are in a remitted state – and therefore "at risk" – for longer than avacopan patients.  In this scenario, even if true relapse rates on steroids were less than or equal to rates on avacopan, the study would mask this.  Accordingly, the FDA told ChemoCentryx, even prior to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the start of the Class Period, that it "considered this analysis of relapse after remission to be exploratory," i.e., not valid empirical support of safety or efficacy, but merely hypothesis-generating. *See* Figure 4.



## Efficacy Considerations (3): Supportive Evidence

- Secondary endpoints provide limited support of efficacy
  - Not adjusted for multiplicity
  - Fewer relapses in avacopan arm, but other measures of increased disease activity similar
    - Trial not designed to assess relapse and interpretability of analysis results is limited
  - Similar changes in Vasculitis Damage Index
  - Differences in renal endpoints small and not sustained
- Phase 2 studies provide limited and inconsistent evidence of efficacy

19

**Figure 4.** FDA-authored slides presented at the Advisory Committee Meeting, enumerating some of the agency's prior warnings to ChemoCentryx at private meetings that ADVOCATE's "[s]econdary endpoints provide limit support" for their claims about the drug's safety and efficacy profile.

123.    Finally, while Defendants repeatedly touted avacopan's "favorable safety results" in ADVOCATE, "with fewer subjects having serious adverse events in the avacopan group than in the prednisone group," in truth, avacopan patients experienced a greater incidence of liver-related adverse events, including a number of serious adverse liver events.  Notably, liver toxicity had been specifically flagged as an "adverse event of interest" in ADVOCATE's design because ChemoCentryx had observed cases of elevated liver enzymes early in avacopan's development program.  Moreover, as the FDA explained, the fact that the serious adverse liver events were observed in ADVOCATE notwithstanding the trial's small sample size was deeply alarming.

124.    ***First***, a greater proportion of avacopan-treated patients experienced hepatic

abnormalities as predefined by the ADVOCATE protocol, including hepatobiliary disorders.[14] The proportion of patients with predefined "adverse events" and "serious adverse events" within the hepatobiliary system organ class were also greater in the avacopan group (6.0% and 3.6%, respectively) as compared to the prednisone group (1.8% and 0.6%, respectively).  Adverse events associated with hepatic abnormalities led to more than three times the number of drug discontinuation in the avacopan arm compared with the prednisone arm (7 vs. 2, respectively).

125.   **Second**, as the FDA pointed out, the nature of the adverse events experienced by avacopan patients raised serious concerns that the drug was associated with increased liver injury. For instance, one avacopan patient had a serious adverse event involving hepatocellular injury with increase in liver enzymes – an issue flagged in clinical development – after being readministered avacopan, having already been taken off the drug because of a previous adverse event that investigators suspected was caused by the drug (a process called "rechallenge").   Another avacopan patient experienced a serious adverse event involving abnormal hepatic function, but experienced improvement in liver enzymes after discontinuing avacopan.  Finally, and extremely troublingly, one avacopan patient experienced severe abnormal hepatic function that met "Hy's Law" criteria with a liver biopsy that indicated drug-induced hepatitis.  As FDA guidance explains, satisfaction of Hy's Law criteria is **"an ominous indicator** of the potential for a drug to cause serious liver injury."  The agency's guidance elaborates:

> Finding one Hy's Law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI [liver injury causing death or requiring transplant] when given to a larger population. Clinical trials of the beta blocker dilevalol . . . showed two such cases ***in about 1,000 exposures***. The drug was not approved in the United States, and examination of a postmarketing study in Portugal revealed fatal liver injury. Clinical trials of tasosartan, an angiotensin II blocking agent, ***showed a single Hy's Law case***. This led to a request for a much larger premarketing database and the drug was abandoned.

126.   To observe a serious adverse liver event meeting Hy's Law criteria in ADVOCATE, a trial in which just 166 patients were administered avacopan, was, as the FDA

---

[14] The hepatobiliary system refers to the liver, gallbladder, and bile ducts.

explained, extremely worrying.  An Advisory Committee member asked the FDA, "[D]etecting a signal like this, even though the exposure is a very small group. Does that heighten your concern?"  Dr. Paul Hayashi, an FDA hepatologist and the agency's DILI Team Lead,[15] responded:

> Your point's well taken. Yes, it did, and it does weigh on my mind. You have an exposure here that's about 160 some odd patients. That is small. For DILI risk of significance, like a Hy's law case, it's really one or two in a large trial of, like, a thousand, is enough for us to be concerned that that drug will have problems postmarketing.

127.    No later than March 2020 – long before the end of the Class Period – ChemoCentryx's most senior medical executive repeatedly warned Company leadership, including Schall, that the adverse liver events observed in ADVOCATE were deeply worrying.  Former Employee 1 ("FE 1") served as the Vice President of Medical Affairs from March to August 2020.  In that role, FE 1 headed several of ChemoCentryx's business functions involved in reviewing and disseminating clinical trial data concerning avacopan, including spearheading the medical affairs liaison teams and the publication of clinical trial data.

128.    FE 1 stated that, throughout FE 1's tenure at ChemoCentryx, Catherine Kelleher, Senior Vice President of Clinical Development and the most senior medical executive in the Company, repeatedly raised red flags about these events with other senior ChemoCentryx executives, including Schall.  Notably, Kelleher was among the senior ChemoCentryx executives who attended the March 2020 meeting with the FDA in advance of the avacopan NDA filing.  FE 1 stated that, in repeated discussions with Schall, Kelleher highlighted the adverse liver event meeting Hy's Law criteria and the adverse liver event occurring after rechallenge as raising troubling safety signals for avacopan.  Schall chastised Kelleher for raising these issues, but, nevertheless acknowledged that these adverse events, particularly the event involving rechallenge, were problematic.  FE 1 explained that this is because "[p]atient rechallenge is the gold standard for determining causality" in a particular patient.  In ADVOCATE, the adverse liver event at issue was particularly serious: the patient's ALT levels went "through the roof," when the drug was

---

[15] "DILI" is an acronym for "drug-induced liver injury."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

stopped they went down, and went back up when the drug was restarted.[16]

129.    Finally, and more generally, the FDA also warned ChemoCentryx no later than the March 19, 2020 meeting, that the avacopan safety database was too small, and therefore lacked adequate statistical power,[17] to provide meaningful evidence of safety.  Indeed, only 134 patients had been exposed to avacopan for more than six months.

### 3.    ADVOCATE's Supposedly Positive Remission Results Were The Product Of Deviations From The Prespecified Clinical Trial Protocol

130.    As alleged above, throughout the Class Period, Defendants repeatedly stated that avacopan had achieved positive results on ADVOCATE's primary BVAS remission endpoint, including achieving *superiority* to standard of care – i.e., a statistically significant greater remission rate than the standard of care – at week 52.  Defendants failed to disclose that, in truth, these positive results were achieved only by deviating from the BVAS methodology prespecified in the ADVOCATE protocol and that, when the protocol is actually followed as required, ChemoCentryx's remission results are no longer superior to standard of care at week 52.

131.    As discussed above, the ADVOCATE protocol provides that remission would be measured using BVAS version 3.  BVAS version 3 (like BVAS version 2) scores not only new or worsening disease (i.e., an adverse change in disease activity), but *persistent* disease as well.  In other words, under BVAS version 3 (and BVAS version 2), patients with *persistent* vasculitis disease activity should *not* receive a score of zero and should *not* be classified as "in remission." Indeed, ChemoCentryx's own ADVOCATE protocol cites a 2009 medical journal article that states, "Ignoring BVAS 2 (persistent disease) underestimates true disease activity."  *See* Figure 5, below.  Accordingly, the BVAS 3 scoring form included a box for clinicians to score persistent disease activity.

---

[16] When the liver is injured it releases ALT (alanine aminotransferase) enzymes into the bloodstream.   High ALT levels in the blood, therefore, signal liver damage or disease.

[17] "Statistical power" refers the ability to observe an effect of a particular size in a study of a particular size, if the effect is truly there.  It is related to the study's false negative rate.



## Specification in the Documents

- **Protocol**
  - Specified the use of BVAS version 3 and cited *Mukhtyar C, et al. 2009 Modification and validation of the Birmingham Vasculitis Activity Score (version 3) Ann Rheum Dis 68:1827–1832*
    - The BVAS version 2 generates two scores; BVAS1 reflects new or worse disease, and BVAS2 reflects persistent disease
    - "Ignoring BVAS2 (persistent disease) underestimates true disease activity"
    - For BVAS version 3, the "persistent" boxes for each item were replaced by a single "persistent" box for the whole form. This box was marked, only if every disease manifestation was attributable to "persistent" disease. All items were treated as "new/worse" if any of them were "new/worse"

- **Adjudication Charter**
  - BVAS adjudication form does not include this single "persistent" box

www.fda.gov                                                                                          70

**Figure 5.** FDA-authored slides presented at the Advisory Committee Meeting, explaining that the ADVOCATE clinical trial protocol requires the use of BVAS version 3, which counts persistent vasculitis as disease activity, but ChemoCentryx did not follow this requirement.

132.    Pursuant to the ADVOCATE protocol, clinicians treating patients at the individual testing sites – called "investigators" – identified the relevant measures of disease activity under BVAS 3, including persistent vasculitis. However, for purposes of calculating the ADVOCATE trial results, scoring was performed by a centralized adjudication committee. The ***adjudicators'*** BVAS scores, not the investigators' scores, were used to calculate the remission results ChemoCentryx publicly reported. Critically, as the FDA explained after the end of the Class Period, the BVAS scoring form provided to the adjudication committee ***omitted*** the required "persistent box," and, therefore, the adjudicators did not count persistent vasculitis in scoring patients' disease. The FDA's Dr. Yuri Kim stated: "In the BVAS adjudication form, the persistent aspect of BVAS was not used" and therefore "was not captured in the version [of BVAS] administered in the study." In other words, and unbeknownst to investors, the positive results reported by ChemoCentryx in the ADVOCATE trial were the product of deviations from the prespecified clinical trial protocol.

133.    ChemoCentryx's failure to follow the ADVOCATE protocol had a significant

impact on the trial's results, making avacopan appear more effective than it was. As discussed above, Defendants told investors that the remission rate in the avacopan arm was statistically significantly greater than in the standard of care arm at week 52 – i.e., avacopan had achieved "superiority" relative to standard of care on the primary endpoint of remission at that timepoint. However, as the FDA later explained, when persistent vasculitis *is* scored – as required by the protocol – *the remission rate in the avacopan arm is not "superior" to the standard of care arm at week 52.* There is no statistically significant difference between them at all. *See* Figure 6, below. In addition, the estimate of avacopan's supposed treatment effect at week 26 also becomes more modest: the publicly reported 3.4% higher remission rate in the avacopan arm shrinks to just 1.3%. As the FDA explained:

> Discrepancies between the Investigator and Adjudication Committee occurred in 17 patients at Week 52. Statistical analyses of the primary endpoint using the Investigator assessment of BVAS remission resulted in *more conservative estimates of treatment effect*, e.g., statistical significance for superiority would *no longer be demonstrated with these scores.*



## Analysis Based on Investigator Assessments

| | Avacopan (N=166) | Prednisone (N=164) | Difference | NI p-value | Sup p-value |
|---|---|---|---|---|---|
| **Remission at Wk26** | 104 (62.7%) | 102 (62.2%) | 1.3% | <0.0001 | 0.79 |
| **95% CI** | (54.8, 70.0) | (54.3, 69.6) | (-8.7, 11.4) | | |
| **Sustained Remission at Wk52** | 91 (54.8%) | 77 (47.0%) | 8.5% | <0.0001 | 0.10 |
| **95% CI** | (46.9, 62.5) | (39.1, 54.9) | (-1.7, 18.6) | | |

Abbreviations: NI=non-inferiority, Sup=superiority, CI=confidence interval, N=number of patients in the primary analysis set. Patients with missing data at week of evaluation were imputed as non-responders. Nominal p-value was constructed using summary score test adjusted for randomization strata. For non-inferiority test, margin of 20% is used.

www.fda.gov                                                                 39

**Figure 6.** Disease assessments performed by ADVOCATE site investigators experienced in the treatment of ANCA vasculitis followed the trial protocol's requirement to score persistent disease and showed a much more modest estimate of treatment effect than the one ChemoCentryx publicly reported, including that avacopan failed to achieve superiority to prednisone.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

134.    ChemoCentryx admitted to the agency that the "[d]iscrepanc[y] between" the non-public "investigator score" and the "adjudicated score" ChemoCentryx publicly touted was "most frequently related to the attribution of persistent vasculitis which was not captured in the modified BVAS" the Company's adjudication committee used.  The FDA continued, "The investigators considered persistent vasculitis as active vasculitis when scoring the BVAS," which is not only required by the ADVOCATE protocol, but also "may better reflect real-world use."

135.    Critically, as the FDA further revealed after the Class Period (and as discussed above), the FDA privately told ChemoCentryx that demonstrating avacopan's non-inferiority to standard of care would be insufficient to obtain approval; superiority was required.  The agency stressed that "throughout development, FDA reiterated [in private meetings with the Company] that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids."  Accordingly, ChemoCentryx turned a failed result at week 52 into a positive one by violating the clinical trial protocol and ignoring persistent vasculitis.

136.    As both the FDA and the members of the Advisory Committee stated, ChemoCentryx's failure to adhere to the ADVOCATE protocol's requirement to count persistent disease seriously undermined Defendants' claims about avacopan's supposed superior remission rates at week 52.  For instance, Advisory Committee member Dr. Jasvinder Singh (University of Alabama) stated ChemoCentryx's failure to account for persistent disease meant it could not claim superiority at week 52: "I think that the loss of significance based on investigator assessment at the 52 weeks *makes that not a hard outcome that one can put weight on for superiority.*"  Chair of the Advisory Committee, Dr. Mara Becker (Duke University), stated, "I think the one *obvious, clearly, significant issue* is that when taking into account the site investigators and their scoring, it changed the statistical significance of" ChemoCentryx's reported remission results.  Likewise, Dr. Pamela Shaw (University of Pennsylvania) questioned whether ChemoCentryx's reported 52-week results were "clinically meaningful," as "we have a score that didn't count" persistent vasculitis.  Finally, Dr. Margrit Weisendanger (Icahn School of Medicine at Mount Sinai) questioned whether ChemoCentryx was "providing a fair judgment on how these patients were doing" and asked, "Are they missing some persistent vasculitis patients, which should not be

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    considered in remission by applying their standards?"

2    137.    In addition, ADVOCATE was supposed to compare avacopan to steroids in treating

3    vasculitis.  As discussed further below, however, steroids were, in fact, widely used by patients in

4    the avacopan arm, frequently to treat persistent vasculitis.  *See* Figure 8, below.  In other words,

5    persistent vasculitis, which ChemoCentryx did not count against avacopan, actually led to

6    increased use of steroids (the very intervention against which avacopan was supposedly competing

7    in ADVOCATE) amongst avacopan patients.   As Advisory Committee Chair Dr. Becker

8    explained, members of the committee "hypothesized that, potentially, if there was a rating of

9    persistent vasculitis, maybe that resulted in increased prednisone use," yet persistent vasculitis was

10   not scored against avacopan.  This undisclosed fact further seriously undermined Defendants'

11   statements that avacopan eliminated the need for steroid use to treat vasculitis.

12            **4.    Steroid Use, Including For The Treatment Of Vasculitis, Was**
                      **Significant And Widespread Among Avacopan Patients**
13

14   138.    As alleged above, throughout the Class Period, Defendants told investors that

15   steroids had been "eliminated" from ADVOCATE's avacopan arm and, thus, the study's positive

16   results ***"resoundingly"*** provided "evidence that ***steroids need not be used when avacopan is***

17   ***available."***

18   139.    In truth, however, the vast majority – ***more than 87%*** – of patients assigned to the

19   avacopan arm actually ***did take steroids***; doctors treating these avacopan patients deemed it

20   necessary and appropriate to prescribe them steroids in order treat their vasculitis, adrenal

21   insufficiency, and other clinical conditions.  A majority of avacopan patients, 63%, were

22   prescribed prednisone specifically because steroids were needed to treat and control their vasculitis

23   – avacopan alone was inadequate.  In particular, while the ADVOCATE protocol provided that all

24   steroids above the built-in prednisone taper should be discontinued by week 4 of the one-year

25   study, ***86%*** of avacopan patients received steroids from week 0 to week 26 of the study.  *See* Figure

26   8, below.  As the FDA pointed out, while prednisone patients received a "nominally" higher mean

27   dosage than avacopan patients during this period, there was no evidence that this difference was

28   clinically significant, "as it may be an artifact of the study design [which specified the parameters

- 54 -

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

of the prednisone taper in the standard of care arm] rather than a reflection of avacopan's control of disease activity."  In any event, as the FDA explained, during this period, ADVOCATE was "not a comparison of avacopan vs. prednisone," as Defendants billed the study, "but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."  Accordingly, "it is not clear how much reduction in glucocorticoids would be considered clinically meaningful and if the protocol-specified higher dose of glucocorticoids is required for control of disease activity."

140.    Moreover, as the FDA pointed out, from week 26 to week 52 in ADVOCATE – following the completion of the prednisone taper in the standard of care arm and through the remainder of the trial – steroid use "was similar between the prednisone and avacopan groups." *See* Figure 7, below.  In other words, once "standard of care" patients were no longer on the study-mandated course of steroids, their steroid use was essentially the same as avacopan patients.  As the FDA explained, this meant that "the increased glucocorticoid use in the prednisone arm compared to the avacopan arm was limited to the period of the first 20 weeks of the study."  Moreover, these data also further indicated that nominal differences in steroid dosage during the first part of the study was "an artifact of the study design rather than a reflection of avacopan's control of disease activity."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST



**Figure 7.** FDA-authored slides presented at the Advisory Committee Meeting, showing that following completion of the study-mandated prednisone taper in the standard of care arm and through the remainder of the trial, steroid use "was similar between the prednisone and avacopan groups."

141.    Non-study supplied steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms – avacopan patients needed non-study supplied steroids to treat their vasculitis as much as standard of care patients did.  *See* Figure 8, below.  Significantly, this remained true during weeks 26-52 of the study, after the conclusion of the protocol-specified prednisone taper in the standard of care arm.  *See id.* [18]  In other words, avacopan patients used steroids just as frequently as standard of care patients to manage their vasculitis, even when standard of care patients were no longer supplementing non-study supplied steroids with study supplied steroids; total steroid use for the purpose of treating vasculitis was the same between both avacopan and non-avacopan patients.  As

---

[18] Respective p-values for these differences are: 0.38; 0.38; and 0.54.  They are not even close to statistically significant.  As the FDA pointed out, while more standard of care patients required steroids to treat relapse than avacopan patients, this comparison is not randomized and, therefore, cannot support the inference that there is a treatment-related difference between arms.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the FDA explained, "[S]imilar proportions of patients required non-study supplied glucocorticoids to control increased disease activity, based on worsening vasculitis, persistent vasculitis, and maintenance of remission."

## Non-Study Supplied Glucocorticoid Use



| | Avacopan (N=166) | Prednisone (N=164) |
|---|---|---|
| **Week 0 to 26** | | |
| Treatment of worsening vasculitis | 27 (16.3%) | 22 (13.4%) |
| Treatment of relapse | 11 (6.7%) | 29 (17.4%) |
| Treatment of persistent vasculitis | 77 (46.4%) | 83 (50.6%) |
| Maintenance of remission | 27 (16.3%) | 20 (12.2%) |
| **Week 27 to 52** | | |
| Treatment of worsening vasculitis | 10 (6.0%) | 14 (8.5%) |
| Treatment of relapse | 8 (4.8%) | 25 (15.2%) |
| Treatment of persistent vasculitis | 10 (6.0%) | 14 (8.5%) |
| Maintenance of remission | 13 (7.8%) | 16 (9.8%) |

10

**Figure 8.** FDA-authored slides presented at the Advisory Committee Meeting, showing that non-study supplied steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms, including following the completion of the study-mandated steroid taper in the standard of care arm.

142.    Moreover, as members of the AdCom were astonished to learn, ChemoCentryx characterized avacopan patients who achieved a BVAS score of zero as having "responded" to avacopan – counting such results in the drug's favor – even if those patients had received significant steroid therapy in order to control their vasculitis (or a "clinical finding potentially concerning for vasculitis").  For instance, AdCom member Dr. Sharon Chung (UC San Francisco) stated she was "surprised" to learn that avacopan patients had been widely treated with steroids and the manner in which ChemoCentryx had reported results for such patients.  As just one example, Dr. Chung cited an avacopan patient "who received 250 milligrams of methylprednisolone for 3 days just before – it looks like 4 days – the week 52 endpoint" – a substantial course of steroid therapy.  "And yet," Dr. Chung observed, "this participant was

1  considered a responder" to avacopan.  As the FDA explained, "These cases highlight how
2  challenging it is to interpret the glucocorticoid use and the contribution to therapeutic benefit in
3  this study."

4      143.   Accordingly, far from demonstrating that "steroids need not be used when
5  avacopan is available," as Defendants claimed, ADVOCATE data showed that avacopan patients
6  required significant steroid treatment – treatment that was not meaningfully different from that
7  required by "standard of care" patients – to manage their disease.

8      144.   Notably, less than two months before the end of the Class Period, ChemoCentryx
9  published the purported ADVOCATE results in a February 18, 2021 *New England Journal of*
10 *Medicine* ("*NEJM*") article.  Buried in an appendix to that article, ChemoCentryx, under scrutiny
11 from the peer review process, included a table purporting to detail glucocorticoid use in
12 ADVOCATE.  While a supplemental table in the appendix indicated that avacopan patients
13 received "other than protocol-specified" glucocorticoids, the table failed to disclose why steroids
14 were administered or how avacopan patients who received steroids were scored for purposes of
15 calculating the BVAS remission endpoints.  Accordingly, the appendix failed to disclose that, for
16 instance, 64% of avacopan patients were prescribed prednisone specifically because steroids were
17 needed to treat and control their vasculitis; that steroid use for the purpose of treating worsening
18 or persistent vasculitis, or for maintaining remission, was essentially equal between the two study
19 arms during the second half of the study (after the protocol-mandated taper in the standard of care
20 arm had concluded); and that avacopan patients were considered "responders" to the drug, even if
21 they required significant steroid treatment to control their disease.

22     145.   Indeed, Schall's first discussion of steroid use in ADVOCATE's avacopan arm
23 came at almost the end of the Class Period, only after an analyst pressed him for details on the
24 subject at ChemoCentryx's March 1, 2021 earnings call following the publication of the *NEJM*
25 article.  Even then, however, Schall concealed the important facts discussed above in his statements
26 to investors, telling them that avacopan patients merely received "piggyback" steroids, either as a
27 taper for steroid treatment that was administered before the trial began or as merely routine
28 coadministration with rituximab to prevent an immune or allergic reaction to the

- 58 -
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

immunosuppressant.[19]  Schall told investors on March 3, 2021, for instance:

> We have, what I call in this trial inevitabl[e] piggyback prednisone. . . totally balanced between the two groups, people who got IV glucocorticoid *prior to randomization* [i.e., prior to the start of the trial], they are tapering off in the first four weeks to get to zero. So that's one source of the piggyback prednisone.
>
> Another source is really important people forget. One of the background medications is rituximab. . . . With rituximab, [steroids are] normally given concomitantly . . . . So those are sources of piggyback prednisone, if [you] will, piggyback glucocorticoid. And *so that's why you still have some*.

146.    These statements were misleading.  Again, Schall failed disclose that 63% of avacopan patients were prescribed prednisone specifically because steroids were needed to treat and control their vasculitis *during the trial*, not simply as a taper for pre-trial treatment or as coadministration with immunosuppressants; that steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms during *the second half of the study* (after the protocol-mandated taper in the standard of care arm had concluded and long after any pre-randomization treatment had ceased); and that avacopan patients were considered "responders" to the drug, even if they required significant steroid treatment to control their disease.

### E.    Defendants Took Advantage Of ChemoCentryx's Inflated Share Price To Conduct A Critical Securities Offering, While Dumping Their Own Stock

#### 1.    Following The FDA's Dire Warnings About ADVOCATE, ChemoCentryx Holds Its Largest Public Securities Offering Since Its IPO

147.    On or about June 15, 2020 – after the FDA had repeatedly warned Defendants that ADVOCATE did not support their claims about avacopan – ChemoCentryx held its largest public offering, selling 5.98 million shares of ChemoCentryx common stock for proceeds of more than $325 million ("June 2020 Offering").  Indeed, ChemoCentryx raised 4.5 times the cash than its next largest securities offering.

148.    The June 2020 Offering was critical for ChemoCentryx.  As discussed, at the time

---

[19] Rituximab is a monoclinal antibody manufactured from a mouse protein and, so, steroids are sometimes administered concomitantly in order prevent an adverse reaction.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

of the Offering, ChemoCentryx did not have a single product on the market, and, therefore, depended almost exclusively on investor capital to finance its operations.  And, unsurprisingly for a pharmaceutical company with several drugs in development, the cost of financing ChemoCentryx's operations was considerable.  As discussed above, ChemoCentryx's annual operating expenses had skyrocketed by the start of the Class Period to over $94 million as its development programs expanded, while the Company posted growing net losses.  Indeed, by the end of 2019, ChemoCentryx had an accumulated deficit of $430 million.  The Company needed an infusion of investor capital to cover these expenses and stay afloat.

149.    Without access to investor capital, ChemoCentryx could not survive, as ChemoCentryx itself explained in its SEC filings:

> We expect to finance future cash needs primarily through public or private equity offerings, debt financings, our credit facility, government grants and contracts and/or strategic collaboration . . . . *If we are unable to obtain adequate financing when needed, we may have to delay, reduce the scope of or eliminate one or more of our clinical trials or research and development programs or our commercialization efforts.*

150.    While ChemoCentryx's survival depended on its ability to raise capital, the Company's ability to raise capital depended, in turn, on investors' perception of avacopan and ADVOCATE, as evidenced by, among other things, the collapse of ChemoCentryx's stock price at the end of the Class Period, when the truth about both the drug and the trial was revealed.  Withholding the adverse facts about ADVOCATE, including the FDA's grim assessment of the trial and its results, gave Defendants time to secure the financing needed to keep the Company afloat and bring its pipeline drugs as far along in development as possible.

151.    Defendants repeatedly acknowledged the June 2020 Offering's significance to ChemoCentryx.  For instance, on the Company's August 2020 earnings call, Schall stated the June 2020 Offering "supplies many important degrees of freedom [to the Company] . . . . We have attracted the financial resources that we need with now over $0.5 billion on the balance sheet at the end of Q2 to drive us to the next phase of our growth."  Likewise, at an investor conference in September 2020, Schall stated that the cash raised in the June 2020 Offering "will provide a successful platform and the financial wherewithal to execute on [the Company's] pipeline plans."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

**2.     Defendant Schall's Insider Sales**

152.     Schall also took advantage of the Company's inflated stock price to dump nearly 20% of his ChemoCentryx holdings and reap over $40 million in proceeds over the Class Period. Indeed, as alleged above, the FDA met privately with ChemoCentryx in March 2020 and flagged serious concerns about the ADVOCATE results.  Two months later, in transactions in May and June 2020, Schall sold over 210,000 shares of ChemoCentryx stock – almost as much as he had sold in the *entire* 17 months preceding the 17-month Class Period, i.e., the Control Period – for proceeds of over $12 million.

153.     Schall's sales also departed from his historical trading patterns.  While Schall sold just 5% of his ChemoCentryx holdings during the Control Period (235,000 shares for proceeds of just over $3 million), he sold four times as much of his holdings during the Class Period – selling nearly 20% of his ChemoCentryx stock, approximately 893,318 shares, for proceeds of over $40.3 million.  Schall's sales were highly fortuitous.  Had Schall sold his stock *following* publication of the AdCom Materials and May 6, 2021 meeting – disclosures which made public the issues the FDA had privately raised in March 2020 and even earlier – Schall's proceeds would have been reduced by *more than 82%.*

154.     The magnitude of Schall's sales is also suspicious in light of the supposed imminent approval of avacopan.  If Defendants' misleading statements touting the progress of the NDA review and the success of ADVOCATE had been true, Schall would have had good reason to expect that his stock would appreciate substantially in the coming months, following avacopan's approval.  Accordingly, Schall's sale of significant volumes of ChemoCentryx stock just before he supposedly believed it would experience a significant positive inflection is highly unusual.

**F.     The Truth Emerges**

**1.     On May 4, 2021, The FDA Published Its Briefing Documents Ahead Of The Advisory Committee Meeting**

155.     The market first began to learn the truth about the ADVOCATE results and the FDA's grim assessment of the avacopan NDA on May 4, 2021, when the FDA published the AdCom Materials, including the Briefing Book and accompanying slides, ahead of the May 6,

1   2021 AdCom Meeting.

2       156.   *First*, in the AdCom Materials, the FDA highlighted serious problems undermining

3   the soundness of ADVOCATE's secondary endpoint results – including the GTI, quality of life,

4   and renal results – which Defendants had repeatedly touted as strong evidence of avacopan's safety

5   versus standard of care.  As the Briefing Book explained, "[T]he secondary endpoints do not

6   provide additional support of a clinically meaningful treatment benefit for avacopan."   For

7   instance, the Briefing Book stated that ADVOCATE "evaluated multiple secondary endpoints;

8   however, they were not adjusted for the multiplicity and thus *should be considered purely*

9   *exploratory,*" i.e., not empirically valid evidence of safety or efficacy, but merely hypothesis-

10  generating.

11      157.   The AdCom Materials also disclosed the FDA's additional concerns about

12  particular reported secondary endpoint results – concerns the FDA had privately, and repeatedly,

13  raised with ChemoCentryx long before the Class Period even began.  The Briefing Book, for

14  instance, stated that the FDA did not consider ADVOCATE's GTI results to be supportive of

15  avacopan's clinical benefit:

16          GTI was not assessed at later time points to assess the effects of glucocorticoids
17          after completion of the pre-specified prednisone taper. In the case of
            [ADVOCATE], where differences in glucocorticoid use were pre-specified in the
18          protocol, the GTI does not provide information beyond that of the cumulative
            glucocorticoid doses to further inform the effect of avacopan. Further, GTI is a
19          novel instrument for which there is no regulatory precedent, and a minimally
            clinically important difference (MCID) has not been established in AAV.
20          Importantly, while the GTI is intended to evaluate the toxicities of glucocorticoids,
            avacopan does not impact the same mechanism of action, and may not be expected
21          to have the same toxicities. Therefore, the assessment for only toxicities associated
            with the control treatment, in the absence of inclusion of assessment of toxicities of
22          the investigational product, is biased as an assessment of overall safety.

23

24      158.   Likewise, the Briefing Book explained that ADVOCATE's quality of life results

25  were not supportive of avacopan's safety because, in addition to ChemoCentryx's failure to correct

26  the results for multiplicity, they "are general quality of life instruments, not specific to vasculitis."

27      159.   The Briefing Book likewise cast doubt on meaningfulness of the renal results

28  Defendants had repeatedly touted, highlighting ChemoCentryx's failure to provide data supporting

- 62 -

their clinical meaningfulness in vasculitis, just as it had privately done directly with Schall no later than November 2016.  The Briefing Book stated, "The mean difference between treatment arms on eGFR was small . . . and the clinical meaningfulness is unclear . . . . In addition, the Applicant did not provide data supporting the use of UACR as a surrogate for clinical outcomes in ANCA-associated vasculitis; however, it seems unlikely that the difference seen at Week 4 but not at later timepoints would predict a meaningful clinical benefit of avacopan over prednisone."

160.    The AdCom Materials also disclosed that ADVOCATE's much-vaunted relapse results were problematic and not supportive of avacopan's efficacy.  For instance, the Briefing Book stated that because the relapse analysis was "based on the subset of patients who achieved remission condition on post-randomization variables, i.e., having first achieved remission and the timing of achieving remission," the "advantages of randomization are eliminated because the treatment arms are no longer balanced with respect to possible confounders, leading to biased comparisons between treatment arms and limiting the interpretability of these results."

161.    And, again, the AdCom Materials stated that the FDA had previously raised these concerns with ChemoCentryx throughout avacopan's development, ADVOCATE's planning, and, again, shortly before the Company submitted the NDA.  For instance, the Briefing Book states that, at a November 1, 2016 meeting: "The Agency raised concerns about the proposed secondary endpoints, including relapses which conditions on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission. The Agency also raised concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  The Briefing Book further stated that the FDA "reiterated" these concerns, among others, at the March 2020 meeting and again told Defendants that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients."

162.    *Second*, the AdCom Materials cast serious doubt on Defendants' statements touting avacopan's remission results in ADVOCATE, including statements touting avacopan's supposed non-inferiority to steroids at week 26 and superiority to steroids at week 52.  The AdCom Materials

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

revealed that the FDA had, on multiple occasions, warned ChemoCentryx that statistical non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead.  As alleged above, for instance, the FDA Briefing Book stated:

> [A]t Week 26, the proportion of patients in disease remission in the avacopan group (72.3%) was non-inferior to the prednisone group (70.1%) according to the Applicant's testing plan. However, superiority was not met. ***In pre-submission communications, FDA stated that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids*** as it would be difficult to establish whether avacopan is effective or whether rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms. In addition, the Agency expressed concerns about the ability to adequately justify an acceptable non-inferiority margin, given that there were no historical trials appropriate to estimate the contribution of glucocorticoids to the treatment effect of glucocorticoids and cyclophosphamide or rituximab in the control arm.

163.   The AdCom Materials also cast doubt on Defendants' statements touting avacopan's "superior" remission rate at week 52.  The AdCom Materials revealed that avacopan's achievement of superiority was driven by ChemoCentryx's choice to employ a "modified version of the BVAS" that failed to account for persistent vasculitis in scoring patient disease.   As discussed above, when persistent disease is counted, avacopan fails to demonstrate superiority to standard of care.  The FDA explained that the assessment that includes persistent vasculitis – the assessment performed by the treating physicians in ADVOCATE, who were "experienced in management of vasculitis" – "may better reflect real-world use."

164.   ***Third***, the AdCom Materials additionally undermined Defendants' statements concerning avacopan's efficacy by revealing that, as alleged above, there was "no evidence of clinically meaningful treatment effect [of avacopan] in the cyclophosphamide induction subgroup."   Instead, the observed benefit was confined to patients who received rituximab induction therapy – patients who, unlike the cyclophosphamide patients, received no maintenance therapy and who the FDA therefore explained "may be considered undertreated."

165.   ***Fourth***, the AdCom Materials revealed that non-study supplied steroid use, including for the treatment of vasculitis, was widespread among avacopan patients, as discussed

above, and, as the FDA explained, seriously confounded interpretation of the study results.  Indeed, the Briefing Book explained, "While only the prednisone group was intended to receive the protocol-specified prednisone taper, 87% of patients in the avacopan treatment group also received glucocorticoids during the study for vasculitis."  The Briefing Book further stated that "[a]lthough the protocol specified that glucocorticoids above the protocol-specified taper should be discontinued by Week 4, 86% of patients in the avacopan arm received glucocorticoids from Week 0 to 26."  Thus, the first half of the ADVOCATE trial "was not a comparison of avacopan versus steroid, but is more accurately described as avacopan plus potentially lower doses of glucocorticoids compared to higher doses of glucocorticoids, in addition to background induction therapy (CYC or RTX) and maintenance therapy (only in the CYC arm)."

166.  And the FDA explained that there was no meaningful evidence avacopan was steroid-sparing in the second half of the trial, after the prespecified steroid taper in the comparator arm was discontinued because "glucocorticoid use from Week 26 to Week 52 was similar between the prednisone and avacopan groups."

167.  Significantly, the Briefing Book revealed that "106 patients (63.9%) in the avacopan arm received glucocorticoids for vasculitis. A similar number of patients in each treatment arm received glucocorticoids for persistent vasculitis . . . worsening vasculitis . . . and maintenance of remission."  The Briefing Book further explained that "patients could receive glucocorticoids for vasculitis and were still considered responders," including "patients who received multiple courses of prednisone for vasculitis."  Accordingly, the FDA explained that it had serious concerns about whether the between-arm comparison in ADVOCATE was clinically informative at all, just as it had previously explained on multiple occasions to ChemoCentryx in private meetings.  For the first half of the study, "The clinical relevance of the differences in the nominal glucocorticoid doses used from Week 0 to 26 between the prednisone and avacopan arms is uncertain, as it may be an artifact of the study design rather than a reflection of avacopan's control of disease activity."  And because steroid use was similar between arms in the second half of the study, "the increased glucocorticoid use in the prednisone arm compared to the avacopan arm was limited to the period of the first 20 weeks of the study."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

168.   *Fifth*, the AdCom Materials revealed the FDA's serious concerns about avacopan's safety, including a troubling signal for hepatic toxicity that included an avacopan patient who met Hy's Law criteria and another patient who experienced hepatocellular injury with increased liver enzymes after rechallenge with avacopan.  Moreover, the AdCom Materials explained that the FDA was concerned about the small size of the avacopan safety database – again, a concern the FDA had expressed to ChemoCentryx privately long before, including at the March 2020 meeting.

169.   Notably, FDA meeting minutes privately provided to ChemoCentryx before and during the Class Period mirror the FDA's disclosures set forth in the AdCom Materials.  As just a few examples:

| FDA's Pre- and Class-Period Private Warnings | FDA's Public Disclosures In The AdCom Materials |
|---|---|
| ***Private Warnings: Secondary and other safety endpoints did not support safety claims.*** | ***FDA Public Disclosure:*** |
| • <u>**November 1, 2016 Meeting**</u> "We do not agree with your [ADVOCATE] study design . . . .[Y]ou have argued that, as replacement for glucocorticoids, [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study is ***likely not adequate to support such safety comparisons.***" | • "Overall, the secondary endpoints [in ADVOCATE] do not provide additional support of a clinically meaningful treatment benefit for avacopan." |
| • <u>**March 19, 2020 Meeting**</u> | |
| o   ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients." | |
| o   Reaffirming "comments during our previous meetings (e.g., the Preliminary Comments dated October 28, 2016) on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L." Reiterating concerns about "[s]upport for use of these endpoints within this population and the interpretability of the results given these tests were not multiplicity controlled (i.e., no control for type 1 error inflation over multiple tests)." | |

| | |
|---|---|
| ***Private Warnings: Secondary endpoints did not support safety claims because results not multiplicity-corrected.*** | <div align="center">**FDA Public Disclosure:**</div> |
| • <u>**March 19, 2020 Meeting**</u> FDA questioned "[s]upport for use of these endpoints [i.e., secondary endpoints] within this population and the interpretability of the results ***given these tests were not multiplicity controlled*** (i.e., no control for type 1 error inflation over multiple tests)." | • ADVOCATE "evaluated multiple secondary endpoints; however, ***they were not adjusted for the multiplicity and thus should be considered purely exploratory.*** " |
| <div align="center">***Private Warnings: GTI Did Not Support Clinical Benefit to Patients.***</div> | <div align="center">**FDA Public Disclosure:**</div> |
| • <u>**November 1, 2016 Meeting**</u><br><br>    ○ "We note that you have included the change from baseline over the first 26 weeks in the glucocorticoid-induced toxicity (GTI) instrument as a secondary endpoint. We note that the instrument appears to include several biomarkers, whose validity for serving as surrogate markers of clinical outcomes (direct measures of how patients function, feel, or survive) impacted by glucocorticoid use is unclear . . . . If you choose to pursue this endpoint [in ADVOCATE], the endpoint should be reviewed through the Clinical Outcomes Assessment (COA) qualification program."<br><br>• <u>**March 19, 2020 Meeting**</u><br><br>    ○ "[T]he clinical meaningfulness of GTI, as a novel instrument . . . has not been characterized. ***Further, it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients.*** "<br><br>    ○ FDA reaffirmed its "comments during our previous meetings . . . on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), [and quality of life endpoints, namely] SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L." The FDA again expressed grave doubts about the | • "GTI does not provide information beyond that of the cumulative glucocorticoid doses to further inform the effect of avacopan. Further, GTI is a novel instrument for which there is no regulatory precedent, and a minimally clinically important difference (MCID) has not been established in AAV. Importantly, while the GTI is intended to evaluate the toxicities of glucocorticoids, avacopan does not impact the same mechanism of action, and may not be expected to have the same toxicities. Therefore, the assessment for only toxicities associated with the control treatment, in the absence of inclusion of assessment of toxicities of the investigational product, is biased as an assessment of overall safety." |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

| | |
|---|---|
| "[s]upport for use of these endpoints within this population." | |
| ***Private Warnings: Quality of Life Endpoints Did Not Support Clinical Benefit to Patients.***<br><br>• **November 1, 2016 Meeting** "We have concerns regarding the inclusion of [quality of life endpoints] SF-36 and EQ-5D-5L as secondary endpoints. ***You have not provided adequate data that either endpoint is a validated measure in vasculitis***" and "[t]here does not appear to be adequate data to support the use of [renal function] endpoints to support long-term outcomes in vasculitis."<br><br>• **March 19, 2020 Meeting** FDA reaffirmed its "comments during our previous meetings . . . on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), [and quality of life endpoints, namely] SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L," and again expressed grave doubts about the "[s]upport for use of these endpoints within this population." | ***FDA Public Disclosure:***<br><br>• ADVOCATE's quality of life results did not support avacopan's safety and efficacy because they "are general quality of life instruments, not specific to vasculitis." |
| ***Private Warnings: Renal Endpoints Did Not Support Clinical Benefit to Patients.***<br><br>• **November 1, 2016 Meeting** "You have included several markers of renal function . . . . There does not appear to be adequate data to support the use of these endpoints to support long-term outcomes in vasculitis."<br><br>• **March 19, 2020 Meeting** FDA reaffirmed its "comments during our previous meetings . . . on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), [and quality of life endpoints, namely] SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L," and again expressed grave doubts about the "[s]upport for use of these endpoints within this population." | ***FDA Public Disclosure:***<br><br>• "The mean difference between treatment arms on eGFR was small . . . and the clinical meaningfulness is unclear . . . . In addition, the Applicant did not provide data supporting the use of UACR as a surrogate for clinical outcomes in ANCA-associated vasculitis; however, it seems unlikely that the difference seen at Week 4 but not at later timepoints would predict a meaningful clinical benefit of avacopan over prednisone." |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

| *Private Warnings: Non-inferiority inadequate to demonstrate efficacy.* | *FDA Public Disclosure:* |
|---|---|
| • <u>**July 14, 2016 Meeting**</u> "A ***non-inferiority study would not be sufficient*** to show that CCX168 can replace glucocorticoids . . . . The Agency indicated that an assessment of remission based on BVAS 0 at Week 26, and sustained remission based on BVAS 0 at Week 52 in a superiority design would be acceptable."<br><br>• <u>**November 1, 2016 Meeting**</u><br><br>    ○ FDA "explained that the superiority analysis is critical to demonstrate efficacy and that a demonstration of non-inferiority would not be sufficient, given previously expressed concerns with the non-inferiority margin and interpretation of results from such an evaluation."<br><br>    ○ "[W]e remain concerned regarding the ability to use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of your product (CCX168). As previously stated, ***a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids*** . . . . [T]he superiority analysis is critical to demonstrate efficacy and [] ***a demonstration of non-inferiority would not be sufficient***, given previously expressed concerns with the non-inferiority margin and interpretation of results from such an evaluation."<br><br>• <u>**March 19, 2020 Meeting**</u> "We refer you to our previous comments regarding the utility and interpretability of the non-inferiority comparisons and support for the selected margin. As such, ***we do not agree with your statements in your SAP which indicate that you will conclude to have a successful study based on the NI comparison alone.*** The determination of substantial evidence will be a review issue." | • "In pre-submission communications, ***FDA stated that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids*** as it would be difficult to establish whether avacopan is effective or whether rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms." |

| *Private Warnings: Relapse results did not support efficacy.* | *FDA Public Disclosure:* |
|---|---|
| • **November 1, 2016 Meeting**<br><br>  ○ "You have defined both 'relapse' and 'minor flare' as events that occur after subjects have achieved remission. ***We do not agree that relapse and minor flare only occur after remission.*** Subjects may experience a worsening of disease during induction, and prior to remission. In addition, ***this is problematic from a statistical point of view because you are conditioning on a post-randomization variable, such that comparisons will be between non-randomized groups*** and the interpretability of results will be challenging."<br><br>  ○ "The FDA reiterated that the ***proposed analysis to evaluate relapse in the subset of patients who achieve remission would be considered exploratory given that it conditions on a post-randomization variable,*** such that differences between arms may be due to the effect of treatment or to differences in patient characteristics." | • ADVOCATE "was not designed to assess time to relapse or proportion of relapses," and thus, any analyses of relapse between the two arms was "based on the subset of patients who achieved remission condition on post-randomization variables, i.e., having first achieved remission and the timing of achieving remission. . . . The advantages of randomization are eliminated because the treatment arms are no longer balanced with respect to possible confounders, leading to biased comparisons between treatment arms and limiting the interpretability of these results." |
| *Private Warnings: Steroid use confounded ADVOCATE's results.* | *FDA Public Disclosure:* |
| • **March 19, 2020 Meeting** "FDA noted that the multiple interventions in the study [including steroid use] ***complicate the assessment of the efficacy of avacopan treatment.***" | • FDA "identified several areas of concern, raising uncertainties about the interpretability of these [efficacy] data and the clinical meaningfulness of these results" and "during the avacopan clinical development, including the phase 3 design stages, the Agency communicated many of the concerns with the design of" ADVOCATE to ChemoCentryx.<br><br>• "While only the prednisone group was intended to receive |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

| | |
|---|---|
| | the protocol-specified prednisone taper, 87% of patients in the avacopan treatment group also received glucocorticoids during the study for vasculitis." |
| | • "[S]imilar proportions of patients required non-study supplied glucocorticoids to control increased disease activity, based on worsening vasculitis, persistent vasculitis, and maintenance of remission." |
| | • "[P]atients could receive glucocorticoids for vasculitis and were still considered responders," including "patients who received multiple courses of prednisone for vasculitis . . . . These cases highlight how challenging it is to interpret the glucocorticoid use and the contribution to therapeutic benefit in this study." |

170.    In response to this news, ChemoCentryx's stock plummeted more than 45% in a single day, falling from $48.82 at the close of market on May 3, 2021 to $26.63 at the close of market on May 4, 2021, on the highest trading volume since the first day of the Class Period on November 26, 2019, when Defendants announced the results of the ADVOCATE trial.

171.    Investors and analysts were shocked and troubled by these disclosures.  H.C. Wainwright analysts reported that "[t]he FDA briefing documents released on Tuesday were surprisingly unfavorable to the Phase 3 ADVOCATE trial," while SVB Leerink called the briefing documents "surprisingly critical" on May 4, 2021.  J.P. Morgan analysts stated, "FDA AdComm Documents Worse Than Expected" and "without a doubt concerning."  Among the issues raised by the AdCom Materials, J.P. Morgan analysts cited:

- "For the ADVOCATE study, the FDA noted that the non-inferiority analysis at week 26 was limited by the fact that ~86% of avacopan patients received non-study supplied glucocorticoids (GCs; thus determining true treatment effect for avacopan is difficult). This was characterized as GC use beyond the time period of week 4, where steroids protocol / taper should have been discontinued."

- "As well, the Agency noted that a non-inferiority comparison would not be sufficient to show that avacopan could replace GCs, given it would difficult to see how avacopan effect would compare to Rituxan / cyclophosphamide."

- "The FDA noted that there were differences between Investigators versus Adjudication Committee assessments at week 52 on the BVAS remission score (most frequently related to persistent vasculitis that was not captured in the modified BVAS administered in the study). Statistical analyses of the primary endpoint using the Investigator assessment of BVAS remission resulted in more conservative estimates of treatment effect (e.g., statistical significance for superiority not met)."

- "While the publication for ADVOCATE (Jayne et al, NEJM, 2021) highlighted the SAE of liver abnormality (events resolved with removal of medication), we would note that FDA noted that one patient had a severe hepatic function abnormality and met Hy's Law laboratory criteria."

172.    Analysts and market commentators were also shocked that Defendants had apparently concealed highly negative FDA feedback it had received, which contrasted starkly with their Class Period statements to investors.  For example, the FDA's response also "[came] as a particular surprise" to analysts at SVB Leerink, who found it "problematic" that the FDA believed Defendants "did not incorporate all of the FDA's requests and recommendations in the company's development program," specifically citing ChemoCentryx's three meetings and "pre-submission communications" with the FDA.  As these analysts explained, "FDA briefing docs suggest that the agency has had reservations about various aspects of CCXI's proposed development plan for avacopan for some time."

173.    Likewise, investor publication *The Motley Fool* reported on May 6, 2021 in an article titled, "Why ChemoCentryx Stock Crashed Today":

The FDA stated in the briefing documents that ChemoCentryx's study design on which its regulatory filing is based "raise questions about the interpretability of the data to define a clinically meaningful benefit of avacopan."  That basically means that the agency doesn't put much stock in the clinical results for the experimental drug. ***This shouldn't have been much of a surprise to ChemoCentryx, though.***

*The FDA stated that it previously informed the company about many of its concerns about the design of the late-stage study for avacopan.*

### 2.   On May 6, 2021, The FDA Held The Advisory Committee Meeting

174.   On May 6, 2021, the FDA held the Advisory Committee Meeting to discuss the avacopan NDA and the ADVOCATE results and published additional review materials.   The Advisory Committee was comprised of expert clinicians and scholars in rheumatology and statistics who were assembled by the FDA to interpret the data from the ADVOCATE trial, provide scientific and clinical context for the data, and draw out facts about what the clinical trial results actually mean for patients and health care providers in practice.   The AdCom Meeting was open to the public and, among other things, was broadcast over the internet, though, while it was ongoing, NASDAQ halted trading in ChemoCentryx stock.   Information disclosed during the AdCom Meeting revealed important details about the ADVOCATE results and also allowed investors to appreciate the significance of the previously concealed facts discussed in the FDA's AdCom Materials.   Among other things:

175.   *First*, the expert Advisory Committee explained that previously undisclosed facts about the ADVOCATE results raised serious questions about whether avacopan was actually steroid-sparing at all.   For instance, the Advisory Committee discussed in detail the fact that avacopan had failed to achieve statistical superiority against patients taking a combination of steroids and cyclophosphamide – patients who *did* receive maintenance therapy (to sustain remission) – and only showed an effect against patients taking rituximab – patients who *did not* receive maintenance therapy and who the FDA therefore concluded "may be considered undertreated."   As AdCom member Dr. Chung explained, contrary to ChemoCentryx's statements, "the need for remission maintenance [with rituximab], or the use of remission maintenance [with rituximab] during the time [that ADVOCATE was designed], was truly standard of care . . . . I don't think many of us thought that we could just treat with one dose of rituximab," though that is what ChemoCentryx did in ADVOCATE.   As AdCom member Dr. Chung also explained, "I think the sponsor has also indicated that rituximab was not approved for remission maintenance until after the trial commenced. But I would say that the studies that showed efficacy for rituximab for

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

remission maintenance were published before this trial protocol was finalized. So I will say that *I was quite surprised that there wasn't a remission maintenance aspect to the rituximab arm for this study.*"  Likewise, AdCom member Dr. Lewis stated, "Basically, although the company only showed us the rituximab data, *clearly the cyclophosphamide group did not show a benefit; so avacopan won over, essentially, nothing* [in the group of patients supposedly receiving steroids plus rituximab]. And I don't think many of us practice with no maintenance therapy in this disease, nor is that the guidelines for many of our societies."

176.    The AdCom allowed investors to understand and appreciate that undertreatment of the steroid-plus-rituximab group had significant consequences for Defendants' claims that avacopan was steroid-sparing.  AdCom member Dr. Nason asked her clinician colleagues on the panel to explain: "[I]f rituximab, for instance, was repeated [as maintenance therapy], would you expect that there would be less steroid use in those people then, because perhaps that would avoid . . . sort of counterfactual, but that the people historically who might have gone to an additional dose of steroids might instead get that additional dose of rituximab."  When Dr. Nason's colleagues responded affirmatively, she explained, "I appreciate your helping me understand the clinical context here, and I think it only reiterates for me that I feel like this non-inferiority comparison is really a little too uncertain to give too much weight to, given all the factors."   As far as the cyclophosphamide comparison, AdCom member Dr. Sperati explained that it was reasonable to infer from the data that "avacopan is not helpful with cyclophosphamide. And simply the similar outcomes in the two arms just reflect that this is what happens when you give cyclophosphamide and a lower dose of steroids."

177.    *Second*, the Advisory Committee Meeting likewise revealed that, contrary to Defendants' statements during the Class Period, results on ADVOCATE's secondary endpoints were, overwhelmingly, not clinically meaningful.[20]   For instance, while Defendants repeatedly touted the supposed improvement in quality of life metrics associated with avacopan in ADVOCATE, AdCom member Dr. Kim pointed out, "There was improvement in SF-36 [quality

---

[20] Clinical meaningfulness is distinct from statistical significance in that an observed effect may be statistically significant, yet too small to be of importance in clinical practice.

of life instrument] in the components that you showed, but I don't think the difference between the treatment group and the placebo group is beyond the minimum clinically important difference." And, indeed, even ChemoCentryx's paid consultant conceded that "some of the differences are small and may not all reach the MCID [minimum clinically important difference]."

178.    Likewise, AdCom members explained that, given clinical distinctions between induction and maintenance therapy, the BVAS relapse results Defendants repeatedly touted during the Class Period failed to support their claims about avacopan's ability to maintain remission, citing issues the FDA had privately raised with ChemoCentryx long before, including the fact that the comparison was not randomized.  For instance, AdCom member Dr. Singh explained:

> The third point is what Dr. Pisetsky has brought up a few times very clearly. This is sort of a combination of induction and maintenance, so one might have to think of additional evidence in which not only do you establish the control or establish the efficacy as one component by including multiple arms, but also try to re-randomize between the induction phase separately and the maintenance phase separately  .  .  .  .  **[I]f the question is whether avacopan would be a good maintenance vis a vis rituximab, then this trial cannot answer that question.** You really need a new trial where induction and maintenance are separated for you to be able to answer that, and I think it is a relevant question at this time.

Dr. Lewis similarly explained that "the group who went in from induction, doing it as a continuous trial, you don't have the randomized group when you're trying to look at the benefits of maintenance."

179.    **Third**, the AdCom Meeting also revealed that ChemoCentryx's failure to include persistent vasculitis in calculating the BVAS primary endpoint seriously undermined Defendants' claims about avacopan's efficacy and supposed steroid-sparing benefit and, indeed, violated the prespecified ADVOCATE protocol.  Materials first released by the FDA at the May 6 AdCom Meeting (and excerpted above) explained that the ADVOCATE clinical trial protocol required the use of BVAS version 3, which counts persistent vasculitis as disease activity, but ChemoCentryx did not follow this requirement.  Accordingly, ChemoCentryx's reported superiority result at week 52 was, in truth, the product of protocol violations.

180.    As Dr. Singh explained, "I think that the loss of significance based on investigator assessment at the 52 weeks makes that not a hard outcome that one can put weight on for

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

superiority."  Dr. Becker stated, "I think the one **obvious, clearly significant issue** is that when taking into account the site investigators and their scoring, it changed the statistical significance of it."  Significantly, as discussed above, the AdCom pointed out that avacopan patients frequently used "non-study" steroids to treat persistent vasculitis – a fact that further undermined Defendants' statements that avacopan eliminated the need for steroid use to treat vasculitis.  AdCom Chair Dr. Becker explained, for example, that "if there was a rating of persistent vasculitis, maybe that resulted in increased prednisone use" among avacopan patients, yet persistent vasculitis was not scored against avacopan.

181.    **Fourth**, the AdCom Meeting explained that, contrary to Defendants' statements, ADVOCATE did not show avacopan could replace steroids.  The AdCom explained that not only was steroid usage, including for the purpose of treating vasculitis, widespread among avacopan patients, but that reported average difference in dosages likely understated the magnitude of avacopan patients' steroid use.  As Dr. Chung explained, this measure was an "underestimation, in some respects, of how much prednisone or the potential impact of prednisone for particular participants."   The AdCom explained that, from a clinical perspective, this was particularly significant since steroids are used at low doses for maintenance therapy.  Dr. Dellaripa explained, for instance, that "many of us have used in clinical practice low doses of steroids to keep people in remission, or theoretically to keep them in remission."   Accordingly, the AdCom made clear that even low dose steroid use by avacopan patients could have provided all of the maintenance benefit observed in avacopan patients, with avacopan doing little or nothing to maintain remission during the second half of the study.

182.    Moreover, the AdCom Meeting pointed out that ChemoCentryx considered many avacopan patients who received significant steroid treatment to be "responders" to treatment.  Dr. Chung explained, "I will confess that I was surprised by some of [the patients ChemoCentryx considered to be responders]. One of them included a participant who received 250 milligrams of methylprednisolone for 3 days just before . . . the week 52 endpoint."  Dr. Chung continued, "what troubles me more about the out-of-study glucocorticoid use is that participants who received a significant amount of outside glucocorticoid use still could be counted as a responder. . . . [T]he

true efficacy and the true effect of avacopan compared to prednisone is just not well verified by this study. I think my other concern is also that ***it appears from the sponsor, or the applicant, that the goal for avacopan would be for it to be used in the absence of glucocorticoids from initial remission induction therapy. And I am hesitant with that because there was a significant amount of glucocorticoid use in the avacopan arm after***" the prednisone arm completed the initial taper period.  Indeed, ChemoCentryx's paid consultant, Dr. Bekker, again conceded that avacopan patients were "not penalized for" out-of-study steroid use and that some patients were considered "responders" even where there was "very high glucocorticoid use."

183.    ***Fifth***, the AdCom Meeting underscored the seriousness of the liver safety issues associated with avacopan in ADVOCATE.  For instance, as discussed above, an Advisory Committee member asked the FDA, "detecting a signal like this [an adverse hepatic event meeting Hy's Law criteria], even though the exposure is a very small group. Does that heighten your concern?"  A senior FDA hepatologist, Dr. Hayashi, responded:

> Your point's well taken. Yes, it did, and it does weigh on my mind. You have an exposure here that's about 160 some odd patients. That is small. For DILI risk of significance, like a Hy's law case, it's really one or two in a large trial of, like, a thousand, is enough for us to be concerned that that drug will have problems postmarketing.

184.    ***Sixth***, the AdCom Meeting revealed that, owing to the facts Defendants had concealed from investors, ADVOCATE had not established avacopan's safety and efficacy consistent with the broad label ChemoCentryx sought.  Indeed, while the AdCom evenly split on the question of whether avacopan should be approved at all, even those who answered this question affirmatively noted that it's label and use should be significantly more limited than provided in the Company's application.

185.    For instance, Dr. Lewis stated, "I voted no [on approvability]. Even if I had voted yes for the previous two questions [concerning safety and efficacy], which obviously I didn't – I voted no for both – this is a way too broad written indication far exceeding – I think even if you had believed yes for the other two – the data presented to us."  Dr. Sperati similarly explained, "[T]his trial, as designed and then ultimately executed, doesn't directly address its role for

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    induction, nor its role in maintenance, and certainly not maintenance therapy."

2    186.    But even, Dr. Piesetsky, who voted in favor of approval, stated that the label should

3    be limited and that the drug "would likely be used, if approved, in people who had persistent

4    activity or had frequent relapses despite being on other agents like rituximab or Cytoxan and

5    Imuran, who still required high doses of steroids."  Likewise, Dr. Seoyoung Kim, who also voted

6    in favor of approval cautioned avacopan's label should be limited: "I voted yes. However, I think,

7    like some of the others mentioned, maybe if it's approved, labeling can specify appropriate

8    indication . . . . Not everybody with the disease are considered with this."

9    187.    In response to this news, ChemoCentryx common stock fell by approximately 62%,

10   from $27.49 at the close of market on May 5, 2021 (as trading in the stock was halted on May 6)

11   to $10.46 at the close of the market on May 7, 2021, on record volume.  Following the May 6

12   disclosures, the price of ChemoCentryx common stock essentially returned to its pre-Class Period

13   level.

14   188.    Analysts again slashed their guidance and price targets for ChemoCentryx stock,

15   reporting that the AdCom Meeting had underscored and contextualized the FDA's concerns.  For

16   instance, in a May 7, 2021 report, J.P. Morgan analysts reduced their rating to "Underweight" and

17   lowered their price target dramatically, from $57 to $17.  These analysts noted, "Heading into the

18   AdComm yesterday, post review of the FDA briefing documents, while acknowledging the unmet

19   need in AAV, we felt the Agency had fundamental concerns on the phase 3 ADVOCATE trial

20   design and data interpretability. Coming out of the AdComm, in our view, the mixed votes by the

21   panelists on all key questions of efficacy, safety, and risk / benefit underscored many of the FDA's

22   concerns. . . . [W]e note that commentary by the panel was skewed to more of a negative tone

23   (with even the need for an additional trial cited multiple times by a number of panelists to better

24   understand / come to a conclusion on the benefit / risk profile of avacopan).  Net-net, we felt the

25   AdComm underscored the FDA's key concerns raised in the briefing documents."

26   189.    Likewise, in a May 6, 2021 article, biotechnology news publication *Pink Sheet*

27   reported that the AdCom repeatedly cited serious problems with ADVOCATE's design and results

28   – the same serious problems Defendants had concealed from investors – in concluding that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

ADVOCATE failed to support broad clinical use for avacopan.  Indeed, "even those who voted in the sponsor's favor acknowledged that [ADVOCATE] was mired by flaws leaving questions about the drug's safety and how best to use the medication in clinical practice."

190.    In all, disclosures of the true facts concerning avacopan and ADVOCATE caused massive losses to investors, with ChemoCentryx shares *falling nearly 79%* from $48.82 at the close of trading on May 3, 2021 to $10.46 at the close of trading on May 7, 2021.

### G.    Post-Class Period Events

191.    On October 8, 2021, the FDA confirmed that ADVOCATE failed to establish avacopan could replace steroids in the treatment of vasculitis, approving the drug with a far more limited label than ChemoCentryx had hoped: with an indication as only an adjunct therapy to steroid-based standard of care in patients with severe vasculitis.  Specifically, the label provides that avacopan is approved for use as "an adjunctive treatment of adult patients with severe active [ANCA vasculitis] . . . in combination with standard therapy including glucocorticoids. TAVNEOS [the trade name for avacopan] *does not eliminate glucocorticoid use.*"  In other words, in contrast to Defendants' Class Period statements that ADVOCATE "resoundingly" provided "evidence that steroids need not be used when avacopan is available," avacopan is approved for use as a treatment only as an adjunct to steroids.

192.    The FDA also refused to allow ChemoCentryx to tout ADVOCATE's safety endpoint results, including the supposed reduction in glucocorticoid-related toxicity, improvement in kidney function, and improvement in health-related quality of life metrics Defendants touted throughout the Class Period.  Because the FDA refused to allow ChemoCentryx to include these results in the avacopan label, the Company is prohibited from making statements – like those they made during the Class Period – touting avacopan for those uses.

193.    In addition, the FDA also required ChemoCentryx to include "warnings and precautions" for liver toxicity on the avacopan label.[21]  Specifically, the avacopan label warns,

---

[21] FDA regulations require that information concerning risks associated with a drug be set forth on the label according to the seriousness of the risk.  For example, the "Warning" section would indicate that there is reasonable evidence of an association of a serious hazard [or risk] with a drug; a causal relationship need not have been proved. 21 C.F.R. § 201.57(3) (v)(e).  The "Precautions"

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

"Hepatotoxicity: Increase in liver function tests occurred in clinical trials. Obtain liver function tests before initiation of therapy and monitor as clinically indicated."  Patients taking avacopan are also required to obtain tests of liver function every four weeks during treatment and should be monitored closely for hepatic adverse reactions:

> Serious cases of hepatic injury have been observed in patients taking TAVNEOS. During controlled trials, the TAVNEOS treatment group had a higher incidence of transaminase elevations and hepatobiliary events, including serious and life-threatening events [*see Adverse Reactions 6.1*].

> Obtain liver test panel (serum alanine aminotransferase [ALT], aspartate aminotransferase [AST], alkaline phosphatase, and total bilirubin) before initiating TAVNEOS, ***every 4 weeks after start of therapy for the first 6 months of treatment and as clinically indicated thereafter.***

> TAVNEOS is not recommended for patients with active, untreated and/or uncontrolled chronic liver disease (e.g., chronic active hepatitis B, untreated hepatitis C, uncontrolled autoimmune hepatitis) and cirrhosis. Consider the risk and benefit before administering this drug to a patient with liver disease. ***Monitor patients closely for hepatic adverse reactions*** [*see Use in Specific Populations (8.7)*].

194.    ChemoCentryx will also have to bear the expense of conducting ***three*** post-marketing studies to further evaluate the drug's liver toxicity.

195.    Avacopan's narrow label, pursuant to which the drug was indicated only in adult patients with "severe active" ANCA vasculitis, dramatically reduced the size of the addressable population to which ChemoCentryx sought to market the drug.  Prior to the start of the Class Period, Defendants projected that avacopan could be marketed to all vasculitis patients, and that, as a base case, the drug could be prescribed to 40,000 patients in the U.S. alone.  With its more limited label, Schall stated that there were only 9,500 patients who "fit the profile outlined in our label."[22]

---

section merely reflects "information regarding any special care to be exercised by the practitioner for safe and effective use of the drug." 21 C.F.R. § 201.57(3)(v)(f).

[22] While ChemoCentryx's stock price increased following approval, that increase occurred only after the end of the PSLRA's 90-day lookback period.  15 U.S.C. § 78u-4(e).

## V.   ADDITIONAL SCIENTER ALLEGATIONS

196.    Numerous allegations set forth above and summarized below give rise to the inference that Defendants knowingly, or at least with deliberate recklessness, misled investors about avacopan's safety and efficacy, ADVOCATE's design and results, and the progress of the avacopan NDA and the Company's interactions with the FDA regarding ChemoCentryx's application.

197.    ***First***, both before and during the Class Period, the FDA repeatedly warned ChemoCentryx in private meetings – and in the pre-meeting memoranda and post-meeting minutes provided to Defendants in connection therewith – that ADVOCATE's serious deficiencies cast significant doubt on the study's ability to demonstrate avacopan's safety and efficacy and to secure approval of the drug with the label ChemoCentryx sought.  Indeed, at a November 2016 meeting attended by Schall, the FDA told Defendants, "We do not agree with your revised [ADVOCATE] study design . . . . [Y]ou have argued that, as replacement for glucocorticoids, [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study is ***likely not adequate to support such safety comparisons.***"  Significantly, as discussed above, the FDA's private warnings mirror the agency's later public disclosures in the AdCom Materials that drove the decline in ChemoCentryx stock at the end of the Class Period.

198.    **Secondary endpoints did not support safety claims**.  At both the November 1, 2016 meeting (attended by Schall) and again at the March 19, 2020 meeting, the FDA further privately "raised concerns about [ADVOCATE's] proposed secondary endpoints" – endpoints supposedly designed to demonstrate that avacopan was safer than steroids, including the GTI, quality of life, and renal endpoints.  First, the FDA "raised concerns" about the "clinical meaningfulness" of these safety endpoints, warning that, directly contrary to Defendants' statements, they had not been validated for the purposes ChemoCentryx sought to deploy them in ADVOCATE.  Second, the FDA warned that ADVOCATE's safety endpoint results were statistically flawed because they had not been corrected for multiplicity, as FDA guidance provides.  Indeed, when these results are corrected for multiplicity, virtually none of them are

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

actually statistically significant as Defendants' claimed.  At both meetings, the FDA also warned Defendants that the avacopan safety database was too small and lacked adequate statistical power to support the Company's safety claims.

199.  **Non-inferiority inadequate to demonstrate efficacy**.  During meetings held between the FDA and ChemoCentryx on July 14, 2016 (which Schall attended), November 1, 2016 (which Schall attended), and March 19, 2020, the FDA warned Defendants that ADVOCATE would be required to demonstrate avacopan's superiority with respect to BVAS remission in order to secure approval of the drug as a replacement for steroid-based standard of care therapy.  The FDA did "not agree" with ChemoCentryx's proposal to secure this indication based on non-inferiority.  Notwithstanding these direct warnings, Defendants repeatedly touted avacopan's non-inferiority results at week 26 in ADVOCATE.

200.  **Relapse results did not support efficacy**.  The FDA also specifically warned ChemoCentryx, including at the November 1, 2016 meeting attended by Schall, that ADVOCATE's relapse results did not provide valid empirical support for avacopan's efficacy, and would be considered merely "exploratory."  Yet, Defendants repeatedly touted these results throughout the Class Period.

201.  **Steroid use confounded ADVOCATE's results**.  At the March 19, 2020 meeting, the FDA warned ChemoCentryx that ADVOCATE's "multiple interventions" including "the addition of avacopan on top of standard of care" steroids, "complicate the assessment of the efficacy of avacopan treatment."  Indeed, as discussed above, the FDA made clear that avacopan patients' widespread steroid use in ADVOCATE, including for the treatment of vasculitis, confounded the assessment of the drug's efficacy.

202.  **Subgroup data undermined Defendants' efficacy claims**.  As alleged above, ADVOCATE's cyclophosphamide subgroup data – which showed that avacopan failed to achieve superiority with respect to BVAS remission at week 52 against patients receiving standard of care maintenance therapy – significantly undermined Defendants' claims concerning avacopan's efficacy.  At the March 19, 2020 meeting, FDA privately told ChemoCentryx that it was focused on this subgroup data – and specifically the fact that rituximab patients were not given maintenance

therapy, while cyclophosphamide patients were.

203.    **An Advisory Committee would likely be convened to discuss specific fundamental flaws in the design, conduct and reporting of ADVOCATE**.  At ChemoCentryx's March 2020 meeting with the FDA, the agency warned Defendants that it believed an Advisory Committee Meeting would likely be necessary to evaluate the ADVOCATE results in light of the multiple interventions in the study (including the use of steroids in the avacopan arm), the unvalidated character of the study's safety endpoints, and the limited safety database, all of which "complicate the assessment of the efficacy of avacopan treatment."

204.    ***Second***, that Defendants' statements touting the ADVOCATE results – including their statements that ADVOCATE's secondary endpoint results were statistically significant in favor of avacopan and that avacopan achieved statistical superiority with respect to BVAS remission at week 52 – were contradicted by ChemoCentryx's own prespecified clinical trial protocol and FDA guidance (to which the agency specifically warned ChemoCentryx it had failed to adhere) gives rise to a strong inference of scienter.

205.    As alleged above, the ADVOCATE protocol provides that remission would be measured using BVAS version 3, which scores persistent disease as active disease, i.e., not in remission.  Contrary to the protocol, however, ChemoCentryx's publicly reported results counted patients with persistent vasculitis as remitted.  When the results are analyzed in accordance with ChemoCentryx's own prespecified rules for ADVOCATE, they show that avacopan failed to achieve superiority to prednisone at week 52.  Notable, because, as discussed above, the FDA warned ChemoCentryx that non-inferiority was inadequate to demonstrate avacopan's efficacy, ChemoCentryx's protocol violations transformed a failed result at week 52 into an ostensibly successful one.

206.    In addition, FDA guidance required ChemoCentryx to correct ADVOCATE's much-vaunted secondary endpoint results for multiplicity – a requirement the FDA emphasized at its private March 19, 2020 meeting with the Company.  Again, when these results are analyzed in accordance with FDA guidance, virtually none of them are statistically significant, including results on three of the four GTI endpoints, as well as results for all of the quality of life, relapse,

renal, and VDI endpoints.  Notably, Schall described these secondary endpoints and their results as *"validated by regulatory authorities,"* even after the FDA reminded ChemoCentryx that the analysis of these endpoints *failed* to adhere to regulatory guidance.

207.  *Third*, ChemoCentryx's most senior medical executive repeatedly warned Schall that the adverse liver events associated with avacopan in ADVOCATE were deeply troubling.  As alleged above, both ChemoCentryx and the FDA were highly focused on avacopan's potential liver toxicity prior to the start of the Class Period.  In numerous meetings with Schall following the unblinding of the ADVOCATE results at the start of the Class Period, ChemoCentryx's chief medical executive repeatedly highlighted the adverse liver event meeting Hy's Law criteria and the adverse liver event occurring after patient rechallenge as raising troubling safety signals for avacopan.   In response, Schall acknowledged that these adverse events were problematic. Nevertheless, Schall repeatedly told investors that "[avacopan] had fewer adverse events and fewer serious adverse events, a very acceptable safety profile to go forward we believe and apply for approval in this indication."

208.  *Fourth*, that Defendants' misstatements concerned the most significant study related to its most significant drug, at the time that it was the subject of intense regulatory scrutiny by way of a critical pending NDA, supports a strong inference of scienter, particularly as ChemoCentryx was a small company with little else to distract management or divide its attention. As alleged above, ChemoCentryx did not have a single drug on the market at the start of the Class Period and was facing rapidly escalating operating costs.  As ChemoCentryx's most advanced drug candidate – and one ChemoCentryx hailed as having "multi-billion dollar market potential" – avacopan was, as Defendants stated, the key to turning ChemoCentryx revenue-positive.  And as the "pivotal trial" on which the avacopan NDA would be based, ADVOCATE was critically important to ChemoCentryx's business.

209.  As Defendants also acknowledged, investors substantially based their investment in ChemoCentryx on avacopan's prospects and were keenly focused on the ADVOCATE results and the progress of the avacopan NDA.  As alleged above, J.P. Morgan analysts "predicated" their "overweight" rating of ChemoCentryx stock "on [their] view on potential of avacopan."  Likewise,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   Canaccord Genuity analysts stated that "AAV remains core to our investment thesis."  Indeed,

2   Schall acknowledged that "[m]uch of the [investor] excitement has been focused on" avacopan,

3   and he began almost every investor call with a discussion of, and fielded numerous analyst

4   questions about, ADVOCATE and the avacopan NDA.  Indeed, as alleged above, given the

5   Company's unusual reliance on regular influxes of investor capital to meet operating costs,

6   ChemoCentryx's very survival during the Class Period depended upon investors' confidence in

7   avacopan's commercial potential.  Yet, despite the overriding importance of avacopan and

8   ADVOCATE to investors, Defendants failed to disclose the FDA's repeated warnings about the

9   trial's design, reported inflated and inaccurate results, and misled the market about the progress of

10  the NDA for nearly eighteen months after the data were unblinded.  Defendants either knew or

11  were deliberately reckless in failing to know that these critically important facts were publicly

12  misstated or concealed.

13      210.  **Fifth**, as an experienced scientist who had spent decades working in drug

14  development, Schall would have appreciated the seriousness of the issues concealed from

15  investors; indeed, as alleged, Schall repeatedly demonstrated fluency with the details of

16  avacopan's mechanism of action, the key clinical issues involved in vasculitis treatments, the

17  design and analysis of ADVOCATE, and the Company's interactions with the FDA as part of the

18  avacopan development program.

19      211.  **Sixth**, given the importance of avacopan and ADVOCATE to ChemoCentryx,

20  Schall discussed both at **every** investor conference and on **every** earnings call during, and for

21  months before, the Class Period.  Indeed, as alleged above, Schall gave detailed, data-laden

22  responses to analyst frequent questions about ADVOCATE's design, the trial's safety and efficacy

23  results, and the Company's interactions with the FDA.  That the highly adverse facts withheld

24  from investors were at the heart of the subjects about which Defendants' frequently communicated

25  with investors during the Class Period supports, at a minimum, an inference of deliberate

26  recklessness.

27      212.  **Seventh**, that the subjects of Defendants' misstatements were also the focus of

28  intense regulatory scrutiny and concern during the Class Period further supports an inference that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the true facts concerning those subjects could not reasonably have escaped ChemoCentryx management's notice.  As alleged above, the avacopan NDA was critically important to the Company's business and, indeed, its very survival.  Given that the FDA's views on avacopan would have had an outsized impact on the Company's business and profitability, ChemoCentryx management could not reasonably have been unaware of the substance of these critical discussions.

213.   ***Eighth***, because ChemoCentryx's very survival during the Class Period depended upon its ability to raise capital, and because ChemoCentryx's ability to raise capital during the Class Period was contingent on investors' perception of avacopan's commercial viability, Defendants had powerful motives to perpetrate the fraudulent scheme described herein.  As alleged above, ChemoCentryx generated no sales revenue during the Class Period and was entirely dependent upon influxes of investor capital.  At the same time, ChemoCentryx incurred significant operating costs, which only grew as the Class Period continued.  Indeed, shortly after ADVOCATE was unblinded and just three months after Defendants' dismal March 19, 2020 meeting with the FDA about those key trial results, ChemoCentryx held the largest public offering in its history, raising $325 million in much-needed capital from investors.  As alleged above, and as evidenced by the implosion of ChemoCentryx's stock price upon disclosure of Defendants' fraud, the Company's share price during the Class Period was a function, in significant part, of investors' views about avacopan, the ADVOCATE results, and the progress of the NDA.  A positive perception of avacopan's commercial prospects was therefore essential to the Company's ability to raise capital on favorable terms.  Accordingly, Defendants had obvious motives to conceal, for as long as possible, the truth about the ADVOCATE results – including the FDA's disappointing feedback, the trial's inflated results, and worrying safety signals – in order to buy time and secure the financing needed to keep the Company afloat, attempt to persuade the FDA to change its views, and bring ChemoCentryx's remaining pipeline drugs as far along in development as possible.

214.   ***Ninth***, Schall's sales of millions of dollars' worth of ChemoCentryx stock shortly before avacopan was supposed to be approved, while failing to disclose known adverse facts about ADVOCATE and the progress of avacopan's NDA, also supports a strong inference of scienter. During the Class Period, Schall sold nearly 20% of his ChemoCentryx holdings reaping over $40

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

million in proceeds.  Notably, just two months after the FDA privately raised serious concerns about the newly-unblinded ADVOCATE results, Schall sold 210,278 shares in transactions in May and June 2020 alone – almost as much as he had sold in the *entire* 17 months preceding the 17-month Class Period – for proceeds of over $12 million.

215.    As alleged above, Schall's sales also departed from his historical trading patterns. While Schall sold just 5% of his ChemoCentryx holdings during the Control Period, he sold four times as much during the Class Period, reaping over thirteen times the proceeds.  Schall's sales were highly fortuitous.  Had Schall sold his stock following publication of the AdCom Materials and May 6, 2021 meeting – disclosures that made public the issues the FDA had privately raised in March 2020 and even earlier – the proceeds of his sales would have been reduced by *more than 82%*.

216.    The magnitude of Schall's sales is also suspicious in light of the supposed imminent approval of avacopan.  If Defendants' misleading statements touting the progress of the NDA review and the success of ADVOCATE had been true, Schall would have had good reason to expect that his stock would appreciate substantially in the coming months, following avacopan's approval.  Accordingly, Schall's sale of significant volumes of ChemoCentryx stock just before he supposedly believed it would experience a significant positive inflection is highly unusual.

## VI.    DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

217.    During the Class Period, Defendants made a series of materially false and misleading statements and omissions to investors, concerning: (1) avacopan's superior safety profile relative to steroid-based therapy based on achieving superiority in ADVOCATE's secondary endpoints, including significantly reducing glucocorticoid related illnesses and toxicities as measured by GTI, and having fewer adverse events; (2) avacopan's ability to more effectively bring patients into remission than steroid-based therapy based on achieving superiority in ADVOCATE's primary endpoint, BVAS; (3) avacopan's ability to be a monotherapy and replace the steroid-based standard of care based on ADVOCATE's results; and (4) ChemoCentryx's interactions with the FDA, including that the FDA had not expressed areas

of concern in their discussions about ADVOCATE or the FDA's review of avacopan's NDA.

> **A.      Defendants' False And Misleading Statements And Omissions Concerning ADVOCATE's Safety Results**

> **1.      ChemoCentryx's November 25, 2019 Announcement Of ADVOCATE's "Top Line" Results**

218.    After the market closed on November 25, 2019, ChemoCentryx issued a press release touting the "positive topline data from the pivotal Phase III ADVOCATE trial of avacopan."   In that press release, ChemoCentryx touted the supposed significant safety benefits associated with avacopan use versus steroid-based standard of care therapy in ADVOCATE. ChemoCentryx stated: "Importantly, subjects who received avacopan experienced additional benefits compared to those in the glucocorticoid [standard of care] control group. These benefits, assessed as pre-specified secondary endpoints, include: 1. Significant reduction in glucocorticoid-related toxicity. . . . [T]he Glucocorticoid Toxicity Index (GTI version 2), [showed a significant statistical advantage in] the avacopan therapy arm vs. the glucocorticoid" containing standard of care arm.

219.    ChemoCentryx's press release touted additional safety benefits supposedly associated with avacopan therapy, including improved kidney function and "an acceptable safety profile," notwithstanding the sick patient population.   The press release stated that, in ADVOCATE, avacopan demonstrated "[s]ignificant improvement in kidney function in patients with renal disease" and that "[t]he topline safety results revealed an acceptable safety profile in this serious and life-threatening disease, with fewer subjects having [serious adverse events] in the avacopan group than in the glucocorticoid [standard of care] control group."

220.    ChemoCentryx's November 25, 2019 press release quoted Schall's statements touting the ADVOCATE results as overwhelming evidence supporting avacopan's safety and efficacy:

> "These results exceed our expectations," said Thomas J. Schall, Ph.D., President and Chief Executive Officer of ChemoCentryx. "Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients. This day we have for the first time ***demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy;*** a therapy which the present findings ***may make***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

*obsolete*. Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that ***the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over."***

221.    Also after the market closed on November 25, 2019, ChemoCentryx held a conference call with investors to discuss the ADVOCATE results.  On that call, Schall touted ADVOCATE's GTI results, stating that, in ADVOCATE, avacopan "exhibited strong evidence for reducing the total burden of disease in ANCA vasculitis as exemplified by avacopan therapy's decreased rates of glucocorticoid toxicities relative to the standard of care."  Schall stated that one of the key "pillars" of ADVOCATE was "reducing steroid-related or glucose corticoid-related [glucocorticoid-related] toxicities."  In addition, Schall further trumpeted the empirical soundness of ADVOCATE's "very powerful" GTI results, stating that "GTI was developed to assess the comparative benefits, if you will, of new therapies against steroid eliminating or steroid sparing agents and with a very comprehensive spectrum of measurements throughout many organ systems of the body be able to score quantitatively the differences in treatment regimens."

222.    Likewise, on the Company's November 25, 2019 investor call, Schall also touted ADVOCATE's "quality of life" results as strong evidence of avacopan's safety benefits.  Schall stated that "avacopan therapy leads to improvement in health-related quality-of-life measurements using validated instruments and patient-reported outcomes."  Schall continued:

> Avacopan therapy was related with a statistically significant improvement in the majority of those categories as assessed by the validated quality of life instruments, the SF-36, and also was statistically significantly better in the EuroQOL-5D-5L . . . . [I]n fact we did not come up with a single measurement where avacopan did not score more highly in all of the measured domains, 10 of 10, for the categories – domains and categories of SF-36 at both weeks 26 and 52. So, it was 100% of the time a better score than the standard of care.

223.    Further Defendant Schall stated that avacopan's safety profile was "very acceptable," touting the "lower incidences of AEs [adverse events] in the ANCA patient population."

224.    Finally, in connection with ChemoCentryx's November 25, 2019 investor call, Defendants issued a presentation to investors touting ADVOCATE's safety results and stating that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   the trial provided "[c]ompelling evidence support[ing] avacopan's superior profile of therapy

2   versus glucocorticoid standard of care."  In that presentation, Defendants stated that avacopan was

3   associated with a "statistically significant reduction in steroid-related toxicit[ies]" and, again,

4   touted the empirical soundness of the GTI endpoint.  *See* Figure 9.

5

6   

7

8

9

10

11

12

13

14

15

16

17

18   **Figure 9.**   Slide from ChemoCentryx's November 25, 2019 investor presentation touting
     ADVOCATE's GTI results.

19

20          225.    In that same investor presentation, Defendants touted avacopan's "quality of life"

21   results in ADVOCATE, stating that avacopan was associated with "[s]tatistically significant

22   improvements seen in health-related quality of life in avacopan vs. glucocorticoid control (SF-36

23   v2 and EQ-5D-5L)."  *See* Figure 10.

24

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST





**Figure 10.** Slide from ChemoCentryx's November 25, 2019 investor presentation touting ADVOCATE's quality of life results.

226. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE and to state that the trial's "pre-specified secondary endpoints" showed a "[s]ignificant reduction in glucocorticoid-related toxicity" associated with avacopan; that avacopan "exhibited strong evidence for reducing the total burden of disease . . . as exemplified by" the GTI results; that GTI provided highly credible evidence of benefit through a "very comprehensive spectrum of measurements throughout many organ systems"; that "avacopan therapy leads to improvement in health-related quality-of-life measurements"; that avacopan patients experienced "[s]ignificant improvement in kidney function" in patients with renal disease; and that ADVOCATE's results "revealed an acceptable safety profile" for avacopan. Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements"; (2) ChemoCentryx failed to correct the results of these safety endpoints for multiplicity, as required by FDA guidance, and, when corrected, results

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

## 2.   December 4, 2019 Piper Jaffray Investor Conference

227.   On December 4, 2019, Defendant Schall attended the Piper Jaffray Healthcare Conference on behalf of ChemoCentryx.   At that conference, Defendant Schall touted ADVOCATE's GTI results as "irrefutable" evidence of avacopan's safety advantage.   Schall told investors that the "evidence [from ADVOCATE] is irrefutable by any metric we looked at, the glucocorticoid toxicities were dramatically reduced, so superior for avacopan therapy.   And again, that was a big deal. It's never been shown before in a clinical trial like that."

228.   At that same investors conference, Schall touted ADVOCATE's quality of life results as "superior" to standard of care.   Schall stated, "[Q]uality of life was superior with avacopan at all time points and in all categories measured in the SF36 and the EuroQOL, and statistically, quite statistically, superior in six of the ten major categories and domains of the SF36; again, never been shown before."

229.   Also at that December 4, 2019 investor conference, Schall touted avacopan's renal benefits, as supposedly demonstrated in ADVOCATE.   Schall stated, "And then finally and astonishingly, maybe the most astonishing finding of the study, renal function not only was stabilized with avacopan in the absence of the high doses of prednisone but improved, consistently and steadily improved over the 52 weeks. So, that you had not just the ability to arrest the decline of renal function, which, again, is a huge deal in this disease, but you have evidence for restoration or improvement."

230.   Defendants' statements were materially false and misleading when made.   It was

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

misleading for Schall to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that the trial provided "irrefutable" evidence that "glucocorticoid toxicities were dramatically reduced" with avacopan; that "quality of life was superior with avacopan at all time points and in all categories measured"; and that "renal function not only was stabilized with avacopan in the absence of the high doses of prednisone but improved, consistently and steadily improved over the 52 weeks," while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements," as well as warning ChemoCentryx that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) ChemoCentryx failed to correct the results of these safety endpoints for multiplicity, as required by FDA guidance, and, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 3.    January 15, 2020 JP Morgan Investor Conference

231.    On January 15, 2020, Defendant Schall attended the JP Morgan Health Care Conference on behalf of ChemoCentryx.   At that conference, Defendant Schall touted ADVOCATE's GTI results.   Schall stated that ADVOCATE provided ***"definitive evidence statistically that we were superior*** in reducing glucocorticoid-related toxicities using a ***newly-validated*** glucocorticoid toxicity index, which is a very comprehensive assessment of toxicities across the body. The higher the score, the worse the toxicities. You can see avacopan scores very

*considerably lower with highly significant P values."*

232.   Schall further trumpeted the supposed renal benefit associated with avacopan in ADVOCATE.  Schall stated, "Renal function as, in this case, the most important evidence of not just organ preservation, but maybe organ function, was really very gratifying. In patients with underlying renal disease . . . . We actually steadily improved renal function by – as measured by EGFR over time getting to about a 7.3 mil per minute improvement in EGFR over 52 weeks. . . . This was not only better than standard of care, it was *significantly superior than standard of care*. This kind of renal improvement, again I think is highly unusual, if not unprecedented in this setting."

233.   At that same conference, Schall also touted the trial's "validated" quality of life results.  Schall stated, "We also checked [the box] with quality of life. In all 10 of 10 measured domains and categories in the SF-36 at all time-points, Week 26 and 52, we were numerically superior in each and every instance with avacopan versus the active comparator control. And 6 of 10 of those categories we were statistically superior and you can see those listed here. . . . That was true also in the other validated instrument [EuroQOL]."  Schall continued:

> So, we really did sweep the board here. In all of the total spectrum, the total burden of disease, I think we've shown good evidence for clinical benefit. And that takes us to a new place both with regulators and thinking about the utility of this molecule, now of course we have to file the NDA, of course we have to get the label, but I think that it really does enhance the prospects for the value proposition for this particular drug in a very, very compelling way.

> So, summary, I think compelling evidence of superior profile of therapy of avacopan, full stop. I'm hoping for a good label. We'll see what the FDA says. We'll have the submission soon. But I think the regulatory path is clear and I think we know what we need to do in the marketplace.

234.   In connection with the January 15, 2020 investor conference, ChemoCentryx issued a presentation to investors.   In that presentation, ChemoCentryx stated that avacopan was associated with a "statistically significant reduction in steroid-related toxicity" and "eliminate[d] current therapy-induced illness."

235.   The presentation also touted ADVOCATE's quality of life results, stating that "ADVOCATE Demonstrates Improvements in Validated Health-Related Quality of Life Metrics"

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

with "Avacopan group scored higher in all (10 of 10) measured domains and categories of the SF-36 QOL instrument at both weeks 26 and 52" and "Avacopan group statistically significantly higher in a majority (6/10)" of the quality of life endpoints.

236.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE provided "definitive evidence statistically that [avacopan was] superior in reducing glucocorticoid-related toxicities"; that avacopan's GTI results were "considerably lower [than standard of care] with highly significant P values"; that avacopan was "superior" to standard of care with respect to ADVOCATE's quality of life endpoints; to trumpet GTI and quality of life as "validated" measures of clinical benefit; and to state that the renal benefit associated with avacopan in ADVOCATE was "significantly superior than standard of care."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "validated" endpoints that provided "definitive evidence" of clinical benefit, ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, as well as the agency's warning that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis"; (2) ChemoCentryx failed to correct the results of these safety endpoints for multiplicity, as required by FDA guidance, and, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

**4.    ChemoCentryx's March 10, 2020 Earnings Announcement For The Fourth Quarter And Full Year 2019**

237.    On March 10, 2020, ChemoCentryx issued a press release announcing the Company's fourth quarter and full-year 2019 financial results, and filed that press release with the SEC on Form 8-K.  In the press release, ChemoCentryx stated that "[t]he topline safety results [of ADVOCATE] revealed an acceptable safety profile in this serious and life-threatening disease with fewer subjects having serious after events in the avacopan group than in the glucocorticoid-containing standard of care."  The Company's press release further stated:

> Avacopan was shown to lower all four aspects of the total burden of disease: stopping active vasculitis; significantly lowering current therapy-induced illness, with a statistically significant reduction in the Glucocorticoid Toxicity Index (GTI) and other accepted assessments of glucocorticoid toxicity; significantly improving kidney function as evidenced by a marked improvement in Estimated Glomerular Filtration Rate, or eGFR; and statistically significant improvements in quality of life, assessed by the SF-36 QOL instrument and the EuroQOL-5D-5L instrument (Visual Analogue Scale and EQ Index).

238.    Also on March 10, 2020, ChemoCentryx reported its fourth quarter and full year 2019 financial results on Form 10-K, and filed that report with the SEC.  In that Form 10-K, the Company stated that "[t]he topline safety results [of ADVOCATE] revealed an acceptable safety profile in this serious and life-threatening disease, with fewer subjects having serious adverse events, or SAEs, in the avacopan group than in the" glucocorticoid-containing standard of care.

239.    ChemoCentryx's Form 10-K trumpeted ADVOCATE's safety results, stating that: "Subjects who received avacopan experienced additional benefits compared to those in the prednisone active comparator SOC control group. These benefits, assessed as pre-specified secondary endpoints, include . . . Significant reduction in glucocorticoid-related toxicity."  The Form 10-K continued, "In the Glucocorticoid Toxicity Index (GTI version 2), the avacopan therapy arm vs. the prednisone active comparator SOC control group was statistically significantly improved for [the] GTI Cumulative Worsening Score [and] The GTI Aggregate Improvement Score."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

240.    The Company's Form 10-K also touted ADVOCATE's renal results, stating that avacopan patients with renal disease experienced "[s]ignificant improvement in kidney function." The Form 10-K continued: "The avacopan group exhibited a statistically significant improvement in estimated glomerular filtration rate[, or] eGFR, from baseline to week 26 and to week 52 compared to the prednisone active comparator SOC control group . . . . Marked improvement in kidney function particularly in patients with a baseline eGFR of < 30 mL/min/1.73 m2. Those patients showed a mean improvement of 14 units at week 52 which was highly statistically significant (p < 0.01)."

241.    In addition, ChemoCentryx's Form 10-K highlighted ADVOCATE's quality of life results.  The Form 10-K stated that "[t]he avacopan group demonstrated statistically significant improvements in the majority of domains measured by the validated quality of life instrument SF-36 version 2 at week 26 and 52" and that "[t]he avacopan group reported statistically significantly better outcomes on the EuroQOL-5D-5L instrument (both Visual Analogue Scale and EQ Index)."

242.    Also on March 10, 2020, Defendants held an earnings call with investors to discuss ChemoCentryx's fourth quarter and full year results for 2019.  On that call, Schall told investors that ADVOCATE was a "stunning" result for avacopan and demonstrated "a wide range of other benefits with avacopan that were not seen with the incumbent standard of care."  Schall highlighted ADVOCATE's GTI results, emphasizing the soundness of the GTI endpoint as a measure of toxicity: "avacopan[] has achieved statistical superiority in reducing the illnesses that are associated with the use of steroids in the active comparator treatment, as compared -- or as measured, rather, by the Glucocorticoid Toxicity Index, a comprehensive quantitative scoring system developed by expert clinicians over the course of some years."

243.    Schall also touted ADVOCATE's renal results as demonstrating avacopan's safety.  Schall stated, "While our goal was originally to stabilize kidney function, to save the kidney, it looks as though with avacopan, kidney function actually improves."  Schall further stated that avacopan showed "statistically significant improvement over the active comparator in Estimated Glomerular Filtration Rate or eGFR."

244.    On that same March 10, 2020 earnings call, Schall told investors that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

ADVOCATE's results relating to quality of life endpoints, which were "validated by regulatory authorities," further demonstrated avacopan's excellent safety profile.  Schall stated that "avacopan therapy was numerically superior to the active comparator standard of care in all 10 of 10 [quality of life] measurements and at each of the time points measured while showing a statistically significant improvement in 6 of the 10 measurement categories assessed by the SF-36 validated quality of life instrument."  Schall also stated that "avacopan was also statistically significantly better in the European index EuroQOL-5D-5L," demonstrating "the ability to actually improve the quality of life over one year of treatment compared to a deterioration for those in the daily steroid containing active comparator arm, a remarkable change in how patients perceive and report their health with an instrument *validated by regulatory authorities.*"

245.    Finally, on the Company's March 10, 2020 earnings call, Schall stated that "[t]he top line safety results reveals an acceptable safety profile in the serious and life threatening disease with fewer subjects having serious adverse events in the avacopan group than in the daily steroid containing active competitor. Putting this all together, we believe avacopan has a very strong value proposition as it demonstrated progress in all four key elements of the total burden of a disease which leads thousands of lengthy two thousands of lengthy hospitalizations each and every year."

246.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE demonstrated "a statistically significant reduction in the Glucocorticoid Toxicity Index (GTI)," and to characterize GTI as an "accepted assessment[] of glucocorticoid toxicity"; that avacopan "significantly improv[ed] kidney function as evidenced by a marked improvement in Estimated Glomerular Filtration Rate, or eGFR"; that, in ADVOCATE, avacopan demonstrated "statistically significant improvements in quality of life, assessed by the SF-36 QOL instrument and the EuroQOL-5D-5L instrument," and that these endpoints were "validated by regulatory authorities"; that ADVOCATE's "top line safety results reveals an acceptable safety profile" for avacopan; and that avacopan "demonstrated progress in all four key elements of the total burden."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements." Indeed, far from being "accepted" endpoints that were "validated by regulatory authorities," ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, the agency's warning that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis," and the agency's warning that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) ChemoCentryx failed to correct the results of these safety endpoints for multiplicity, as required by FDA guidance, and, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 5. ChemoCentryx's May 11, 2020 Earnings Announcement For The First Quarter 2020

247.    On May 11, 2020, ChemoCentryx reported its first quarter 2020 financial results on Form 10-Q, and filed that form with the SEC. In its Form 10-Q, ChemoCentryx touted avacopan's superior safety profile as evidence by ADVOCATE's secondary endpoint results, including GTI, quality of life, and renal function: "Reduction in overall burden of disease management and improvement in quality of life was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone." In a press release issued on the same day,

ChemoCentryx further stated that ADVOCATE's "topline safety results revealed an acceptable safety profile in this serious and life-threatening disease with fewer subjects having serious after events in the avacopan group than in the glucocorticoid-containing standard of care."

248.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that in ADVOCATE, "[r]eduction in overall burden of disease management improvement in quality of life [for avacopan patients] was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone [i.e., GTI results]."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 6.    ChemoCentryx's June 11, 2020 Prospectus Filed In Connection With The June 2020 Offering

249.    In order to facilitate its $325 million June 2020 Offering, ChemoCentryx filed a prospectus supplement with the SEC on June 11, 2020.  ChemoCentryx's June 2020 prospectus

incorporated by reference all of the statements made in ChemoCentryx's 2019 Form 10-K identified in ¶¶ 238-41 and in its first quarter 2020 Form 10-Q identified in ¶ 247.

250.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE's "topline safety results reveal[] an acceptable safety profile" for avacopan; that patients on avacopan saw "[s]ignificant reduction in glucocorticoid-related toxicity"; that avacopan patients with renal disease experienced "[s]ignificant improvement in kidney function" and "statistically significant improvement in estimated glomerular filtration rate[, or] eGFR"; that avacopan patients saw "statistically significant improvements" in quality of life metrics, which were "validated," including SF36 version 2 and EuroQOL-5D-5L instruments; and that "[r]eduction in overall burden of disease management and improvement in quality of life [for avacopan patients] was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone [i.e., GTI results]."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "validated," ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the company chose "to pursue" the GTI endpoint, "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, the agency's warning that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis," and the agency's warning that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the

VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 7.    ChemoCentryx's July 9, 2020 Press Release

251.    In its July 9, 2020 press release announcing the Company's filing of the avacopan NDA, Defendants touted the ADVOCATE results as demonstrating avacopan's superior safety and providing strong support for the Company's application.  The press release stated, "The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial . . . .  In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group."

252.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE and the "support" they provided for the avacopan NDA, and to state that avacopan patients experienced "significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures"; and that "avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events," while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of

life measurements"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 8. ChemoCentryx's August 10, 2020 Earnings Announcement For The Second Quarter 2020

253.    On August 10, 2020, ChemoCentryx issued a press release announcing its second quarter 2020 financial results.  The Company's press release touted its filing of the avacopan NDA as a "Key Highlight" for the quarter, stating: "Filed the New Drug Application (NDA) for avacopan in the treatment of ANCA-associated vasculitis in July. The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial . . . . In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity [i.e., superior GTI results], greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group."

254.    On August 10, 2020, ChemoCentryx also reported its second quarter 2020 financial results on Form 10-Q, and filed that form with the SEC.  In its August 10, 2020 Form 10-Q, ChemoCentryx stated, "Reduction in overall burden of disease management and improvement in quality of life was also demonstrated [in ADVOCATE] through key secondary endpoints,

including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone. . . . Based on the success of the avacopan clinical studies in ANCA vasculitis, we filed an NDA with the FDA in July 2020."

255.    In addition, Defendants held an earnings call with investors on August 10, 2020 to discuss ChemoCentryx's second quarter results.  On that call, Schall also touted ADVOCATE's safety results as support for the avacopan NDA:

> Our applications to regulatory agencies and our preparations for the anticipated commercialization of avacopan are built upon the key findings in the ADVOCATE pivotal trial . . . . Too many ANCA patients experienced poor quality of life, feeling listless, ill and lacking in anything like normal vitality. From ADVOCATE, there was good news here, too. *A statistically significant improvement in clinically validated measurements of quality of life* on avacopan therapy. And overall, avacopan also *demonstrated a favorable safety result* in this serious and life-threatening disease with fewer subjects having *fewer numbers of serious adverse events in the avacopan group than in the steroid standard of care group*.

256.    Schall further stated on that earnings call that "the ADVOCATE findings demonstrate a compelling value proposition in terms [of] avacopan's potential to meet the four major unmet needs of ANCA vasculitis patients," including "a statistically significant improvement in the estimated glomerular filtration rate" and "statistically significant improvement in clinically validated measurements of quality of life on avacopan therapy."

257.    Schall also stated "even there in ANCA, [ADVOCATE] could show 40% fewer number of severe AEs in the avacopan group versus the prednisone standard of care group. So here [it] seems to be, at many levels, very good safety advantages to using avacopan."

258.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE and the "support" they provided for the avacopan NDA, and to state that avacopan patients experienced "significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures"; that "avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events"; and to tout ADVOCATE's "validated" quality of life results while failing to disclose that, in truth: (1) the

FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements." Indeed, far from being "validated," ChemoCentryx failed to heed the FDA's warning that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results. Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 9. August 11, 2020 BTIG Investor Conference

259.    On August 11, 2020, Defendant Schall attended the BTIG Virtual Biotechnology Conference on behalf of ChemoCentryx. At that conference, Schall touted ADVOCATE's GTI results, stating that ADVOCATE showed that avacopan could "reduce the many known effects of glucocorticoid illnesses and toxicities." Schall further stated that ADVOCATE showed avacopan could "improve [patients'] quality of life" and "improve . . .the critical organ functions such as in the kidney." Schall also stated:

> Importantly, we also showed that in addition to being able to eliminate these daily steroids that did correlate with a reduction, a meaningful and significant reduction in glucocorticoid related illnesses and toxicities.
>
> We had a fascinating improvement in renal function . . . . [W]e could increase renal function as measured by something called estimated glomerular filtration rate. And

in fact, those improvements were quite marked including in the people of the trial who had the worst kidney function coming in.

And then importantly validated quality of life metrics also statistically improved for these patients. I don't think that's ever been seen that improvement in quality of life has ever been seen in a Phase III trial of ANCA vasculitis before . . . . Patients seem to continue to do well. Their quality of life has continued, and increasing, it seems to be enhanced even over the 52 weeks.

260.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE's GTI results showed avacopan was associated with "a meaningful and significant reduction in glucocorticoid related illnesses and toxicities," that ADVOCATE's "validated quality of life metrics also statistically improved for [avacopan] patients" and that this improvement was unprecedented, and that renal function "improvements [for avacopan patients in ADVOCATE] were quite marked including in the people of the trial who had the worst kidney function coming in."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "validated," ChemoCentryx failed to heed the FDA's warning that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis" and that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results. Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

**10.     August 12, 2020 Canaccord Genuity Investor Conference**

261.    On August 12, 2020, Defendant Schall attended the Canaccord Genuity Growth Conference on behalf of ChemoCentryx.  During that conference, a securities analyst asked Schall "why you're so confident in that filing package and some of the data from ADVOCATE and the overall avacopan in ANCA-associated vasculitis program that gives you confidence in that submission?"  Schall responded by stating that ADVOCATE's safety endpoint results strong supported the avacopan NDA, including "statistically better" kidney function in avacopan patients and "marked improvements" in "quality of life" that the Company "measured using validated clinical instruments":

> So, it was notable that, on avacopan, we showed an increase in the estimated glomerular filtration rate, which was statistically better to the standard of care. And in fact, in those folks that had the worst kidney function – and all of these are, by the way, pre-specified analyses. Of those folks who've had the worst kidney function . . . . [w]e improved on avacopan their kidney function by about 14 ml per min over the 52 weeks of therapy. So, that was really quite a striking result. And for a nephrologist, one of the most dramatic results in the entire trial.
>
> I will say also that the quality of life that we measured using validated clinical instruments also improved substantially for these individuals. And that has many benefits and it's never been shown before that quality of life would improve in a significant way for ANCA vasculitis patients. So, again, across these four major burdens, active vasculitis, glucocorticoid-related illnesses, kidney function and quality of life, we actually showed marked improvements with the avacopan therapy. So, that's the clinical basis of the NDA.

262.    At that same conference, a securities analyst asked Schall about the "quality of life effect" observed in ADVOCATE and the "importance" of those results.  Schall stated that avacopan's supposedly superior quality of life results were "fundamentally important" and were "really going to have a big impact on the, I think, the value proposition" of avacopan.

263.    Defendant Schall also highlighted ADVOCATE's GTI results: "In addition, by

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    eliminating the need for the chronic steroids in the regimen, we could also show fundamentally

2    and significantly a lowering of the glucocorticoid-related illnesses and toxicities."

3         264.    Defendants' statements were materially false and misleading when made.  It was

4    misleading for Schall to tout the supposed significant safety benefits associated with avacopan in

5    ADVOCATE, to state that "quality of life that we measured using validated clinical instruments

6    also improved substantially for" avacopan patients; that these results were "fundamentally

7    important"; and to state that avacopan "showed an increase in the estimated glomerular filtration

8    rate, which was statistically better to the standard of care."  Defendants failed to disclose that, in

9    truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary

10   endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns

11   about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of

12   life measurements."  Indeed, far from being a "validated" and "fundamentally important" endpoint,

13   ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that

14   the Company had "not provided adequate data that either [quality of life] endpoint is a validated

15   measure in vasculitis" and that "[t]here does not appear to be adequate data to support the use of

16   [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA

17   warned ChemoCentryx that the Company had inappropriately failed to correct the results of these

18   safety endpoints for multiplicity, as required by agency guidance, calling into question the

19   "support" for the Company's "use of these endpoints" and the "interpretability of" their results.

20   Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the

21   VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients

22   experienced a greater incidence of serious adverse liver events that raised dire concerns about the

23   drug's safety, including an avacopan patient who met Hy's Law criteria and another who

24   experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned

25   ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide

26   meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of

27   treatment with glucocorticoids with potential toxicities with avacopan treatment represents a

28   clinical benefit to patients."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

**11.    September 15, 2020 H.C. Wainwright & Co. Investor Conference**

265.    On September 15, 2020, Defendant Schall attended the H.C. Wainwright & Co. Global Investment Conference on behalf of ChemoCentryx.  At that conference, Schall touted ADVOCATE's results as strong evidence that avacopan enhanced patient safety and quality of life, and reduced overall disease burden – a result Schall trumpeted as having "changed the landscape" for vasculitis treatment and "validated our entire approach."  Schall stated:

> It really changed the landscape in a number of ways, both for the company and in ANCA vasculitis. It really validated our entire approach at ChemoCentryx. It was the first time a single chemoattractant inhibitor for a very complex human condition was shown to be able to *derive clinical benefit across a number of endpoints in a trial*.

> What we tried to do with avacopan is address the total burden of disease across this spectrum . . . . *[W]e wanted to get rid of the steroids* and get rid of the steroid-induced illnesses which are many and are not captured in the vasculitis index . . . . So, we designed this trial called the ADVOCATE trial, a pivotal Phase III trial in ANCA vasculitis. Essentially, we took two arms in a double-blinded placebo-controlled double-dummy study and we gave one arm of *avacopan with no steroid, no prednisone*.

266.    At that investor conference, Schall trumpeted ADVOCATE's GTI results.  Schall stated, "[W]e also were able to reduce the number of prednisone and glucocorticoid-related toxicities" as measured by GTI, which Schall stated was a "meticulous systematic scoring system."  Schall touted these GTI results as "highly statistically significant" and critically important from a clinical standpoint:

> And particularly when you realize that we also were able to reduce the number of prednisone and glucocorticoid-related toxicities. Without going into the details, this is a scale, the higher the score, the worse the toxicities related to glucocorticoids with a very meticulous systematic scoring system.

> As you can see, the avacopan arm was better than the prednisone standard of care arm. Lower scores is a better result, highly statistically significant . . . . All of this adds up to the same message, if you're on avacopan therapy, you have far, far fewer steroid-related toxic events. And those are really significant kind of illnesses. So, to reduce this is huge. And probably the biggest thing that patients have on their mind.

267.    Schall also highlighted ADVOCATE's renal and quality of life results as evidence of avacopan's favorable safety profile: "And in addition to not just stopping the active vasculitis,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

eliminating or reducing the current glucocorticoid-related illnesses, and being able to stabilize indeed improved kidney function, we improved the quality of life as well in these patients. And again, that's not been seen in a Phase 3 trial for ANCA vasculitis."

268.   And, at the September 15, 2020 investor conference, Schall further stated:

So, across this entire spectrum of the disease in ANCA vasculitis, avacopan therapy seemed to show superior results to the standard of care or certainly in aggregate, a superior profile of therapy and it did so safely. *We had fewer adverse events and fewer serious adverse events, a very acceptable safety profile to go forward we believe and apply for approval in this indication*.

269.   Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE's GTI results showed avacopan "reduce[d] the number of prednisone and glucocorticoid-related toxicities"; that "if you're on avacopan therapy, you have far, far fewer steroid-related toxic events"; to tout those GTI results as the product of a "meticulous systematic scoring system" and "huge[ly]" important; to state that, in ADVOCATE, avacopan was "able to stabilize indeed improved kidney function" and quality of life; that avacopan demonstrated "clinical benefit across a number of endpoints" in ADVOCATE; and that the "very acceptable safety profile" in ADVOCATE supported avacopan's "approval in this indication."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being a "meticulous" endpoint, ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, as well as the agency's warning that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

"support" for the Company's "use of these endpoints" and the "interpretability of" their results. Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

270.    Defendants' statements touting ADVOCATE's design and stating that "we gave one arm of *avacopan with no steroid, no prednisone*" were further misleading because they failed to disclose that the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.

### 12.    September 17, 2020 Press Release

271.    ChemoCentryx's September 17, 2020 press release touting the FDA's acceptance of the avacopan NDA for review touted ADVOCATE's safety results as supporting the strength of the Company's application.  The press release stated, "The NDA included data from the global, Phase III ADVOCATE trial, . . . [in which] the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan

demonstrated favorable safety results, with fewer patients having serious adverse events in the avacopan group than in the prednisone group."

272.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE as supporting the strength of the avacopan NDA, and to state that "the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures," as well as, "favorable safety results, with fewer patients having serious adverse events," while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements," as well as warning ChemoCentryx that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

## 13.    ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020

273.    On November 9, 2020, ChemoCentryx reported its third quarter 2020 financial

1  results on Form 10-Q, and filed that form with the SEC.  In its Form 10-Q, ChemoCentryx stated

2  that, in ADVOCATE, "[r]eduction in overall burden of disease management and improvement in

3  quality of life was also demonstrated [with avacopan] through key secondary endpoints, including

4  improved kidney function and reduction of adverse events and illnesses associated with steroids,

5  such as prednisone."

6      274.    Defendants' statements were materially false and misleading when made.  It was

7  misleading for Defendants to tout the supposed significant safety benefits associated with

8  avacopan in ADVOCATE, and to state that "[r]eduction in overall burden of disease management

9  and improvement in quality of life was also demonstrated [with avacopan] through key secondary

10  endpoints, including improved kidney function and reduction of adverse events and illnesses

11  associated with steroids, such as prednisone," while failing to disclose that, in truth: (1) the FDA

12  repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private

13  meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and

14  interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life

15  measurements," as well as warning ChemoCentryx that "[t]here does not appear to be adequate

16  data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in

17  vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to

18  correct the results of these safety endpoints for multiplicity, as required by agency guidance,

19  calling into question the "support" for the Company's "use of these endpoints" and the

20  "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI

21  endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not

22  statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse

23  liver events that raised dire concerns about the drug's safety, including an avacopan patient who

24  met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with

25  avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked

26  adequate statistical power to provide meaningful evidence of safety, such that "it is not clear

27  whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities

28  with avacopan treatment represents a clinical benefit to patients."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

**14.    January 13, 2021 JP Morgan Investor Conference**

275.    On January 13, 2021, Defendant Schall attended the JP Morgan Healthcare Conference on behalf of ChemoCentryx.  At that conference, Schall touted ADVOCATE's GTI results, stating that "avacopan therapy was associated with statistically significant fewer steroid related toxicities."  Schall further stated, "Avacopan therapy also led to a significant improvement in kidney function versus the standard prednisone-based therapy. This is a finding of enormous patient benefit and large pharmacoeconomic implications."

276.    In the investor presentation ChemoCentryx issued in connection with the January 13, 2021 JP Morgan Healthcare Conference, Defendants told investors that ADVOCATE demonstrated that avacopan "[a]chieved [s]tatistical [s]ignificance" in "[r]educ[ing] current therapy-induced illness," as demonstrated by the "[r]eduction in Glucocorticoid Toxicity Index (GTI) and other accepted assessments of glucocorticoid toxicity" in the avacopan group.  The presentation further stated that ADVOCATE demonstrated that avacopan "[a]chieved [s]tatistical [s]ignificance" in "[i]mprov[ing] patient quality of life," with "[i]mproved quality of life as assessed by validated patient reported outcome instruments."

277.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that "avacopan therapy was associated with statistically significant fewer steroid related toxicities," as measured by GTI; that GTI was an "accepted assessment[] of glucocorticoid toxicity"; and that avacopoan "led to a significant improvement in kidney function" and "[i]mproved quality of life as assessed by validated patient reported outcome instruments."  Defendants failed to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "accepted" and "validated" endpoints, ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could

be used, that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis," and that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results. Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 15. ChemoCentryx's March 1, 2021 Earnings Announcement For The Fourth Quarter And Full Year 2020

278.   On March 1, 2021, ChemoCentryx reported its fourth quarter and full year 2020 financial results on Form 10-K, and filed that form with the SEC.  In its Form 10-K, ChemoCentryx touted ADVOCATE's GTI results, stating that avacopan:

> Significantly lowered glucocorticoid toxicity, with avacopan therapy 39.7 vs. 56.6 in the prednisone group in the Glucocorticoid Toxicity Index, or GTI, Cumulative Worsening Score with a difference between groups of −16.8 points (95% CI, −25.6 to −8.0), and 11.2 with avacopan therapy vs. 23.4 for the prednisone group in the GTI Aggregate Improvement Score, with a difference between groups of −12.1 points (95% CI, −21.1 to −3.2).

279.   The Form 10-K also highlighted ADVOCATE's renal results, stating that avacopan:

> Demonstrated greater improvement in kidney function, with a mean increase from baseline to week 52 in [estimated glomerular filtration rate] [(]eGFR[)] of 7.3 mL/min/1.73 m2 with avacopan therapy vs. an increase in eGFR of 4.1

mL/min/1.73 m2 in the prednisone group, and the difference between groups was 3.2 mL/min/1.73 m2 (95% CI, 0.3 to 6.1).

280.    Further, ChemoCentryx's Form 10-K trumpeted ADVOCATE's quality of life results, stating that avacopan:

Led to greater improvement in health-related quality of life, measured by the Short Form 36 [(SF-36)] version 2 and the EuroQOL-5D-5L instrument (both Visual Analogue Scale and EQ Index), compared to the prednisone group.

281.    The Form 10-K further stated:

Avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

282.    Finally, the Form 10-K touted ADVOCATE's safety and quality of life results in support of the Company's avacopan NDA: "Based on the success of the avacopan clinical studies in ANCA vasculitis, we filed an NDA with the FDA in July 2020, which is currently under review by the FDA."

283.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that avacopan "significantly lowered glucocorticoid toxicity," as measured by GTI; "[d]emonstrated greater improvement in kidney function," as measured by the trial's eGFR endpoints; "[l]ed to greater improvement in health-related quality of life"; "demonstrated favorable safety results . . . with fewer subjects having serious adverse events"; and that these "favorable" results supported the avacopan NDA, while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements," as well as warning ChemoCentryx that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to

correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 16.   March 9, 2021 H.C. Wainwright & Co. Investor Conference

284.   On March 9, 2021, Defendant Schall attended the H.C. Wainwright Global Life Science Conference on behalf of ChemoCentryx.  At that conference, Schall stated:

> In fact, the evidence from the ADVOCATE trials suggest that avacopan has the potential to change the treatment paradigm in ANCA vasculitis. . . . [B]y eliminating the need for daily prednisone, we reduce in a statistically significant way the steroid-related toxicities. And avacopan therapy also led to a significant improvement in kidney function versus standard prednisone-based therapy, a finding of enormous patient benefit and of pharmacoeconomic implications.

285.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that avacopan "significantly lowered glucocorticoid toxicity," as measured by GTI; "[d]emonstrated greater improvement in kidney function," as measured by the trial's eGFR endpoints; "[l]ed to greater improvement in health-related quality of life"; "demonstrated favorable safety results . . . with fewer subjects having serious adverse events"; and that these "favorable" results supported the avacopan NDA, while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of

life measurements," as well as warning ChemoCentryx that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

**17.    ChemoCentryx's April 14, 2021 Virtual R&D Day Investor Conference**

286.    On April 14, 2021, ChemoCentryx held its Virtual R&D Day investor conference, which Schall attended on the Company's behalf.  At that conference, Schall told investors that "[a]vacopan benefit risk profile is strong."  Schall further stated:

> They [FDA] want us to understand clinical efficacy and biometrics around both the primary and the secondary endpoints. And the secondary endpoints are important because they are, we believe, fundamentally, clinically relevant.

287.    Schall also stated:

> [W]e believe that the benefit risk profile for Avacopan is distinctly favorable in ANCA vasculitis . . . . In ADVOCATE trial, the number of serious hepatic function AEs was 9% or 5.4% in the Avacopan group versus 6% in the prednisone group. That is not a statistically significant difference, by the way, and as you can see the numbers are very small.

288.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with

avacopan in ADVOCATE, and to state that the "[a]vacopan benefit risk profile is strong" and "distinctly favorable," including with respect to hepatic safety; and that ADVOCATE's "secondary endpoints," including GTI and quality of life, were "fundamentally, clinically relevant," while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "fundamentally, clinically relevant," ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, and that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; and (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients."

### 18.    ChemoCentryx's April 29, 2021 Earnings Announcement For The First Quarter 2021

289.    On April 29, 2021, ChemoCentryx held an earnings call to announce its first quarter 2021 results.  During that call, Schall stated, "We believe that clinically meaningful primary and secondary endpoint signals consistently favor avacopan therapy."

290.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the supposed significant safety benefits associated with avacopan in ADVOCATE, and to state that ADVOCATE's secondary endpoints were "clinically meaningful" and "consistently favor[ed] avacopan therapy," while failing to disclose that, in truth: (1) the FDA repeatedly "raised concerns about [ADVOCATE's] proposed secondary endpoints" in private meetings with ChemoCentryx, including specifically "rais[ing] concerns about the use and interpretation of the Glucocorticoid Toxicity Index, and health-related quality of life measurements."  Indeed, far from being "clinically meaningful" ChemoCentryx failed to heed the FDA's warning (including at a meeting attended by Schall) that if the Company chose "to pursue" the GTI endpoint "the endpoint should be reviewed through the Clinical Outcome Assessment" program before it could be used, that the Company had "not provided adequate data that either [quality of life] endpoint is a validated measure in vasculitis," and that "[t]here does not appear to be adequate data to support the use of [ADVOCATE's renal] endpoints to support long-term outcomes in vasculitis"; (2) the FDA warned ChemoCentryx that the Company had inappropriately failed to correct the results of these safety endpoints for multiplicity, as required by agency guidance, calling into question the "support" for the Company's "use of these endpoints" and the "interpretability of" their results.  Indeed, when corrected, results on three of the four GTI endpoints – as well as results for all of the VDI, quality of life, and renal endpoints – are not statistically significant; (3) avacopan patients experienced a greater incidence of serious adverse liver events that raised dire concerns about the drug's safety, including an avacopan patient who met Hy's Law criteria and another who experienced hepatocellular injury after rechallenge with avacopan; (4) the FDA warned ChemoCentryx that the avacopan safety database lacked adequate statistical power to provide meaningful evidence of safety, such that "it is not clear whether replacing potential toxicities of treatment with glucocorticoids with potential toxicities with avacopan treatment represents a clinical benefit to patients"; and (5) the FDA had privately provided Defendants with the AdCom Briefing Book, which highlighted each of these issues and cast serious doubt on avacopan's approvability with the label the Company sought.

B.     **Defendants' False And Misleading Statements And Omissions That Avacopan Achieved ADVOCATE's BVAS Primary Endpoint And Demonstrated Superior BVAS Remission Versus Prednisone**

1.     **ChemoCentryx's   November   25,   2019   Announcement   Of ADVOCATE's "Top Line" Results**

291.   In its November 25, 2019 press release announcing the ADVOCATE results, ChemoCentryx stated that avacopan patients "met both of [ADVOCATE's] primary endpoints, disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS."  ChemoCentryx further stated in the press release that "[t]he pre-specified primary endpoints were remission of acute vasculitis activity at week 26 and sustained remission at week 52, where avacopan therapy was at least statistically non-inferior to the currently used glucocorticoid-containing standard of care (glucocorticoid SOC)."

292.   As alleged above, ChemoCentryx also held a November 25, 2019 call with investors to discuss the ADVOCATE results.  On that call, Schall stated that "avacopan successfully achieved its two primary endpoints as measured by BVAS, B-V-A-S, or the Birmingham Vasculitis Activity Score."  Schall added that avacopan "met the null hypothesis of statistical non-inferiority to the standard of care in terms of remission at week 26. . . . The p value for non-inferiority was highly significant, 0.0001."  Schall further stated that the ADVOCATE results were "highly statistically significant for superiority of avacopan at week 52 remission when compared to standard of care" and that "[a]vacopan therapy succeeded in demonstrating statistical superiority over the traditional standard of care therapy regimen in durable remission at week 52."

293.   In a ChemoCentryx investor presentation deck issued in connection with the November 25, 2019 investor call, Defendants stated that one of the "Key Take Home Messages" was that "ADVOCATE trial demonstrates avacopan's superiority over standard of care" because it "[f]ulfills pre-specified primary endpoint null hypothesis of statistical non-inferiority of remission of acute vasculitis at week 26 vs. standard of care" and "demonstrates 52 week sustained remission statistical superiority over standard of care."

294.   Defendants' statements were materially false and misleading when made.  It was misleading for ChemoCentryx to state that avacopan had achieved ADVOCATE's primary

endpoints of BVAS remission at weeks 26 and 52, that avacopan was "at least statistically non-inferior" to standard of care therapy with respect to both endpoints, and that "[a]vacopan therapy succeeded in demonstrating statistical superiority over the traditional standard of care therapy regimen in durable remission at week 52," while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids, and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy.

### 2.    December 4, 2019 Piper Jaffray Investor Conference

295.    At the December 4, 2019 Piper Jaffray Healthcare Conference, Schall told investors that ADVOCATE "showed" that "we could induce [vasculitis patients] into a remission as measured by something called the Birmingham Vasculitis Activity Score. We could get them there as well or better, numerically better, than the steroids at week 26, which is the first measured time point for that endpoint. And indeed, we were superior to the standard of care at 52 weeks of sustained remission. That's never been shown before and that was done with avacopan in the absence of these high chronic doses of steroids, so that was big deal."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

296.   Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's "BVAS" remission results and to state that, in ADVOCATE, avacopan induced BVAS remission "as well or better, numerically better, than the steroids at week 26" and "superior to the standard of care at 52," while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids, and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy.

### 3.   January 15, 2020 JP Morgan Investor Conference

297.   At the January 15, 2020 JP Morgan Health Care Conference, Schall purported to describe ADVOCATE's design and stated that avacopan patients were given only a "dummy prednisone" – i.e., placebo – course of therapy on top of avacopan and background immunosuppressants, without any "discretion" provided to treating physicians to deviate from this regime:

> [W]e have the active comparator standard of care control arm . . . . That is prednisone, methylprednisone, but mostly prednisone, oral prednisone plus X, where X is either cyclophosphamide or rituximab. And we compared that with

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

avacopan plus X, and **we give them a dummy prednisone course**. This is all kitted and protocolized. **There's no discretion and this is what the protocol dictates.**

298.     At that January 15, 2020 investor conference, Schall further touted the empirical soundness of ADVOCATE's non-inferiority endpoint, stating that ADVOCATE non-inferiority results are considered "a rousing success." Schall stated, "[T]he statistical null hypothesis of non-inferiority is **the standard** here . . . . So, we have non-inferiority at Week 26, then at Week 52 if we hit those two endpoints, **it would be a rousing success."** Schall further touted both the week 26 and week 52 efficacy results:

> Gratifyingly this trial turned out really well. We hit our primary endpoints that we were aspiring to hit. You can see we were numerically superior to the active comparator standard of care control arm at Week 26, 72% versus 70%, and that was highly statistically significantly non-inferior. When we looked at durable remission and remember you have to be at Week 26 remission to get to Week 52 durable remission, we were still about 66% remission on the avacopan arm, only about 55% in this control active comparator arm. That was not only non-inferior, it was as you can see highly significant for superiority. I have to say that probably exceeded our expectations and gratifyingly so, this has never been shown in a trial before for ANCA vasculitis.

299.     In a ChemoCentryx slide presentation issued to investors in connection with the January 15, 2020 investor conference, Defendants stated that at the 26 and 52 week endpoints, the avacopan group achieved, and sustained, "BVAS Remission."

300.     Defendants' statements were materially false and misleading when made. It was misleading for Defendant Schall to tout ADVOCATE's trial design and "BVAS remission" results, and to state that ADVOCATE compared standard of care treatment to avacopan patients who had received "dummy" steroids and that treating physicians had no "discretion" to deviate from this course of treatment; that ChemoCentryx met the "primary endpoints that we were aspiring to hit" in ADVOCATE; that ADVOCATE would be a "rousing success" if avacopan met the "standard" endpoint of non-inferiority and, indeed, avacopan "was highly statistically significantly non-inferior" to standard of care at week 26; and that avacopan's results were "highly significant for superiority" at week 52. Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and

grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids, and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy.

### 4.    February 26, 2020 SVB Leerink Investor Conference

301.    On February 26, 2020, Defendant Schall attended the SVB Leerink Global Healthcare Conference on behalf of ChemoCentryx.  At that conference, Schall stated, "[W]e were with our primary endpoints not just a numerically superior and statistically non-inferior at the two primary endpoint times 26-week and 52 weeks of durable therapy but we had a sustained remission superiority to the active comparator standard of care which is prednisone plus immunosuppressant. We were superior to that at the 52-week sustained remission time-point."

302.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's remission results and to state that avacopan "had a sustained remission superiority to the active comparator standard of care which is prednisone plus immunosuppressant," while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids, and had made

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly

2    warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan

3    could replace steroid-based standard of care therapy, and that superiority would be required

4    instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent

5    vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is

6    included, as required, avacopan achieved statistical superiority to standard of care at neither week

7    26 nor 52; (4) steroid use, including for the purpose of treating vasculitis, was widespread and

8    significant among avacopan patients and "was similar between the prednisone and avacopan

9    groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment

10    of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to

11    avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in

12    order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52

13    against the only subgroup of steroid patients actually receiving "standard of care" maintenance

14    therapy.

### 5. ChemoCentryx's March 10, 2020 Earnings Announcement For The Fourth Quarter And Full Year 2019

17       303.    In its March 10, 2020 press release announcing the Company's fourth quarter and

18    full year 2019 earnings results, Defendants stated that ChemoCentryx "[e]xceeded expectations

19    for avacopan with topline data from the ADVOCATE Phase III pivotal clinical trial announced in

20    the fourth quarter of 2019, which demonstrated avacopan's statistical superiority in sustaining

21    remission at 52 weeks over the prednisone-containing standard-of-care."  ChemoCentryx's press

22    release further stated, "In the pivotal Phase III ADVOCATE trial, avacopan demonstrated the

23    ability to induce vasculitis remission at 26 weeks and statistical superiority in sustaining vasculitis

24    remission at 52 weeks."

25       304.    In ChemoCentryx's March 10, 2020 Form 10-K, reporting its fourth quarter and

26    full-year 2019 financial results, ChemoCentryx stated that ADVOCATE had achieved both its

27    BVAS remission primary endpoints, touted the non-inferiority results as evidence of efficacy, and

28    trumpeted the trial's superiority results:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

The ADVOCATE trial compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care, or SOC. Subjects in both study arms received background therapy with rituximab or cyclophosphamide. The trial met both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve *disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group,* where BVAS remission was achieved in 72.3% of the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group (p<0.0001 for non-inferiority). *Sustained remission at 52 weeks* was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, *achieving both non-inferiority and superiority* to prednisone active comparator SOC (p=0.0066 for superiority of avacopan).

\*      \*      \*

The ADVOCATE study met both of its primary endpoints, disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by BVAS.

305.    ChemoCentryx further stated in its March 10, 2020 Form 10-K that steroids were "eliminated" in the avacopan arm in ADVOCATE.  The Form 10-K stated that ADVOCATE "included two treatment arms: the test arm contained 30 mg twice-daily oral doses of avacopan and *eliminated prednisone*, and the prednisone active comparator control arm contained an avacopan-matching placebo and maintained a standard regimen of high-dose chronic prednisone."

306.    As alleged above, ChemoCentryx also held its fourth quarter 2019 earnings call on March 10, 2020.  On that call, Schall touted ADVOCATE's supposedly "stunning" BVAS remission results:

[L]ast quarter in a stunning result for a pivotal Phase III clinical trial, top line data from the ADVOCATE study . . . revealed that *avacopan achieved superiority over the daily steroid containing active comparator standard of care therapy in sustaining remission in patients with ANCA-associated vasculitis* over 52 weeks of treatment, in addition to showing a wide range of other benefits with avacopan that were not seen with the incumbent standard of care.

\*      \*      \*

The result of the ADVOCATE trial surpassed all of our expectations and could mark a critical turning point in the treatment of this devastating, debilitating and life-threatening disease. . . . *avacopan is numerically superior and statistically*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

*non-inferior to the daily steroid containing active comparator at 26 weeks in achieving remission that is in stopping active vasculitis as measured by the Birmingham Vasculitis Activity Score or BVAS which was the tool used for the primary efficacy endpoints used in this trial.* After 52 weeks of treatment, the avacopan therapy sustained remission at a rate of 65.7% compared to 54.9% in the active comparator arm. Not only was this numerically and statistically non-inferior to the income and standard of care but *this result was highly statistically significant for the superiority of avacopan in terms of sustained remission after one year.*

307.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's trial design and its supposedly "stunning" "BVAS" remission results, and to state that ADVOCATE "eliminated prednisone" in the avacopan arm; that, in ADVOCATE, "avacopan demonstrated the ability to induce vasculitis remission at 26 weeks and statistical superiority in sustaining vasculitis remission at 52 weeks"; that ADVOCATE "met both of its primary endpoints," namely "disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score," while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids, and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup

of steroid patients actually receiving "standard of care" maintenance therapy.

**6.      ChemoCentryx's April 6, 2020 Proxy Statement**

308.    On April 6, 2020, ChemoCentryx issued a proxy statement in connection with its annual shareholder meeting, and filed that proxy statement with the SEC on Schedule 14A.  In the proxy statement, Defendants told investors that Schall had earned additional incentive compensation in connection with the apparent success of the ADVOCATE trial.  In particular, Defendants told investors that Schall was entitled to this incentive compensation because, among other things, avacopan had achieved "the study's primary endpoints demonstrating avacopan's statistical superiority in sustaining remission over the prednisone-containing standard of care."

309.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's remission results and to state that avacopan had achieved "the study's primary endpoints demonstrating avacopan's statistical superiority in sustaining remission over the prednisone-containing standard of care," while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups"

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx.

### 7.     ChemoCentryx's May 11, 2020 Earnings Announcement For The First Quarter 2020

310.    On May 11, 2020, ChemoCentryx issued a press release announcing the Company's first quarter 2020 financial results, and filed that press release with the SEC on Form 8-K.  In the press release, Defendants touted, among ChemoCentryx's key highlights, that the Company was "[o]n track to file the NDA for avacopan in the treatment of ANCA-associated vasculitis in mid-2020, following the ADVOCATE Phase III pivotal clinical trial, which demonstrated avacopan's statistical superiority in sustaining remission at 52 weeks over the prednisone-containing standard-of-care."

311.    As alleged above, on May 11, 2020, ChemoCentryx reported its financial results for the first quarter of 2020 and filed those results on Form 10-Q with the SEC.  In its Form 10-Q, ChemoCentryx stated that ADVOCATE:

> [M]et both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group, where BVAS remission was achieved in 72.3% of the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group (p<0.0001 for non-inferiority).  Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, achieving both non-inferiority and superiority to prednisone active comparator SOC (p=0.0066 for superiority of avacopan).

312.    In addition, Defendants held an earnings call with investors on May 11, 2020 to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

discuss ChemoCentryx's first quarter results.  On that call, Schall stated:

> Our dialogue with the FDA continues on track, and we are on schedule to file our NDA for avacopan mid this year. Our confidence that we will meet this target was high to start with and has grown with each week that passes. It is a confidence that is founded upon what we consider to be the superlative results achieved in the pivotal Phase III ADVOCATE clinical trial, in which avacopan demonstrated statistical superiority in sustained disease remission during one year of treatment versus the current steroid-containing standard of care group. This exceeded most expectations since the trial was not powered for superiority.

Schall added: "We have lots of people in a remitted state. . . . They are sustained in remission, sustained in remission at week 52 in a very statistically significantly superior way to the standard-of-care arm."

313.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's trial design, the trial's remission results, and the progress of avacopan NDA, and to state that ADVOCATE "met both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score"; that "BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group"; that "both non-inferiority and superiority to prednisone" were achieved at week 52; and that ChemoCentryx NDA filing was "on track" and proceeding as planned, while failing to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx.

### 8.    ChemoCentryx's June 11, 2020 Prospectus Filed In Connection With The June 2020 Offering

314.    As alleged above, ChemoCentryx filed a prospectus supplement with the SEC on June 11, 2020 to facilitate the June 2020 Offering.  ChemoCentryx's June 2020 prospectus incorporated by reference all of the statements made in ChemoCentryx's 2019 Form 10-K identified in ¶¶ 304-05 and in its first quarter 2020 Form 10-Q identified in ¶ 311.

315.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that ADVOCATE "met both of its primary endpoints, disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by BVAS"; that "BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group"; that "both non-inferiority and superiority to prednisone" were achieved at week 52; and that ADVOCATE "eliminated prednisone" in the avacopan arm. Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx.

### 9. ChemoCentryx's August 10, 2020 Earnings Announcement For The Second Quarter 2020

316.     As alleged above, on August 10, 2020, ChemoCentryx reported its financial results for the second quarter 2020 on Form 10-Q, and filed those results on Form 10-Q with the SEC.  In its Form 10-Q, ChemoCentryx stated that ADVOCATE:

> [M]et both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group, where BVAS remission was achieved in 72.3% of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, achieving both non-inferiority and superiority to prednisone active comparator SOC (p=0.0066 for superiority of avacopan).

317.    In addition, on ChemoCentryx's August 10, 2020 second quarter earnings call, Schall stated that during the last six months of ADVOCATE, avacopan had been administered as a "monotherapy" to patients assigned to the avacopan arm and that the trial's results "suggest that avacopan alone may suffice in controlling ANCA vasculitis":

There are some other subtle but notable findings from the ADVOCATE study. One of these, for example, is that patients on avacopan therapy performed very well in the second six months of the trial.

During this period, ***avacopan was essentially a monotherapy*** since the standard concomitant background therapies such as cyclophosphamide or rituximab have ceased. ***The data suggests that avacopan alone may suffice in controlling ANCA vasculitis over time***, perhaps without the need for repeated administrations of background immunosuppressant drugs such as rituximab.

318.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that ADVOCATE "met both of its primary endpoints"; "show[ed] that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score"; that "BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group"; that "both non-inferiority and superiority to prednisone" were achieved at week 52; and that during the last six months of ADVOCATE, avacopan had been administered as a "monotherapy" to patients assigned to the avacopan arm and that the trial's results "suggest that avacopan alone may suffice in controlling ANCA vasculitis." Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx.

### 10.   August 11, 2020 BTIG Investor Conference

319.    At the August 11, 2020 BTIG Virtual Biotechnology Conference, a securities analyst asked Schall, "You have also recently announced that the NDA for the FDA has been submitted. So, maybe if we can just briefly revisit what you showed in that Phase III and specifically what you anticipate in terms of responses from the FDA now that you've filed on the NDA front." In response, Schall touted ADVOCATE's BVAS remission results, telling investors that avacopan had brought vasculitis patients into remission without the need for steroids:

> [I]f you talk to patients and physicians, this steroid regimen, especially the chronic high-dose steroids, which are quite toxic is really something everyone would love to get rid of. So what we did is we took a two-arm study, and we said, ***let's do avacopan instead of the glucocorticoids, certainly, let's try to eliminate the need for daily steroids in this trial.*** So on one arm, we've had the standard the standard

of care therapy, the so called active comparator of glucocorticoid plus X where X is either cyclophosphamide or rituximab, and ***the other arm was no glucocorticoid***, it was avacopan plus the background X cyclophosphamide or rituximab.

\* \* \*

We brought people in to remission very well with the ANCA – I'm sorry, with the avacopan therapy. ***In the absence of chronic glucocorticoids, in fact, we were superior to the active comparator, traditional standard of care glucocorticoid plus X over 52 weeks, and keeping people in a durable remission with avacopan.***

\* \* \*

The trial was long enough and designed in such a way that in that second six months segment of the trial, weeks 26 to 52, ***avacopan was essentially used as monotherapy***. When we've set up the trial for example, rituximab which is a common background therapy, again, remember, glucocorticoid plus X is the standard of care where X is either cyclophosphamide, but increasingly in the modern era, it's rituximab . . . . That second six months, ***all folks were getting was avacopan***, they weren't getting additional rituximab. ***They weren't getting additional cyclophosphamide, et cetera***. And they were beautifully maintaining remission, with all of the other benefits I also alluded to. So, it begs the question, why would we give – again, why would we take people off of avacopan if they're doing well? And do we need to give them anything else or ***is monotherapy sufficient?***

320.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that avacopan "brought people in to remission very well" without the need for steroids; that, during the second six months of the trial, avacopan had been administered as a "monotherapy" to avacopan patients; and that the trial's results indicate that avacopan could be used as a monotherapy and replacement for steroid-based standard of care.  Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and

that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; and (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx.

**11.     August 12, 2020 Canaccord Genuity Investor Conference**

321.     At the August 12, 2020 Canaccord Genuity Growth Conference, a securities analyst asked Schall, "[Y]ou just filed your NDA pretty recently here. And so, could you just help us to understand why you're so confident in that filing package and some of the data from ADVOCATE and the overall avacopan in ANCA-associated vasculitis program that gives you confidence in that submission?" In response, Schall touted ADVOCATE's BVAS remission results, telling investors they showed the drug could induce remission without steroids:

> So, our trial, the ADVOCATE trial, really set out to test if avacopan could essentially be used and if we could ***get away from this need for chronic steroids in the therapy.*** And so, we ran a double-blind, double-dummy study which was two arms for 52 weeks where essentially ***avacopan was given again with standard background meds such cyclophosphamide or rituximab versus this, the active comparator standard of care which was the full dose of glucocorticoids, again given plus either cyclophosphamide or rituximab.*** And the results were pretty striking across that total burden of disease and constitute the clinical part of our new drug application. We were able to show that, in arresting the active vasculitis, ***we were actually superior to bringing people in remission using the index that***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    ***measures active vasculitis, maintaining them in remission superior to the
2    standard of care regimen over 52 weeks.***

3    322.    Schall also told investors that avacopan was associated with a significantly lower
4    relapse rate versus standard of care therapy in ADVOCATE:

> And of course, when we look at the fact that people also can look forward to fewer
> relapses, that was one of the interesting parts of the data set. ***There were
> significantly fewer relapses on avacopan than on the standard of care. And again,
> when I say standard of care, that's best medical practice right now.*** Avacopan
> therapy carried 54% less risk of relapse over that trial versus the prednisone group.
> And so, for a patient to think that they have less risks, they're living in less dread
> of relapse and having to go back to a more noxious therapy, I think that really is
> super important.

323.    Defendants' statements were materially false and misleading when made.  It was
misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and
to state that avacopan was "superior to [standard of care in] bringing people in remission using the
index that measures active vasculitis, maintaining them in remission superior to the standard of
care regimen over 52 weeks"; and that "[t]here were significantly fewer relapses on avacopan than
on the standard of care."  Defendants failed to disclose that, in truth: (1) the FDA told
ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and
grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids
(including restating those concerns at the March 2020 pre-NDA meeting and telling
ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had
made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had
repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that
avacopan could replace steroid-based standard of care therapy, and that superiority would be
required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent
vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is
included, as required, avacopan achieved statistical superiority to standard of care at neither week
26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in
ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting
regarding the "multiple interventions in the study," such as the "addition of avacopan on top of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

324.    Further, Defendants' statement that the standard of care represented "best medical practice right now" was misleading because it failed to disclose that rituximab patients were not receiving standard of care maintenance therapy, and that avacopan failed to achieve superiority when compared with patients who *did* receive standard of care maintenance.

### 12.    September 15, 2020 H.C. Wainwright Investor Conference

325.    At the September 15, 2020, H.C. Wainwright & Co. Global Investment Conference, Defendant Schall touted ADVOCATE's BVAS remission results at week 26 and 52 and told investors these results had been achieved "with no steroid, no prednisone":

> What we tried to do with avacopan is address the total burden of disease across this spectrum rather than just trying to arrest the signs of active vasculitis which is what current therapy does and that's really its only goal. And we measure that in clinical trials with something called the Birmingham Vasculitis Activity Score or BVAS. But rather than just trying to do that with avacopan, *we wanted to get rid of the steroids* and get rid of the steroid-induced illnesses which are many and are not captured in the vasculitis index . . . . So, we designed this trial called the ADVOCATE trial, a pivotal Phase III trial in ANCA vasculitis. *Essentially, we took two arms in a double-blinded placebo-controlled double-dummy study and we gave one arm of avacopan with no steroid, no prednisone.* They still got X in background or we gave them the normal therapy prednisone plus X without avacopan.
>
> The primary endpoint was the Birmingham Vasculitis Activity Score, both at weeks 26 and 52 . . . . *So, we demonstrated essentially superiority over the prednisone*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

*regimen. Over to today's best therapy, the current standard of care prednisone plus X, avacopan was actually numerically superior and certainly statistically non-inferior at week 26 at arresting the signs and symptoms of active vasculitis as assessed by BVAS.* And in fact, at week 52, avacopan was not just non-inferior which was the goal of the study to the active standard of care, but it was in fact *superior in maintaining people in a remitted state.*

326. Schall further stated that "in fact, relapse risk throughout the trial was significantly less with avacopan."

327. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that avacopan "demonstrated essentially superiority over the prednisone regimen" in ADVOCATE; to tout ADVOCATE's week 26 "non-inferiority" results and its week 52 "superiority" results; to state that the avacopan arm received "no steroid, no prednisone"; and to state that "relapse risk throughout the trial was significantly less with avacopan." Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

328.    Further, Defendants' statement that patients in the standard of care arm received "today's best therapy" was misleading because it failed to disclose that rituximab patients were not receiving standard of care maintenance therapy, and that avacopan failed to achieve superiority when compared with patients who *did* receive standard of care maintenance.

### 13.    ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020

329.    As alleged above, on November 9, 2020, ChemoCentryx reported its third quarter 2020 financial results on Form 10-Q, and filed that form with the SEC. In its Form 10-Q, ChemoCentryx stated that ADVOCATE:

> [M]et both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group, where BVAS remission was achieved in 72.3% of the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, achieving both non-inferiority and superiority to prednisone active comparator SOC (p=0.0066 for superiority of avacopan).

330.    ChemoCentryx's November 9, 2020 Form 10-Q further touted the Company's filing of the avacopan NDA based on ADVOCATE's supposed "success": "Based on the success

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

of the avacopan clinical studies in ANCA vasculitis, we filed an NDA with the FDA in July 2020."

331.    In addition, Defendants held an earnings call with investors on November 9, 2020 to discuss ChemoCentryx's third quarter results.  On that call, Schall touted the strength of the avacopan NDA, derived from the ADVOCATE results.  Schall stated, "[T]he cornerstone of our submission to the regulatory agencies has been the data from the pivotal Phase III ADVOCATE clinical trial, which demonstrated statistical superiority of the avacopan group and sustaining remission at 52 weeks compared to the prednisone group."

332.    On that same November 9, 2020 investor call, Schall touted the results of the subgroup of avacopan patients taking rituximab as strong evidence of avacopan's efficacy, and stated that these patients "were receiving in fact only avacopan essentially during the last 48 weeks of treatment":

> And the patients who received rituximab as background therapy seem to receive **extra benefit** as well . . . . [P]atients in the ADVOCATE trial, initially treated with avacopan and rituximab as a background medication, **were receiving in fact only avacopan essentially during the last 48 weeks of treatment, following their initial rituximab background medication dose**. In this stratum, patients who did not receive rituximab thereafter, that is after the first four weeks, indeed had a sustained remission rate at week 52, as alluded to by Professor Merkel in his presentation of 71% in the avacopan group, compared with 56% in the same comparator, the prednisone group that had rituximab as background therapy.

<p style="text-align:center">*       *       *</p>

> **So avacopan was kind of monotherapy, right?** They didn't get azathioprine or anything else after the ritux, and **people are really markedly in remission at the end of 52 weeks.**

333.    Likewise, on ChemoCentryx's November 9, 2020 investor call, Schall told investors that avacopan patients in ADVOCATE experienced significantly lower relapse rates than patients on standard of care therapy:

> [T]he more subtle and for me the more profound point is that, my goodness, when you look at the fact that avacopan not only had really just a general improvement in relapse risk – reducing relapse risk by some 54%, and those were two charts shown in these meetings as Kaplan-Meier graphs, where avacopan was clearly advantageous in the population.

334.    Defendants' statements were materially false and misleading when made.  It was

1   misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and

2   to state that ADVOCATE "met both of its primary endpoints"; "show[ed] that avacopan therapy

3   without the need for daily prednisone could achieve disease remission at 26 weeks and sustained

4   remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score"; that "BVAS

5   remission at week 26 in the avacopan treated subjects was numerically superior and statistically

6   non-inferior to" standard of care; that "both non-inferiority and superiority to prednisone" were

7   achieved at week 52; and that during the last six months of ADVOCATE, avacopan had been

8   administered as a "monotherapy" to avacopan patients; that avacopan "had really just a general

9   improvement in relapse risk" in ADVOCATE; and to tout the ADVOCATE results as the

10  "cornerstone" of the successful NDA filing.  Defendants failed to disclose that, in truth: (1) the

11  FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious

12  concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to

13  replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and

14  telling ChemoCentryx that the agency believed an AdCom "may be required" to address them),

15  and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA

16  had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate

17  that avacopan could replace steroid-based standard of care therapy, and that superiority would be

18  required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent

19  vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is

20  included, as required, avacopan achieved statistical superiority to standard of care at neither week

21  26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in

22  ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting

23  regarding the "multiple interventions in the study," such as the "addition of avacopan on top of

24  standard of care [steroids] in the second 6 months" of the trial) which was widespread and

25  significant and "was similar between the prednisone and avacopan groups" following the

26  conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members,

27  ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy,"

28  even if they required significant treatment with out-of-study steroids in order to manage their

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

**14.     January 13, 2021 JP Morgan Investor Conference**

335.     At the January 13, 2021 JP Morgan Healthcare Conference, Schall told investors that "avacopan doesn't just bring ANCA patients into remission by say months 6 or 12, avacopan keeps them in remission significantly better than standard prednisone based therapy thereby significantly lowering the risk of relapse in ANCA vasculitis. Now, this is important because every relapse carries with it some irreversible organ damage. And the evidence shows that daily dosing of avacopan is highly effective, indeed more effective than daily prednisone-based therapy at keeping patients from the otherwise debilitating and progressive effects of ANCA that can otherwise threaten their organs, such as the kidney or even their lives."

336.     At that investor conference, Schall further touted ADVOCATE's relapse results:

> *[L]et us be clear*, the evidence from the ADVOCATE trial overall strongly indicates that avacopan has the potential to change the treatment paradigm in ANCA vasculitis. As I mentioned, the need for daily prednisone therapy is eliminated [with avacopan], *yet symptomatic remission is as good or indeed superior with avacopan compared to prednisone therapy and people relapse significantly less*.

337.     Also at the investor conference, a securities analyst asked, "What does your market research suggests about chronic use of avacopan in AAV versus a dosing to remission, i.e. once you cut out the steroids, maybe you go on a lower priced product or for maintenance like RITUXAN or something, cyclophosphamide?"  In response, Schall touted avacopan's supposed relapse results in ADVOCATE:

> [T]he data from the ADVOCATE trial over one year of continuous dosing, those relapse curves are amazingly different. *Avacopan keeps people from relapsing at a much better rate than the standard of care*, the prednisone based therapy combined with cyclophosphamide or prednisone combined with rituximab. So *it's*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

***pretty clear*** that you can keep people in a lot more quiescent state and remember each relapse carries with it progressive and irreversible organ damage.

So there's a big benefit to patients from staying in remission and not relapsing. Avacopan has demonstrated that again in the longest ever blinded clinical trial in ANCA vasculitis. So there's real evidence there, right?

338.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that "avacopan doesn't just bring ANCA patients into remission by say months 6 or 12, avacopan keeps them in remission significantly better than standard prednisone based therapy thereby significantly lowering the risk of relapse in ANCA vasculitis"; that it was "clear" that "the evidence from the ADVOCATE trial overall strongly indicates that avacopan has the potential to change the treatment paradigm in ANCA vasculitis"; and that ADVOCATE made it "pretty clear" and provided "real evidence" that "[a]vacopan keeps people from relapsing at a much better rate than the standard of care."  Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the :addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

### 15.   ChemoCentryx's March 1, 2021 Earnings Announcement For The Fourth Quarter And Full Year 2020

339.    As alleged above, on March 1, 2021, ChemoCentryx reported its fourth quarter and full-year 2020 results on Form 10-K, and filed it with the SEC.  In that Form 10-K, ChemoCentryx stated:

> The ADVOCATE trial met both of its primary endpoints, demonstrating disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score (BVAS). Specifically, BVAS remission at week 26 was achieved in 72.3% of the avacopan treated patients vs. 70.1% of subjects in the prednisone group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone group, achieving both non-inferiority and superiority to the prednisone group (p=0.007 for superiority of avacopan).

340.    ChemoCentryx's March 1, 2021 Form 10-K further stated that, in ADVOCATE, avacopan "[r]educed the risk of vasculitis relapse by 54%; there was a 10.1% relapse rate in the avacopan group compared to 21.0% in the prednisone group."

341.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that ADVOCATE "met both of its primary endpoints, demonstrating disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score"; and that avacopan "[r]educed the risk of vasculitis relapse."  Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

### 16.    March 9, 2021 H.C. Wainwright Investor Conference

342.    At the March 9, 2021 H.C. Wainwright Global Life Science Conference, Schall stated that ADVOCATE showed that "symptomatic remission is as good or indeed superior with avacopan compared to the traditional prednisone-based therapy."  Defendant Schall also stated

1   that "avacopan doesn't just bring ANCA patients into remission by month 6 or 12, avacopan keeps

2   them in remission significantly better than standard prednisone-based therapy."

3        343.    Defendants' statements were materially false and misleading when made.  It was

4   misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and

5   to state that ADVOCATE showed that "symptomatic remission is as good or indeed superior with

6   avacopan compared to the traditional prednisone-based therapy"; and that "avacopan keeps

7   [patients] in remission significantly better than standard prednisone-based therapy."  Defendants

8   failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with

9   ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of

10  the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns

11  at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an

12  AdCom "may be required" to address them), and had made specific proposals regarding trial

13  design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-

14  inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard

15  of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported

16  BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's

17  prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved

18  statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed

19  concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including

20  expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in

21  the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6

22  months" of the trial) which was widespread and significant and "was similar between the

23  prednisone and avacopan groups" following the conclusion of the study-mandated prednisone

24  taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan

25  patients as "responders" to avacopan "monotherapy," even if they required significant treatment

26  with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at

27  neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard

28  of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private

- 148 -

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

**17.    ChemoCentryx's April 14, 2021 Virtual R&D Day Investor Conference**

344.    At ChemoCentryx's April 14, 2021 Virtual R&D Day conference, Schall stated, "We wanted to stop the active vasculitis from progressing, in fact, maybe even get it to regress without the need for daily prednisone. We measured that with something called the Birmingham Vasculitis Activity Score and we hit our primary endpoints in the Phase 3 pivotal trials."

345.    Also at the R&D Day investor conference, Schall touted avacopan's supposed benefit in ADVOCATE's rituximab subgroup, stating: "[I]t's pretty clear that Avacopan combined with rituximab is superior to sustaining remission to prednisone combined with rituximab." Schall continued, "This will be a lot of discussion will be around what happens, for example, can Avacopan be used as a monotherapy."  Schall repeated that ADVOCATE answered that question in the affirmative, stating ChemoCentryx "look[ed] at a second six months [in ADVOCATE] which is ***truly a placebo controlled trial.*** And when we do that, the Avacopan group was in remission . . . . 71% of the subjects versus the prednisone group had something like . . . 56% and it's highly superior for Avacopan. ***So, it demonstrates Avacopan's potential as a single-agent efficacy for sustaining remission potentially.***"

346.    At the R&D Day investor conference, Schall also touted avacopan's relapse results in ADVOCATE, stating that "the relapse rate was really quite reduced during the 52 weeks of treatment," with "[a]vacopan at a 54% relapse reduction risk versus prednisone."

347.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and to state that "[w]e measured [remission] with something called the Birmingham Vasculitis Activity Score and we hit our primary endpoints in the Phase 3 pivotal trials"; that "it's pretty clear that Avacopan combined with rituximab is superior to sustaining remission to prednisone combined with rituximab"; that the second six months of ADVOCATE was "truly a placebo controlled trial"

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

in the rituximab subgroup; that the data from this subgroup "demonstrates Avacopan's potential as a single-agent efficacy for sustaining remission potentially" and as a replacement for steroid-based standard of care; and that "the relapse rate was really quite reduced during the 52 weeks of treatment." Defendants failed to disclose that, in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required" to address them), and had made specific proposals regarding trial design that ChemoCentryx ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1
2
### 18.     ChemoCentryx's April 29, 2021 Earnings Announcement For The First Quarter 2021

3      348.     As alleged above, on April 29, 2021, Schall touted "[T]he potential for avacopan
4  to reduce the number of relapses which would reduce the risk of permanent organ damage and
5  reduce the cost of care."

6      349.     On that same call, Schall touted the results in the subgroup of ADVOCATE patients
7  treated with rituximab: "[A]pproximately two thirds of the total patients in ADVOCATE balanced
8  across both avacopan and placebo arms did not receive rituximab or another immunosuppressant
9  during the last 26 weeks of the ADVOCATE trial. Why this is important? Because, in effect, the
10  last 26 weeks in ADVOCATE allow for a glimpse of avacopan activity in a placebo-controlled,
11  blinded fashion for some 200 plus patients in that period of the trial. It showed avacopan's efficacy
12  in sustaining remission without the help of an immunosuppressant such as additional rituximab or
13  cyclophosphamide.  Could avacopan can be used as a monotherapy maintenance regimen[?] And
14  the answer is, well, this data suggests that it could."

15      350.     Defendants' statements were materially false and misleading when made.  It was
16  misleading for Defendants to tout ADVOCATE's "BVAS" remission results and trial design, and
17  to state that ADVOCATE showed avacopan's potential "to reduce the number of relapses"; that
18  the last 26 weeks of ADVOCATE were effectively "placebo-controlled" in the rituximab
19  subgroup; and that these data suggest "avacopan can be used as a monotherapy maintenance
20  regimen" and a replacement for steroid-based standard of care.  Defendants failed to disclose that,
21  in truth: (1) the FDA told ChemoCentryx it did "not agree" with ADVOCATE's design, had
22  expressed serious concerns and grave doubts about the adequacy of the trial to demonstrate
23  avacopan's ability to replace steroids (including restating those concerns at the March 2020 pre-
24  NDA meeting and telling ChemoCentryx that the agency believed an AdCom "may be required"
25  to address them), and had made specific proposals regarding trial design that ChemoCentryx
26  ignored; (2) the FDA had repeatedly warned ChemoCentryx that non-inferiority would be
27  inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy, and
28  that superiority would be required instead; (3) ChemoCentryx's reported BVAS remission results

failed to include persistent vasculitis, contrary to ADVOCATE's prespecified protocol, and, when persistent vasculitis is included, as required, avacopan achieved statistical superiority to standard of care at neither week 26 nor 52; (4) the FDA privately expressed concern to ChemoCentryx about steroid use in ADVOCATE's avacopan arm (including expressing concern at the March 2020 pre-NDA meeting regarding the "multiple interventions in the study," such as the "addition of avacopan on top of standard of care [steroids] in the second 6 months" of the trial) which was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease; (5) avacopan achieved superiority at neither week 26 nor 52 against the only subgroup of steroid patients actually receiving "standard of care" maintenance therapy – a subgroup the FDA had specifically highlighted in private meetings with ChemoCentryx; and (6) the FDA warned ChemoCentryx that ADVOCATE's relapse results were not supportive of efficacy because they were "condition[ed] on a post-randomization variable and in addition, the Agency did not agree that 'relapse' or 'minor flare' should only occur in patients after achieving remission."

C. **Defendants' False And Misleading Statements And Omissions About ADVOCATE's Design And Avacopan's Ability To Replace Steroid Therapy**

1. **ChemoCentryx's November 25, 2019 Announcement Of ADVOCATE's "Top Line" Results**

351. In its November 25, 2019 press release announcing the ADVOCATE results, ChemoCentryx purported to describe ADVOCATE's design, stating, "Eligible study subjects were randomized to receive avacopan plus either rituximab or cyclophosphamide (followed by azathioprine/mycophenolate) or prednisone plus either rituximab or cyclophosphamide (followed by azathioprine/mycophenolate)."

352. Likewise, on ChemoCentryx's November 25, 2019 call with investors announcing the ADVOCATE results, Schall stated that "the avacopan group is [achieving superior remission]

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   very rapidly without the steroid regimen."

2   353.    On that same investor call, an analyst asked Defendants, "Are we at a point yet

3   where we can say because of the superiority, don't use steroids in these patients."  In response,

4   Schall stated that ADVOCATE had taken "steroids out of the mix" for avacopan patients: "So,

5   what we tried to do in the test is *we simply took the steroids out of the mix* and we still used in

6   this trial the background therapy was rituximab or cyclophosphamide as if we were giving a steroid

7   instead of the avacopan."

8   354.    Defendants' statements were materially false and misleading when made.  It was

9   misleading for Defendants to state that the treatment provided to patients assigned to the avacopan

10  group in ADVOCATE consisted of "avacopan plus either rituximab or cyclophosphamide," and

11  that ADVOCATE "simply took the steroids out of the mix" for avacopan patients, while failing to

12  disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread

13  and significant among avacopan patients and "was similar between the prednisone and avacopan

14  groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment

15  of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to

16  avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in

17  order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the

18  FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of

19  avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose

20  glucocorticoids."

21          **2.      December 4, 2019 Piper Jaffray Investor Conference**

22  355.    At the December 4, 2019 Piper Jaffray Healthcare Conference, an analyst asked

23  Schall, "Does ADVOCATE support replacing steroids with avacopan in AAV patients?"  Schall

24  responded affirmatively: "Does the ADVOCATE trial provide evidence that steroids need not be

25  used when avacopan is available? I think in a word, yes, *resoundingly, yes*. I think that this may

26  be the beginning given the breadth of these results across all of these spectrum of total burden of

27  disease. This may be the beginning of the era where *steroids go by the way of dinosaur."*

28  356.    Defendants' statements were materially false and misleading when made.  It was

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

misleading for Schall to say that ADVOCATE "resoundingly" provided "evidence that steroids need not be used when avacopan" and that "steroids go by the way of dinosaur" as a treatment for vasculitis, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

357.    Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**3.    January 15, 2020 JP Morgan Investor Conference**

358.    At the January 15, 2020 JP Morgan Health Care Conference, Schall purported to describe ADVOCATE's design.  Schall stated:

> [W]e have the active comparator standard of care control arm . . . . That is prednisone, methylprednisone, but mostly prednisone, oral prednisone plus X, where X is either cyclophosphamide or rituximab. And we compared that with avacopan plus X, and *we give them a dummy prednisone course*. This is all kitted and protocolized. ***There's no discretion and this is what the protocol dictates.***

359.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's trial design and to state that ADVOCATE compared

standard of care treatment to avacopan patients who had received "dummy" steroids and that treating physicians had no "discretion" to deviate from this course of treatment, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease. Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

### 4. ChemoCentryx's March 10, 2020 Earnings Announcement For The Fourth Quarter And Full Year 2019

360. In ChemoCentryx's March 10, 2020 press release announcing the Company's fourth quarter and full-year 2019 financial results, the Company stated that ADVOCATE demonstrated "avacopan's statistical superiority in sustaining remission at 52 weeks over the prednisone-containing standard-of-care, eliminating the need for daily noxious steroids." The press release further stated, "The topline safety results revealed an acceptable safety profile in this serious and life-threatening disease with fewer subjects having serious after events in the avacopan group than in the glucocorticoid-containing standard of care."

361. As alleged above, on March 10, 2020, ChemoCentryx reported its fourth quarter and full-year 2019 financial results on Form 10-K and filed that form with the SEC. The Form 10-K stated, "The ADVOCATE trial compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care, or SOC. Subjects in both study arms received background therapy with rituximab or cyclophosphamide."

362. The Form 10-K further stated that ADVOCATE "included two treatment arms: the test arm contained 30 mg twice-daily oral doses of avacopan and *eliminated prednisone*, and the prednisone active comparator control arm contained an avacopan-matching placebo and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    maintained a standard regimen of high-dose chronic prednisone."

2         363.    Defendants' statements were materially false and misleading when made.  It was

3    misleading for Schall to tout ADVOCATE's design and to state that the trial's avacopan arm

4    "eliminated prednisone"; and to purport to describe the drug intervention provided to patients in

5    ADVOCATE, including that the "trial compared avacopan with the currently used glucocorticoid

6    (most commonly prednisone) active comparator containing standard of care," while failing to

7    disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread

8    and significant among avacopan patients and "was similar between the prednisone and avacopan

9    groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment

10   of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to

11   avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in

12   order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the

13   FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of

14   avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose

15   glucocorticoids."

16        364.    Defendants' statements were further misleading because they failed to disclose that

17   the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support

18   their claim that avacopan could replace steroids (including at meetings Schall personally attended).

19   The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for

20   glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar

21   efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is

22   likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that

23   "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

24        **5.    ChemoCentryx's April 6, 2020 Proxy Statement**

25        365.    As alleged above, on April 6, 2020, ChemoCentryx issued a proxy statement in

26   connection with its annual shareholder meeting, and filed that proxy statement with the SEC on

27   Schedule 14A.  In the proxy statement, Defendants touted avacopan's success over "prednisone-

28   containing standard of care" therapy.  Specifically the proxy touted "the successful outcome of the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

avacopan ADVOCATE Phase III pivotal trial in anti-neutrophil cytoplasmic auto-antibody associated vasculitis ("ANCA") in achieving the study's primary endpoints demonstrating avacopan's statistical superiority in sustaining remission over the ***prednisone-containing standard of care.***"

366.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's design and to tout avacopan's success versus ***"prednisone-containing*** standard of care," while failing to disclose that, in truth, not only was the treatment administered to avacopan patients also "prednisone-containing," such steroid use, including for the purpose of treating vasculitis, was widespread and significant and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

### 6.   ChemoCentryx's May 11, 2020 Earnings Announcement For The First Quarter 2020

367.   As alleged above, on May 11, 2020 ChemoCentryx issued a press release announcing its first quarter 2020 financial results.  In that press release, ChemoCentryx stated, "We at ChemoCentryx are entirely devoted to a different and, we believe, better approach: highly targeted, non-immunosuppressive medicines such as avacopan. ***Such medicines are entirely unlike the current immune-destroying regimen of high doses of prednisone*** combined with other immune system dampeners."

368.   As also alleged above, on May 11, 2020, ChemoCentryx reported its first quarter 2020 financial results on Form 10-Q, and filed that form with the SEC.  In the Form 10-Q, Defendants stated, "The ADVOCATE trial compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care, or

SOC. Subjects in both study arms received background therapy with rituximab or cyclophosphamide. The trial met both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS." The Company's Form 10-Q further stated that "avacopan treated subjects" had achieved efficacy results superior to those in "the prednisone active comparator SOC control group."

369.     Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's design and to state that avacopan was "entirely unlike the current immune-destroying regimen of high doses of prednisone"; that ADVOCATE "compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care"; and that results for "avacopan treated subjects" were superior to those achieved by "the prednisone active comparator" group, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

370.     Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended).  The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

"a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**7.    ChemoCentryx's June 11, 2020 Prospectus Filed In Connection With The June 2020 Offering**

371.    As alleged above, ChemoCentryx filed a prospectus supplement with the SEC on June 11, 2020 to facilitate the June 2020 Offering.  ChemoCentryx's June 2020 prospectus incorporated by reference all of the statements made in ChemoCentryx's 2019 Form 10-K identified in ¶¶ 361-62 and in its first quarter 2020 Form 10-Q identified in ¶ 368.

372.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that the trial's avacopan arm "eliminated prednisone"; to purport to describe the drug intervention provided to patients in ADVOCATE, including that the "trial compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care"; that ADVOCATE "compared avacopan with the currently used glucocorticoid (most commonly prednisone) active comparator containing standard of care"; and that results for "avacopan treated subjects" were superior to those achieved by "the prednisone active comparator" group, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

373.    Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**8.   ChemoCentryx's July 9, 2020 Press Release**

374.   In its July 9, 2020 press release announcing the Company's filing of the avacopan NDA, Defendants stated that ADVOCATE patients "were randomized to receive avacopan plus either rituximab or cyclophosphamide (followed by azathioprine/mycophenolate) or prednisone plus either rituximab or cyclophosphamide (followed by azathioprine/mycophenolate)." ChemoCentryx further stated that "the avacopan group" achieved superior remission, GTI, quality of life, and safety as "compared to the prednisone group."

375.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's design and to state that patients in the avacopan group "receive[d] avacopan plus either rituximab or cyclophosphamide"; and to describe the two study arms as "the avacopan group" and the "prednisone group," while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

376.   Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

### 9.    ChemoCentryx's August 10, 2020 Earnings Announcement For The Second Quarter 2020

377.    As alleged above, on August 10, 2020, ChemoCentryx announced its financial results for the second quarter 2020, including hosting an earnings call with investors to discuss those results.  On that earnings call, Schall stated that during the last six months of ADVOCATE, avacopan had been administered as a "monotherapy" to patients assigned to the avacopan arm and that the trial's results "suggest[] that avacopan alone may suffice in controlling ANCA vasculitis":

> There are some other subtle but notable findings from the ADVOCATE study. One of these, for example, is that patients on avacopan therapy performed very well in the second six months of the trial.
>
> During this period, ***avacopan was essentially a monotherapy*** since the standard concomitant background therapies such as cyclophosphamide or rituximab have ceased. ***The data suggests that avacopan alone may suffice in controlling ANCA vasculitis over time,*** perhaps without the need for repeated administrations of background immunosuppressant drugs such as rituximab.

378.    Schall further stated that ADVOCATE showed avacopan "eliminat[ed] the need for chronic steroid therapy" to treat vasculitis.

379.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's design and to state that "avacopan was essentially a monotherapy" during the second six months of ADVOCATE; that ADVOCATE indicated "avacopan alone may suffice in controlling ANCA vasculitis over time"; and that ADVOCATE showed avacopan "eliminat[ed] the need for chronic steroid therapy" to treat vasculitis, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   patients as "responders" to avacopan "monotherapy," even if they required significant treatment

2   with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid

3   use in the avacopan arm, the FDA explained that, contrary to Defendants' statements,

4   ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower

5   dose glucocorticoids vs. higher dose glucocorticoids."

6          380.    Defendants' statements were further misleading because they failed to disclose that

7   the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support

8   their claim that avacopan could replace steroids (including at meetings Schall personally attended).

9   The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for

10  glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar

11  efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is

12  likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that

13  "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

14              **10.    August 11, 2020 BTIG Investor Conference**

15         381.    At the August 11, 2020 BTIG Virtual Biotechnology Conference a securities

16  analyst asked Schall, "You have also recently announced that the NDA for the FDA has been

17  submitted. So, maybe if we can just briefly revisit what you showed in that Phase III and

18  specifically what you anticipate in terms of responses from the FDA now that you've filed on the

19  NDA front."  In response, Schall told investors that, in ADVOCATE, avacopan patients had

20  achieved remission without steroids, that the avacopan "arm was no glucocorticoid," and that, for

21  the last six months of the trial, "avacopan was essentially used as monotherapy. . . . [A]ll folks

22  were getting was avacopan":

23          [I]f you talk to patients and physicians, this steroid regimen, especially the chronic
            high-dose steroids, which are quite toxic is really something everyone would love
24          to get rid of. So what we did is we took a two-arm study, and we said, ***let's do***
            ***avacopan instead of the glucocorticoids, certainly, let's try to eliminate the need***
25          ***for daily steroids in this trial.*** So on one arm, we've had the standard the standard
            of care therapy, the so called active comparator of glucocorticoid plus X where X
26          is either cyclophosphamide or rituximab, and ***the other arm was no glucocorticoid***,
            it was avacopan plus the background X cyclophosphamide or rituximab.
27

28                                   *       *       *

1
2
3

We brought people in to remission very well with the ANCA – I'm sorry, with the avacopan therapy. ***In the absence of chronic glucocorticoids, in fact, we were superior to the active comparator, traditional standard of care glucocorticoid plus X over 52 weeks, and keeping people in a durable remission with avacopan***.

4

\*    \*    \*

5
6
7
8
9
10
11
12

The trial was long enough and designed in such a way that in that second six months segment of the trial, weeks 26 to 52, ***avacopan was essentially used as monotherapy***. When we've set up the trial for example, rituximab which is a common background therapy, again, remember, glucocorticoid plus X is the standard of care where X is either cyclophosphamide, but increasingly in the modern era, it's rituximab . . . . That second six months, ***all folks were getting was avacopan***, they weren't getting additional rituximab. ***They weren't getting additional cyclophosphamide, et cetera***. And they were beautifully maintaining remission, with all of the other benefits I also alluded to. So, it begs the question, why would we give – again, why would we take people off of avacopan if they're doing well? And do we need to give them anything else or ***is monotherapy sufficient?***

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

382.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that avacopan patients had achieved remission without steroids, that the avacopan "arm was no glucocorticoid," that, for the last six months of the trial, "avacopan was essentially used as monotherapy . . . . [A]ll folks were getting was avacopan . . . . [a]nd they were beautifully maintaining remission," and that the ADVOCATE results offered evidence that avacopan as a "monotherapy [was] sufficient" to manage vasculitis, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

28

383.    Defendants' statements were further misleading because they failed to disclose that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons." Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**11.   August 12, 2020 Canaccord Genuity Investor Conference**

384.   At the August 12, 2020 Canaccord Genuity Growth Conference, Schall purported to describe ADVOCATE's design:

> So, our trial, the ADVOCATE trial, really set out to test if avacopan could essentially be used and if we could ***get away from this need for chronic steroids in the therapy.*** And so, we ran a double-blind, double-dummy study which was two arms for 52 weeks where essentially ***avacopan was given again with standard background meds such cyclophosphamide or rituximab versus this, the active comparator standard of care which was the full dose of glucocorticoids, again given plus either cyclophosphamide or rituximab.***

385.   Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that ADVOCATE was designed to test whether avacopan could allow patients to "get away from this need for chronic steroids in the therapy"; and that, in the avacopan arm, "avacopan was given again with standard background meds such cyclophosphamide or rituximab," while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

386.    Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**12.    September 15, 2020 H.C. Wainwright Investor Conference**

387.    At the September 15, 2020 H.C. Wainwright & Co. Global Investment Conference Schall told investors that, in ADVOCATE, avacopan patients achieved remission "with no steroid, no prednisone":

> [W]ith avacopan, *we wanted to get rid of the steroids* and get rid of the steroid-induced illnesses which are many and are not captured in the vasculitis index . . . . So, we designed this trial called the ADVOCATE trial, a pivotal Phase III trial in ANCA vasculitis. *Essentially, we took two arms in a double-blinded placebo-controlled double-dummy study and we gave one arm of avacopan with no steroid, no prednisone.* They still got X in background or we gave them the normal therapy prednisone plus X without avacopan.

388.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that ADVOCATE was designed to test whether avacopan could allow patients to "get rid of the steroids"; and that avacopan patients received "no steroid, no prednisone," while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan

plus lower dose glucocorticoids vs. higher dose glucocorticoids."

389.     Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

### 13.     ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020

390.     As alleged above, on November 9, 2020, ChemoCentryx announced its financial results for the third quarter 2020, including hosting an earnings call with investors to discuss those results.  On that earnings call, Schall touted the results of the subgroup of avacopan patients taking rituximab as strong evidence of avacopan's efficacy, and stated that these patients "were receiving in fact only avacopan essentially during the last 48 weeks of treatment":

> And the patients who received rituximab as background therapy seem to receive ***extra benefit*** as well . . . . [P]atients in the ADVOCATE trial, initially treated with avacopan and rituximab as a background medication, ***were receiving in fact only avacopan essentially during the last 48 weeks of treatment, following their initial rituximab background medication dose***. In this stratum, patients who did not receive rituximab thereafter, that is after the first four weeks, indeed had a sustained remission rate at week 52, as alluded to by Professor Merkel in his presentation of 71% in the avacopan group, compared with 56% in the same comparator, the prednisone group that had rituximab as background therapy.
>
> *          *          *
>
> ***So avacopan was kind of monotherapy, right?*** They didn't get azathioprine or anything else after the ritux, and ***people are really markedly in remission at the end of 52 weeks***.

391.     Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that avacopan patients in the rituximab subgroup "were receiving in fact only avacopan essentially during the last 48 weeks of

treatment"; and that, even though "avacopan was kind of monotherapy" for these patients, they were "really markedly in remission at the end of 52 weeks," while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

392.   Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

### 14.   ChemoCentryx's March 1, 2021 Earnings Announcement For The Fourth Quarter And Full Year 2020

393.   As alleged above, on March 1, 2021, ChemoCentryx reported its fourth quarter and full-year 2020 financial results on Form 10-K and filed that form with the SEC.  The Form 10-K stated that, in ADVOCATE, "[e]ligible patients were randomized to receive either 30 mg twice-daily oral doses of avacopan or a standard regimen of high-dose chronic prednisone.  In addition, all patients received standard background therapy of either: (a) rituximab for 4 weeks; or (b) cyclophosphamide for 13 weeks followed by azathioprine/mycophenolate, evenly balanced between the avacopan and prednisone groups."

394.   In addition, Defendants held an earnings call with investors to discuss

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

ChemoCentryx's fourth quarter and full-year results for 2020 on March 1, 2021.  On that call, Defendant Schall stated that the ADVOCATE trial demonstrated that avacopan "eliminat[es] the need for daily oral prednisone."

395.    Also during that same earnings call, and in response to an analyst question, Schall reassured investors that avacopan patients' prednisone use in ADVOCATE was largely limited to "piggyback prednisone that comes in with concomitant dosing with rituximab, for example, that was not insignificant, the balance between the two arms, of course. When people come in [and are first enrolled into the trial], in crisis, they can get bolus IV prednisone. And they did in our trial, again balance between the two arms before they were randomized. And so, that had to be tapered . . . . *So there is piggyback prednisone, but, again balanced between both groups.*"

396.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's design and to state that "[e]ligible patients were randomized to receive either 30 mg twice-daily oral doses of avacopan or a standard regimen of high-dose chronic prednisone"; and that steroid use in the avacopan group was essentially limited to "piggyback prednisone" – either for "concomitant dosing with rituximab" or tapering of pre-enrollment treatment – that was "balance[d] between the two arms," while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper; that 64% of avacopan patients were prescribed prednisone specifically because steroids were needed to treat and control their vasculitis *during the trial* – not simply as a taper for pre-trial treatment; that steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms during the second half of the study (after the protocol-mandated taper in the standard of care arm had concluded and long after any pre-randomization treatment had ceased); and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

397.    Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

### 15.    March 3, 2021 Raymond James Institutional Investors Conference

398.    On March 3, 2021, Defendant Schall attended the Raymond James Institutional Investors Conference on behalf of ChemoCentryx.  At that conference, Defendant Schall told investors:

> We have what I call in this trial inevitably piggyback prednisone . . . . totally balanced between the two groups, people who got IV glucocorticoid *prior to randomization* [i.e., prior to the start of the trial], they are tapering off in the first four weeks to get to zero. So that's one source of the piggyback prednisone. Another source is really important people forget. One of the background medications is rituximab . . . . With rituximab, [steroids are] normally given concomitantly . . . . So those are sources of piggyback prednisone, if I will, piggyback glucocorticoid. And *so that's why you still have some*.

399.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to state that the prednisone that the avacopan patients received was merely "piggyback prednisone" as either a taper for steroid treatment that was administered "prior to randomization" or as merely routine coadministration with rituximab, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper; that 64% of avacopan patients were prescribed prednisone specifically because steroids were needed to treat and control

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

their vasculitis *during the trial* – not simply as a taper for pre-trial treatment; that steroid use for the purpose of treating worsening or persistent vasculitis, or for maintaining remission, was essentially equal between the two study arms during the second half of the study (after the protocol-mandated taper in the standard of care arm had concluded and long after any pre-randomization treatment had ceased); and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

400.    Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids.  However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

### 16.    ChemoCentryx's April 29, 2021 Earnings Announcement For the First Quarter 2021

401.    As alleged above, on April 29, 2021, ChemoCentryx announced its financial results for the first quarter 2021, including hosting an earnings call with investors to discuss those results. On that earnings call, Schall stated that "avacopan [is] a potential monotherapy for non-severe disease helping to prevent longer term relapse."

402.    On that same call, an analyst asked Schall, "[C]ould you maybe walk us through how you think about avacopan fitting in with the current standard of care, and how it compares to the current standard of care?" Schall responded, "Could avacopan can be used as a monotherapy maintenance regimen[?] ***And the answer is, well, this data suggests that it could.***"

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

403.   Defendants' statements were materially false and misleading when made.  It was misleading for Schall to tout ADVOCATE's design and to state that ADVOCATE provided evidence that avacopan could induce remission as a "monotherapy" and replace the steroid-based standard of care, while failing to disclose that, in truth, steroid use, including for the purpose of treating vasculitis, was widespread and significant among avacopan patients and "was similar between the prednisone and avacopan groups" following the conclusion of the study-mandated prednisone taper, and, to the astonishment of AdCom members, ChemoCentryx counted remitted avacopan patients as "responders" to avacopan "monotherapy," even if they required significant treatment with out-of-study steroids in order to manage their disease.  Indeed, given the widespread steroid use in the avacopan arm, the FDA explained that, contrary to Defendants' statements, ADVOCATE was "not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids."

404.   Defendants' statements were further misleading because they failed to disclose that the FDA had privately warned ChemoCentryx that ADVOCATE was likely inadequate to support their claim that avacopan could replace steroids (including at meetings Schall personally attended). The FDA told ChemoCentryx, for instance, "[Y]ou have argued that, as replacement for glucocorticoids, CCX168 [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study [ADVOCATE] is likely not adequate to support such safety comparisons."  Likewise, the FDA told Defendants that "a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids."

**D.     Defendants' False And Misleading Statements And Omissions Concerning The Avacopan NDA And ChemoCentryx's Communications With The FDA**

**1.     ChemoCentryx's November 25, 2019 Announcement Of ADVOCATE's "Top Line" Results**

405.   On ChemoCentryx's November 25, 2019 investor call announcing the ADVOCATE results, Schall touted the Company's "potential path to regulatory approval" based on the ADVOCATE results:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

[W]e've met our primary endpoints. We've shown evidence of glucocorticoid-related toxicity reductions with avacopan. We seem to be improving quality of life and there's evidence even for renal improvement. And I will say I mentioned as well safety seems to be very acceptable . . . . ***Obviously, we have a potential path to regulatory approval as I've just laid out with some of the qualities that I've shown you from the ADVOCATE data set.***

406.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the ADVOCATE data as providing ChemoCentryx with an "obvious[] potential path to regulatory approval," while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

## 2.    January 15, 2020 JP Morgan Investor Conference

407.    At the January 15, 2020 JP Morgan Health Care Conference, after touting avacopan's safety and efficacy results (including BVAS remission, GTI, quality of life, and others), Schall stated that the ADVOCATE trial provided "compelling evidence of superior profile of therapy of avacopan, ***full stop,***" strongly supporting approval of the avacopan NDA and

"clear[ing]" the "regulatory path" for the drug:

> *So, we really did sweep the board here*. In all of the total spectrum, the total burden of disease, I think we've shown good evidence for clinical benefit. And *that takes us to a new place both with regulators* and thinking about the utility of this molecule, now of course we have to file the NDA, of course we have to get the label, but I think that it really does enhance the prospects for the value proposition for this particular drug in a very, very compelling way.
>
> So, summary, I think compelling evidence of superior profile of therapy of avacopan, *full stop.* I'm hoping for a good label. We'll see what the FDA says. We'll have the submission soon. But *I think the regulatory path is clear* and I think we know what we need to do in the marketplace.

408.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE as supporting the Company's avacopan NDA and to state that the ADVOCATE results "takes us to a new place both with regulators"; provides "compelling evidence of superior profile of therapy of avacopan, full stop"; and makes "the regulatory path [] clear," while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

lacked adequate statistical power to provide meaningful evidence of safety.

### 3. ChemoCentryx's May 11, 2020 Earnings Announcement For The First Quarter 2020

409.   As alleged above, on May 11, 2020 ChemoCentryx issued a press release announcing its first quarter 2020 financial results.  In that press release, ChemoCentryx stated, "We at ChemoCentryx are entirely devoted to a different and, we believe, better approach: highly targeted, non-immunosuppressive medicines such as avacopan. Such medicines are entirely unlike the current immune-destroying regimen of high doses of prednisone combined with other immune system dampeners. Our mission at ChemoCentryx continues with increased urgency. *We are actively preparing our NDA submission to the FDA following the positive results of the Phase III ADVOCATE trial of avacopan for the treatment of ANCA vasculitis."*

410.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ADVOCATE's "positive results" as supporting the Company's avacopan NDA, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

**4.      ChemoCentryx's July 9, 2020 Press Release**

411.    In its July 9, 2020 press release announcing the Company's filing of the avacopan NDA, Defendants touted the ADVOCATE results as the foundation of the Company's application:

> ***The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial***, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

412.    The Company's press release further quoted Schall as stating, "'We have achieved a ***major landmark*** for ChemoCentryx with the submission of the NDA for avacopan in ANCA-associated vasculitis following our ***highly successful*** Phase III ADVOCATE trial.'"

413.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that the "Company's NDA submission is supported by the [ADVOCATE] results"; and to tout the NDA as "a major landmark" supported by the "highly successful" ADVOCATE trial, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

**5.   ChemoCentryx's August 10, 2020 Earnings Announcement For The Second Quarter 2020**

414.   As alleged above, on August 10, 2020 ChemoCentryx issued a press release announcing its second quarter 2020 financial results.  In that press release, ChemoCentryx touted the avacopan NDA filing as a "Key Highlight" and stated that the application was "supported by" the supposedly successful ADVOCATE results:

> Key Highlights
>
> Filed the New Drug Application (NDA) for avacopan in the treatment of ANCA-associated vasculitis in July. ***The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial***, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

415.   Also on August 10, 2020, ChemoCentryx reported its second quarter 2020 financial results on Form 10-Q, and filed that Form 10-Q with the SEC.  In its Form 10-Q, after touting the ADVOCATE results, ChemoCentryx stated, "In July 2020, we submitted a New Drug Application, or NDA, to the U.S. Food and Drug Administration, or FDA, for avacopan for the treatment of ANCA vasculitis in the United States. . . . Based on the success of the avacopan clinical studies in ANCA vasculitis, we filed an NDA with the FDA in July 2020."

416.   On the Company's August 10, 2020 second quarter earnings call, Schall again touted ADVOCATE as the foundation of the avacopan NDA: "In early July as shown on slide 4

we submitted our new drug application to the FDA for avacopan in the treatment of patients with ANCA-associated vasculitis. . . . Our applications to regulatory agencies and our preparations for the anticipated commercialization of avacopan are built upon the key findings in the ADVOCATE pivotal trial."

417.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout "the success of" ADVOCATE as "support[ing]" the Company's avacopan NDA, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

**6.    August 11, 2020 BTIG Investor Conference**

418.    At the August 11, 2020 BTIG Virtual Biotechnology Conference, an analyst asked Schall, "[S]pecifically what you anticipate in terms of responses from the FDA now that you've filed on the NDA front[?]"  Schall touted the avacopan NDA as "a great achievement" that was amply supported by the "stunning results" of the ADVOCATE trial:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

***This NDA filing I think was a great achievement.*** The data, the clinical data that led to that new drug application filing, as you mentioned, came from a Phase III pivotal trial called the ADVOCATE trial . . . . We brought people in to remission very well with [] avacopan therapy . . . . [W]e also showed . . . a meaningful and significant reduction in glucocorticoid related illnesses and toxicities.  And then importantly validated quality of life metrics also statistically improved for these patients . . . . So, ***a lot of stunning results that was the clinical basis of the NDA that went in.***

419.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the avacopan NDA as "a great achievement" and that ADVOCATE's "stunning results" provided a strong "clinical basis" for the application, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

### 7.    August 12, 2020 Canaccord Genuity Investor Conference

420.    At the August 12, 2020 Canaccord Genuity Growth Conference, an analyst asked

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

Schall, "You talked about you just filed your NDA pretty recently here. And so, could you just help us to understand why you're so confident in that filing package and some of the data from ADVOCATE and the overall avacopan in ANCA-associated vasculitis program that gives you confidence in that submission?"  Schall told investors that the strength of the ADVOCATE results gave ChemoCentryx confidence in the avacopan NDA: "[T]he [ADVOCATE] results were pretty striking across that total burden of disease and constitute the clinical part of our new drug application . . . . [A]cross these four major burdens, active vasculitis, glucocorticoid-related illnesses, kidney function and quality of life, we actually showed marked improvements with the avacopan therapy. So, that's the clinical basis of the NDA."

421.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to state that ADVOCATE's "striking result[s]" gave ChemoCentryx "confidence" in the avacopan NDA, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

8.      **ChemoCentryx's November 9, 2020 Earnings Announcement For The Third Quarter 2020**

422.    During ChemoCentryx's November 9, 2020 third quarter 2020 earnings call, Schall stated, "As many of you know, the cornerstone of our submission to the regulatory agencies has been the data from the pivotal Phase III ADVOCATE clinical trial, which demonstrated statistical superiority of the avacopan group and sustaining remission at 52 weeks compared to the prednisone group."

423.    On that same call, a securities analyst asked Schall, "[G]ive us a little bit of color around your NDA acceptance for avacopan? Did the FDA indicate any review issues and is there any update around the agency's view around at AdCom? It's a question that keeps coming up in our discussion."  Schall assured investors that the FDA's review of the avacopan NDA was proceeding successfully, that "all" of the Company's interactions with the FDA in connection with the avacopan NDA had been "straightforward," and that the agency had raised no serious or unexpected issues that might jeopardize approval:

> *All of our interactions* with the agency so far, again without going into any real detail because we are under review, but to my mind have been *straightforward and expected*. And I think we have ready access and have had ready access to all the answers so far for the queries. So I have not seen, personally, anything unusual or anything that again we did not fundamentally anticipate and for which we've been, quite frankly, ready. So I think it's going forward in a very reasonable, straightforward, logical way.

424.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to state that "all" of the Company's interactions with the FDA in connection with the avacopan NDA had been "straightforward and expected" and "very reasonable," and that he had not seen "anything unusual" in ChemoCentryx's discussions with the agency, while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern,

raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

### 9.   January 13, 2021 JP Morgan Investor Conference

425.    At the January 13, 2021 JP Morgan Healthcare Conference, an investor attending the conference asked Schall, "[A]re you preparing for an AdCom and what is the latest communication from FDA on this topic?"  In reply, Schall stated, "I think AdComs are the default position. So yes, we're planning on an AdCom, we're preparing for an AdCom. ***FDA has not highlighted any particular issues that would have to be discussed at AdCom*** but we're really doing a lot of intense preparation."

426.    In response to another investor question about the progress of the FDA's review of the avacopan NDA, Schall stated, "[T]he review process in our opinion is going in a ***very straightforward, routine manner*** and I think the questions and answers we've provided in a timely fashion are again quite expected for this kind of application. So, ***nothing extraordinary*** to report at this point."

427.    Defendants' statements were materially false and misleading when made.  It was misleading for Schall to state that the "FDA has not highlighted any particular issues that would have to be discussed at AdCom"; that the review process was "going in a very straightforward routine manner" and as "expected"; and that there was "nothing extraordinary to report at this

point," while failing to disclose that the FDA had repeatedly warned Defendants that glaring flaws in ADVOCATE's design and deficiencies in its results cast serious doubt on the study's ability to demonstrate avacopan's safety and efficacy, and to support the label the Company sought.  As alleged above, in multiple private communications with ChemoCentryx, both before and during the Class Period (including meetings Schall personally attended), the FDA "identified several areas of concern, raising uncertainties about the interpretability of [the ADVOCATE] data and the clinical meaningfulness of these results," including, (1) that ADVOCATE "was not designed to assess whether replacing potential toxicity of treatment with GC with potential toxicities with avacopan represents a clinical benefit to patients"; (2) that "a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids," casting doubt on the Company's critical week 26 results; (3) raising "concerns about the proposed secondary endpoints," including relapse, GTI, and quality of life results, with respect to both the meaningfulness of the instruments and ChemoCentryx's failure to correct the results for multiple testing; (4) that steroid use in the avacopan arm raised grave concerns about the meaningfulness of the results; (5) that ADVOCATE's rituximab and cyclophosphamide subgroup data undermined its claims; and (6) that the avacopan safety database was small and lacked adequate statistical power to provide meaningful evidence of safety.

428.    Moreover, totally contrary to Schall's statement that the "FDA has not highlighted any particular issues that would have to be discussed at AdCom," the FDA had warned ChemoCentryx nearly a year earlier that "external input may be required in the interpretation of the clinical benefits of the avacopan program," citing numerous issues, including the use of steroids in the avacopan group, on which the agency contemplated AdCom discussion.

## VII.    LOSS CAUSATION

429.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.  Throughout the Class Period, ChemoCentryx's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created false impressions concerning: (1) the design and results of the ADVOCATE trial; (2) the safety and efficacy of avacopan; and (3) ChemoCentryx's

interactions with the FDA relating to the ADVOCATE trial and the avacopan NDA.  As a result of Defendants' materially false and misleading statements and omissions, the market price of ChemoCentryx's common stock was inflated throughout the Class Period.

430.    The artificial inflation in ChemoCentryx's stock price was removed when the facts, risks, and conditions concealed from investors by Defendants' material misstatements and omissions were revealed to the market and/or materialized on May 4, 2021 and May 6, 2021.

431.    *First*, on May 4, 2021, the FDA published the AdCom Materials, which revealed, among other things, that: (1) the FDA had repeatedly warned Defendants that the secondary endpoint results – including relapse, renal, and GTI results – did not provide empirically meaningful evidence of avacopan's safety and efficacy, and, at best, were merely exploratory; (2) that the FDA had, on multiple occasions, warned ChemoCentryx that statistical non-inferiority would be inadequate to demonstrate that avacopan could replace steroid-based standard of care therapy; (3) contrary to Defendants' statements, the FDA found that there was "no evidence of clinically meaningful treatment effect [of avacopan] in the cyclophosphamide induction subgroup"; (4) non-study supplied steroid use was widespread among avacopan patients, including to control and treat their vasculitis, but such patients were nevertheless counted as "responders" to avacopan, confounding study interpretation; and (5) avacopan was associated with serious adverse liver events in ADVOCATE, including an adverse event meeting Hy's Law criteria for drug-induced liver injury and a hepatocellular injury with increased liver enzymes after rechallenge with avacopan.

432.    On this news, the price of ChemoCentryx common stock fell more than 45%, from $48.82 per share on May 3, 2021 to $26.63 per share on May 4, 2021, on unusually high trading volume.

433.    Investors and analysts were shocked and troubled by these disclosures.  H.C. Wainwright analysts reported that "[t]he FDA briefing documents released on Tuesday were surprisingly unfavorable to the Phase 3 ADVOCATE trial," while SVB Leerink called the briefing documents "surprisingly critical" on May 4, 2021.  J.P. Morgan analysts stated, "FDA AdComm Documents Worse Than Expected" and "without a doubt concerning."

434.   Analysts and market commentators were also shocked that Defendants had apparently concealed highly negative FDA feedback it had received, which contrasted starkly with their Class Period statements to investors.  For example, the FDA's response also "[came] as a particular surprise" to analysts at SVB Leerink, who reported on May 4, 2021 that they found it "problematic" that the FDA believed Defendants "did not incorporate all of the FDA's requests and recommendations in the company's development program," specifically citing ChemoCentryx's three meetings and "pre-submission communications" with the FDA.  As these analysts explained, "FDA briefing docs suggest that the agency has had reservations about various aspects of CCXI's proposed development plan for avacopan for some time."

435.   **Second**, on May 6, 2021, while trading of ChemoCentryx stock was halted, the FDA held the Advisory Committee Meeting.  Information disclosed during the AdCom Meeting revealed important details about the ADVOCATE results and also allowed investors to appreciate the significance of the previously concealed facts discussed in the FDA Briefing Materials, including, among other things: (1) avacopan had failed to achieve statistically superior remission against patients who received maintenance therapy and that the administration of such therapy was truly standard of care, including at the time the trial was designed; (2) undertreatment of the steroid-plus-rituximab group significantly undermined Defendants' claims that avacopan was steroid-sparing because rituximab patients would have received a lower glucocorticoid load under standard of care therapy; (3) results on ADVOCATE's secondary safety endpoints, even if they had not been statistically infirm, were, overwhelmingly, too small to be meaningful to clinicians; (4) that ADVOCATE "cannot answer [the] question" of whether avacopan can provide maintenance therapy; (5) ChemoCentryx's failure to score persistent vasculitis in assessing BVAS remission was a "clearly significant issue" that "makes [the claimed superiority result at 52 weeks] not a hard outcome that one can put weight on for superiority"; (6) that nominal differences in dosage did not allay concerns that use of steroids to control disease in the avacopan arm confounded results since "many of us have used in clinical practice low doses of steroids to keep people in remission, or theoretically to keep them in remission," and that, in any event, ChemoCentryx's reported results underreported the true magnitude of steroid treatment; (7) that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

avacopan patients who received significant steroid dosing were still considered "responders" to avacopan; (8) that the adverse liver events that had been concealed from investors were highly unusual and deeply troubling; and (9) owing to the facts Defendants had concealed from investors, ADVOCATE had not established avacopan's safety and efficacy consistent with the broad label ChemoCentryx sought.

436.    On this news, the price of ChemoCentryx common stock fell approximately 62%, from $27.49 per share on May 6, 2021 to $10.46 per share on May 7, 2021, on unusually high trading volume.

437.    In all, disclosures of the true facts concerning avacopan and ADVOCATE caused massive losses to investors, with ChemoCentryx shares falling nearly 79% from $48.82 at the close of trading on May 3, 2021 to $10.46 at the close of trading on May 7, 2021.

438.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of ChemoCentryx's common stock.  It was also foreseeable to Defendants that the revelation of the truth about avacopan and ADVOCATE would cause the price of the Company's common stock to decline as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

439.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.  The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

440.    To the extent that any of Defendants' alleged false and misleading Class Period statements are considered forward-looking (which they should not be), ChemoCentryx's "Safe Harbor" warnings accompanying those statements were ineffective to shield those statements from liability.

441.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, the speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized and/or approved by an executive officer of ChemoCentryx who knew that the statement was false or misleading when made.

## IX.    THE PRESUMPTION OF RELIANCE

442.    The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for ChemoCentryx's common stock was efficient for the following reasons, among others:

      a.    ChemoCentryx's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

      b.    ChemoCentryx's common stock traded at high weekly volumes;

      c.    As a regulated issuer, ChemoCentryx filed periodic reports with the SEC;

      d.    ChemoCentryx was eligible to and did file registration statements with the SEC on Form S-3;

      e.    ChemoCentryx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

      f.    ChemoCentryx was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to those brokerage firm(s)' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace; and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1    g.   There was a cause and effect relationship between unexpected corporate

2         events or financial releases and movements in ChemoCentryx's stock price.

3    443.   As a result of the foregoing, the market for ChemoCentryx's common stock

4    reasonably promptly digested current information regarding ChemoCentryx from all publicly

5    available sources and reflected such information in the price of ChemoCentryx's common stock

6    during the Class Period.  Under these circumstances, all purchasers of ChemoCentryx common

7    stock during the Class Period suffered similar injury through their purchase of ChemoCentryx

8    common stock at artificially inflated prices, and a presumption of reliance applies.

9    444.   A Class-wide presumption of reliance is also appropriate in this action under the

10   United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

11   128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because

12   this action involves Defendants' failure to disclose material adverse information regarding

13   ChemoCentryx's business – information that Defendants were obligated to disclose – positive

14   proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld

15   be material in the sense that a reasonable investor might have considered them important in making

16   investment decisions.  Given the importance of the FDA's approval of avacopan and the impact

17   the FDA's denial could have on the Company's future revenue, that requirement is satisfied here.

18   **X.   CLASS ACTION ALLEGATIONS**

19   445.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

20   Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired the

21   common stock of ChemoCentryx during the Class Period, and who were damaged thereby (the

22   "Class").  Excluded from the Class are Defendants and their immediate families, the officers and

23   directors of the Company at all relevant times, members of their immediate families, and

24   Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants

25   have or had a controlling interest.

26   446.   The members of the Class are so numerous that joinder of all members is

27   impracticable.  Throughout the Class Period, ChemoCentryx shares were actively traded on the

28   NASDAQ Stock Market.  As of March 31, 2021, there were approximately 69.7 million shares of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

ChemoCentryx common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the Class.  Class members who purchased ChemoCentryx common stock may be identified from records maintained by ChemoCentryx or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.  Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

447.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

448.    Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.  Lead Plaintiff has no interest that conflicts with the interests of the Class.

449.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

      a.    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

      b.    whether Defendant Schall is personally liable for the alleged misrepresentations and omissions described herein;

      c.    whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

      d.    whether the members of the Class have sustained damages, and the proper measure of damages.

450.    A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

451.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

452.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase ChemoCentryx common stock at artificially inflated prices.

453.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ChemoCentryx common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

454.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

455.    During the Class Period, Defendants made the false statements specified above, which they knew, or were deliberately reckless in not knowing, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

456.    Defendants had actual knowledge of the misrepresentations and omissions of

- 189 -

material fact set forth herein, or were deliberately reckless in not knowing the true facts that were available to them.  Defendants engaged in this misconduct to conceal ChemoCentryx's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

457.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ChemoCentryx's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for ChemoCentryx's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

458.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

459.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendant Schall)**

460.   Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

461.   Defendant Schall acted as a controlling person of ChemoCentryx within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

462.   By reason of his high-level position of control and authority as the Company's most senior officer, Defendant Schall had the authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Defendant Schall was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by ChemoCentryx during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

material facts as alleged herein.   Indeed, Defendant Schall was virtually the exclusive ChemoCentryx officer who communicated with investors on earnings calls and at investor conferences on the Company's behalf.  Defendant Schall was provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

463.    Defendant Schall spoke to investors on behalf of the Company during the Class Period.  Therefore, Defendant Schall was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by ChemoCentryx during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

464.    As set forth above, ChemoCentryx violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

465.    By virtue of his position as a controlling person of ChemoCentryx and as a result of his own aforementioned conduct, Defendant Schall is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired ChemoCentryx securities. As detailed above, during all relevant times, Defendant Schall served as the President and CEO of ChemoCentryx.

466.    As a direct and proximate result of Defendant Schall's conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of ChemoCentryx common stock.

### COUNT III

**For Violations of Section 10(b) and Section 20A of the Exchange Act
and Rule 10b-5 Promulgated Thereunder For Insider Trading
(Against Defendant Schall)**

467.    This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class who purchased shares of

ChemoCentryx common stock contemporaneously with the sale of ChemoCentryx common stock by Defendant Schall while he was in possession of material, nonpublic information as alleged herein, including concerning ChemoCentryx's ADVOCATE study and the communications with the FDA concerning avacopan.

468.   Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class."

469.   As set forth herein, Defendant Schall violated Exchange Act Section 10(b), Rule 10b-5, and Section 20(a) for the reasons stated in Counts I and II above.  Additionally, Defendant Schall further violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of ChemoCentryx common stock while in possession of material, nonpublic adverse information concerning ChemoCentryx's ADVOCATE study and the communications with the FDA concerning its design, which information he had a duty to disclose, and which he failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

470.   Contemporaneously with Defendant Schall's sale of 900,000 shares of ChemoCentryx common stock during the Class Period (for proceeds of more than $40 million), Lead Plaintiff purchased over 96,800 shares of ChemoCentryx common stock during the Class Period, on a national securities exchange, while Defendant Schall was in possession of material, nonpublic information he had a duty to disclose, but failed to disclose, as alleged herein, including information concerning ChemoCentryx's ADVOCATE study and the communications with the FDA concerning avacopan.

471.   Other Class members also purchased shares of ChemoCentryx common stock contemporaneously with Defendant Schall's sales of ChemoCentryx common stock.

472.   Lead Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

473.    By reason of the violations of the Exchange Act alleged herein, Defendant Schall is liable to Lead Plaintiff and other members of the Class who purchased shares of ChemoCentryx common stock contemporaneously with Defendant Schall's sale of ChemoCentryx common stock during the Class Period.

474.    Lead Plaintiff and the other members of the Class who purchased contemporaneously with Defendant Schall's sales of ChemoCentryx common stock sales seek disgorgement by Defendant Schall of profits gained or losses avoided from his transactions in ChemoCentryx common stock contemporaneous with Lead Plaintiff and other members of the Class.

475.    This action was brought within five years after the date of the last transaction that is the subject of the Defendant Schall's violations of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by Defendant Schall.

## XII.    PRAYER FOR RELIEF

476.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

   a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

   b.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

   d.    Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XIII.    JURY DEMAND

477.    Lead Plaintiff hereby demands a trial by jury.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST

1   DATED: March 28, 2022                    **BERNSTEIN LITOWITZ BERGER**
2                                               **& GROSSMANN LLP**

3                                            _/s/  Abe Alexander_
                                             Salvatore Graziano (admitted _pro hac vice_)
4                                             (salvatore@blbglaw.com)
                                             Abe Alexander (admitted _pro hac vice_)
5                                             (abe.alexander@blbglaw.com)
                                             Yando Peralta (admitted _pro hac vice_)
6                                             (yando.peralta@blbglaw.com)
                                             1251 Avenue of the Americas
7                                             New York, New York  10020
                                             Tel: (212) 554-1400
8                                             Fax: (212) 554-1444

9                                             _-and-_

10                                            Jonathan D. Uslaner (Bar No. 256898)
11                                            (jonathanu@blbglaw.com)
                                             Lauren M. Cruz (Bar No. 299964)
12                                            (lauren.cruz@blbglaw.com)
                                             2121 Avenue of the Stars, Suite 2575
13                                            Los Angeles, California  90067
                                             Tel: (310) 819-3470
14

15                                            _Lead Counsel for Lead Plaintiff Indiana Public_
                                             _Retirement System and the Class_
16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:21-cv-03343-JST