# Exhibit 2

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Lisa J. Cisneros, Magistrate Judge

4

5  HOMYK,                         )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                            )   No. C 21-03343-JST
                                  )
8  CHEMOCENTRYX, INC., et al.,    )
                                  )
9           Defendants.           )
   _____)
10

11                                San Francisco, California
                                  Tuesday, July 30, 2024
12

13    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 11:13 - 11:52 = 39 MINUTES
14

   APPEARANCES:
15

   For Plaintiff:
16                                Bernstein Litowitz Berger &
                                    Grossmann, LLP
17                                2121 Avenue of the Stars
                                  Suite 2575
18                                Los Angeles, California 90067
                             BY:  JONATHAN USLANER, ESQ.
19
   For Defendants:
20                                Latham & Watkins, LLP
                                  1271 Avenue of the Americas
21                                New York, New York 10020
                             BY:  BLAKE DENTON, ESQ.
22

23

24

25

2

1 APPEARANCES:

2 Transcribed by:              Echo Reporting, Inc.
                             Contracted Court Reporter/
3                            Transcriber
                             echoreporting@yahoo.com
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   <u>Tuesday, July 30, 2024</u>                                    <u>11:13 a.m</u>

2                   P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4           THE CLERK:  Please come to order.  The U.S.

5   District Court is now in session.  The Honorable Magistrate

6   Judge Lisa J. Cisneros is presiding.  We are calling Civil

7   matter 21-cv-03343.

8       Counsel, please state your appearances for the record,

9   beginning with Plaintiff.

10          MR. USLANER (via Zoom):  Good morning, your Honor.

11  Jonathan Uslaner from Bernstein Litowitz Berger and

12  Grossmann for Lead Plaintiff Indiana Employment Retirement

13  System and the class.

14          THE COURT:  Thank you.

15          MR. DENTON (via Zoom):  Good morning, your Honor.

16  Sorry.  Blake Denton from Latham and Watkins for the

17  Defendants.

18          THE COURT:  Thank you.

19      So I've got a question just right off the bat for the

20  Lead Plaintiff with respect to this discovery dispute.  You

21  know, both sides served subpoenas on the five analyst firms

22  just a few months ago, you know, so that creates this

23  impression that something happened during discovery that

24  made both sides believe that these five analyst firms were

25  important and perhaps more important than the other 17

4

1 analyst firms that had covered ChemoCentryx during the class

2 period.  So, you know, for Lead Plaintiffs, why did you

3 subpoena the firms?

4          MR. USLANER:  Yes, your Honor.  We subpoenaed the

5 firms in response to Defendants subpoenaing these firms.

6 Unlike all of the other witnesses at issue in this motion,

7 Defendants did subpoena these five analyst firms.

8          THE COURT:  Okay.  Well, how did -- how do you

9 reconcile that with your argument that you had no way of

10 knowing that Defendants could call these five firms at

11 trial?

12          MR. USLANER:  So with respect to the firms, your

13 Honor, we have two responses.

14      Number one, in their disclosures, which we note in our

15 letter brief, Defendants didn't identify who at the analyst

16 firms they intend on using at trial, which is contrary to

17 the rules with respect to disclosures.

18      And then with respect to their service of these

19 subpoenas to these analysts, we recognize, your Honor, that

20 unlike with respect to the other witnesses, the Defendants

21 did indeed issue subpoenas to these folks.  Those subpoenas

22 were issued very late in the process, and there's no

23 indication that there -- through those issuance of those

24 subpoenas that they were indeed going to rely upon them at

25 trial, given that there were many other potential analysts

5

1  and analyst firms that they could use.

2         THE COURT:  So it seems like you're saying because

3  you didn't know the names of the individuals?

4         MR. USLANER:  Yes, your Honor, with respect to the

5  analyst firm, the disclosures were incomplete and

6  insufficient because they did not provide the individuals'

7  names, which violates rule 26.  And there are cases that we

8  cite in our letter brief which indicate that in such

9  circumstances, the disclosure of the mere entity's name is

10 insufficient because we have no ability to conduct

11 depositions or discovery on that particular individual,

12 including, for example, obtaining documents from Defendants

13 about their communications with that individual, including

14 seeking a deposition of the individual.  None of these --

15 none -- no individual at any of the analyst firms have been

16 deposed.  The only instance in which any analyst is

17 potentially being deposed within the fact period is one that

18 is occurring on the last day of the fact period.  All of the

19 other analysts who Defendants have sought to depose, they

20 have done this at the very tail end of discovery with just a

21 couple of days left.  And those depositions, according to

22 Defendants, they're trying to seek to take those outside the

23 discovery period, and we believe that that as well is

24 improper and highly prejudices us, including because we

25 received these documents at the very tail end.

6

1          THE COURT:  Okay.

2          MR. DENTON:  Your Honor, would you like me to

3  respond now, or would you like me to wait until the end?  I

4  think the analyst one is a pretty simple issue.

5          THE COURT:  Go ahead and respond on the analyst

6  point.

7          MR. DENTON:  So, your Honor -- so these are

8  analysts that they mentioned in their complaint.  They've

9  known about them from 2022.  We picked them because these

10  are the ones who follow the company the most closely.  And

11  so these are the ones we are publishing the reports around

12  the key times during the class period.  So that's why we

13  picked them.

14      We subpoenaed them in April.  So we did not wait until

15  -- I mean, August 7th is when our fact discovery period

16  ends.  We subpoenaed them in April, obviously timely, very

17  timely.  In fact, Plaintiffs followed up with a subpoena

18  after that.  After two months, in mid-June, we still had not

19  received documents from the analysts.  And so what we did at

20  that point was we added those five analyst firms to our

21  disclosures, out of a total abundance of caution here.  We

22  don't even have their documents yet, but we don't want to

23  add them on the last day of discovery and have Plaintiffs

24  argue that they were jammed.  So we thought, "Two months in

25  advance, we'll add them to our list."  Why did we not add

1   names of individuals?  Because we don't even have their
2   documents yet.  We're literally telling them as much
3   information as we possibly can.  And so the idea that we're
4   supposed to give them information that we don't even have?
5   We're doing this to reserve our rights and to make sure that
6   when we have this trial in 14 months from now, that the
7   Plaintiffs, when we publish our witness list, don't act all
8   surprised and say, "Hey, where did this come from?"  So
9   instead, we've done the proper process.  We noticed them in
10  advance.  When we didn't get documents, we subpoenaed them
11  for depositions.  And the Plaintiffs have had two months,
12  and they've used that to sit on their hands.  They've issued
13  six new subpoenas in the past couple of days to people who
14  aren't on anybody's initial disclosures, just people that
15  they feel like deposing, but they've left all the analysts.
16  They haven't sent them more subpoenas.  They haven't asked
17  for depositions.
18      And so it's very selective in the way this is being
19  litigated by the other side.  It's clear that they don't
20  want the analysts to testify, and we think that's because,
21  as we've now dug into the reports, a lot of the stuff that
22  they say was hidden from the market was well known.  It's
23  literally published in an analyst report.  And so I think
24  the analysts are going to be bad for them, so rather than
25  actually trying to get at the facts, they're trying to

8

1 exclude them from the case.

2          MR. USLANER:  Your Honor, if I may respond

3 briefly?

4          THE COURT:  All right.  Go ahead.

5          MR. USLANER:  So with respect to the analysts,

6 Defendants, as they've indicated, knew about these analysts

7 from the get-go.  There's no explanation as to why these

8 analysts that they were going to rely upon them were not

9 identified in the initial disclosures a year ago.

10      With respect to the accusation that we've been sitting

11 on our hands, the moment the Defendants served these

12 subpoenas, we issued our own subpoenas seeking additional

13 documents from these very same analysts.  The whole problem

14 with respect to Defendants' course here of identifying these

15 folks so late in the process, which is contrary to the

16 rules, is now we don't have the totality of their documents.

17 These folks won't be able to be deposed in the discovery

18 period, which ends next week.  It is frankly Exhibit A to

19 the fact that Defendants' entire approach here with respect

20 to attempting to sandbag through these late disclosures is

21 creating disruption in the discovery schedule, which is

22 impermissible.

23          THE COURT:  I just wanted to clarify one aspect of

24 your response.  I understood you to be saying that other

25 analyst firms other than the five firms were also

9

1  subpoenaed.  I guess from the briefing, I had the impression
2  that there were only five analyst firms that were
3  subpoenaed.
4          MR. USLANER:  I'm sorry if I misspoke, your Honor.
5  No, five analyst firms in total have been subpoenaed.  There
6  are 22 analysts out there who covered the company.
7          THE COURT:  Okay.
8          MR. USLANER:  Defendants knew about these analysts
9  from the get-go and yet waited until very shortly before the
10  fact cut-off to indicate that they were going to rely upon
11  them, which we think is wrong.
12          THE COURT:  Okay.  All right.
13      Now, for Defendants, the subpoenas to Doctor Stone and
14  Ms. Reyes seemed to be differently situated from the analyst
15  firms, you know, because they were issued very early during
16  the discovery, and the parties didn't seem to focus on
17  either of these individuals during the deposition phase of
18  the litigation.  How was -- that's the impression I have.
19  And how was Lead Plaintiff supposed to know that Defendants
20  intended to call either of these individuals, Doctor Stone
21  or Ms. Reyes at trial, given their minimal importance during
22  the discovery process?
23          MR. DENTON:  And so -- I mean, first, your Honor,
24  just to be clear, we're not necessarily saying we're going
25  to call them at trial.  This is really an abundance of

10

1  caution here to put them on a list with two months left to

2  go in fact discovery, so that a year from now when we

3  actually have to get ready for trial --

4          THE COURT:  Okay.

5          MR. DENTON:  -- nobody can claim surprise.  But on

6  these folks, so Dalia Reyes is -- so both of these people

7  are people who they've indisputably known about since the

8  very beginning of the case, right?  In August of 2023, they

9  asked for Dalia Reyes' documents, and we produced scores of

10 them, right?  John Stone, they subpoenaed him a year ago,

11 and he's produced his documents, right?  And it's been

12 because as this case has evolved, it's been changing.

13 Plaintiff's theory has been very much a moving target, and

14 we're trying to keep up with it.  And the -- you know, one

15 of the examples that we talked about in our brief is this

16 new data manipulation theory, right?  There's a new theory,

17 nowhere in the complaint, that in the middle of -- I'm

18 sorry.

19         THE COURT:  The data manipulation theory.  It was

20 a theory that I touched on in my earlier -- or it was raised

21 in an earlier joint discovery letter.

22         MR. DENTON:  You're right, your Honor.  No, I'm --

23 I understand.  I'm not saying we learned about it for the

24 first time in the middle of June.  What I'm saying is this

25 has been an evolving thing.  The Plaintiff's theory has been

11

1 changing as the case goes.  And so what happened -- so they
2 raised this in briefing.  We had to first understand what
3 they were even saying about it because it's not in the
4 complaint.  This is one of the most complicated clinical
5 trial -- it's more complicated than any trial I've ever
6 seen, and I'm told by experts this is about as complicated
7 as it gets, this rare disease trial for, you know, a
8 condition that has deadly side effects.
9      And so what we've now learned, and it's taken
10 depositions, it's taken a long time -- the Plaintiffs want
11 to litigate, re-adjudicating the definition of remission
12 inside the clinical documents to determine whether remission
13 at four weeks was achieved.  And so we're -- we had to
14 diligence this, figure out what they're talking about, find
15 out what their allegations were, then internally investigate
16 on our side, "All right.  What did really happen in the
17 trial?  What happened with the definition of remission at
18 four weeks, and how was data changed, and why was it
19 changed, and was that -- where was that specified in the
20 protocol upfront that this is how it would be handled?"  And
21 so we did all of that.  And then once we found out what
22 really happened, then we needed to start determining who to
23 tell the story through with our witnesses.  And then on top
24 of that, we have all these depositions that have occurred
25 over the last several weeks.

12

 1      And so, your Honor, what we're doing, we're trying to

 2 keep up with this.  And again, two months before the end of

 3 fact discovery to supplement your disclosures is not trying

 4 to sandbag someone and hurt them here.  It's really trying

 5 to be as upfront as we can about where we are in the case

 6 and telling you, "We'll continue to supplement as we learn

 7 more."

 8      And so Ms. Reyes, for example, she was the head of

 9 commercialization at the company.  And so if you look at it,

10 she was primarily involved after the class period, right?

11 She's the one who's involved, taking the drug to market once

12 it's already approved.  This should all be after the class

13 period.  So she's relevant in that she's an employee, she's

14 touched the ADVOCATE trial, she saw it over time.  And so we

15 included her as a custodian.  She was in the case.  But now

16 that we're getting to this point where they're saying,

17 "Well, actually, the trial didn't demonstrate that this was

18 a good drug that helps people.  You snuck it by the FDA by

19 lying about the data and changing it," right?  And so Ms.

20 Reyes is -- and that ended up resulting in this very narrow

21 label, right?  And Plaintiffs are saying, "We couldn't sell

22 the product to many people."  Ms. Reyes is going to respond

23 to all of that.  She's going to say, "No, the label that we

24 ended up with was similar to the label that we thought it

25 was going to be in the beginning.  We did not consider it a

13

1   narrow label.  I've been in charge of marketing this product
2   to people, and I am -- and I can tell you this is a drug
3   that works.  The clinical trial did work properly, and it's
4   actually proven out since then because we have people where
5   this drug is changing their lives," right?
6        And so we knew who Ms. Reyes was.  We included her as a
7   custodian.  She's been here all along.  However, her level
8   of importance to the case has changed as Plaintiff's case
9   has changed.  And when they change their case, we get to try
10  to keep up with them.  It's not a -- it shouldn't be a one
11  way-street, your Honor.
12          THE COURT:  So you think that they should have
13  known about her through (Zoom glitch) should have been able
14  to understand that she had become more important.
15          MR. DENTON:  And they -- and -- well, it's a two-
16  part thing, your Honor.  First, they've been aware all along
17  of her role, her involvement, exactly what she does, who she
18  is, what her responsibilities are, everything.  And that's
19  been since 2023.  And then she had us make her a defense
20  custodian.  And then in October of 2023, they separately
21  subpoenaed her.  She's been -- we -- 67,000 produced
22  documents on.  She's been referenced in multiple
23  depositions, including these recent ones that have caused us
24  to amend our disclosures.  So she's all over the record,
25  your Honor.  They know exactly who she is, and they -- and

14

1  the thing is they've got extra depositions.  They've chosen

2  not to use them on her.  They've sat here for two months

3  complaining.  They haven't used them on her, because they

4  know what she's going to say.  They want her out of the

5  trial.  They don't want to get a fair chance at discovery.

6  They want her out.  And we got the same problem with Mr.

7  Stone, who was --

8          THE COURT:  Okay.  Before we turn to Mr. Stone,

9  Mr. Uslaner, will you please respond to these various points

10  that Mr. Denton is making in -- with respect to Ms. Reyes?

11          MR. USLANER:  Absolutely, your Honor.  First off,

12  with respect to his suggestion that they provided us with

13  sufficient time, I would direct your Honor to Judge

14  Westmore's decision in the Baird v. BlackRock case, which,

15  frankly, is on all fours with this case.  And the situation

16  in that case, 10 additional witnesses were added to a Rule

17  26 disclosure with two months left -- a month and a half

18  left in the discovery period, which is identical to the

19  situation here, and Judge Westmore correctly struck the

20  disclosures.

21      With regard to Dalia Reyes, she's never been deposed,

22  she's barely been mentioned in any depositions to date,

23  she's never been mentioned by Defendants in any brief they

24  filed, she authored two e-mails, more than three --

25          THE COURT:  So you're saying she's hardly ever

15

1 been referenced in any --

2          MR. USLANER:  She's -- she hasn't been referenced

3 at all in any meaningful respect.

4          THE COURT:  Mr. Denton is saying the opposite.

5          MR. USLANER:  Well, with all respect --

6          THE COURT:  Mr. Denton is saying the opposite.

7 So, Mr. Denton, why don't you give us the depositions?

8          MR. DENTON:  I actually have the excerpts here,

9 your Honor.  So she was discussed in the deposition of Jane

10 (phonetic) Helenson (phonetic) on pages 334 to 336, and I'm

11 happy to provide copies of these to your Honor afterwards.

12 She was discussed in the Kas (phonetic) Kelleher deposition

13 on pages 295 and 296.  She was discussed in the Susan Kanaya

14 deposition on page 281.  And -- well, those are the three

15 from Ms. Reyes, and the other I had here was Mr. Stone, but

16 we can talk --

17          MR. USLANER:  There have been -- your Honor, there

18 have been 20 depositions in the case.  Judge Tigar in his

19 decision in Twitter specifically held that a passing

20 reference to witnesses in depositions does not constitute

21 making known that a defendant is going to rely upon those

22 witnesses at trial or at summary judgment.  What Mr. Denton

23 just described to you is passing references during a massive

24 discovery case which has involved dozens of depositions, and

25 Ms. Dalia Reyes has barely been mentioned in any of them.

16

1  Defendants have not called her as a deponent, Defendants

2  have not sought her documents, Defendants have never

3  mentioned her in any briefing.  I -- scout's honor, we had

4  no idea that they were going to seek to rely upon Ms. Reyes

5  at trial or at summary judgment, which is why we were

6  shocked and brought this motion.  And with respect to Doctor

7  Stone, likewise.  He's -- he has not -- if -- unless your

8  Honor wants to continue on Ms. Reyes.

9         THE COURT:  (Zoom glitch) your reliance on these

10 depositions, I mean -- and describe what they say about her

11 or -- I mean, you could read from the deposition

12 transcripts.  This is --

13        MR. USLANER:  Your Honor, I attended them all.

14 Mr. Denton just joined the case.  I attended all the

15 depositions --

16        THE COURT:  (Zoom glitch).

17        MR. USLANER:  They literally are a reference to

18 her having sent or received a document and her title.

19 There's no substantive discussion with respect to her.  But,

20 Mr. Denton, feel free, please, to read the transcript

21 excerpts.

22        THE COURT:  Or point to some indication that it's

23 more than, "Oh, yes, Ms. Reyes received this particular e-

24 mail," or something like that.

25        MR. DENTON:  So I'm happy to go through it in more

1  detail, your Honor.  But just to be clear, we're not saying
2  -- and the cases are clear, yes, if there's just mere
3  passing references to somebody in the discovery record
4  somewhere, that isn't good enough.  Of course, what my
5  adversary is ignoring here is their subpoena, the fact that
6  she was one of our document custodians, the 67,000
7  documents.  When you put all of that together with the
8  deposition record, it's more than sufficient here, your
9  Honor.  And, frankly, you know, we distinguish the cases in
10  our brief.  They do not have any cases that are even in the
11  same area code here, and they cite over and over again the
12  <u>Baird</u>, <u>Johnson</u>, and <u>Spencer</u> cases, because those are the
13  only ones they have that are even in discovery.  Instead,
14  it's all summary judgment cases and trial witnesses and all
15  of that stuff that obviously doesn't apply here.
16      And so the best one they said they've come up with is
17  <u>Baird</u>, where, first off, the judge did not just strike the
18  disclosures.  There were 29 new witnesses disclosed, and 8
19  were stricken.  But it was only after the defendant
20  stipulated with the plaintiff that the plaintiff would not
21  conduct any more discovery and then tried to drop these new
22  names and say, "Too bad.  You already stipulated.  No more
23  discovery.  You can't take their depositions."  We're in the
24  opposite scenario.  We disclosed two months ago.  We've
25  urged them, "Take any depositions you want," and they just

18

1 won't do it.

2          THE COURT:  Yeah.  Well, you know, there were 31

3 custodians here, so it's quite a few to determine who (Zoom

4 glitch).

5          MR. USLANER:  Your Honor, I think you're correct.

6 We know that there are 31 custodians in this case.  How are

7 we to know which of these custodians Defendants may use as a

8 trial witness?  That's why the rule obligates disclosure of

9 that.

10      With respect to both Dalia Reyes and Doctor Stone, they

11 weren't involved at all in the data manipulation.  The data

12 manipulation involved three witnesses, largely at

13 ChemoCentryx, neither -- none of whom are Dalia Reyes or

14 Doctor Stone.

15          THE COURT:  Okay.  Mr. Denton, how were Lead

16 Plaintiffs supposed to know that Mr. -- Doctor Stone --

17 excuse me -- was potentially going to be called at trial?

18          MR. DENTON:  Yeah.  So this is another one.  And

19 your Honor, again, I don't understand how we are supposed to

20 disclose things to them before we actually know them.  At no

21 point have they told us, "Oh, this witness you knew was

22 critical to this issue at this point in time."  Instead,

23 they're just complaining.  It's been two -- you know, you

24 gave it to us two months in advance.

25      So I don't really understand the argument here, but on

19

1 John Stone, he was the consultant who created the liver
2 toxicity test used in the study.  Again, something that we
3 didn't think was terribly important since that was not the
4 primary endpoint of the study and not what we were
5 supposedly litigating.  But the secondary endpoints have
6 taken on a new significance for the Plaintiffs throughout
7 discovery, and they're focused on this GTI, Glucocorticoid
8 Toxicity Index and the FDA's criticism of that, and that is
9 Mr. Stone's domain.  And so that's why we have put Mr. Stone
10 on there, another person who, again, they subpoenaed him in
11 2023, he produced documents, he's on over 1,000 documents in
12 the case, he too has come up in at least one of the
13 depositions.
14      And, again, we're in discovery.  This is when you hone
15 your case theories.  This is when you figure out who your
16 important witnesses are.  And that's what we've been doing.
17 And so, again, I think we would be in a very different
18 scenario if on August 7th is our fact discovery deadline and
19 August 6, we drop new names on them.  But they've had two
20 months, and they've made the strategic choice not to take
21 discovery from these people -- not to take further
22 discovery.  They got discovery from him, but not to take
23 more.
24           THE COURT:  Okay.
25           MR. USLANER:  Your --

20

1          THE COURT:  So this is another -- oh, do you want
2  to respond?
3          MR. USLANER:  I do, your Honor.  First off, with
4  the GTI secondary endpoint, I just ran a search.  GTI, the
5  secondary endpoint, is referred to 123 times in our
6  complaint.  This -- the GTI secondary endpoint and
7  Defendants' misrepresentations concerning the GTI endpoint
8  has been a significant component of this case since Judge
9  Tigar and before Judge Tigar denied Defendants' motion to
10 dismiss.  Doctor Stone has never been deposed.  He's only
11 been mentioned once in 20 depositions.  He's never been
12 mentioned by Defendants in any brief.  He didn't author any
13 of the 380 exhibits.  We had no idea that Defendants at the
14 very end of fact discovery were going to say, "Aha, we're
15 going to rely upon him at trial."  The rules, the case law,
16 Judge Westmore's decision, and Judge Tigar's decision in
17 Twitter all say that what has been done here is wrong and,
18 accordingly, Doctor Stone should be struck from the witness
19 list.
20         THE COURT:  Okay.  The GTI secondary endpoint --
21 you know, theory or really a significant focus in the
22 briefing, and that's -- it's an explanation for why the
23 Plaintiff subpoenaed Doctor Stone.  So this is feeling kind
24 of like a newer element even though it's in the complaint.
25 So, you know, I will consider it.  But it's just -- if Mr.

21

Denton wants to respond to that -- to what Mr. Uslaner is
arguing, he can.  Otherwise, I would like to move on to my
other questions.

MR. DENTON:  Happy to move on unless there's
anything specific you would like for me, your Honor.

THE COURT:  Okay.  All right.  So this is my other
question for Defendants.  You claim that Ms. -- Medspace
(sic), Doctor Specs (phonetic), Doctor Hagno, Mr. Massey
(phonetic) -- and forgive me if I'm mispronouncing any of
these names -- that they were disclosed in response to Lead
Plaintiff's "new theory" that ChemoCentryx manipulated
clinical trial data to trick the FDA into approving an
ineffective drug, you know, firstly in Lead Plaintiff's
class certification reply filed in January.  But this data
manipulation theory, which I mentioned just a while ago, was
in the first joint discovery letter that I had to decide,
and you mentioned in your supplemental brief that this
theory was coming up during Doctor Richard Glass' deposition
which occurred on December 1st, 2023.  So, clearly the -- in
my view, we've had -- Defendants had more than six months
notice of this new theory, so why wait until it's late June
to update the rule 20(a) -- 26(a) disclosures to add those
four witnesses?

MR. DENTON:  Your Honor, this has been very much
an evolving process throughout discovery here.  So, yes, we

22

1   heard their theory that we had manipulated data, but we --

2                  THE COURT:  Yeah.  I just --

3                  MR. DENTON:  -- didn't know what that meant.  And

4   so I explained to your Honor before kind of all the

5   different steps that we took there.  I won't re-explain

6   that, understood, but --

7                  THE COURT:  Just what I understood you to be

8   saying earlier in the hearing was, the shape of the claims

9   is shifting and so forth, but --

10                  MR. DENTON:  It becomes center stage.  So, your

11  Honor -- so you'll recall, when they put in that brief

12  making this data manipulation argument, our response was,

13  "Whoa, that's not in the case.  That should be stricken.

14  That shouldn't be allowed at all," right?  And then the

15  Court issued a ruling.  And in that ruling, the Court said,

16  "I'm not going to consider that issue.  I'm not going to

17  consider the data manipulation."  Our hope until up that --

18  up until that point was that this would not be in the case.

19  It would be very clear it's not the case.  And from the

20  Court's ruling, it wasn't clear that it's in the case.  The

21  Court was expressly declining to consider that issue.  And

22  our Plaintiffs have taken it and run with it.  I mean, this

23  is all over the deposition.  We were just in a deposition

24  yesterday, and this was all over the deposition of Pirow

25  Bekker going on and on about data manipulation.  And it's a

23

theory that, honestly, we've thought multiple times they
would drop because it's made up.  Literally, the trial
protocol says we're going to have people collect the data.
It's going to be collected by various different people.  And
it's very complicated data that requires some discretion in
order to figure out are people worsening, are they not
worsening?

       And so we had a protocol, and the protocol involved,
afterwards, some limited people would be unblinded to make
sure the data was adjudicated consistently and correctly,
and some changes would be made if needed.  And now our
Plaintiffs have jumped on it.  There was a change made, and
they've said that we've been manipulating the data, that we
were messing with it, and that we were trying to trick the
FDA.

       This did not all come out in one piece.  This has been
an evolving theory.  It's one that we've tried to squash a
few times and say, "This shouldn't be in the case," but
they've pushed it, and now we're at the point we do have to
respond to it.  And so we've spent discovery figuring out
who are our best witnesses on this, what do we have to say
about it, and trying to put together our case.

       And, again, we've -- we thought we were doing this far
in advance, your Honor.  I thought giving somebody two
months notice before discovery is over as to who might be on

24

1  our witness list in a year and change was plenty of time,

2  but they've had an issue with it.  But your Honor, it --

3          THE COURT:  Well, this is in isolation -- two

4  months in advance of fact discovery could seem like a

5  reasonable amount of time, but this is two witnesses

6  amongst, you know, numerous others, 11.  So --

7          MR. DENTON:  And --

8          THE COURT:  -- that's --

9          MR. USLANER:  Your Honor, if I may --

10          MR. DENTON:  (Indiscernible).

11          THE COURT:  Go ahead.

12          MR. USLANER:  I'm sorry.  Go ahead, please.

13          THE COURT:  We'll let Mr. Denton finish.

14          MR. USLANER:  Of course.

15          MR. DENTON:  So, your Honor, and just on the

16  specific witnesses, just so you know, so with Medpace, we

17  have basically the same issue as the analysts.  The

18  Plaintiff subpoenaed them back in 2023, and then by the time

19  of our supplemental disclosures, Medpace still had not

20  produced documents.  They still had not turned them over.

21  So, again, out of an abundance of caution, we added Medpace

22  to our witness list.

23      Now, again, Plaintiffs are saying, "Oh, how did we know

24  Medpace was relevant?  How do we know Medpace would be

25  involved?"  Your Honor, they are in 100 -- on 107,000

25

documents in the case, Medpace is mentioned.  I believe

that's about 20-percent of the entire record.  Medpace ran

the trial.  The Plaintiffs know exactly who Medpace is and

what their involvement was.

     And then as for these two physicians, these are ones

we're adding directly in response to their theory.  These

were the people who actually collected the data.  The data

that the Plaintiffs are now saying was manipulated

afterwards and changed, these are the people who are going

to say, "No, no, no, we delivered our data.  We followed the

protocol.  The protocol said people would be unblinded to go

do this.  They were unblinded to go do it, and they did it

properly, and we have no issues with the result."  And

that's a very direct response to their new theory that has

been evolving through depositions, including yesterday.

          MR. USLANER:  Your Honor, if I may.

          THE COURT:  Go ahead.  Uh-huh.

          MR. USLANER:  So Defendants' argument with respect

to this fails for three reasons.  Number one, the -- as your

Honor noted, the data manipulation discovery has been going

on for seven months.  Number two, the folks who they've

identified to testify have absolutely no relationship to the

data monitoring -- excuse me -- to the data manipulation.

For example, Doctor -- Doctor Hagno and Specs are two of 238

investigators who, as Defendants note in their brief,

1 treated patients during the ADVOCATE.  No party has deposed

2 them.  They've never been mentioned in any of the

3 depositions.  They weren't involved in the data

4 manipulation.  The subjects on which Defendants have added

5 them are not data manipulation.  Their use of the drug,

6 their FDA approval process, they have nothing to do with

7 data manipulation.

8      Additionally, Mr. Massey, he is a patient.  They are

9 trying to use a patient and have him testify about the use

10 of Tavneos.  He has no relevance whatsoever to data

11 manipulation, which, again, as your Honor noted, was

12 disclosed seven months ago.  The subject matter which they

13 have identified Mr. Massey, a patient, one of thousands of

14 patients is use of Tavneos, which, again, has absolutely no

15 relationship to data manipulation.

16      With respect to Medpace, Lead Plaintiff recognizes that

17 Medpace is relevant.  We absolutely do.  Defendants knew

18 they were relevant as well.  Defendants waited a year and a

19 half to identify them on their disclosures.  They don't even

20 list who at Medpace is going to be a trial witness.  Medpace

21 is differently situated than the others.  We recognize that.

22 We did subpoena them, of course, but we have been operating

23 with the working understanding, based on their disclosures,

24 that they were not relying upon Medpace at trial.  That is

25 why with respect to Medpace, we moved to strike Medpace.  We

27

absolutely understand Medpace is relevant.  We absolutely

sought documents from Medpace.  But what Judge Tigar and

what Judge Westmore correctly note is that the

supplementation rules require a defendant to identify who

they are going to rely upon in a timely manner, and that was

not done.  We don't even have the name of an individual at

Medpace who they're going to be relying upon and discovery

closes next week.  Thank you, your Honor.

          THE COURT:  So space -- you know, clearly it's not

a part of this case in that it ran a clinical trial.  So why

wouldn't -- without even an amendment, Mr. Denton, why

wouldn't Defendants include Medspace (sic) in the initial

disclosures?  It just seems like they have a central role.

But help me understand.

          MR. DENTON:  Because from our perspective, this

case was never about whether the trial was run properly or

improperly.  The question was about the discussions with the

FDA, because that's the Plaintiff's entire theory.  The

Plaintiff's entire theory is we -- the FDA was telling us,

"There's no way we're ever approving this drug," and then at

the same time were saying things to the market that are more

rosy than that.

     And so that's the theory of the case.  And then that's

why when we get to discovery and they start this data

manipulation theory that we've tried to squash a few times

28

1  now, then eventually we do have to respond to it.  And the

2  way to respond to that is, "Okay.  Bring in the people who

3  did the clinical trial and let them all tell you that nobody

4  manipulated any data."  And I think that's a response that

5  we've got to be able to give because, you know, like,

6  opposing counsel is right, like, these are the investigators

7  in the trial and the entity that ran the trial, and they're

8  responding to the theory that this is a terrible drug that

9  never should have been approved and that it was based on

10  lies to the FDA.  And in order to tell the story, even

11  though that's not what the claim is about, even though

12  that's not what the case is about, we have to be able to

13  respond at trial to them telling this one-sided and

14  incorrect story.

15          MR. USLANER:  And, your Honor, just with respect

16  to that, again, the data manipulation component of discovery

17  came out seven months ago.  With respect to all of these

18  folks, Medpace, Doctor Spano (phonetic), Doctor Specs, and

19  the patient, none of them are being identified to testify

20  with respect to the data manipulation.  They're being

21  identified to test on completely different things, including

22  the use of Tavneos.  They're disclosed late -- too late in

23  the process, well after our ability to conduct depositions

24  of them, well after our ability to redepose folks who've

25  been deposed previously on the subject matter.  And we think

1   it's inappropriate, and we don't think that we need to

2   completely redo discovery because Defendants, you know, have

3   changed their tune and now want to take these folks as trial

4   witnesses.

5          MR. DENTON:  Your Honor, may I briefly respond on

6   the redeposing point that Plaintiff has brought up?  Your --

7   they keep saying that.  And as I mentioned, they've had two

8   months now to take discovery.  They've chose -- they made a

9   strategic choice, "Don't do that.  They're not actually

10  going after them," but then on redeposing, they're saying,

11  "And we need to go back and ask every witness we already

12  deposed all about these people"?  Well, your Honor, we had

13  three days of depositions this week.  They didn't ask about

14  any of them.  They didn't ask about these people.  They

15  didn't -- I think Ms. Reyes is the only name that came up,

16  and it was in the context of a document, but Christian Pagno

17  (phonetic) didn't come up, Erlich (phonetic) Specs didn't

18  come up, Glenn (phonetic) Massey didn't come up.  They

19  didn't even raise these people.  So the idea that they're

20  worried that they need to go back and ask every witness

21  about them, they're not even doing that contemporaneously.

22         MR. USLANER:  Your Honor, with respect to that,

23  these witnesses are just not relevant to the witnesses who

24  were recently deposed.  They're, frankly, not relevant to

25  the case, which is why they haven't been -- Defendants

30

1  haven't asked a single question of any witness about these

2  folks.  They haven't mentioned them in any briefing.  They

3  haven't been the subject of any discovery responses or

4  anything of that nature, which is why we had no -- they did

5  not make it known that they were going to rely upon them in

6  a timely manner, which is the operative test.

7          THE COURT:  Yeah, I think, you know, on the

8  briefing, I wasn't -- there wasn't much of an explanation as

9  to why you need to reopen positions.  I know it was your

10  alternative request, but --

11         MR. USLANER:  Yeah, we --

12         THE COURT:  -- even if (Zoom glitch) allow --

13  don't strike all of the witnesses, tell me with greater

14  detail why I would need to reopen the depositions.

15         MR. USLANER:  Your Honor, I mean, our --

16         THE COURT:  Prejudice, and if you learn something

17  more, then you could come back and raise it, possibly,

18  but --

19         MR. USLANER:  Our view, undoubtedly, is that the

20  witnesses should be struck, that there -- and as a result,

21  there would be no need to inquire as to additional witnesses

22  with respect to any of these folks.  That said, you know, we

23  do believe that we would be entitled to fulsome discovery so

24  that we can test these folks at trial, including their --

25  and the Defendants' communications with them haven't been

31

1  produced.  We haven't received the documents from the

2  witnesses themselves.  You know, Glenn Massey, I don't even

3  know who he is, he's never been mentioned.  This type of

4  sandbagging at the end of discovery is not permitted, and,

5  you know, it would completely disrupt the schedule that

6  Judge Tigar has specifically said cannot be altered.

7       And we have worked so hard to keep to this schedule.

8  We have deposed every single witness on Defendants' initial

9  disclosures, the one that was correctly served at the start.

10 We relied upon that in good faith.  And for Defendants now

11 at the last minute to add all these folks' names, to double

12 it -- double the list is improper, which is why we brought

13 this motion, your Honor.

14       THE COURT:  Okay.  All right.  Thank you.

15       Any final words, Mr. Denton?

16       MR. DENTON:  So, first, thank you, your Honor, for

17 the time.  Thank you for taking the time to hear this

18 dispute, and we regret that we weren't able to sort it out

19 amongst ourselves.  We've actually had a pretty good track

20 record of sorting some things out, and so -- but I

21 appreciate your Honor's attention.

22       And the only thing I would emphasize for your Honor is,

23 you know, to the extent it matters here, this was us doing

24 the best we could.  Again, I thought two months in advance

25 was a long time.  And I guess the question is, if two months

1  isn't enough, what's the cut-off here, like, before our

2  witnesses start getting struck?  Like, is it three months?

3  Is it four months?  Is it two months after it's first

4  mentioned?  And I think the cases don't have that type of

5  bright line standard because that's exactly not the type of

6  calculation that the federal rules require.  Instead, 26(e)

7  says pretty clearly, "You have a duty to supplement.  We

8  expect you to supplement as you learn things."  And so we

9  thought we did the right thing here, you know, egg on our

10 face if we should have done it with two and a half months or

11 three months rather than two months, but we did the best we

12 could as we learned facts, and we're trying here, our goal

13 is not to sandbag Plaintiff.  I don't think we have, but to

14 the extent there was any prejudice, we would want to make

15 sure that they get whatever discovery they need.  And they

16 -- and we've been waiting for that.  They just wouldn't

17 chime in with what they want.  It's been an all or nothing.

18 It's been throw everybody out or redo discovery.

19      So in any event, we appreciate your Honor's time, but

20 we are trying to do the right thing here.

21          MR. USLANER:  Your Honor, I just need to correct

22 the record on one thing.  Mr. Denton continues to say two

23 months.  In actuality, it was 39 days from the second

24 supplemental disclosure, not two months.  And for the first

25 supplemental disclosure, it was 49 days.  And in the <u>Baird</u>

33

1 v. BlackRock case, that was precisely the same amount of

2 time.  With that, your Honor, we do thank you for your time.

3 We really do appreciate your making yourself available for

4 this dispute.

5          THE COURT:  All right.  Thank you both, and I'll

6 take this under submission.

7          MR. DENTON:  Thank you, your Honor, so much.

8          THE COURT:  Thank you.

9          THE CLERK:  Court is now adjourned.

10     (Proceedings adjourned at 11:52 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3        I certify that the foregoing is a true and correct
4   transcript, to the best of my ability, of the above pages of
5   the official electronic sound recording provided to me by
6   the U.S. District Court, Northern District of California, of
7   the proceedings taken on the date and time previously stated
8   in the above matter.

9        I further certify that I am neither counsel for,
10  related to, nor employed by any of the parties to the action
11  in which this hearing was taken; and, further, that I am not
12  financially nor otherwise interested in the outcome of the
13  action.

14

15

16

17          Echo Reporting, Inc., Transcriber

18              Saturday, August 24, 2024

19

20

21

22

23

24

25