LATHAM & WATKINS LLP
Michele D. Johnson (Bar No. 198298)
*Michele.Johnson@lw.com*
Jordan D. Cook (Bar No. 293394)
*Jordan.Cook@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
T: +1.714.540.1235

Colleen C. Smith (Bar No. 231216)
*Colleen.Smith@lw.com*
12670 High Bluff Drive
San Diego, CA 92130
T: +1.858.523.5400

Meryn C. N. Grant (Bar No. 291315)
*Meryn.Grant@lw.com*
355 South Grand Avenue
Los Angeles, CA 90071
T: +1.213.485.1234

*Attorneys for Defendants ChemoCentryx, Inc.
and Thomas J. Schall*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JONNIE HOMYK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEMOCENTRYX, INC. and THOMAS J. SCHALL,<br><br>Defendants. | Master Case No. 4:21-cv-03343-JST *and related cases,* Nos. 4:21-cv-04357-HSG, 4:22-cv-00499-JST<br><br>**DEFENDANTS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 7, 2025<br>Time: 2:00 p.m.<br>Location: Courtroom 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

**FILED UNDER SEAL -- REDACTED VERSION**

TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 7, 2025, at 2:00 p.m., or as soon thereafter as the parties may be heard, before the Honorable Jon S. Tigar, District Court Judge, United States District Court for the Northern District of California, in the Oakland Courthouse, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California 94612, and shall then and there present this motion for summary judgment on behalf of Defendants ChemoCentryx, Inc. and Dr. Thomas J. Schall ("Defendants").

Defendants bring this motion under Rule 56 of the Federal Rules of Civil Procedure. Defendants will, and hereby do, move for an order granting summary judgment in Defendants' favor because there is no genuine dispute of material fact as to the identified claims against Defendants, and Defendants are entitled to judgment as a matter of law. The motion is based on this notice of motion, the following memorandum of points and authorities and the exhibits attached thereto, the pleadings and other papers filed in this action, any oral argument, and any other evidence that the Court may consider in deciding this motion.

## ISSUES PRESENTED

Whether Defendants are entitled to summary judgment under Federal Rule of Civil Procedure 56.

DATED:  May 29, 2025                LATHAM & WATKINS LLP


By:/s/ *Michele D. Johnson*
        Michele D. Johnson (Bar No. 198298)
        *Michele.Johnson@lw.com*
        Jordan D. Cook (Bar No. 293394)
        *Jordan.Cook@lw.com*
        650 Town Center Drive, 20th Floor
        Costa Mesa, CA 92626
        T: +1.714.540.1235

Colleen C. Smith (Bar No. 231216)
*Colleen.Smith@lw.com*
12670 High Bluff Drive
San Diego, California 92130
T: +1.858.523.5400

Meryn C. N. Grant (Bar No. 291315)
*Meryn.Grant@lw.com*
355 South Grand Avenue
Los Angeles, CA 90071
T: +1.213.485.1234

Andrew B. Clubok (*pro hac vice*)
*Andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
*Susan.Engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel.:  +1.202.637.2200

Blake T. Denton (*pro hac vice*)
*Blake.Denton@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Tel.:  +1.212-906-1200

*Attorneys for Defendants ChemoCentryx, Inc.
and Thomas J. Schall*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND ...................................................................................3

        A.      ChemoCentryx Develops Avacopan To Treat The Rare Disease AAV .................3

        B.      FDA Agrees To The AVOCATE Trial Plan...........................................................3

        C.      Chemocentryx Conducts A Successful Trial According To The Trial
                Protocol ..................................................................................................................4

        D.      ChemoCentryx Discloses ADVOCATE's Positive Topline Results......................5

        E.      ChemoCentryx Widely Discloses Details Supporting Topline Results...................6

        F.      The Market Reacted Positively To ChemoCentryx's Disclosures .........................7

        G.      FDA Confirms ADVOCATE Data Is Sufficient And Accepts The NDA...............7

        H.      FDA Holds An Advisory Committee To Evaluate Avacopan................................8

        I.      The AdCom Meets And Votes On Avacopan.........................................................9

        J.      FDA Approves Avacopan As TAVNEOS...............................................................10

III.    LEGAL STANDARD..............................................................................................10

IV.     ARGUMENT ...........................................................................................................11

        A.      Summary Judgment Is Warranted Because Defendants' Statements Are
                Inactionable Opinions ...........................................................................................11

                1.      FDA Approval Of Avacopan Shows Defendants' Statements Were
                        Not False Or Unreasonable..........................................................................13

                2.      Even Without A *Per Se* Rule, The Statements Were Not False Or
                        Unreasonable................................................................................................14

                3.      INPRS Cannot Show Scienter Based On Omission Of FDA
                        Feedback ......................................................................................................17

        B.      Defendants Are Entitled To Partial Summary Judgment On Several
                Claims .....................................................................................................................18

                1.      INPRS Cannot Establish Loss Causation As To The May 7 Stock
                        Price Drop ....................................................................................................19

2. Defendants Are Entitled To Summary Judgment On INPRS's Claim Challenging The Primary Efficacy Results Based On A "Protocol Violation" ........................................................23

    a. Summary Judgment Should Be Granted On INPRS's Claim That Primary Efficacy Results Were Based On A BVAS Scoring Violation ........................................................23

    b. INPRS Cannot Rely On ████████████ To Suggest A Securities Fraud Claim ........................................................24

3. Defendants Are Entitled To Summary Judgment On INPRS's Claim That Defendants Concealed Allegedly Negative Data About Steroid Use And Subgroup Efficacy Results Because That Information Was Disclosed During the Class Period ........................................................25

    a. Summary Judgment Is Warranted On INPRS's Steroid Claim ........................................................26

    b. Summary Judgment Is Warranted On INPRS's Subgroup Claim ........................................................28

4. Summary Judgment Is Appropriate On Several Additional Categories of Statements ........................................................29

    a. Statements That Are Forward-Looking And/Or Puffery Are Inactionable ........................................................29

    b. Statements That Predate The Class Period Are Inactionable ........................................................31

    c. INPRS's Own Expert Forecloses Its Claim That Defendants Misrepresented 2020 FDA Communications ........................................................31

    d. Defendants Are Entitled To Summary Judgment On Claims Based On Previously Dismissed Statements ........................................................32

    e. INPRS Has Now Disclaimed Its "Label" Theory, Which Also Fails As A Matter Of Law. ........................................................32

C. INPRS's Section 20A and 20(a) Claims Likewise Fail ........................................................33

D. The Court Should Deny INPRS's Request For Summary Judgment On Market Efficiency And Trade Timing ........................................................34

V. CONCLUSION ........................................................35

# TABLE OF AUTHORITIES

## CASES

*Bazzelle v. Novocure Ltd.*,
2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ................................................................... 13, 14

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ...................................................................... 34

*Bricklayers & Trowel Trade Int'l Pension Fund v. Credit Suisse First Boston*,
853 F. Supp. 2d 181 (D. Mass. 2012) .................................................................................. 34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................................. 11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ............................................................................................... 12

*Corns v. Laborers Int'l Union of N. Am.*,
709 F.3d 901 (9th Cir. 2013) ............................................................................................... 11

*Dalberth* v. *Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014) ................................................................................................ 26

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................................. 19

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ............................................................................................... 25

*Evanston Police Pension Fund v. McKesson Corp.*,
2021 WL 4902420 (N.D. Cal. Oct. 21, 2021) ..................................................................... 20

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ............................................................................................. 26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................................................. 35

*Hodges v. Akeena Solar, Inc.*,
2010 WL 3705345 (N.D. Cal. May 20, 2010) ..................................................................... 31

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ............................................................................................. 26

*In re AVEO Pharmaceuticals, Inc. Securities Litigation*,
2017 WL 5484672 (D. Mass. Nov. 14, 2017) ..................................................................... 22

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

iii

DEFENDANTS' CROSS-MOT. FOR S.J. AND OPP.
TO LEAD PLAINTIFF'S MOT. FOR PARTIAL S.J.
CASE NO. 4:21-cv-03343-JST

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ................................................................... 19, 20, 24

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991)........................ 26

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)................................................................ 21, 29

*In re Garrett Motion, Inc. Sec. Litig.*,
    2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) ................................................................ 31

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)................................................................ 31

*In re Kalobios Pharms., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) ................................................................ 26

*In re Mylan N.V. Sec. Litig.*,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023)................................................................ 19, 22

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ................................................................ 19

*In re Nuvelo, Inc., Sec. Litig.*,
    2008 WL 5114325 (N.D. Cal. Dec. 4, 2008)................................................................ 32

*In re Oracle Corp. Sec. Litig.*,
    627 F. 3d. 376 (9th Cir. 2010) ................................................................ 11, 19, 33

*In re PETCO Corp. Sec. Litig.*,
    2008 WL 8876554 (S.D. Cal. Apr. 29, 2008)................................................................ 18

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) ................................................................ passim

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................ 18, 19, 26

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ................................................................ 12, 14

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
    F.3d 199 ................................................................ 15, 16, 21, 29

*In re Seagate Technology II Sec. Litig.*,
    1995 WL 66841 (N.D. Cal. Feb. 8, 1995) ................................................................ 31

*In re Sona Nanotech, Inc. Sec. Litig.*,
    562 F. Supp. 3d 715 (C.D. Cal. 2021) ...................................................................................... 30

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 392 (9th Cir. 2021) ................................................................................................... 33

*Jaszczyszyn v. SunPower Corp.*,
    2024 WL 3463348 (N.D. Cal. July 17, 2024)........................................................................... 30

*Kader v. Sarepta Therapeutics, Inc.*,
    887 F.3d 48 (1st Cir. 2018) ..................................................................................................... 18

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
    119 F. 4th 711 (9th Cir. 2023) ................................................................................................. 11

*Mandalevy v. BofI Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018)........................................................................... 34

*Matter of Giga Watt, Inc.*,
    2022 WL 17883793 (9th Cir. Dec. 23, 2022) ........................................................................... 33

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................................................... 34

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ................................................................................................... 33

*Omnicare, Inc. v. Laborers District Council Construction Industries Pension
    Fund*,
    575 U.S. 175 (2015)................................................................................................................. 11

*Pardi v. Tricida, Inc.*,
    2024 WL 1056013 (N.D. Cal. Mar. 11, 2024)....................................................................... 12, 15, 16

*Pitman v. Immunovant, Inc.*,
    2024 WL 1342737 (E.D.N.Y. Mar. 29, 2024)........................................................................... 15

*Pitman v. Immunovant, Inc.*,
    2024 WL 964258 (E.D.N.Y. Feb. 25, 2024).............................................................................. 17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................................. 22, 30

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ................................................................................................. 25

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard
    Co.*,
    845 F.3d 1268 (9th Cir. 2017) ................................................................................................. 30

*Shash v. Biogen Inc.*,
2025 WL 928779 (D. Mass. Mar. 27, 2025)................................................................................ 21

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 27, 2019) .............................................................................. 32

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
552 U.S. 148 (2008)..................................................................................................................... 11

*Strezsak v. Ardelyx Inc.*,
2024 WL 1160900 (N.D. Cal. Mar. 18, 2024)..................................................................... passim

*Thant v. Rain Oncology Inc.*,
2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ........................................................... 11, 12, 14

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................... 12, 15, 16, 22

*Twitchell v. Enovix Corp.*,
2024 WL 3522187 (N.D. Cal. July 23, 2024)............................................................................. 30

*Williams v. City of Las Vegas*,
359 Fed. App. 753 (9th Cir. 2009).............................................................................................. 32

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .................................................................................................... 30

**STATUTES**

15 U.S.C. § 78t................................................................................................................................ 33

15 U.S.C. § 78t-1(a)........................................................................................................................ 33

15 U.S.C. § 78u-5 ........................................................................................................................... 29

21 U.S.C. § 355(d) .................................................................................................................... 10, 14

**RULES**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 11

**REGULATIONS**

21 C.F.R. § 312.23(a)(6)................................................................................................................... 4

21 C.F.R. § 312.30............................................................................................................................. 4

21 C.F.R. § 312.30(a)........................................................................................................................ 4

21 C.F.R. § 312.47(b)(1)(v)................................................................................................ 3, 13, 15, 18

21 C.F.R. § 312.47(b)(2).................................................................................................... 8

21 C.F.R. § 314.101(a).................................................................................................... 8

21 C.F.R. § 314.105 ................................................................................................. 10, 14

21 C.F.R. § 314.125 ...................................................................................................... 10

21 C.F.R. § 314.126 ........................................................................................................ 3

21 C.F.R. § 314.50(c)(1) ............................................................................................... 10

21 C.F.R. § 314.50(d)(5)-(6) ........................................................................................... 4

52 Fed. Reg. 8798 ......................................................................................................... 15

DEFENDANTS' CROSS-MOT. FOR S.J. AND OPP.
TO LEAD PLAINTIFF'S MOT. FOR PARTIAL S.J.
CASE NO. 4:21-cv-03343-JST

## I.       INTRODUCTION

In late 2023, almost a year after this Court decided Defendants' Motion to Dismiss, the Second Circuit held in *Philip Morris International Securities Litigation* that, as a matter of law, FDA's approval of a drug precludes a securities fraud plaintiff from showing that a defendant's favorable interpretation of the drug's clinical trial data was fraudulent. 89 F.4th 408, 421-22 (2d Cir. 2023). *Philip Morris* explained that a defendant's statements reflecting its interpretation of trial data are opinion statements, and the fact that a plaintiff—or an advisory committee— expresses a different view cannot show the defendant's interpretation was false or misleading. *Id.* at 415, 421-422. Since that decision, courts in this district have dismissed as a matter of law claims like Lead Plaintiff INPRS's that challenge positive statements about trial data. This recent judicial consensus dooms INPRS's case. It is undisputed that avacopan, now TAVNEOS®, was approved by FDA based on the trial data at issue here. Even without the *per se* reasonableness rule *Philip Morris* adopted, INPRS has not met its burden to show the challenged statements are fraudulent statements of opinion. Summary judgment is therefore appropriate as to its entire case.

Fatal problems also plague individual pieces of INPRS's case, making partial summary judgment appropriate on the following claims.

*First,* there is no loss causation for May 7, 2021. FDA published its briefing book regarding its views about the avacopan new drug application ("NDA") on May 4, 2021 ("Briefing Book"), and the avacopan Advisory Committee ("AdCom") met and voted May 6; May 7 was the next trading day. Although INPRS contends the May 4 disclosures were not fully corrective, and the market needed the AdCom's May 6 input to fully reflect the information in the stock price, the undisputed evidence (and INPRS's arguments) show otherwise. INPRS agrees FDA's concerns about trial design were disclosed on May 4, and INPRS's expert concedes the May 6 disclosures "mirror" those on May 4. Indeed, this lawsuit was filed on May 5, 2021, alleging that the Briefing Book "presented a substantial concern regarding the viability of ChemoCentryx's NDA for avacopan." ECF No. 1. The May 6 disclosures did not provide any additional corrective information, and INPRS cannot show loss causation for May 7.

*Second*, summary judgment is appropriate on INPRS's claims based on alleged protocol violations. In its complaint, INPRS alleged that Defendants misrepresented avacopan as superior by measuring disease remission in a way that supposedly violated the trial protocol. But the undisputed record shows Defendants used the methodology required by the protocol and disclosed that method throughout the "Class Period" (Nov. 26, 2019 to May 6, 2021). Unable to establish its pled theory, INPRS has manufactured a different theory about ███████████████ But, this Court has already found that █████████ is not a separate theory of liability. While Defendants dispute the relevance of this theory to scienter, that question is appropriately addressed, if any claims remain, in a motion *in limine*.

*Third,* summary judgment is appropriate on INPRS's claims based on two sets of allegedly omitted facts—about steroid use and subgroup results—because the undisputed record shows those facts were disclosed before May 4, 2021.

*Fourth*, summary judgment is appropriate on INPRS's claims for additional statement-specific reasons:

(a) certain statements are forward-looking and aspirational under Ninth Circuit law;

(b) statements that pre-date the Class Period are inactionable under established law;

(c) INPRS's own expert forecloses any claim based on alleged FDA feedback in 2020 because he testified that no new inflation was introduced into the stock price after November 26, 2019;

(d) INPRS's claim cannot proceed based on statements that mirror those already dismissed by the Court; and

(e) INPRS has disclaimed its label misrepresentation theory, including at the *Daubert* hearing when INPRS's counsel stated, "I can assure you, Your Honor, that in discussing damages in this case, discussing loss causation, you will never hear once any reference to any FDA label."

*Fifth*, summary judgment is appropriate as to INPRS's derivative claims, including the Section 20A claim for insider trading and the Section 20(a) control claim against Dr. Schall, both of which require but lack a predicate violation of the federal securities laws.

*Finally*, the Court should deny INPRS's motion for partial summary judgment on market

efficiency and Class Period trades. INPRS's position on market efficiency is inconsistent at best and cannot be disposed of on summary judgment. INPRS cannot, on the one hand, claim that the market needed time to incorporate information disclosed on May 4 and, on the other, obtain a ruling that the market was efficient as a matter of law. As to the timing of trades, the law requires INPRS to have traded between the alleged misrepresentation and the revelation of the truth. Because the undisputed evidence shows the allegedly concealed information was disclosed long before the end of the Class Period, summary judgment is inappropriate.

## II.     FACTUAL BACKGROUND

### A.     ChemoCentryx Develops Avacopan To Treat The Rare Disease AAV

ChemoCentryx was a biopharmaceutical company that developed new medications to treat autoimmune diseases. Ex. 1 (Topline Press Release) at 4; ECF No. 47 (Amended Complaint or "AC") ¶ 31. Its drug avacopan—approved in 2021 as TAVNEOS after a Phase 3 trial called "ADVOCATE"—treats the rare disease ANCA-associated vasculitis ("AAV"). Ex. 2 (Briefing Book) at 5-6, 9.[1] A breakthrough, TAVNEOS spares patients from the awful side effects of the chronic high-dose glucocorticoid ("steroid") regimen traditionally used to treat AAV. Ex. 1 at 2; Ex. 3 (Ferreiro Dep.) 109:24-110:11; Ex. 4 (JMIR) at 2; Ex. 2 at 46-47.

### B.     FDA Agrees To The AVOCATE Trial Plan

In 2016, ChemoCentryx met with FDA as part of the regulatory process that allows drug sponsors to obtain FDA agreement as to "the overall plan" for a Phase 3 trial, including the trial's "objectives and design." 21 C.F.R. §§ 312.47(b)(1)(v), 314.126; Ex. 5 (Weisman Rep.) ¶¶ 60-67. Following rounds of feedback and revisions to ADVOCATE's design,[2] FDA's official record of

---

[1] Unless otherwise noted, all exhibits are to the concurrently filed Declaration of Meryn Grant, and all emphases are added. Likewise, unless otherwise noted, all statement numbers reference Appendix A (Statement Chart). For the Court's convenience, Defendants have included Appendix B, which lists each purported omission identified by INPRS in its interrogatory responses as the material omitted facts that rendered misleading the challenged statements. *See* Ex. 60 No. 10.

[2] During this process, FDA recommended various alternative trial designs including "a superiority trial," a longer, 52-week trial, and a third arm (or group) of patients who would receive no steroids, except for emergencies, as a control. Ex. 6 (7/16 FDA Minutes) at 6; Ex. 5 ¶¶ 60-63. Responding, ChemoCentryx incorporated a superiority endpoint into the design and doubled the trial's length

the meeting reflects the agreement reached: "FDA agreed with [ChemoCentryx's] approach." Ex. 7 at 4; Ex. 5 ¶ 58; Ex. 13 (Jayne Dep.) 217:5-220:25; Ex. 12 (Wang Dep.) 180:17-25; Ex. 9 (Erratum) at 1-2; Ex. 10 (Bekker Dep. I) 227:20-229:9; Ex. 11 (Bekker Dep. II) 265:2-12; Ex. 15 (Schall Dep. II) 348:14-18. ChemoCentryx then submitted its full Phase 3 trial protocol reflecting the agreement; FDA accepted the protocol and allowed ADVOCATE to begin. Ex. 5 ¶¶ 66-67; 21 C.F.R. § 312.30(a). As required, the protocol and a separate document, the Statistical Analysis Plan ("SAP"), pre-specified the rules for analyzing trial results. Ex. 16 (Protocol) at 82-91; Ex. 18 (Published Protocol) at 13-16; Ex. 75 (SAP); Ex. 5 ¶¶ 38, 67, 96; 21 C.F.R. §§ 312.23(a)(6), 312.30; Ex. 20 (FDA New Drug Guidance) at 60-64; Ex. 21 (FDA Statistics Guidance) at 3, 27. ChemoCentryx was required to, and did, report trial results to FDA according to those rules when it later submitted its NDA. 21 C.F.R. §§ 314.50(d)(5)-(6); Ex. 5 ¶¶ 28, 67, 96; Ex. 22 (Yue Dep.) 433:5-15; Ex. 11 422:23-423:11; Ex. 14 (Schall Dep. I) 51:5-8.

**C.    Chemocentryx Conducts A Successful Trial According To The Trial Protocol**

ADVOCATE ran from March 15, 2017, to November 1, 2019. Ex. 17 (NEJM) at 5.

Bekker Decl. ¶ 10.

---

to 52 weeks. Ex. 7 (11/16 FDA Minutes) at 2, 4. As to the third arm, ChemoCentryx explained to FDA that following consultations with experts, ChemoCentryx did not believe ADVOCATE could have a third "no steroid" arm, because those patients would be deprived of steroids, the only treatment then known to be effective. Ex. 6 at 7-8; Ex. 7 at 8. FDA also gave ChemoCentryx feedback about proposed measurements for secondary efficacy endpoints. Ex. 7 at 2-3; Ex. 5 ¶¶ 43-44, 60-66; *see also* Ex. 9 at 2. ChemoCentryx explained that it intended to measure that data to provide information to physicians and to spark future development of avacopan, even if FDA might not consider that data for approval. Ex. 7 at 4; Ex. 5 ¶¶ 60-63; Ex. 11 280:5-281:11; Ex. 12 184:13-185:18.

███████████████████████████████████████████████████

██████████████████████

### D.    ChemoCentryx Discloses ADVOCATE's Positive Topline Results

On November 25, 2019, the day before the start of the Class Period, ChemoCentryx announced ADVOCATE's topline results. Ex. 1 at 1. The data showed the avacopan group had achieved its primary efficacy endpoints at 26 and 52 weeks, "with statistical superiority of avacopan over [the] standard of care (SOC)." *Id.* ChemoCentryx explained that patients in both groups (the avacopan group and the control group) had received one of two immunosuppressants, rituximab ("RTX") or cyclophosphamide ("CYC"); the avacopan group received avacopan, and the "control" group received a high dose of daily steroids for the first 21 weeks of the trial. Ex. 25 (Topline Slides) at 7; *see also* Ex. 1 at 3; Ex. 26 (Topline Call) at 18. ChemoCentryx disclosed the methodology used to measure whether patients were in remission for the primary efficacy endpoints: remission required a Birmingham Vasculitis Activity Score ("BVAS") of 0, with no steroids to treat AAV (as opposed to steroids to treat other conditions, which was allowed) in the four weeks prior to the endpoint measurements (*i.e.*, in the four weeks prior to either the 26- or 52-week measurement). Ex. 1 at 1; Ex. 25 at 5. ChemoCentryx reported that certain secondary endpoint results showed "additional benefits for avacopan," and that "topline safety results revealed an acceptable safety profile in this severe and life threatening disease," but that "full . . . publication of [ADVOCATE] data" would come later. Ex. 1 at 2.

Dr. Schall, ChemoCentryx's CEO, expressed belief in a "potential path to regulatory approval." Ex. 26 at 7-8, 11-12, 16, 18-19; Ex. 25 at 16. When asked if avacopan could replace steroids altogether, Dr. Schall cautioned he "did not know" and "can't comment on the discussions or comments that will come up with the [regulatory] agencies"; he could comment only on what the data showed—"you do not need the *chronic* steroid regimen"—and declined to comment on what any potential label would say. Ex. 26 at 18-19.

ChemoCentryx warned that a specific label, or even approval, was not guaranteed. Ex. 27 (Ferrell Class Cert. Rep.) ¶ 19; Ex. 28 (2018 10-K) at 23 ("[W]e cannot be certain that any approvals for our drug candidates will be granted on a timely basis, if at all."), 26, 54. It cautioned

investors that (1) FDA has "substantial discretion" in determining approval, (2) trial data "can be interpreted in different ways," such that "[e]ven if we believe the preclinical or clinical data for our drug candidates are promising, such data may not be sufficient to support approval by the FDA," (3) development may be delayed by "the need to conduct additional trials," (4) FDA may "limit the approved indications for use of the product, [or] require that contraindications, warnings or precautions be included in the product labeling," and (5) "FDA may ultimately decide" not to approve avacopan at all. Ex. 28 at 23, 26, 34, 54; Ex. 27 ¶ 19. Investors, ███████████ ████████████████████████████████████████████████████████████████ were well aware of these risks. Ex. 3 182:7-184:8; Ex. 29 (Cain Dep.) 194:8-14; Ex. 27 ¶ 21.

**E.    ChemoCentryx Widely Discloses Details Supporting Topline Results**

ADVOCATE's design was disclosed both before the Class Period, Ex. 4, and throughout, with detailed analyses of the design and results appearing in medical journals, symposia, calls, and conferences, Ex. 17; Ex. 18; Ex. 19 (NEJM App'x); Ex. 30 (ERA-EDTA Presentation); Ex. 31 (EULAR Presentation); *see also* Ex. 27 ¶¶ 34-40; Ex. 32 (Seiden Rep.) ¶¶ 61-69. ChemoCentryx also disclosed that ADVOCATE's data had "limitations." Ex. 17 at 608. Specifically, steroids "were used by patients in the avacopan group," although in lower average daily doses than in the control group. *Id.*; *see also* Ex. 19 at Tables S5, S6, Fig. S5, S6; Ex. 31 at 10; Ex. 30 at 11; Ex. 32 ¶¶ 79-81, 84-85; Ex. 4 at 13. ChemoCentryx disclosed that results in the subgroup of avacopan patients receiving the immunosuppressant CYC (as opposed to RTX) were, within that subgroup, not positive, Ex. 17 at 602, 608; Ex. 30 at 19, but that "the trial was not powered [or large enough] to make conclusions from these data" and thus "not conclusive" as to subgroups, Ex. 17 at 602.

ChemoCentryx disclosed statistics comparing adverse events and serious adverse events between the treatment groups. Ex. 17 at  599, 606-607. There were more adverse events, serious adverse events, and deaths in the control group than the avacopan group. *Id.* at 606-607. But, there were more serious adverse events related to liver safety in the avacopan group (nine patients) compared to the control group (six patients). *Id.* at 606. Based on the safety data, ChemoCentryx disclosed that "[l]onger trials are required to determine the durability and safety of avacopan." *Id.* at 608. And ChemoCentryx addressed the limits in the secondary endpoint results, cautioning that,

based on the disclosed methodology, "[n]o definite conclusions can be drawn from these data" either. *Id.* at 602, 604-606.

**F.    The Market Reacted Positively To ChemoCentryx's Disclosures**

The market's reaction to ChemoCentryx's disclosures was positive. Ex. 27 ¶ 41. Analysts reported on the "detailed" data, Ex. 33 (2/21 Wells Fargo) at 1, reflecting their "cover to cover" review of publications that included the February 2021 *New England Journal of Medicine* ("NEJM") article, Ex. 34 (2/21 Raymond James) at 1-4; Ex. 27 ¶ 41.

**G.    FDA Confirms ADVOCATE Data Is Sufficient And Accepts The NDA**

ChemoCentryx continued taking steps toward FDA approval, providing investors with regular updates along the way. In its March 10, 2020 10-K filing, ChemoCentryx told investors it intended to submit its NDA in mid-2020. Ex. 38 (2019 10-K) at 4. At the same time, it reiterated the risks accompanying its disclosure of clinical trial results, and expanded on risks applicable to its NDA submission—*i.e.*, that trial data "are susceptible to varying interpretations that could delay, limit or prevent regulatory approvals" and any approval (and label) "will be limited to those indications . . . for which the drug product is demonstrated . . . to be safe and effective." *See supra* Section II.D; Ex. 38 at 23, 30, 35, 51.

In March 2020, ChemoCentryx requested a "Pre-NDA" meeting with FDA and submitted an overview of the trial results to FDA in advance of the meeting. Ex. 39 (3/20 FDA Minutes) at 2; 21 C.F.R. § 312.47(b)(2). FDA confirmed that the data "appear[ed] adequate to support filing of the NDA," Ex. 39 at 2-3; Ex. 5 ¶ 71, but FDA would determine once the NDA was accepted and could be reviewed whether the data were sufficient to meet the "benefit-risk" standard for eventual FDA approval. Ex. 39 at 2-3; Ex. 5 ¶¶ 71-73.

On July 7, 2020, ChemoCentryx submitted its NDA, containing the full results of the ADVOCATE trial. Ex. 40 (7/20 Press Release) at 1; Ex. 5 ¶ 74; Ex. 22 433:5-15. On September 17, 2020, ChemoCentryx announced that FDA had accepted its NDA and that FDA "indicated that it may . . . hold an advisory committee meeting to discuss the application." Ex. 41 (9/20 Press Release) at 1. By law, FDA's acceptance meant the NDA was "sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101(a) ("Within 60 days after FDA receives an NDA, the Agency will determine whether the NDA may be filed. The filing of an NDA means that FDA has made a threshold determination that the NDA is sufficiently complete to permit a substantive review."); Ex. 42 (Day 74 Letter) at 1; Ex. 5 ¶¶ 78-79; Ex. 43 (FDA Refuse to File Guidance) at 2.

## H.    FDA Holds An Advisory Committee To Evaluate Avacopan

On April 15, 2021, ChemoCentryx received a pre-publication draft of the Briefing Book that FDA prepared for the AdCom. Ex. 44 (FDA Briefing Book Letter) at 1; Ex. 48 (Weisman Class Cert. Rep.) ¶¶ 79-80. ChemoCentryx identified errors in FDA's description of the regulatory history, id. ¶¶ 81-82, 86-87; Ex. 11 263:7-264:13, and on May 4, 2021, FDA published a redacted version of the Briefing Book and an Erratum with the corrected "[p]ertinent regulatory history." Ex. 9 at 1-2; Ex. 2 at 22-26 (redacted "Table 2"); Ex. 6 at 5-9; Ex. 7 at 2-4. Also on May 4, FDA published its presentations for the AdCom on ADVOCATE's data. Ex. 45 (FDA AdCom Presentation); Ex. 46 (FDA AdCom Presentation Tr.); Ex. 47 (Ferrell Rep.) ¶ 50 n.61.

The Briefing Book acknowledged that, when analyzed according to the methods pre-specified in the trial protocol, ADVOCATE achieved superiority at week 52. Ex. 2 at 7-8 ("pre-specified analysis" for superiority at week 52 was statistically significant); id. at 14 ("avacopan arm demonstrated superiority over the prednisone arm in achieving sustained remission at Week

52"). But FDA questioned the "clinical meaningfulness of these results" based on its own, alternate analyses of the data. Ex. 2 at 8-9; *see also id.* at 13, 42; Ex. 5 ¶ 96. For example, FDA calculated the primary efficacy results using investigator-generated BVAS scores—instead of the protocol-required scores determined by the Adjudication Committee. Ex. 45 at 12, 39-40; Ex. 48 ¶ 85; Ex. 5 ¶ 96. Only the latter, adjudicated BVAS scores consistently excluded persistent vasculitis, as the trial protocol required. Ex. 16 at 100-102; Ex. 2 at 9. FDA also looked at efficacy results by immunosuppressant subgroup, instead of the entire trial population as the protocol specified. Ex. 2 at 8, 42-43. Based on the subgroup results, FDA questioned if avacopan's superior primary efficacy results were "clinically meaningful"—and if not, the Briefing Book stated that FDA had told ChemoCentryx "a non-inferiority comparison would not be sufficient." *Id.* at 8; *see also* Ex. 9 at 1-2.

With respect to safety, FDA reported the same statistics ChemoCentryx had previously disclosed—including overall adverse events experienced by patients in the avacopan and control groups. *Compare* Ex. 2 at 12, *with* Ex. 17 at 606. FDA then provided its interpretation of individual adverse events related to liver safety, including that one patient "met Hy's Law laboratory criteria"[4] but had "received multiple other drugs associated" with liver safety issues. Ex. 2 at 12-13. FDA stated that "given the small safety database, conclusions are limited." *Id.* at 13.

FDA's Briefing Book asked the AdCom to weigh in on whether ADVOCATE was sufficient to meet the overall standard for approval, or whether further trials were needed. *Id.* at 16; *see also* Ex. 50 (AdCom Tr.) 204-208, 208-334. By the close of market on May 4, ChemoCentryx's stock price had dropped by $20.96, more than 45%. AC ¶ 170. This lawsuit was filed the next day, May 5, before the May 6 AdCom meeting. ECF No. 1; AC ¶¶ 431-32; Ex. 51 (Cain Rep.) ¶ 38.

## I.    The AdCom Meets And Votes On Avacopan

FDA convenes advisory committees to gather views from independent experts with

---

[4] Hy's Law is a tool used to predict a risk of liver injury and requires: (i) elevation of liver enzymes; (ii) elevations of bilirubin; and (iii) no other explanations for the elevations. Ex. 49 (Chalasani Rep.) ¶¶ 17-18, 60. The first two criteria are the "laboratory criteria." *Id.* ¶ 49 & n.97.

relevant expertise on questions posed by FDA in its briefing materials. Ex. 5 ¶¶ 53, 90; *see also* Ex. 32 ¶ 121; Ex. 52 (Walton Rep.) ¶ 36; Ex. 53 (FDA AdCom Meeting Guidance) at 5-6; 21 C.F.R. § 314.50(c)(1). Here, AdCom members met on May 6 to discuss and vote on whether the "safety," "benefit-risk," and "efficacy data" from ADVOCATE were adequate to support approval of avacopan. Ex. 50 207:18-208:18. Members were evenly split on all three issues. *Id.* 314-22, 324-31; Ex. 54 (AdCom Minutes) at 7; Ex. 50 303-14.

Trading in ChemoCentryx stock was halted during the AdCom, as is customary. AC ¶ 187; Ex. 51 ¶ 137; Ex. 47 ¶ 59. The next day, on May 7, the stock price dropped by $17.10, or 62%. Ex. 51 ¶ 159; Ex. 47 ¶ 68.

### J.     FDA Approves Avacopan As TAVNEOS

On July 6, 2021, ChemoCentryx filed an amendment to its NDA containing further analyses and discussion of the ADVOCATE trial data. Ex. 55 (7/21 Press Release) at 1. On October 7, 2021, FDA announced approval of avacopan, now TAVNEOS, based on ADVOCATE's results. Ex. 56 (FDA Approval Letter) at 1; Ex. 57 (FDA Approval Notice). Based on its approval, FDA determined that ADVOCATE had demonstrated avacopan met the statutory standards for approval—*i.e.*, that it was effective and safe. 21 C.F.R. § 314.105 ("FDA will approve an NDA after it determines that the drug meets statutory standards for safety and effectiveness").[5] The next trading day, ChemoCentryx's stock price increased 96.6%. Ex. 27 ¶ 49.

## III.    LEGAL STANDARD

To succeed on its securities fraud claim, INPRS must establish the following elements as to each challenged statement: (1) a material misrepresentation or omission by Defendants; (2) scienter; (3) a connection between the challenged statement and the purchase or sale of a security; (4) reliance upon the statement; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Summary judgment is appropriate

---

[5] *See also* 21 U.S.C. § 355(d); 21 C.F.R. § 314.125 (outlining basis for refusal to approve an NDA, including "results of the tests show that the drug is unsafe" or "[t]here is a lack of substantial evidence consisting of adequate and well-controlled investigations" of drug's effect); Ex. 5 ¶ 33; Ex. 58 (FDA Benefit-Risk Guidance) at 3 ("Because all drugs can have adverse effects, the demonstration of safety requires a showing that the benefits of the drug outweigh its risks."); Ex. 57 at 1 ("Safety and effectiveness of Tavneos were demonstrated in one study [ADVOCATE]").

if "there is no genuine dispute as to any material fact" as to one or more of these elements, "and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Corns v. Laborers Int'l Union of N. Am.*, 709 F.3d 901, 907 (9th Cir. 2013).

The moving party has the initial burden of showing that there is no genuine issue of material fact. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d. 376, 387 (9th Cir. 2010) (citation omitted). Where a movant does not bear the burden at trial, its burden is satisfied "by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 718 (9th Cir. 2023) (citation omitted).

## IV.    ARGUMENT

### A.    Summary Judgment Is Warranted Because Defendants' Statements Are Inactionable Opinions

Where a defendant speaks about the results of a clinical trial and expresses views about the implications of that trial data, the defendant's statements are, as the Second Circuit recently clarified, statements of opinion subject to the heightened falsity standard set forth in *Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*, 575 U.S. 175, 183-84 (2015). *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 422 (2d Cir. 2023). Under *Omnicare*, a defendant's statements interpreting trial data cannot be false or misleading merely because a plaintiff—or FDA—disagrees with that interpretation. *See id.* at 421. And further, when FDA approves the drug at issue, that approval precludes—as a matter of law—a plaintiff from showing that a defendant's favorable interpretation of trial data was fraudulent. *See id.* at 421-22.

Applying this legal framework, courts within this district have recently dismissed as a matter of law claims like INPRS's that challenge positive statements about clinical trial data. *See Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *4 (N.D. Cal. Feb. 24, 2025); *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *5 (N.D. Cal. Mar. 18, 2024); *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *7 (N.D. Cal. Mar. 11, 2024). As those courts explained, "there is no single 'correct' way to

interpret data." *Thant*, 2025 WL 58894, at *4. Even before *Omnicare,* the Ninth Circuit recognized that a defendant's reported trial results are not false or misleading for failing "to disclose alternative methods for interpreting the data." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 879 (9th Cir. 2012). Applying the *Omnicare* standard to a defendant's statements about trial data raises the bar even higher. As the same courts have explained in applying *Omnicare*, a defendant's interpretation of trial data can be fraudulent only where the plaintiff shows, for an affirmative statement, that "'the speaker did not hold the belief she professed' and that the belief is objectively untrue," *Strezsak*, 2024 WL 1160900, at *5 (citations omitted), or, for a statement alleged to be misleading by omission, that it "lacked a reasonable basis," *Pardi*, 2024 WL 1056013, at *7; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). It is not enough for the plaintiff to point to a competing, more negative interpretation of the data or to undisclosed FDA feedback allegedly casting doubt on a defendant's favorable interpretation. *See Thant*, 2025 WL 588994, at *4-6; *Strezsak*, 2024 WL 1160900, at *5-7; *Pardi*, 2024 WL 1056013, at *6-9.

These legal principles are fatal to INPRS's case. The challenged statements are all interpretations of trial data that are subject to *Omnicare*. *See, e.g.*, *Philip Morris*, 89 F.4th at 420-23; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016); *Strezsak*, 2024 WL 1160900, at *5; *Pardi*, 2024 WL 1056013, at *6-7. For example, INPRS challenges Defendants' statements about ADVOCATE's trial results—including that "avacopan successfully achieved its two primary endpoints," Stmt. 15 (AC ¶ 292), and had "an acceptable safety profile," Stmt. 3 (AC ¶ 219). INPRS also challenges statements about the implications of those results, including that avacopan could replace "regimens that contain chronic high doses of steroids," Stmt. 4 (AC ¶¶ 60, 220). And it challenges statements expressing optimism—*e.g.*, that "results exceed our expectations," Stmt. 4 (AC ¶¶ 60, 220)—and expectations relating to the regulatory path forward, *e.g.*, Stmt. 57 (AC ¶ 312) ("[o]ur dialogue with the FDA continues on track").

INPRS challenges these statements on the same grounds that courts have rejected, namely that Defendants mischaracterized the data by leaving out adverse facts and concealing FDA's communications about supposed flaws in the trial design and potential weaknesses in the results.

That claim fails as a matter of law for three independent reasons: (1) INPRS cannot show falsity under *Omnicare* because FDA's approval of avacopan based on ADVOCATE's data forecloses any claim that Defendants' interpretation of that data was false or unreasonable; (2) even without a *per se* approval rule, INPRS cannot show falsity under *Omnicare* because FDA agreed to ADVOCATE's design before the trial began, 21 C.F.R. § 312.47(b)(1)(v), and any FDA concerns "at most constitute 'contrary views' to Defendants' statements concerning the sufficiency of the data," *Strezsak*, 2024 WL 1160900, at *6; *Bazzelle v. Novocure Ltd.*, 2025 WL 843668 at *10 (S.D.N.Y. Mar. 18, 2025); and (3) at the very least, Dr. Schall (and by imputation ChemoCentryx) cannot have acted with scienter in failing to disclose FDA feedback when they knew FDA had allowed ADVOCATE to proceed and throughout the Class Period repeatedly cautioned investors FDA would have the final word.

### 1. FDA Approval Of Avacopan Shows Defendants' Statements Were Not False Or Unreasonable

As explained above, the Second Circuit recently applied *Omnicare* to hold that where a defendant "express[es] an interpretation of scientific data that is ultimately endorsed by" FDA through approval, "such statements [are] per se 'reasonable' (i.e., supported by 'meaningful inquiry') as a matter of law." *Philip Morris*, 89 F.4th at 414 (cleaned up). In *Philip Morris*, much like here, an advisory committee issued a mixed recommendation on pending device applications; the stock dropped, and a lawsuit was filed—then, months later, FDA authorized the device. *Id.* at 415-16. The Second Circuit found that FDA's approval "confirm[ed] that" defendant's interpretations of the data as supporting approval "were contemporaneously reasonable," and "therefore not actionable." *Id.* at 422.

Here too, it is undisputed that FDA approved avacopan, now TAVNEOS, for use in the United States based on ADVOCATE's data. Ex. 59 (2021 8-K) at 3; Ex. 57 at 1. That approval "conclusively" establishes that Defendants' favorable interpretation of the data was reasonable. *Philip Morris*, 89 F.4th at 422. Indeed, in order for FDA to approve avacopan, it was required to agree that ADVOCATE's results provided clinically meaningful evidence of both efficacy and an acceptable safety profile. 21 C.F.R. § 314.105; *see also* 21 U.S.C. § 355(d) (requiring substantial

evidence of efficacy and safety for FDA approval); Ex. 58 at 3; Ex. 5 ¶¶ 33-34; Ex. 49 ¶¶ 27-28. For this reason alone, INPRS cannot show that Defendants' statements were "objectively 'irrational or unreasonable' when they were made." *Philip Morris*, 89 F.4th at 422.

### 2. Even Without A *Per Se* Rule, The Statements Were Not False Or Unreasonable

Even apart from the *per se* rule that comes with FDA's approval, INPRS cannot show—as required to establish the falsity of an opinion—that Defendants' statements were affirmatively untrue (*i.e.*, subjectively and objectively false) or misleading by omission (*i.e.*, lacked a reasonable basis).

INPRS points to two categories of facts in support of its claim. *First*, INPRS says Defendants omitted supposedly adverse facts about the trial itself, including a flawed design and underperforming subgroups. Here, INPRS's claim is that ADVOCATE's results were less favorable when considering the flawed design or when analyzing the data differently. But that claim is just a competing interpretation of the trial's results, which the case law now establishes does not make Defendants' positive interpretation false or unreasonable. *Thant*, 2025 WL 588994, at *4 (collecting cases, including *Philip Morris*, holding that interpretations of trial data are opinions subject to the *Omnicare* standard); *cf. Rigel Pharms.*, 697 F.3d at 879 (holding pre-*Omnicare* that companies reporting information from "imperfect studies are not required to disclose alternative methods for interpreting the data"). The securities laws do not require a drug sponsor to take a gloomy view of clinical trial data. *See Philip Morris*, 89 F.4th at 420; *see also Bazzelle*, 2025 WL 843668, at *12 (holding that "'[i]t is not the Court's job' to determine whether the flaws a plaintiff alleges with the [trial design] were 'so anomalous' that stating the topline results of their trial was 'fraudulent if [those methodologies were] not disclosed'") (citation omitted).

*Second*, INPRS points to Defendants' failure to disclose FDA's communications during the regulatory process, including communications in 2016 before ADVOCATE began and communications in 2020 when FDA accepted ChemoCentryx's NDA for review. *E.g.*, AC ¶¶ 84-129; Ex. 60 (7/10/2024 Rog Resp.) No. 9.

At the outset, FDA communications in 2016 cannot undermine Defendants' positive interpretation of ADVOCATE's data because FDA ultimately agreed to ADVOCATE and permitted it to proceed. Ex. 7 at 4 ("FDA agreed with [ChemoCentryx's] approach"); *see also* Ex. 9 at 2 (same). FDA minutes serve as the "permanent record" of "agreement[]," and create a regulatory presumption that ADVOCATE "shall be presumed to be sufficient in objective and design for the purpose of obtaining marketing approval for the drug." 21 C.F.R. § 312.47(b)(1)(v).[6] If FDA had at any time changed that view, and decided instead that ADVOCATE was incapable of yielding valid evidence of safety and efficacy, FDA could have stopped the trial by issuing a "clinical hold." 52 Fed. Reg. 8798 (FDA has authority to stop a trial where "serious defects in study design . . . would render the study incapable of producing valid evidence of safety and effectiveness"); s*ee also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 533-34 (S.D.N.Y. 2015) (FDA's concerns about trial design did not render statements false because FDA "allowed those trials to proceed"), *aff'd sub nom. Sanofi*, 816 F.3d 199 (expressly "agree[ing] with the district court's reasoning and holding" in dismissing claim). FDA, of course, did not do so, further confirming the reasonableness of Defendants' views of the data here. *See Pitman v. Immunovant, Inc.*, 2024 WL 1342737, at *9 (E.D.N.Y. Mar. 29, 2024) (holding FDA's approval of trial design "supports the reasonableness" of defendants' statements).

Regardless of the regulatory presumption that comes with FDA agreement to a trial, FDA feedback does not undermine a defendant's positive interpretation of trial data even if that feedback "cast[s] doubt on the trial data," *see Streszak*, 2024 WL 1160900, at *6, or FDA expresses "its view that the results *likely* would not be applicable to the U.S. population" relevant for approval, *Pardi*, 2024 WL 1056013, at *7, or FDA repeatedly communicates that the trial design is "unlikely to provide substantial support for" approval, *Sanofi*, 816 F.3d at 203, 212. As the case law now establishes, *Omnicare* requires INPRS to show that FDA's communications *conflicted with*, thereby undermining any reasonable basis for, Defendants' statements about the trial's results and

---

[6] FDA had expressed concerns about the original design. *See supra* Section II.B. But after ChemoCentryx revised and clarified the trial design and approach, FDA agreed. *See id.* The evidence on this point is undisputed. Ex. 7 at 4; Ex. 11 263:21-264:13; Ex. 13 219:17-220:25.

the potential for approval. *See Pardi*, 2024 WL 1056013, at *8 (holding that "a years-long iterative dialogue with the FDA, during which the agency unsurprisingly raised issues as to which there were differences of opinion, does not plausibly allege that the opinion statements . . . were false or misleading by omission"). INPRS has not met that high burden here.

None of FDA's communications in either 2016 or 2020 undermines the reasonableness of Defendants' statements because those communications are, at most, contrary (and provisional) views about "the sufficiency of the data—communications that courts have not required similarly situated Defendants to disclose" merely because the sponsor expresses positive views of the trial data. *Strezsak*, 2024 WL 1160900, at *6; *see also Sanofi*, 816 F.3d at 212 ("Defendants need not have disclosed the FDA feedback merely because it tended to cut against their projections."); *see also Sanofi*, 87 F. Supp. 3d at 541 (compiling "a series of cases" that "rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review").

INPRS points to feedback FDA gave to ChemoCentryx in 2016, while the trial design was still being discussed, citing for example FDA's statement that a noninferiority design was "likely not adequate" to demonstrate that avacopan was safer than the traditional chronic steroid regimen. AC ¶ 86; *see also* ECF No. 275 at 2. But FDA never said that ADVOCATE's revised trial design, which included a superiority endpoint and did not test non-inferiority alone, would not support such a comparison or would not support approval. To the contrary, after giving that feedback, FDA agreed to ADVOCATE's revised trial design and allowed the trial to go forward, and then ultimately approved avacopan. *See supra* Section II.B. Likewise, in 2016 FDA raised concerns about secondary endpoint measurements, AC ¶¶ 88-95, 101-103, 110-122; ECF No. 275 at 3, but again, FDA agreed to ADVOCATE, Ex. 7 at 4, and Defendants never told investors that secondary endpoints would be the basis for FDA approval, *see generally* AC. INPRS also points to FDA's criticisms of a design with only a single 26-week noninferiority endpoint. AC ¶¶ 96-100; *see also* ECF No. 275 at 2-3. But it is undisputed that ChemoCentryx added a 52-week superiority endpoint. Ex. 7 at 4; Ex. 16 at 87-88. FDA agreed to a design with those two primary endpoints (26 and 52 weeks) and, as stated in its Briefing Book, ADVOCATE met both endpoints when results were

calculated according to the trial protocol. Ex. 2 at 6-7. FDA raised concerns in 2020 about only one subgroup receiving maintenance therapy, AC ¶¶ 107-08, but Defendants told investors the same information, as well as the data's limitations, Ex. 30 at 19; Ex. 66 (ACR) at 21; Ex. 17 at 608. FDA never said that ADVOCATE's data was not sufficient for approval—to the contrary, FDA accepted the NDA for filing, *see supra* Section II.G, and later approved the drug on the basis of ADVOCATE, Ex. 59 at 3; *see also* Section II.J.

The market reacted to the release of the Briefing Book, which contained the views of some FDA reviewers about ADVOCATE's data. But "a dispute about the proper interpretation of data" does not show that Defendants' interpretation was wrong. *Philip Morris*, 89 F.4th at 424. Defendants had no obligation to second-guess FDA's agreement to ADVOCATE or FDA's years-long consent to the trial proceeding, or to speculate as to how FDA might interpret the data differently—particularly when ChemoCentryx expressly warned investors of the risks of alternate interpretations and even non-approval (*see supra* Sections II.D, II.G). *See Pitman v. Immunovant, Inc.*, 2024 WL 964258, at *7 (E.D.N.Y. Feb. 25, 2024) ("Defendants have not satisfactorily alleged securities claims based on their post-hoc reassessment of the trial design where the actual trial met the FDA's standards."), *report and recommendation adopted*, 2024 WL 1342737; *see also Strezsak*, 2024 WL 1160900, at *6 (noting that defendants had "warned that success depended on whether [the drug's] 'efficacy profile is satisfactory to the FDA'").[7]

### 3.    INPRS Cannot Show Scienter Based On Omission Of FDA Feedback

INPRS cannot show that Defendants acted with scienter by expressing a favorable view of ADVOCATE's data without disclosing FDA feedback. Courts have recognized that a failure to "divulge the details of interim 'regulatory back-and-forth' with FDA . . . alone cannot support an inference of scienter under the PSLRA when the defendants do provide warnings in broader terms." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 59 (1st Cir. 2018) (citation omitted).

---

[7] While this Court previously addressed Defendants' argument that certain statements preceded by "I think" or "I believe" were not statements of opinion, ECF No. 61 at 22, it has never addressed the argument that *Philip Morris* and other courts in this district have more recently endorsed, that statements about clinical data and their implications are statements of opinion subject to *Omnicare*'s falsity standard regardless of whether they have those traditional indicia of an opinion.

Here, Defendants repeatedly cautioned investors that "FDA may interpret data differently than we interpret data," Ex. 28 at 26; *see also supra* Section II.D, and INPRS cannot show that Defendants believed FDA's contrary interpretation was more than a hypothetical possibility. Dr. Schall, like every witness who attended the 2016 meetings, testified that he believed FDA had signed off on ADVOCATE. Schall Dec. ¶¶ 17, 21; Ex. 11 263:21-264:13; Ex. 13 219:17-220:25. Particularly given the regulatory presumption in favor of agreed-to trials, 21 C.F.R. § 312.47(b)(1)(v), Dr. Schall could not have acted with "actual knowledge" or "conscious or deliberate recklessness," in expressing his positive view of the data without disclosing contrary views. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010); *In re PETCO Corp. Sec. Litig.*, 2008 WL 8876554, at *3-10 (S.D. Cal. Apr. 29, 2008).

For all of these reasons, summary judgment is warranted as to the entirety of INPRS's case.

**B.      Defendants Are Entitled To Partial Summary Judgment On Several Claims**

Even if the complaint could survive *Omnicare*, Defendants are entitled to summary judgment on many of Plaintiff's claims and statements for the following independent reasons.

*First*, INPRS cannot establish any losses on the second alleged corrective disclosure date because none of the information disclosed on that day was both new and corrective. The federal securities laws do not provide investor insurance for losses caused by information that was new to the market and Defendants alike.

*Second*, INPRS cannot establish any claim that Defendants violated the trial protocol in reporting primary efficacy results. FDA itself recognized that the primary efficacy results were correct when measured according to the trial protocol—and this Court has already found that INPRS's ███████████████ is not a separate claim.

*Third*, INPRS cannot establish any claim that Defendants omitted facts regarding steroids or subgroups in reporting primary efficacy results or the implications of those results, or that those omitted facts caused investor losses, because all of the allegedly omitted information was disclosed during the Class Period.

*Fourth*, several statements fail for statement-specific reasons discussed further below.

**1.    INPRS Cannot Establish Loss Causation As To The May 7 Stock Price Drop**

Summary judgment is warranted on INPRS's claim that it can recover losses allegedly suffered in a stock drop on May 7, 2021. Securities actions do "not . . . provide investors with broad insurance against market losses, but . . . protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). "[D]rug candidates do not always live up to their potential . . . [but] that does not mean that a pharmaceutical company has defrauded the investing public." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 831 (9th Cir. 2022). INPRS can recover only for losses caused by fraud, not by other factors. *Dura*, 544 U.S. at 345-46 (plaintiff has "'burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'") (citation omitted). To prevail at trial, INPRS must establish that the information revealed during the May 6 AdCom[8] was (i) "new . . . to the market," and "not yet reflected in the company's stock price," and (ii) corrective, meaning it "revealed . . . the truth concealed by the defendant's [alleged] misstatements." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791, 794 (9th Cir. 2020). Where there is no such evidence, the defendant is entitled to summary judgment. *See Oracle*, 627 F.3d at 392; *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 325 (S.D.N.Y. 2023) (granting summary judgment where disclosures included "'negative characterizations' of already public information"); *REMEC,* 702 F. Supp. 2d at 1266-67.

INPRS cannot meet this burden. The information disclosed on May 6 either repeated facts already disclosed on May 4—*i.e.*, supposedly adverse trial data, FDA reviewers' data interpretations, and history of communications during the regulatory process—or it involved entirely new (and thus non-corrective) information—*i.e.*, the AdCom's discussion and vote on whether avacopan met the standard for approval. The market had already reacted to the former, and the latter is not "corrective." Indeed, INPRS concedes that almost all of the information

---

[8] As noted, ChemoCentryx stock trading halted on May 6 and resumed May 7. *See supra* Section II.I.

disclosed during the AdCom on May 6 is the same as the information disclosed on May 4.[9] And there is no dispute that ChemoCentryx's stock traded "in an efficient market in which all publicly available information about the company . . . is quickly incorporated into the stock price." *BofI*, 977 F.3d at 789; *see also* Ex. 51 ¶ 1; Ex. 61 (Cain Reply Rep.) ¶ 12; ECF No. 267 at 5-7 (INPRS seeking summary judgment on market efficiency). As a matter of law then, duplicative disclosures on May 6 do not constitute the "new information" needed to establish loss causation. *See BofI*, 977 F.3d at 794.

INPRS argues that investors had not fully digested the Briefing Book until the AdCom "clarified" and "provided important context" for that information. Ex. 51 ¶¶ 137, 152; Ex. 61 ¶ 217. That argument is meritless. This is not a case where the market initially did not react to those public facts, which were then repackaged with "extensive and tedious research" into a more digestible form to which the market was able to respond. *BofI*, 977 F.3d at 794; *see also Evanston Police Pension Fund v. McKesson Corp.*, 2021 WL 4902420, at *5 (N.D. Cal. Oct. 21, 2021). To the contrary, INPRS's expert admits that the facts about ADVOCATE's results disclosed on May 6 "mirrored" the facts disclosed on May 4. Ex. 51 ¶ 99, n.253. INPRS itself relies on the fact that the market reacted to the May 4 disclosure of the Briefing Book. *Id.* ¶¶ 107-114. And, even ignoring all of that, this lawsuit alleging fraud was filed on May 5, 2021, the day before the AdCom took place. ECF No. 1 ¶¶ 22-50; 51-57. These facts belie any suggestion that the sophisticated biopharma investors operating in this space did not understand the facts disclosed in the Briefing Book.[10]

The only truly "new" information on May 6 was AdCom's reaction to the Briefing Book,

---

[9] INPRS's own interrogatory responses indicate that the market learned on May 4, 2021, that (i) "secondary endpoints [were not] clinically meaningful," (ii) ChemoCentryx "failed to account for persistent vasculitis," (*i.e.*, the modified BVAS issue), (iii) avacopan's benefit "was confined to patients who received . . . no maintenance therapy," (iv) "there was no meaningful evidence avacopan was steroids-sparing," and (v) "FDA's serious concerns about avacopan's [liver] safety)." Ex. 60 No. 11. That is the same information INPRS says the market reacted to on May 6, 2021. *See id.* No. 12.

[10] There is no dispute investment analysts and INPRS's own investment advisor had the expertise to digest this information. *See* Ex. 32 ¶ 23, n.31 (listing advanced degrees of analysts covering ChemoCentryx including MDs and PhDs); ███████████████████████████ *see also supra* n.3.

as INPRS concedes. Ex. 51 ¶¶ 150-159. But AdCom members' reactions, including their votes, were "development[s] that [Defendants] learned about for the first time at the AdCom itself." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024). Courts have held that an AdCom's "negative view" is not corrective where it "was new to the market and to defendants alike." *Sanofi*, 87 F. Supp at 543; *Shash v. Biogen Inc.*, 2025 WL 928779, at *9 (D. Mass. Mar. 27, 2025) (rejecting argument that AdCom vote was a corrective disclosure where plaintiff alleged that prior report disclosed the facts that caused the negative vote).

Another court in this District recently rejected a nearly identical claim at the class certification stage. In *FibroGen*, 2024 WL 1064665, at *13, FDA had published a briefing book two days before an AdCom. There was no statistically significant stock price drop on the date of the briefing book. Instead the plaintiff argued that discussion of the briefing book information during the AdCom caused a stock drop attributable to the alleged fraud. *FibroGen* rejected that claim on two grounds, both relevant here. One, data that was previously disclosed, or could be "inferred from the data that was presented," in the briefing book "was not a new disclosure at the AdCom meeting" and therefore not a corrective disclosure. *Id.* at *13-15. Two, neither the AdCom discussion nor vote could "properly be characterized as a corrective disclosure" because neither was "previously known to Defendants and did not contradict a previously uncorrected misstatement." *Id.* at *12, *13.

In its *Daubert* Order, this Court distinguished *FibroGen*, relying on INPRS's argument that "the adverse AdCom discussion and related vote were foreseeable to ChemoCentryx . . . [because] Defendants were told repeatedly and for years that FDA had grave concerns about the results and the design of the ADVOCATE trial." ECF No. 275 at 34 (quoting INPRS's Opp., ECF No. 220-3 at 25). While Defendants dispute INPRS's premise, the Court need not decide that dispute, as INPRS contends these purported FDA concerns were disclosed in the Briefing Book on May 4. Ex. 60 No. 11; *see also* ECF No. 1 ¶¶ 52-54. It follows that any increased risk flowing from FDA concerns and related to the outcome of the AdCom vote would have been known to the market on May 4. Indeed, the initial complaint in this action, filed May 5, 2021, alleges that the Briefing Book "revealed" the "truth" and its contents "presented a substantial concern regarding the

viability of ChemoCentryx's NDA for avacopan." ECF No. 1 ¶ 57. The only new information on May 6 was the AdCom's discussion and vote, which reflected the members' views about FDA's already-public negative interpretation of the data. Ex. 54 at 7; Ex. 50 314:7-322:9, 331:19-332:8. The Court also noted INPRS's argument that ChemoCentryx downplayed FDA concerns and suggested the AdCom would yield a positive vote, and that the AdCom vote was related to those statements. ECF No. 275 at 34-35 (citing ECF No. 202-25 (INPRS Damages Expert Report) ¶¶ 117-133). But INPRS has never alleged that ChemoCentryx's statements on May 4 or May 5 supposedly downplaying the Briefing Book were fraudulent—nor could it have, given that optimistic suggestions about an upcoming "positive vote" are inactionable puffery and opinion. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014); *Philip Morris*, 89 F.4th at 420-24. Therefore, INPRS cannot rely on any connection between those statements and the AdCom discussion and vote to establish that that any information on May 6 was corrective of the alleged fraud.[11]

No doubt the market reacted negatively on May 7, 2021. The parties' experts agree on that. Ex. 47 ¶ 57; Ex. 51 ¶ 159 (citing analyst reports). But the existence of a stock drop alone, reflecting "greater risk heading into FDA's decision," *e.g.* Ex. 51 ¶ 147, is not sufficient to connect the losses to fraud—particularly where the underlying data and FDA concerns had already been disclosed, and any new information coming out of the AdCom—the discussion and the vote—was new to Defendants too. *See Mylan N.V.*, 666 F. Supp. 3d at 325 (granting summary judgment where

---

[11] The Court also relied on *In re AVEO Pharmaceuticals, Inc. Securities Litigation*, 2017 WL 5484672, at *7 (D. Mass. Nov. 14, 2017), but there, the plaintiff identified new information revealed for the first time by FDA at the AdCom meeting that contradicted the challenged statements. *Id.* Notably in *AVEO* (unlike here), FDA's presentation to the AdCom was not published before the meeting, and so the allegedly corrective facts were revealed by FDA—not the AdCom—for the first time during the meeting. *Id.* (recognizing that at the AdCom meeting, FDA contradicted plaintiff's earlier statements that its drug was equivalent to a competitor drug, "stat[ing] that no other drug approved for metastatic renal cell cancer had the same "concerning issue''). Here, in contrast, both the Briefing Book and AdCom presentations were published on May 4 in advance of the AdCom itself. Ex. 47 ¶ 50 n.61; Ex. 51 ¶ 17. And INPRS has not identified any fact disclosed for the first time on May 6 that reveals any fraud in Defendants' interpretation of ADVOCATE's results. *See Philip Morris*, 89 F.4th at 420 ("We have 'rejected' the proposition that a mere 'dispute about the proper interpretation of data' can form 'a basis for liability' under section 10(b) and Rule 10b-5") (quoting *Sanofi*, 816 F.3d at 214).

disclosures included "'negative characterizations' of already public information" which were "as a matter of law, insufficient as a basis to find loss causation"). Instead, like FDA's interpretation of the results on May 4, the AdCom discussion and vote again reflected the materialization of a known risk. Ex. 47 (Ferrell Rep.) ¶ 64; Ex. 28 at 26.

### 2. Defendants Are Entitled To Summary Judgment On INPRS's Claim Challenging The Primary Efficacy Results Based On A "Protocol Violation"

INPRS's challenge to Defendants' interpretation of the primary efficacy results survived a motion to dismiss, ECF No. 61 at 15-16, based on its allegation that Defendants did "not disclose its failure to follow trial protocol in calculating remission [*i.e.*, primary efficacy] results." ECF No. 275 at 3 (citing AC ¶¶ 130-137). Now, undisputed facts—the protocol itself—show there was no such violation. ███████████████████████████████████████████ ██████████████████████████████ INPRS cannot, however, rely on this theory to prove its claim that Defendants misrepresented the primary efficacy results. Summary judgment is warranted on INPRS's primary efficacy result claim. *See* App'x B No. 6.

### a. Summary Judgment Should Be Granted On INPRS's Claim That Primary Efficacy Results Were Based On A BVAS Scoring Violation

INPRS alleges that Defendants reported primary efficacy results that did not measure remission according to the methodology supposedly required by ADVOCATE's protocol—namely, BVAS scores that included persistent (*i.e.*, continuing or unchanged) vasculitis. *See* App'x B No. 6. According to INPRS, FDA disclosed in the Briefing Book on May 4, 2021, supposedly for the first time, that when the primary efficacy results were measured according to the trial protocol, they did not achieve superiority. Ex. 2 at 9, 42. That claim fails.

At summary judgment, the undisputed record shows ChemoCentryx used exactly the methodology called for by the protocol. Specifically, the protocol required use of an adjudicated version of BVAS scores that excluded persistent vasculitis. Ex. 16 at 100; Ex. 4 at 17. Contrary to INPRS's theory, FDA acknowledged in the Briefing Book that the "pre-specified analysis [in the trial protocol] used the Adjudicator assessments," which consistently excluded persistent vasculitis based on "the modified BVAS administered in the study." Ex. 2 at 9. And FDA acknowledged that

when the results were measured according to the trial protocol, ADVOCATE met its primary endpoints, demonstrating non-inferiority at 26 weeks and superiority at 52 weeks, *id.* at 6-7, 9—just as ChemoCentryx told investors, *e.g.* Ex. 1 at 1; Ex. 31 at 7-8; Ex. 17 at 599. Because there was no BVAS-related protocol violation, INPRS cannot establish that Defendants misrepresented the primary efficacy results on that basis.

Nor can INPRS establish that the Briefing Book disclosed for the first time how Defendants would measure the primary efficacy results—and thus cannot establish loss causation for this claim. *See BofI*, 977 F.3d at 794 (corrective disclosures must reveal "new facts" that "render some aspect of the defendant's prior statements false"). Defendants repeatedly disclosed that ADVOCATE was designed to measure changes in disease activity and whether avacopan was effective in inducing remission—meaning controlling new, active, or worsening disease. Ex. 4 at 17; Ex. 17 at 601. And it disclosed that the trial protocol required using adjudicated BVAS scores that did not capture persistent vasculitis symptoms. Ex. 4 at 17; Ex. 16 at 100; Ex. 18 at 64.

### b.    INPRS Cannot Rely On ███████████████████ To Suggest A Securities Fraud Claim

Unable to establish its pled theory of liability, ███ ██████████████████████ ██████████████████████████████ This Court found, however, in its *Daubert* Order that INPRS is not advancing ████████ as a separate theory of liability. ECF No. 275 at 10. Nor could INPRS do so, given that ████████████ has ever been publicly reported, Ex. 29 237:2-238:3, and therefore cannot possibly have caused the stock drop for which INPRS seeks to recover, *BofI Holding, Inc.*, 977 F.3d at 789 (explaining there is no actionable loss "[i]f [alleged] fraud remains concealed"). And while the Court endorsed INPRS's argument that the ████████████████████████████ for purposes of resolving *Daubert* motions, ECF No. 275 at 10, the relevance and admissibility of any evidence on that point are properly addressed in motions *in limine*, if necessary.

For present purposes, nothing about that theory saves INPRS's protocol violation claim. INPRS is not claiming (and cannot claim) that any of Defendants' statements were rendered fraudulent because of ████████████████████, ECF No. 275 at 10; Ex. 60

Nos. 9-10 (no claimed omissions related to ████████████); *see also* Ex. 2 at 6-7, 9 (no FDA references to ████████████).[12] Any ████████ therefore do not show, as scienter requires, that Defendants knew but concealed the facts that supposedly rendered their statements false. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536-38 (9th Cir. 2024) (scienter requires allegations "as to the omitted disclosures," including "knowledge" of the omitted information and "an intent to defraud").

Nor is there any evidence that ChemoCentryx or any of its officers ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ In short, this theory cannot demonstrate scienter for any of INPRS's pled claims. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1110 (9th Cir. 2021) ("[W]ithout particularized allegations showing that [defendant] was directly involved with the Report and ignored its falsity, there is not enough factual support for . . . scienter").

**3.    Defendants Are Entitled To Summary Judgment On INPRS's Claim That Defendants Concealed Allegedly Negative Data About Steroid Use And Subgroup Efficacy Results Because That Information Was Disclosed During the Class Period**

Summary judgment is warranted on INPRS's claim that any of Defendants' statements

---

[12] Nor could it, as it is undisputed that the ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

misleadingly omitted negative data on steroid use and subgroup efficacy results. The undisputed record shows Defendants repeatedly disclosed this information prior to May 4, 2021. In a securities fraud case like this one, where INPRS is claiming an efficient market, the stock price incorporates material information when it is first disclosed. *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); *see also REMEC*, 702 F. Supp. 2d at 1272. Any failure to repeat that information with every challenged statement does not alter the total mix of public information—and the plaintiff cannot prove materiality or reliance. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989)); *see also In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1009 (N.D. Cal. 2017) (granting dismissal on reliance grounds where omitted information was previously reported); *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (affirming where "sufficient disclosures made prior to either of the claimed corrective disclosure dates").

### a.    Summary Judgment Is Warranted On INPRS's Steroid Claim

INPRS claims Defendants misrepresented the following material facts: (i) the two patient groups had "similar" steroid use, (ii) patients were counted as responders to avacopan even when they took steroids, and (iii) 64% of avacopan patients took steroids to treat their AAV. *See* App'x B Nos. 1, 10. These facts were revealed throughout the Class Period, long before May 4, 2021, and cannot support a claim.

Avacopan patients' steroid use was at the core of ADVOCATE's well-publicized design. The control group received a daily, high steroid dose to induce remission that was tapered off by 21 weeks. Ex. 19 at Table S1. By contrast, the avacopan group received avacopan daily for 52 weeks and, in the first four weeks of the trial, was tapered off any steroids they had been taking prior to the trial. *Id.* Both groups were permitted to take additional steroids as needed to treat worsening of their disease, or for other illnesses. Ex. 17 at 608, Ex. 19 at Table S6. Defendants disclosed this design before and during the Class Period. Ex. 4 at 13; Ex. 17 at 606.

INPRS claims that investors did not know that so many patients in the avacopan group took steroids (even if in lower amounts) and were still counted as responding to avacopan. But the

undisputed record shows this information was disclosed—both the number of patients taking steroids, Ex. 31 at 10; Ex. 30 at 10-11; Ex. 66 at 14; Ex. 17 at 608; Ex. 19 at Tables S1, S5, S6; Ex. 8 (2011 RTX Label) at 1, and how steroid use impacted which patients were counted as responders, Ex. 1 at 1 (patients in "remission" if no steroids used in four weeks prior to primary endpoint assessment); Ex. 4 at 7. The NEJM article disclosed the exact percentage—87.3%—of avacopan patients who used steroids during the trial to treat AAV and for other reasons. Ex. 19 at Table S5, Table S6, Fig. S7. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ None of INPRS's experts contradicted him. Contemporaneous market analyst reports show the market was not surprised by the amount of steroid use in the avacopan group.[13] Ex. 74 at 2 (describing steroid use in the avacopan arm); Ex. 32 ¶ 84 (citing analysts). The Briefing Book merely repeated this already-public information. *See* Ex. 2 at 49 (citing the same figures regarding the amount of steroid use noted above).

On the class certification record, the Court found that Defendants had not disclosed certain details about steroid use, including that 64% of avacopan patients were prescribed steroids to treat AAV. ECF No. 131 at 10. The summary judgment record, however, shows indisputably that all but one of INPRS's steroid "omissions" were disclosed well before May 4, 2021. *See supra* Section II.E. The only exception is the single statistic that 64% of avacopan patients used steroids to treat their AAV—a subset of the disclosed statistic that 87.3% of avacopan patients used steroids during the trial. But the 64% statistic is something FDA calculated, not Defendants. That Defendants did not analyze the data the same way as FDA—or know that FDA would analyze steroid use

---

[13] All of the investors deposed in this case, ███████████████████████████████ ███████████████████████ *See* Ex. 68 (Tenthoff Dep.) 49:17-20, 87:3-4; Ex. 69 (Seedhouse Dep.) 123:14-19 ("Do you recall that it was disclosed that steroids were being used with patients receiving avacopan during the drug trial? A. In certain circumstances, yes, I was aware of that."), 140:2-141:16 ("Patients in the avacopan arm of the study did receive some steroids; hence, steroids were not completely eliminated."); ███████████████ ███████████████████████████████████████ ; Ex. 70 (White Dep.) 142:10-19, 164:21-25. Analysts' contemporaneous publications reflect the same knowledge. Ex. 34 at 1; Ex. 71 (5/21 Canaccord Rep.) at 1-2; Ex. 72 (5/21 Stifel Rep.) at 1.

differently—is not a basis for a securities fraud claim. *See supra* at IV.A. Indeed, during the Class Period, ChemoCentryx disclosed the pre-specified statistics comparing steroid use between the two patient groups, Ex. 75 at 28 (pre-specified comparison of steroid use); Ex. 19 at Fig. S5-S7; Tables S5, S6. And those analyses showed that an even higher number of avacopan patients (87.3%) had received steroids for any reason. Ex. 19 at Table S5. In any case, Defendants expressly disclosed in the NEJM that steroids confounded the results: "[t]his trial had limitations" because "[g]lucocorticoids were used by patients in the avacopan group[.]" Ex. 17. at 607. And Dr. Schall told investors on November 25, 2019 that he "did not know" whether avacopan could be used without steroids because "we have to test that clinically," adding that it would not surprise him if the drug was used "in the first incarnation" in the way it was tested during ADVOCATE. Ex. 25 at 18; *see also* Ex. 32 ¶ 60.

For all of these reasons, summary judgment is warranted on INPRS's claim that Defendants misrepresented steroid use.

### b.    Summary Judgment Is Warranted On INPRS's Subgroup Claim

INPRS claims Defendants misrepresented the efficacy results by reporting results for the avacopan group without disclosing that only the subgroup not receiving a maintenance therapy (rituximab, or RTX) achieved superior primary efficacy results. *See* App'x B No. 2. Again, that information was repeatedly disclosed, and summary judgment is warranted on that claim too.

Defendants disclosed both the design of ADVOCATE for each subgroup and also the results. ADVOCATE treated one subgroup in each arm with a maintenance therapy (the cyclophosphamide, or CYC, subgroup); the second subgroup received RTX for only four weeks without a maintenance therapy. *E.g.*, Ex. 4 at 5; Ex. 17 at 601. This protocol was notable because after ADVOCATE began, FDA approved RTX as a maintenance treatment, permitting patients to take it for longer than four weeks. *Compare* Ex. 76, *with* Ex. 8; Ex. 77. Defendants disclosed that avacopan had achieved superiority in the RTX subgroup, but not in the CYC subgroup receiving maintenance therapy. Ex. 30 at 19; Ex. 19 at Table S9. In fact, Defendants disclosed the same subgroup data that appeared in the Briefing Book. *Compare id.*, *with* Ex. 2 at 42-43, Table 10. And

throughout the Class Period, ChemoCentryx disclosed that the RTX subgroup was not receiving a maintenance therapy, explaining that the RTX subgroup was not "getting additional [RTX]," *e.g.*, Stmts. 68 (AC ¶¶ 319, 381), 105 (AC ¶ 345), and avacopan was working as a "monotherapy" in the RTX subgroup after the first four weeks, *e.g.*, Stmt. 83 (AC ¶¶ 332, 390).

In the Briefing Book, FDA questioned whether avacopan would have achieved superior results if the RTX subgroup had received a maintenance therapy. Ex. 2 at 8-9; *see also id.* at 42-43. INPRS's expert, Dr. Cain, acknowledges the market reacted to this information. Ex. 51 ¶ 115 (citing analyst Q&A at -23, -25-27). The summary judgment record is undisputed that Defendants did not know—let alone conceal—that FDA would question avacopan's superior efficacy results based on the subgroup data alone, *see* Ex. 39 at 3-4; Ex. 42 at 2, data which Defendants had disclosed was not superior in one subgroup. *See, e.g.*, *FibroGen*, 2024 WL 1064665 at *13; *Sanofi*, 87 F. Supp. 3d at 543. Before FDA relied on the subgroup data to question the primary efficacy results, there were no further implications Defendants could have disclosed—beyond warning investors, as Defendants did, that FDA might interpret the results differently. Analysts reviewed and reached their own conclusions about the meaningfulness of the disclosed efficacy result, the RTX mid-trial maintenance approval, and the subgroup data.[14]

### 4. Summary Judgment Is Appropriate On Several Additional Categories of Statements

#### a. Statements That Are Forward-Looking And/Or Puffery Are Inactionable

Summary judgment is warranted on Statements 4, 28, 31, 34, 55, 57, 105, 110, and 112 because they fall under the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 78u-5, and/or (as identified below) are puffery.

At the motion to dismiss stage, the Court held that certain statements were "mixed"

---

[14] *E.g.*, Ex. 74 at 1 ("a greater difference between avacopan and prednisone in patients induced by RITUXAN vs. cyclophosphamide"); Ex. 34 at 1 (reporting on NEJM article, "[v]irtually all subgroup/secondary endpoint data trend in favor of avacopan"); Ex. 33 at 1 ("Remission rate data from several subgroups were analyzed, and the investigators highlighted patients in the RITUXAN stratum").

statements of future and past fact. ECF No. 61 at 27-29. But the Court did not expressly address statements indicating that ChemoCentryx was "on track" with FDA. *See* Stmts. 55 (AC ¶ 310) and 57 (AC ¶ 312). Such statements (Stmts. 55 and 57) are forward-looking under Ninth Circuit law. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021); *see also Twitchell v. Enovix Corp.*, 2024 WL 3522187, at *10-*11 (N.D. Cal. July 23, 2024) ("on track" statement inactionable under *Wochos*); *Jaszczyszyn v. SunPower Corp.*, 2024 WL 3463348, at *10 (N.D. Cal. July 17, 2024) (same).

In addition, Statements 4, 28, 31, 34, 105, 110, and 112 regarding steroid use, progress towards approval, and the label are forward-looking and puffery. Take, for example, Dr. Schall's statement that "[t]his may be the beginning of the era where steroids go the way of the dinosaur." Stmt. 28 (AC ¶ 355). Dr. Schall spoke about what he hoped would happen—*i.e.*, that AAV patients would no longer have to take an often-fatal daily dose of chronic steroids. *See Intuitive Surgical*, 759 F.3d at 1059; *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276-77 (9th Cir. 2017); *see also In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 725 (C.D. Cal. 2021). Other statements share these same characteristics. These include statements such as: "the time of making patients sick with steroid therapy in an attempt to make their AAV better *may* at last be over," Stmt. 4 (AC ¶ 220); *see also* Stmts. 105 (¶ 344), 110 (¶ 349), 112 (¶ 402); "we'll have the submission soon, but I *think* the regulatory path is clear, and I *think* we know what we need to do in the marketplace," Stmts. 31 (¶ 233), 34 (¶ 407); and "I'm *hoping* for a good label," Stmts. 31 (¶ 233), 34 (¶ 407).

Each of these statements was likewise accompanied by cautionary language that the Ninth Circuit has found meaningful. *See Intuitive Surgical*, 759 F.3d at 1059. Specifically, Defendants warned that FDA may disagree with ChemoCentryx's interpretation of the trial data, that any label would reflect only uses established by the trial, and that FDA may decline to approve the drug for a particular indication or at all.[15] Those warnings bring the forward-looking statements within the

---

[15] *See* Ex. 1 at 5; Ex. 78 (Piper Conference Slides) at 2; Ex. 79 (Piper Conference Press Release) at 1; Ex. 80 (JPM Conference Slides) at 2; Ex. 81 (5/20 Press Release) at 3; Ex. 82 (5/20 Investor Call) at 2; Ex. 83 (R&D Slides) at 3; Ex. 84 (R&D Investor Call) at 4; Ex. 85 (4/21 Investor Call)

safe harbor.

### b.    Statements That Predate The Class Period Are Inactionable

Summary judgment is warranted on Statements 1-23, which were all made on November 25, 2019, because INPRS chose to begin the Class Period a day later, on November 26, 2019. AC at 1. Courts have long held that pre-class period statements, even just one day before, are not actionable. *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *In re Garrett Motion, Inc. Sec. Litig.*, 2022 WL 976269, at *1-2 (S.D.N.Y. Mar. 31, 2022) (collecting cases); *Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *2 (N.D. Cal. May 20, 2010) (collecting cases) (pre-class period statements "cannot serve as a basis of liability as a matter of law"); *In re Seagate Technology II Sec. Litig.*, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995) (granting summary judgment on statements made outside class period).

### c.    INPRS's Own Expert Forecloses Its Claim That Defendants Misrepresented 2020 FDA Communications

INPRS cannot proceed with a claim that Defendants misrepresented feedback that FDA communicated for the first time in 2020 because it has no evidence that this feedback had any price impact or caused its losses. *See* App'x B Nos. 5, 9, 11, 13, 14, 15, 17, 19, 20, 21.[16] As this Court recognized in its *Daubert* Order, Dr. Cain has taken the position that all artificial inflation entered the stock on the first day of the Class Period, on November 26, 2019, and this inflation supposedly remained constant until May 4, 2021. Ex. 51 ¶¶ 163-165; *see also* Ex. 29 54:3-14, 59:14-18, 81:24-82:3. This Court found Dr. Cain's testimony admissible to show loss causation on the ground that the allegedly "misleading statements and omissions over the remainder of the Class Period were substantially identical to [Defendants'] prior ones." ECF No. 275 at 32. That "constant inflation" theory means that any *new* misrepresentations, including of the FDA communications in 2020

at 4; Ex. 86 (2020 10-K) at 17, 25, 26, 27, 31, 33, 34, 50; Ex. 87 (*Daubert* Hearing Tr.) at 23, 30, 34, 36, 37, 51; Ex. 38 at 25-26, 33, 34, 35, 54.

[16] Certain of INPRS's omissions purport to rely on "repeated" FDA feedback or multiple communications—*i.e.*, from both 2016 on trial design and 2020—in an effort to mask this problem. *E.g.*, App'x B Nos. 9, 11, 12, 14. To the extent INPRS challenges any statements based on FDA communications during the Class Period from after November 25, 2019, which would include FDA communications related to the trial's results, INPRS cannot establish reliance or loss causation.

(when FDA reviewed and accepted the NDA for filing), caused *no* inflation in the stock price. By its own expert's admission, INPRS has no evidence that "the fraud-related component" of the stock price "increase[d] on" any date after November 25, 2019, when Defendants learned but did not reveal new information. *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *6 (D. Ariz. Dec. 27, 2019); *see also In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *6 (N.D. Cal. Dec. 4, 2008). Summary judgment is therefore warranted on INPRS's claim that Defendants misrepresented FDA's 2020 feedback.

### d.    Defendants Are Entitled To Summary Judgment On Claims Based On Previously Dismissed Statements

INPRS identified in its interrogatory responses statements that are identical or substantially the same as statements the Court previously dismissed on motion to dismiss. Ex. 60 Nos. 8, 9. For example, INPRS still claims that statements indicating that the NDA was "supported by the results of" ADVOCATE, Stmt. 60 (AC ¶¶ 251, 253, 374), and statements that "immunosuppressive medicines" are "entirely unlike" high-dose steroids, Stmt. 56 (AC ¶ 367), are false or misleading. The same is true for Statements 61 (AC ¶ 255); 74 (¶ 420); 80 (¶ 271); and 81 (¶¶ 282, 330), all of which repeat statements this Court dismissed as merely "convey[ing] that ChemoCentryx submitted an NDA on the basis of trial results." ECF No. 61 at 19. Summary judgment is warranted on these statements for the same reasons identified by the Court in its prior Order. ECF No. 61 at 17, 19.

### e.    INPRS Has Now Disclaimed Its "Label" Theory, Which Also Fails As A Matter Of Law

Summary judgment should be granted on INPRS's claim that Defendants misled investors about the scope of the label by failing to disclose that FDA had told ChemoCentryx that secondary endpoints "would not be included in the label." *See* App'x B No. 23. INPRS has disclaimed any "label" theory in open court and "assured" the Court that it "will never hear once any reference to

any FDA label."[17] Ex. 87 45:5-12. That alone is grounds for summary judgment. *See Williams v. City of Las Vegas*, 359 Fed. App. 753, 754 (9th Cir. 2009); *Matter of Giga Watt, Inc.*, 2022 WL 17883793, *1 (9th Cir. Dec. 23, 2022). Moreover, as this Court recently noted, ECF No. 275 at 8, TAVNEOS's label is not relevant to whether the Class Period statements were false or misleading. Only one challenged statement even discusses the label, Stmt. 31 (AC ¶ 233), saying only that Defendants were "hoping for a good label," without suggesting whether secondary endpoints would be included in its scope. And nothing about the label, including whether the secondary endpoints would be on it, was "revealed" on May 4 or May 6, 2021. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 392, 407 (9th Cir. 2021). FDA did not release the final label for TAVNEOS until the drug was approved in October 2021, five months after the end of the Class Period. Ex. 56 at 1. INPRS thus cannot establish loss causation with respect to the label, even if it wanted to resuscitate this abandoned theory.

### C.     INPRS's Section 20A and 20(a) Claims Likewise Fail

INPRS has alleged two derivative claims against Dr. Schall alone: a Section 20A claim for insider trading and a Section 20(a) control person claim. Both claims require a predicate violation of the securities laws. *See* 15 U.S.C. §78t; 15 U.S.C. § 78t-1(a). INPRS's inability to establish a triable issue on the Section 10(b) claims described above therefore dooms its related Section 20A and Section 20(a) claims. *See Oracle Corp.*, 627 F.3d at 394-95 (dismissing 20A claim absent viable "predicate" 10(b) claims); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 419 (9th Cir. 2020) (same as to 20(a)).

---

[17] Ex. 87 45:5-12 (INPRS's counsel stating: "The case at issue concerns misrepresentation about the ADVOCATE trial, not about a label or a prediction about the label. No aspect of loss causation or damages concerns what ultimate label the company may or may not have received well after the class period and well after anything remotely relevant to this case. I can assure you, Your Honor, that in discussing damages in this case, discussing loss causation, you will never hear once any reference to any FDA label."); *see also id.* 30:3-14 ("Your Honor, the fact of the matter is that such evidence about FDA approval after the class period is not relevant in a securities class action.").

**D.    The Court Should Deny INPRS's Request For Summary Judgment On Market Efficiency And Trade Timing**

INPRS moves for partial summary judgment on three of the four elements needed to establish the presumption of reliance, arguing that: (1) the challenged statements were publicly known, (2) the stock traded in an efficient market, and (3) INPRS traded prior to revelation of the "truth." ECF No. 267. While Defendants do not contest the first issue, summary judgment should be denied on the latter two.

Defendants do not disagree that ChemoCentryx stock traded in an efficient market, properly understood. As explained, *supra* Sections IV.B.1 and IV.B.2-3, INPRS's theory of fraud—that the market was unaware of previously disclosed facts and had not fully digested the Briefing Book until the AdCom "clarified" and "provided important context" for that information, Ex. 51 ¶ 152; Ex. 61 ¶ 217—is fundamentally inconsistent with true market efficiency, which "presumes that all public information is incorporated into the market price no matter how far flung it may be," *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at \*5 (N.D. Cal. Sept. 2, 2016). Yet even as it seeks summary judgment on the point that the market was efficient, INPRS's theory of this case challenges the efficiency of the market, contending the market took time to fully digest the information disclosed on May 4. If the case proceeds, the jury should hear the totality of the evidence and determine for itself what information the market had already incorporated into the stock price—by May 4 or May 6, 2021. Put another way, INPRS cannot have both a conclusive legal determination that the market was efficient and still argue to the jury claims that, by their very nature, rest on market inefficiencies. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) ("The efficient market theory [ ] is a Delphic sword: it cuts both ways. [A plaintiff] cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation. Either the market is efficient or it is not."). Holding otherwise would permit INPRS "to have their cake and eat it too." *Bricklayers & Trowel Trade Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012); *accord Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at \*13-14 (S.D. Cal. June 19, 2018) (rejecting similar argument and explaining that it "would [ ] turn the

efficient market theory on its head").

In addition, INPRS is wrong that summary judgment is proper on the third element of the presumption merely because INPRS traded "during the Class Period," *id.* at 7, which extends through May 6, 2021. The presumption requires INPRS to have purchased stock between the time of the alleged misrepresentation (*i.e.*, at an inflated price) and the time the truth was revealed. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). Yet, as discussed, the undisputed evidence shows that the "truth" was "revealed" when the market was made aware of the facts that INPRS claims were omitted from the challenged statements—and, as noted above, that occurred far before the end of the Class Period on May 6, 2021. *See supra* Sections IV.B.1 and IV.B.2-3. The more appropriate course is a stipulation as to the specific dates of INPRS's trades, to the extent INPRS's claim goes forward at all.

## V.    CONCLUSION

For the above reasons, Defendants respectfully request that the Court grant their motion for summary judgment.

DATED:  May 29, 2025                    LATHAM & WATKINS LLP


By:/s/ *Michele D. Johnson*
    Michele D. Johnson (Bar No. 198298)
    *Michele.Johnson@lw.com*
    Jordan D. Cook (Bar No. 293394)
    *Jordan.Cook@lw.com*
    650 Town Center Drive, 20th Floor
    Costa Mesa, CA 92626
    T: +1.714.540.1235

    Colleen C. Smith (Bar No. 231216)
    *Colleen.Smith@lw.com*
    12670 High Bluff Drive
    San Diego, California 92130
    T: +1.858.523.5400

    Meryn C. N. Grant (Bar No. 291315)
    *Meryn.Grant@lw.com*
    355 South Grand Avenue
    Los Angeles, CA 90071

T: +1.213.485.1234

Andrew B. Clubok (*pro hac vice*)
*Andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
*Susan.Engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel.: +1.202.637.2200

Blake T. Denton (*pro hac vice*)
*Blake.Denton@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Tel.: +1.212-906-1200

*Attorneys for Defendants ChemoCentryx, Inc.
and Thomas J. Schall*