LATHAM & WATKINS LLP
  Michele D. Johnson (Bar No. 198298)
*Michele.Johnson@lw.com*
  Jordan D. Cook (Bar No. 293394)
*Jordan.Cook@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
T: +1.714.540.1235

  Colleen C. Smith (Bar No. 231216)
*Colleen.Smith@lw.com*
12670 High Bluff Drive
San Diego, California 92130
T: +1.858.523.5400

  Meryn C. N. Grant (Bar No. 291315)
*Meryn.Grant@lw.com*
12050 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
T: +1.424.653.5500

  Andrew B. Clubok (*pro hac vice*)
*Andrew.Clubok@lw.com*
  Susan E. Engel (*pro hac vice*)
*Susan.Engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
T: +1.202.637.2200

*Attorneys for Defendants ChemoCentryx, Inc.
and Thomas J. Schall*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| JONNIE HOMYK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEMOCENTRYX, INC. and THOMAS J. SCHALL,<br><br>Defendants. | Master Case No. 4:21-cv-03343-JST *and related cases*, Nos. 4:21-cv-04357-HSG, 4:22-cv-00499-JST<br><br>**DECLARATION OF THOMAS J. SCHALL IN SUPPORT DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 7, 2025<br>Time: 2:00 p.m.<br>Location: Courtroom 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

**FILED UNDER SEAL -- REDACTED VERSION**

I, Thomas J. Schall, declare and state as follows:

1. I am the former President, Chief Executive Officer, and Founder of ChemoCentryx, Inc. ("ChemoCentryx"), and a Defendant in this case. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. The evidence set out in the foregoing declaration is based on my personal knowledge. I submit this declaration in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Lead Plaintiff's Motion for Partial Summary Judgment.

2. I founded ChemoCentryx in 1997 and served as President, Chief Executive Officer, and Chairman until October, 2022.

3. I received my Ph.D in cancer biology from Stanford University, and worked on early discoveries of proteins in the body that play a key role in inflammation and infectious diseases. I created ChemoCentryx to focus on the development of oral medications to treat cancer, inflammatory disorders, and autoimmune disease.

4. I and the research team at ChemoCentryx identified a receptor in the body that none of the existing ANCA associated vasculitits ("AAV") treatments attacked. In the mid-2000s, ChemoCentryx began testing whether AAV could be treated by blocking this receptor with avacopan, a drug that ChemoCentryx discovered and developed.

5. Before avacopan, there were few treatments for AAV. Such treatments that were known carried with them significant side effects and toxicities. Even with treatment, AAV is a typically a life sentence because there is no cure. The best a patient can hope is to get their disease into "remission," which does not mean inactive disease, but rather a state where it is no longer progressing. For decades, the treatment to achieve remission was chronic high-dose steroids (typically prednisone or closely related compounds). Steroids have many effects on the body, among them immune suppressive effects which include blocking proteins that trigger inflammation. In combination with these chronic steroids, traditional therapy includes patients receiving other immunosuppressants as well to stop the immune system, thus reducing autoimmune reactions in diseases like AAV.

6.      Though effective in treating AAV, chronic steroids are incredibly taxing on the body. They suppress the immune system, leaving people vulnerable to infections. In fact, prior to avacopan's approval, over 50% of the deaths in AAV during the first year were caused by the treatments rather than the disease. Those chronic high-dose steroid treatments cause horrible side effects such as diabetes, osteoporosis, gastrointestinal bleeding, depression, and even progressive organ damage. They also take a visible toll on the body, leading to things like back humps and swelling of the face, which have an impact on a patient's quality of life.

7.      Despite the havoc they wreak on the body, chronic high-dose steroids have been part of the prevailing AAV treatment for decades because chronic steroids were one of the only treatments that effectively controlled the inflammation and pain associated with AAV.

8.      ChemoCentryx's goal in developing avacopan was to provide an alternative to the need for high dose steroid regimens in AAV, while achieving similar efficacy for controlling AAV, but without the debilitating side effects.

**Key ChemoCentryx Consultants and Employees**

9.      I hired Dr. Pirow Bekker in 2005 as a Medical Director. He was then promoted to Senior Medical Director, Vice President of Clinical and Medical Affairs, and eventually Chief Medical Officer. Dr. Bekker retired in 2017 to care for his wife (who suffers from a serious chronic illness) full time; he was no longer an employee of ChemoCentryx after that date. Shortly after his retirement, Dr. Bekker was retained as an external consultant for ChemoCentryx. As a consultant, he assisted ChemoCentryx with the completion of ADVOCATE, the Phase III clinical trial testing avacopan in the treatment of AAV, as well as the analysis of the results and drafting the New Drug Application to market avacopan for the treatment of AAV in the United States (the "NDA").

10.     Dr. Huibin Yue served as ChemoCentryx's Senior Director of Biostatistics from March 2019 to January 15, 2021. Dr. Yue was responsible for data collection and analyzing the results of the ADVOCATE trial.

11.     ChemoCentryx contracted out the management of the ADVOCATE trial to a clinical research organization called Medpace.

**Trial Design**

12.    After the successful conclusion of a Phase II trial for avacopan for the treatment of AAV, I attended two meetings in 2016 with the FDA regarding a proposed Phase III trial design.

13.    During the first of these two meetings on July 14, 2016, the FDA indicated that a study design based upon a single noninferiority endpoint (*i.e.*, showing avacopan was not inferior to its comparator) would be insufficient to demonstrate the efficacy of avacopan in AAV. (This was despite the Company's observation that the only precedent for a Phase III study that led to an FDA approval for AAV was a 26 week non-inferiority study, the so-called RAVE trial). FDA and ChemoCentryx also discussed if the trial could have three arms, including one arm where the patients would receive no steroids or a rapid steroid taper with "rescue steroids" offered in the event of a disease flare or medical emergency. ChemoCentryx (and their academic clinical experts at the meeting) questioned whether this design would be ethical, and FDA encouraged us to discuss this potential study design and its ethical implications further with experts in the field of AAV. The FDA did not require ChemoCentryx to adopt this trial design. To the contrary, the FDA acknowledged that AAV is a rare disease and indicated a willingness to consider other "feasible study designs." At the end of the meeting, FDA advised that it would like to work with ChemoCentryx on a revised design and encouraged ChemoCentryx to request a second meeting.

14.    ChemoCentryx then revised its proposed Phase III study design. The revised design added a superiority primary endpoint at the end of the trial, as FDA had requested. It retained the non-inferiority primary endpoint because ChemoCentryx had reached agreement in principle with the European Medicines Agency ("EMA") regarding a trial design predicated upon a noninferiority endpoint at week 26. (In other words, the non-inferiority endpoint was still needed because it would be relevant to avacopan's potential approval in Europe.) For the superiority endpoint, the noninferiority endpoint would also serve a "gatekeeping" function. If the trial did not show noninferiority at week 26, superiority at week 52 would not be calculated.

15.    ChemoCentryx also discussed the possibility of a steroid-free control arm with experts, as FDA had advised. Those experts indicated that it would be unethical and impractical

to conduct such a study because steroids were part of the then standard of care for treating AAV and depriving patients in a third arm of steroids would mean that they would not be receiving the only treatment then known to be effective.  The experts also advised that because AAV is a rare disease, it would not be possible to find enough patients for a three-arm trial.

16.    Based on the conversations with experts referenced above, I believed it would be impractical and unethical to include a third arm in the trial.

17.    On November 1, 2016, ChemoCentryx again met with the FDA regarding the proposed revised Phase III trial design.  Prior to the meeting, FDA circulated written feedback to ChemoCentryx regarding certain issues, including the trial's design.  ChemoCentryx made certain additional changes to the trial's design in response to that feedback.  During the November 2016 meeting, which I attended, ChemoCentryx discussed with FDA the basis for the changes that ChemoCentryx had made to the trial design (e.g., adding a superiority endpoint) and the changes it had declined to make (e.g., the third arm).  ChemoCentryx also informed FDA why it was keeping the week 26 noninferiority endpoint, which, as previously noted, was for purposes of seeking approval of avacopan in Europe.  At the conclusion of the November 2016 meeting, the FDA agreed to the proposed revised trial design with a 52-week superiority endpoint, as reflected in the official meeting minutes, and ChemoCentryx's internal meeting minutes.

18.    I am familiar with the official FDA meeting minutes for the July 14, 2016 meeting between ChemoCentryx and the FDA, which I understand are attached to the Declaration of Meryn Grant as Exhibit 6.

19.    I am familiar with the official FDA meeting minutes for the November 1, 2016 meeting between ChemoCentryx and the FDA, which I understand are attached to the Declaration of Meryn Grant as Exhibit 7.

20.    A true and correct copy of ChemoCentryx's internal meeting minutes for the November 1, 2016 meeting between ChemoCentryx and the FDA are attached hereto as Exhibit 1.

21.    Based on the meetings with the FDA referenced above, I believed FDA's initial

concerns about the trial design had been resolved, and that FDA had agreed to the trial design that was ultimately utilized in ADVOCATE.

22.     ChemoCentryx spent tens of millions of dollars conducting ADVOCATE, which ran for three years and involved hundreds of patients and test sites around the world, and many more millions preparing for commercialization in the event of regulatory approval. ChemoCentryx would not have proceeded with the ADVOCATE trial or with commercialization preparations at such great expense and effort if we did not believe that the FDA had agreed to the trial's design. After the submission of the NDA, ChemoCentryx also spent millions of dollars on building and training a marketing team. This too would have been folly had ChemoCentryx not believed that the FDA concurred with the trial design and the data fundamentally supported a potential FDA approval—which we eventually received in October 2021.

23.     After the November 2016 meeting at which the FDA agreed to the Phase III trial design, I do not recall the FDA ever making a comment during subsequent meetings, and there were no comments in the corresponding meeting minutes, that suggested patients receiving avacopan should not be permitted to receive any steroids at all, if necessary to treat AAV, or other conditions during the ADVOCATE trial (until the release of the FDA briefing book).

**Trial Procedures**

24.     Several written documents governed how the ADVOCATE trial was to be administered, and how its results would be analyzed.

25.     The ADVOCATE trial was governed by a trial protocol, which set forth how the trial would be conducted and how the results would be analyzed. I am familiar with the trial protocol and amendments for the ADVOCATE trial, which I understand are attached to the Declaration of Meryn Grant as Exhibit 16.

26.     A statistical analysis plan sets forth further detail on the analyses used to evaluate the results of a clinical trial and is typically prepared before the results are analyzed. The Statistical Analysis Plan ("SAP") for the ADVOCATE trial was finalized on October 27, 2019. I am familiar with the SAP for the ADVOCATE trial, which I understand is attached to the Declaration of Meryn Grant as Exhibit 75.

27.    The trial protocol required that an Adjudication Committee determine whether patients were in remission at Week 26 and sustained remission at Week 52, according to the rules in the trial protocol.

28.    The Adjudication Committee was made up of experts in AAV, and was chaired by Dr. David Jayne, who, at the time, was (and still is) a Professor of Clinical Autoimmunity at the University of Cambridge and an honorary consultant and director of the Vasculitis and Lupus Service at the University of Cambridge's National Health Service.

29.    The Adjudication Committee was governed by an Adjudication Committee Charter, which set forth the process by which the Adjudication Committee would determine whether patients were in remission and sustained remission. I am familiar with the Adjudication Committee Charter for the ADVOCATE trial, which I understand is attached to the Declaration of Meryn Grant as Exhibit 24.

**Initial Analysis of ADVOCATE's Trial Results**

30.    During the trial, ChemoCentryx and Medpace personnel were responsible for ensuring the data were accurately reported and complied with the rules set out in the trial protocol and SAP. This involved Medpace and ChemoCentryx issuing queries to trial sites to resolve inconsistencies or ambiguities in patient data reported by individual physician investigators.

31.    Specific procedures for unblinding and analyzing the initial results from the ADVOCATE trial were set forth in a Study Results Analysis Plan ("SRAP"). I am familiar with the SRAP for the ADVOCATE trial.

32.    

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

SCHALL DECL. ISO DEFS' CROSS-MOT. SJ AND
OPP. TO PLAINTIFF'S PARTIAL SJ
CASE NO. 4:21-cv-03343-JST

[REDACTED]

33. [REDACTED] I relied on Dr. Bekker, Dr. Yue, Dr. Kelleher (then ChemoCentryx Senior Vice President of Clinical Development) and Medpace to ensure accuracy of trial data and results.

34. Dr. Bekker had full autonomy in leading the analysis of the results. [REDACTED] In fact, I did not speak to, or see Dr. Bekker [REDACTED]

35. On or around November 15, 2019, Dr. Bekker texted me that we could meet in person on November 21, 2019 to discuss the trial results. This was the only contact I had with Dr. Bekker between November 8, 2019 and November 20, 2019.

36. On November 21, 2019, I met with Dr. Bekker to discuss the results of the ADVOCATE trial at an off-site location in Helena, California. No one else was present at this meeting. Dr. Bekker presented the results in a slide deck to me at that November 21, 2019 meeting.

37. At our meeting, [REDACTED]

38. Based on what Dr. Bekker told me on November 21, 2019, I had no reason to question the accuracy of the reported results. The FDA requires sponsors to follow the rules in the trial protocol and SAP, and a trial sponsor's utmost obligation is to ensure that clinical trial data are accurate. I relied on Dr. Bekker to ensure that the data were accurate according to the

pre-specified rules in the trial protocol, and have no reason to believe he did not do so.

**Public Statements Regarding Future Development**

39.    Generally speaking, AAV patients have two primary treatment goals: (1) to induce remission (defined as not worsening) of active disease, and (2) to maintain remission of disease. Generally, remission does not refer to absence of AAV, but rather refers to a state where the disease is not worsening or progressing. As I mentioned above, the ADVOCATE trial investigated whether avacopan was an effective treatment to induce remission of AAV, when used in combination with an immunosuppressant, either rituximab ("RTX") or cyclophosphamide ("CYC").

40.    RTX was administered in ADVOCATE according to its FDA approved label at the time ADVOCATE was designed and began enrolling patients in 2016-17, which indicated that RTX could be used once a week for four weeks, to induce remission of AAV. According to the trial protocol, after four weeks, patients in the RTX subgroup did not receive further treatment with an immunosuppressant to maintain remission of AAV.

41.    Because this subgroup of patients maintained remission while taking avacopan without additional immunosuppressants, I believed and continue to believe that the week 52 sustained remission results showed that avacopan may be effective in helping to maintain remission for a longer term, even though testing avacopan as a maintenance therapy was not a primary objective of the trial. That is why I described avacopan as a potential "monotherapy"—because it was tested during the second half of the trial in the absence of immunosuppressants in the rituximab subgroup.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this Declaration on May 29, 2025, in Sonoma, CA.

By: _____
       Thomas J. Schall