# Attachment 61

# Uslaner Declaration Ex. 151

# (ECF No. 303-113)

# Exhibit 151

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| JONNIE HOMYK, individually and on behalf of all others similarly situated,<br><br>**Plaintiff,**<br><br>v.<br><br>CHEMOCENTRYX, INC. AND THOMAS J. SCHALL,<br><br>**Defendants.** | **Case No. 4:21-cv-03343** |

EXPERT REPORT OF

# MARC WALTON, MD PHD

**SEPTEMBER 25, 2024**

CONTENTS

**I.    Introduction and Summary of opinions** ............................................................**4**

**II.   Qualifications and Compensation** ....................................................................**8**

**III.  Overview of FDA Regulatory Process** ............................................................**10**

A.   The FDA's Role in Regulating the Marketing and Sale of Pharmaceutical Drugs.........10

B.   During the Investigational Period, the FDA Provides Critical Guidance to Sponsors on the Ability of Proposed Studies to Support Claims Concerning Efficacy and Safety.....11

C.   The NDA Review Process....................................................................................16

D.   Advisory Committee Meetings............................................................................18

E.   Approval and Labeling .......................................................................................19

F.   FDA's Reliance on Study Data Monitoring Committees During the Investigational Phase.................................................................................................................21

G.   Sponsor Responsibility to Submit Information That is True, Accurate, and Does Not Omit Material Facts ............................................................................................25

**IV.  The FDA Raised Issues During the IND and NDA Phases That Made it Unlikely the FDA Would Approve Avacopan With the Broad Label for Efficacy and Safety Chemocentryx Sought** ...................................................................................**26**

A.   The FDA Warned ChemoCentryx That ADVOCATE's Design Would Make Interpretation of Study Results and Determination of Risk-Benefit Challenging...........29

B.   ChemoCentryx's Preferred Non-Inferiority Analysis Could Not Support an Efficacy Claim .................................................................................................................35

C.   The FDA Told ChemoCentryx That It Could Not Rely on the ADVOCATE Secondary Endpoints the Company Hoped to Use to Support its Claims That Avacopan Provided an Improved Safety Profile...................................................................................41

D.   The FDA Told ChemoCentryx That Extensive Steroid Use By Avacopan Patients For the Treatment of AAV Raised Concerns About Interpretability of, and Bias to, the BVAS Efficacy Results ......................................................................................48

E.   The FDA Told ChemoCentryx That Undertreatment of Patients in ADVOCATE's Comparator Arm Raised Concerns About Interpretability of, and Bias to, the BVAS Efficacy Results.................................................................................................51

F.   Significant Concerns About Avacopan's Association With Hepatoxicity and Angioedema Put ChemoCentryx on Notice That It Was Unlikely Avacopan Would be Approved With a Broad Label for Safety and Efficacy .................................................56

G.   ChemoCentryx's Changing of Primary Outcome Data in ADVOCATE Following an Unblinded Post-Database-Lock Review Should Have Been Disclosed to the FDA and Undermines the Integrity of the Reported BVAS Result .................................................67

**V.   The FDA's Advisory Committee Meeting Briefing Materials and the Issues Raised During the Meeting Itself Repeated the Same Concerns FDA and Others Had Raised Previously with ChemoCentryx in Private Communications**............................................**71**

    A.   The Complexity of ADVOCATE's Design Made Interpretation of Results and Determination of Risk-Benefit Challenging.......................................................71

    B.   ADVOCATE's Non-Inferiority Results Did Not Support Avacopan's Efficacy ...........72

    C.   ADVOCATE's Secondary Endpoint Results Did Not Support Claims About Avacopan's Efficacy or Safety........................................................................74

    D.   Extensive Steroid Use By Avacopan Patients For the Treatment of AAV Raised Concerns About Interpretability of the BVAS Efficacy Results....................................77

    E.   Undertreatment of Patients in ADVOCATE's Comparator Arm Raised Concerns About Interpretability of, and Bias to, the BVAS Efficacy Results...........................................80

    F.   Hepatotoxicity and Angioedema Safety Signals Raised Concerns About Avacopan's Risk-Benefit Profile.....................................................................................82

**VI.  The FDA Approved Label Was Far Narrower Than the One ChemoCentryx Sought and Reflected the Concerns About Which the Company Had Warned Throughout Avacopan's Development**.......................................................................................**84**

## I.    INTRODUCTION AND SUMMARY OF OPINIONS

1. I have over 30 years of experience in drug development and approval of pharmaceutical drugs, including clinical trial design, conduct, and analysis; the New Drug Application ("NDA") and Biologic License Application (BLA) review process; and product labeling.  I worked at the U.S. Food and Drug Administration ("FDA") for over 20 years.  At FDA, I served as Acting Deputy Director of the Division of Clinical Trial Design and Analysis and Director of the Division of Biologic Internal Medicine Products in the Center for Drug Evaluation and Research ("CDER") – roles in which I oversaw the review of numerous applications for drug approval.  I also served as a Senior Medical Policy Advisor in the Office of the Commissioner of the FDA and Associate Director for Translational Medicine in the Office of Translational Science, and, in these roles, helped author FDA guidance for clinical trial design, conduct, and analysis, including Adaptive Design Clinical Trials, Use of Non-Inferiority Clinical Trials, Use of Multiple Endpoints in Clinical Trials – published guidance that is highly relevant to this case.  Additionally, I was Senior Scientific Director in the Quantitative Sciences Consulting at Janssen Pharmaceuticals, Inc. (a subsidiary of Johnson & Johnson), where I provided guidance on regulatory approval strategies, including clinical trial design and the development of safety and efficacy evidence required for approval and labeling.

2. I have been asked by Lead Counsel in this case to provide opinions on regulatory issues relating to avacopan and the ADVOCATE study.  The opinions presented in this report can be summarized as follows:

3. In my opinion, ChemoCentryx's study design and support approach was unusually unresponsive to FDA's expressed concerns and advice in a way that would have made it unlikely that the FDA would approve avacopan with ChemoCentryx's intended broad label for efficacy and safety. The FDA had clearly identified and reiterated the shortcomings of the ADVOCATE study in advance, along with their potential impact on the FDA decision.

   a. The FDA continually expressed concerns that ChemoCentryx's complex study design made it challenging to interpret study results and as such would provide questionable support for the intended usage for which ChemoCentryx sought approval.  The FDA communicated to ChemoCentryx that the ADVOCATE study design, including the administration of multiple

background therapies to patients, would not provide results the FDA would consider clearly interpretable as supporting a positive risk-benefit determination. ChemoCentryx had not taken action to ameliorate this weakness prior to finalizing the study design. Despite all the FDA concerns, ChemoCentryx proceeded with their planned study which was in my opinion unusual behavior by a sponsor, and, foreseeably, led to the FDA not approving ChemoCentryx's requested labeling.

b.  The FDA communicated to ChemoCentryx that the Company's proposed non-inferiority analysis of BVAS remission in ADVOCATE could not support claims regarding avacopan's efficacy because given the multiple background therapies administered to patients in both arms, even if avacopan had no effect, both arms could be non-inferior to each other with regard to the primary endpoint of disease remission. This warning negatively impacted the likelihood that avacopan would be approved with a broad efficacy and safety labeling desired by ChemoCentryx because it meant that ChemoCentryx would have to rely exclusively on the claimed BVAS superiority result avacopan supposedly achieved at week 52 of ADVOCATE, even though the FDA had raised concerns about interpreting those results given the "complexity" of ADVOCATE's design.

c.  ChemoCentryx proposed to evaluate multiple secondary endpoints in the ADVOCATE study aiming to show that avacopan could be a replacement for glucocorticoids by offering an improved benefit-risk profile with similar efficacy but less toxicity. In my opinion, the FDA's communications with ChemoCentryx put the Company on notice that the agency did not believe ChemoCentryx could use ADVOCATE's secondary endpoints to support claims about avacopan's safety or efficacy, and that, at a minimum, it was highly unlikely the FDA would consider the results of those endpoints in deciding whether to approve avacopan or allow the Company to include the results in the avacopan label (if approved). These warnings negatively impacted the likelihood that avacopan would be approved with a broad efficacy and safety labeling as desired by ChemoCentryx.

d.  During NDA review, the FDA became aware of significant use of "non-study" glucocorticoids by patients receiving avacopan. In my opinion, the FDA's communications with ChemoCentryx during NDA review put the Company on notice that the agency was seriously concerned that widespread use of steroids by avacopan patients to treat their disease

would confound interpretation of ADVOCATE's BVAS results and potentially bias them in favor of avacopan. This concern had a negative impact on the likelihood that avacopan would be approved with a broad labeling for safety and efficacy as desired by ChemoCentryx because it cast further doubt on ADVOCATE's ability to meaningfully demonstrate avacopan's efficacy.

e.  The FDA highlighted that undertreatment of patients in advocate's comparator arm undermined the clinical significance of the BVAS superiority result reported by ChemoCentryx, because the study did not demonstrate the necessary efficacy in patients actually receiving standard care. The FDA communicated to ChemoCentryx problems with interpretation of the difference in treatment outcomes based on week 52 BVAS sustained remission superiority results, because any superior results for the avacopan group were confounded by the absence of maintenance treatment in two-thirds of the ADVOCATE patient population. Week 52 BVAS superiority was reported only for the subgroup of patients who received no established maintenance treatment during the remission-maintenance period. The FDA's communications with ChemoCentryx put the Company on notice that the agency was seriously concerned that undertreatment of patients in the ADVOCATE study as compared to standard of care would confound interpretation of the study's BVAS results and potentially bias them in favor of avacopan. This concern had a negative impact on the likelihood that avacopan would be approved with a broad labeling for safety and efficacy as desired by ChemoCentryx because it cast further doubt on ADVOCATE's ability to meaningfully demonstrate avacopan's efficacy, just as the FDA had explained in numerous pre-NDA meetings.

f.  The ADVOCATE Data Monitoring Committee and ChemoCentryx's independent consultant and expert hepatologist, Dr. Willis Maddrey, warned the Company that avacopan was associated with significant liver toxicity and angioedema safety signals, and that these signals would be of concern to the FDA. These warnings, which highlighted several strands of evidence the FDA standardly views as giving rise to a substantial safety signal, put ChemoCentryx on notice that it was unlikely avacopan would be approved with a broad labeling as desired by ChemoCentryx for efficacy and safety. This is particularly so given the small size of the safety database and FDA's warnings to ChemoCentryx that "there is limited long term safety data with avacopan treatment." Indeed, in my experience,

hepatotoxicity is a leading cause of drug attrition during development, and any incidence of this level of liver toxicity in clinical trials would usually be understood by sponsors as presenting a serious concern for likelihood of approval.

g.  Even without the implications of the above-mentioned shortcomings in the ADVOCATE study design, the BVAS superiority result was obtained by altering the unblinded data after the protocol-compliant results indicated non-superiority.  The ADVOCATE protocol called for all adjudication of data to be completed and entered into the database prior to database lock and unblinding; this protocol mandate was violated here.  ChemoCentryx failed to report to the FDA in detail the process, with documentation, of any changes to the 'locked' clinical database after an unblinded analysis has occurred which would raise concerns about the integrity of the study as whole.  This is particularly concerning when the changes are made to the primary endpoint data and change the study result from not-statistically-significant to statistically significant, as occurred with ADVOCATE.  Disclosure of the changes to FDA would have significantly undermined confidence in the efficacy of avacopan and might have led to avacopan not being approved at that time given the host of additional concerns about that result the agency had expressed.

4.  As will be discussed below, it is my opinion that ChemoCentryx's communications with the FDA put ChemoCentryx on clear notice that the FDA was unlikely to approve avacopan with ChemoCentryx's desired broad labeling for efficacy (including allowing ChemoCentryx to claim that avacopan was a replacement for glucocorticoids in the treatment of AAV) or for safety (including allowing ChemoCentryx to claim that avacopan had a safety profile superior to glucocorticoids).  Moreover, it is my opinion that the unlikeliness of such an approval would have been obvious to any reasonable sponsor given the substance and character of these warnings.

5.  On May 6, 2021 the FDA held an Advisory Committee meeting to discuss the avacopan NDA.  On May 4, 2021, the FDA published briefing materials in advance of that Advisory Committee meeting.  As discussed below, the concerns and issues regarding avacopan and ADVOCATE reflected in the May 4, 2021 briefing materials and in the May 6, 2021 Advisory Committee discussion reflect the same concerns and issues communicated to ChemoCentryx during the investigational and NDA review phases by the FDA and others discussed above.

6.  In my opinion, the highly likely narrowness, compared to ChemoCentryx's desired form, of the labeling the FDA ultimately approved was clearly communicated to ChemoCentryx long before the Advisory Committee date.  Any expression of an expectation of achieving their desired broader labeling, or representation of study results as supporting efficacy or safety beyond what was ultimately approved, were inconsistent with what ChemoCentryx knew.

## II.    QUALIFICATIONS AND COMPENSATION

7.  I received a B.A., *magna cum laude*, in chemistry from Franklin and Marshall College in Lancaster PA in 1975.  I received both an M.D. and Ph.D. in Pharmacology/Physiology from the University of Chicago Medical School in 1982 and 1981, respectively. I completed a medical internship at Rush Presbyterian St. Lukes Medical Center (Chicago, IL) and a residency in neurology at the University of Rochester (Rochester, NY).

8.  Following my residency, I was a Senior Staff Fellow at the National Institutes of Health, the primary government agency responsible for biomedical and public health research, for seven years.  I performed research in embryonic development of the nervous system at the Laboratory of Neurophysiology, which is a department within in the National Institute of Neurological Diseases and Stroke (NIH, Bethesda MD).

9.  I joined the FDA in September 1993 as a Medical Officer in the Center for Biologics Evaluation and Research ("CBER").  In April 2003, I was promoted to Acting Deputy Director of the Division of Clinical Trial Design and Analysis.  In October 2003, I was promoted to Director of the Division of Biologic Internal Medicine Products in the Center for Drug Evaluation and Research ("CDER").  In these roles, I oversaw the development of clinical investigation programs and review of applications for drug approval, both for new drug treatment and for the expansion of approved uses in marketed drugs.

10. In November 2006 I became a Senior Medical Policy Advisor in the Office of the Commissioner of the FDA, developing FDA-wide policies on a diverse range of matters and representing the FDA at other agencies with the US Department of Health and Human Services.

11. In March 2008, I became the Associate Director for Translational Medicine in the Office of Translational Science in CDER.  In that role I worked on policies to promote innovation in methods that would advance the development of drugs and could be relied upon by pharmaceutical companies and by the review divisions in CDER with oversight for those drugs. I was part of the core working groups in writing a wide variety of published FDA Guidances, such as those providing FDA policy on Adaptive Design Clinical Trials, Use of Non-Inferiority Clinical Trials, Use of Multiple Endpoints in Clinical Trials, Enrichment Studies in Development of Drugs, and others.

12. While at the FDA, the agency asked me to serve as an expert witness in cases brought by the U.S. Department of Justice and the FDA Office of Criminal Investigations concerning the regulation of medical products, particularly the laws relating to marketing of unapproved drugs.

13. After 21 years at the FDA, I became a Senior Scientific Director at Jannsen Pharmaceuticals, Inc., a subsidiary of Johnson & Johnson, in 2014.   At Jannsen, I worked in the Quantitative Sciences Consulting department, where I advised on regulatory strategy at all stages of drug development, including clinical trial design, analysis, and FDA submissions, including NDAs. Among other things, I advised on the kinds of efficacy and safety evidence that FDA would require for approval and labeling.  While at Janssen, I was named a Janssen Fellow, which is an honorary award to Janssen Scientific Directors for significant contributions to pharmaceutical science and development.

14. I retired from Janssen after 9 years and, in October 2023, founded a consulting company, MKWalton Consulting LLC, which I currently own and operate.  My company consults on topics of drug development strategy and programs, clinical trial design and interpretation of results, regulatory strategy, review, and interactions, and regulatory science.

15. A copy of my CV attached hereto as **Appendix A.**

16. I am a Fellow of the Society for Clinical Trials.

17. My opinions are based on my knowledge and expertise gained during my professional career and my academic training, as well as the materials I reviewed to date.  A list of the documents that I have relied upon in forming my opinions is attached hereto as **Appendix B**.  My work in this

matter is ongoing, and I reserve the right to supplement or modify my opinions as additional information becomes available, or as I perform further analysis.

18. Professionals at The Brattle Group ("Brattle") have assisted me by performing work at my direction and under my supervision. All opinions and conclusions stated in this report are my own.

19. I am being compensated for my work in this matter at a rate of $700 per hour. Brattle is being compensated for its professionals' work at rates in a range of $300-$800 per hour. Neither my nor Brattle's compensation is contingent on my opinions or the outcome of this matter.

## III.    OVERVIEW OF FDA REGULATORY PROCESS

### A.    THE FDA'S ROLE IN REGULATING THE MARKETING AND SALE OF PHARMACEUTICAL DRUGS

20. The FDA is responsible for, among other roles, protecting the public health by ensuring the safety and effectiveness of drugs, including biological products, and medical devices in the United States.[1] Before drugs intended for the treatment or prevention of diseases can be marketed for medical use in the US, they must obtain the FDA's approval for specified uses.[2] When a drug is approved, the FDA also regulates what pharmaceutical companies can claim about the safety or effectiveness of approved drugs on the label.[3]

21. The FDA's oversight of the development and approval of drugs generally has two major periods. The first is the investigational period (prior to a submission of a formal application for marketing approval) where nonclinical (not in humans) and clinical studies are conducted by a pharmaceutical company developing the drug.[4] The second major period is the New Drug

---

[1]    *See* U.S. Food & Drug Admin., *What We Do*, available at https://www.fda.gov/about-fda/what-we-do.

[2]    *See* U.S. Food & Drug Admin., *Development & Approval Process | Drugs*, available at https://www.fda.gov/drugs/development-approval-process-drugs.

[3]    *See* U.S. Food & Drug Admin., *Laws Enforced by FDA*, available at https://www.fda.gov/regulatory-information/laws-enforced-fda.

[4]    *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective*, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

Application ("NDA") review period.  This period occurs after all necessary clinical and other studies have been completed and analyzed.  The NDA review period begins when a company submits all the relevant information to the FDA to an NDA file requesting the FDA review the information.[5]

> B.    DURING THE INVESTIGATIONAL PERIOD, THE FDA PROVIDES CRITICAL GUIDANCE TO SPONSORS ON THE ABILITY OF PROPOSED STUDIES TO SUPPORT CLAIMS CONCERNING EFFICACY AND SAFETY

22. During the investigational period ("IND"), or pre-NDA period, the FDA advises sponsors about the extent to which the elements of a proposed study – including proposed endpoints and analyses – may support claims about a drug's efficacy or safety and, therefore, may support approval and labeling claims.[6]  The FDA communicates this advice to sponsors in several ways.

23. First, the FDA will hold formal meetings with the sponsor during the IND, including, as particularly relevant here, Type B and Type C Meetings.[7]  Type B Meetings are held at a few key milestones during the clinical development process at the request of the sponsor, at which point the FDA will, among other things, provide its assessment of the sponsor's plans for moving to the next step in development.[8]  As most relevant here, Type B Meetings include End-of-Phase-2 (EOP2) Meetings and Pre-NDA meetings.[9]  The purpose of an EOP2 Meeting is for the FDA to

---

[5]    *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective*, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

[6]    *See* U.S. Food & Drug Admin., *Best Practices for Communication Between IND Sponsors and FDA During Drug Development, Guidance for Industry and Review Staff,* at 8 (Dec. 2017), available at https://www.fda.gov/media/94850/download.

[7]    There is also the Type A meeting. Type A meetings address crucial and urgent matters, often as a follow-up to a Type B meeting to address a specific aspect of the development program that could not be resolved at the Type B meeting. *See* U.S. Food & Drug Admin., *PDUFA reauthorization performance goals and procedures fiscal years 2018 through 2022*, at 16, available at https://www.fda.gov/media/99140/download.

[8]    *See* U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products for Industry – Draft Guidance,* at 3-4 (Dec. 2017), available at https://www.fda.gov/media/109951/download.

[9]    *See* U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products for Industry – Draft Guidance*, at 3-4 (Dec. 2017), available at https://www.fda.gov/media/109951/download ("Type B meetings are as follows: Pre-investigational new drug application (pre-IND) meetings... End-of-phase 2 (i.e., pre-phase 3) meetings (21 CFR 312.47)").

provide its evaluation of the sponsor's plans for conducting the pivotal phase 3 trial or trials[10] that will comprise the principal support for drug approval and proposed labeling in the sponsor's NDA.[11]

24. Similarly, at a pre-NDA meeting, the FDA will, among other things, advise the sponsor of perceived weaknesses in the design or results of trials that will be used to support an NDA or raise questions that will be important in the agency's NDA review.[12] Type C meetings are meetings requested by the sponsor "regarding the development and review of a product" that are not Type A or B meetings.[13] As FDA guidance notes, the FDA provides its assessment of proposed study endpoints, including more novel endpoints, among other things, at Type C meetings.[14]

25. Prior to any meeting, the sponsor submits questions to the FDA, along with information relevant to those questions.[15] The FDA then responds with a pre-meeting memorandum providing the agency's official answers to the sponsor's questions. The answers provided to the sponsor in the pre-meeting memorandum remain the FDA's official position with regard to the questions posed

---

[10] Phase 3 studies are the largest studies of a development program in both patient numbers and duration. These studies are designed to provide sufficient comprehensive information to enable FDA to reach firm conclusions about the efficacy, safety, and benefit-risk comparison that are necessary to make regulatory decisions to approve a drug for marketing.

[11] 21 C.F.R. § 312.47 (2024), available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=312.47 ("The purpose of an end-of-phase 2 meeting is to determine the safety of proceeding to Phase 3, to evaluate the Phase 3 plan and protocols and the adequacy of current studies and plans to assess pediatric safety and effectiveness, and to identify any additional information necessary to support a marketing application for the uses under investigation.").

[12] *See* U.S. Food & Drug Admin., *IND Meetings for Human Drugs and Biologics* § V.C. (May 2001), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/ind-meetings-human-drugs-and-biologics-chemistry-manufacturing-and-controls-information.

[13] *See* U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products Guidance for Industry – Draft Guidance*, at 4 (Dec. 2017), available at https://www.fda.gov/media/109951/download ("A Type C meeting is any meeting other than a Type A, Type B, Type B (EOP), Type D, or INTERACT meeting regarding the development and review of a product, including meetings to facilitate early consultations on the use of a biomarker as a new surrogate endpoint that has never been previously used as the primary basis for product approval in the proposed context of use.").

[14] *Id.*

[15] *See id.* at 4-5 ("Meeting Requests…When a meeting is needed, a written request must be submitted to the FDA via the electronic gateway… The meeting request should include adequate information for the FDA to assess the potential utility of the meeting and to identify FDA staff necessary to discuss proposed agenda items. The meeting request should include the following information … A list of proposed questions, grouped by FDA discipline. For each question there should be a brief explanation of the context and purpose of the question.").

unless the agency specifically and clearly states a revised position in a post-meeting memorandum of meeting minutes.

26. At the scheduled meeting, the FDA and the sponsor will discuss the FDA responses provided in the pre-meeting memorandum.  Following the meeting, the FDA provides the sponsor with official minutes of the meeting in a post-meeting memorandum, which includes a summary of the discussion at the meeting.[16]  The FDA may also provide some additional advice to the sponsor, identified as post-meeting  discussion.[17] The FDA always offers the sponsor opportunity to notify FDA of any significant differences in understanding the meeting outcome.[18]  Again, if the FDA modifies its position from the pre-meeting memorandum with regard to a particular answer to a question, the change would be clearly and unambiguously stated in the final meeting summary.

27. It is important to understand the import of the FDA's responses in the course of formal meetings. Again, such responses reflect the agency's official position on an issue raised by the sponsor.  If the FDA raises "concerns" about a particular design feature or analysis, as it did in connection with the ADVOCATE study, that is a clear signal that the FDA does not have confidence that feature of the study design is likely to yield data that will support the relevant desired efficacy or safety claims, and therefore likely not supportive of approval or appropriate for the desired labeling or marketing.  Agreements reached in FDA responses to questions and in discussions may indicate FDA acceptance of certain aspects of the study design for a specific role in the

---

[16]  *See id.* at 14-15 ("The FDA will issue the official, finalized minutes to the requester within 30 calendar days after the meeting . . .. FDA minutes will outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted format. The minutes should be sufficiently detailed that they provide clarity about the agreements, such as on study design elements, or statistical testing, or enrollment criteria and similar important areas of the development program. The minutes are not intended to represent a transcript of the meeting.").

[17]  *See id.* at 15 ("The FDA may communicate additional information in the final minutes that was not explicitly communicated during the meeting (e.g., pediatric requirements, data standards, abuse liability potential) or that provides further explanation of discussion topics. The FDA's final minutes will distinguish this additional information from the discussion that occurred during the meeting.").

[18]  *See id.* at 15 ("The following steps should be taken when there is a difference of understanding regarding the minutes:  Requesters should contact the FDA project manager if there is a significant difference in their and the FDA's understanding of the content of the final meeting minutes issued to the requesters. If after contacting the FDA project manager there are still significant differences in the understanding of the content, the requester should submit a description of the specific disagreements either: To the application; or If there is no application, in a letter to the division director, with a copy to the FDA project manager. The review division and the office director, if the office director was present at the meeting, will take the concerns under consideration…").

NDA review process.  However, they do not imply acceptance of the study design for all of the sponsor's intended purposes.  The FDA does not agree in Type B meetings and official minutes that a particular design as a whole can provide study results that will support all of the sponsor's intended purposes for the study (e.g., marketing approval, specific labeling claims).  Such comprehensive agreement about study design is obtained with a specialized review process the sponsor can request, called a "Special Protocol Assessment."[19] As discussed below, ChemoCentryx did not obtain a Special Protocol Assessment with respect to the ADVOCATE study, as ChemoCentryx personnel acknowledged, and, indeed, continued to modify both the ADVOCATE protocol and statistical analysis plan throughout the study.

28. The FDA also communicates with sponsors during the investigational phase through "IND Information Requests."  During the conduct of investigational clinical trials, sponsors are required to inform the FDA if certain events occur.  For instance, as relevant here, the sponsor is required to report to the agency any serious and unexpected adverse event suspected to be associated with the use of the drug (a suspected unexpected serious adverse reaction, or "SUSAR") that occurs during the trial or trials.[20]  Likewise, any amendments to key clinical trial documents, including the clinical trial protocol (which prespecifies the rules for conducting and analyzing the trial), the statistical analysis plan ("SAP," which prespecifies in greater detail the manner in which the analyses set forth in the protocol will be conducted), investigator brochure (which is provided to doctors participating in the study to provide them with an understanding of the current knowledge about and experience with the experimental drug); and patient consent forms (which provides the patient with information about the drug).  In response to these updates, the FDA may send the sponsor IND Information Requests seeking additional

---

[19]    U.S. Food & Drug Admin., *Special Protocol Assessment, Guidance for Industry*, at 1 (Apr. 2018), available at https://www.fda.gov/media/97618/download ("[Special Protocol Assessment] is a process in which sponsors may ask to meet with FDA to reach agreement on the design and size of certain clinical trials, clinical studies, or animal studies…to determine if they adequately address scientific and regulatory requirements for a study that could support marketing approval.").

[20]    U.S. Food & Drug Admin., *Guidance for Industry and Investigators, Safety Reporting Requirements for INDs and BA/BE Studies*, at 8 (Dec. 2012), available at https://www.fda.gov/media/79394/download ("The sponsor must report in an IND safety report any suspected adverse reaction to study treatment… that is both serious and unexpected.")

information regarding the reported development or change.[21] Even if the IND Information Request only seeks information from the sponsor without offering recommendations on the development program or the study, it can still signal areas of particular interest to the FDA that may become important issues in the NDA review.

29. Here, for instance, the FDA sent ChemoCentryx IND Information Requests after ChemoCentryx reported serious adverse liver events and protocol amendments urged by the DMC modifying the ADVOCATE study in response to the committee's safety concerns.[22]  Among other things, the FDA asked ChemoCentryx how it would mitigate liver risk in the avacopan program, and, in response, ChemoCentryx assured the FDA that the DMC would continue to exercise oversight and, in addition, the Company would hire a leading expert in liver toxicity, Dr. Willis Maddrey.[23] ChemoCentryx had also amended the protocol to increase the frequency of liver enzyme testing and provide investigators a guide on how to respond to abnormal test results.  As discussed below, this interaction signaled that the FDA would be focused on avacopan's liver safety and, given ChemoCentryx's assurances, the agency would expect to be informed if the DMC or Dr. Maddrey raised significant additional concerns about avacopan's hepatotoxicity.

30. Another way the FDA communicates guidance to sponsors more generally is through the issuance of published industry Guidances on a host of topics related to clinical trial conduct and analysis, regulatory review, and more.  These published Guidances "explain the agency's interpretation of, or policy on, a regulatory issue," particularly important or recurring issues in drug development; clinical trial conduct and analysis; and regulatory review and approval.[24] Indeed, as discussed below, the FDA has issued Guidances directly relevant to issues in the ADVOCATE study, including guidance regarding trial design and analysis of efficacy and safety data.  These Guidances were well-established at the time ChemoCentryx initiated the ADVOCATE study.  While Guidances are not legally binding on either the FDA or the sponsor,

---

[21]  U.S. Food & Drug Admin., *Good Review Practice: Good Review Management Principles and Practices for Effective IND Development and Review,* at 15-16 (Apr. 29, 2013), available at https://www.fda.gov/media/85790/download.

[22]  *See e.g*., CCXI-0001665849; CCXI-0001533272.

[23]  CCXI-0001665849 ("Willis C. Maddrey, M.D., University of Texas Southwestern Medical Center, an independent expert in drug induced liver injury, has been retained to provide his hepatology expertise.").

[24]  U.S. Food & Drug Admin., *Background: FDA Good Guidance Practices*, available at https://www.fda.gov/about-fda/reports/background-fda-good-guidance-practices.

they provide the FDA's thinking about a particular issue and provide a roadmap for the way in which the agency will approach that issue in the context of a review.  Indeed, if a sponsor wishes to depart from published Guidance, FDA advises them to flag the proposed alternative and provide a clear justification for it.[25]

### C.    THE NDA REVIEW PROCESS

31.  The second major period is the NDA period when all clinical and other studies of a drug have been completed and analyzed and the sponsor submits the NDA – the application for marketing approval.[26] During this period FDA reviews the information submitted in the NDA and decides whether the drug should be approved for marketing and, if so, how it should be labeled and marketed.[27]

32.  All of the clinical studies conducted to date are submitted in the NDA.[28] The portion of the NDA presenting the data from these clinical trials is called the "Clinical Study Report," or "CSR." The CSR is a critical component of the NDA.  The CSR is a clear, organized, comprehensive report of the clinical study including design, conduct, analysis plan and results.[29]  The CSR is built upon the "Tables, Listings and Figures" prepared by the sponsor or CRO according to the analysis plan after study unblinding from the now locked and unblinded trial database.

---

[25]    U.S. Food & Drug Admin., *Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff, Good Review Practice*, at 21-22 (Dec. 2017), available at https://www.fda.gov/media/94850/download ("FDA uses guidance documents to explain its current thinking on policy, scientific, and/or regulatory issues…In general, FDA guidances do not establish legally enforceable responsibilities…Stakeholders can use an alternative approach if the approach satisfies the requirements of applicable laws and regulations.").

[26]    *See* U.S. Food & Drug Admin., *New Drug Application (NDA)*, available at https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

[27]    *See id.*

[28]    *See id.*

[29]    *See* U.S. Food & Drug Admin., *E3 Structure and Content of Clinical Study Reports*, at 1 (July 1996), available at https://www.fda.gov/media/71271/download ("The clinical and statistical description, presentations, and analyses are integrated into a single report, incorporating tables and figures into the main text of the report or at the end of the text, with appendices containing such information as the protocol, sample case report forms, investigator-related information, information related to the test drugs/investigational products including active control/comparators, technical statistical documentation, related publications, patient data listings, and technical statistical details such as derivations, computations, analyses, and computer output.").

33. In addition to summaries of all studies, the sponsor must also submit the protocol under which each study was conducted, all amendments to the protocol from the commencement to the completion of the study, the SAP detailing the analysis, all data collected during the study (both efficacy and safety related), results of all analyses prespecified in the protocol and SAP, and the sponsor's proposed labeling, setting forth the manner in which the Company proposes to market and sell the drug.[30]

34. After the submission of an NDA, the FDA notifies the sponsor whether the NDA has been accepted for filing. Acceptance of an NDA for filing is not an indication that the FDA approved of the design of any clinical trials used to support the NDA (that is the purpose of the SPA which ChemoCentryx did not obtain). Nor does NDA acceptance indicate that the FDA finds the data submitted in the NDA to be sufficient to support approval. Acceptance of an NDA for filing merely means that the FDA found the required sections of the NDA are sufficiently complete to permit substantive review.

35. During the review process, the FDA continues to communicate with the sponsor, including through scheduled meetings and through further correspondence, such as Information Requests indicating areas of FDA concern.[31] If soon after receiving the NDA submission the FDA has identified major concerns with the NDA that may create barriers to proposed approval or labeling, it will send the sponsor a Day 74 (Deficiencies Identified) Letter.[32] Here, ChemoCentryx received such a letter; that letter, among other things, reiterated concerns regarding ADVOCATE's secondary endpoints and the Company's failure to administer rituximab maintenance therapy to patients in the study, potentially biasing results in avacopan's favor.[33] The FDA further informed the Company that it would hold an Advisory Committee

---

[30] *See* 21 C.F.R. § 314.50, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=314.50.

[31] *See* U.S. Food & Drug Admin., *Information Request and Discipline Review Letters Under the Prescription Drug User Fee Act*, at 2 (Nov. 2001), available at https://www.fda.gov/media/77409/download ("CDER and CBER used IR letters to ask for information that would assist reviewers during the course of the review or to convey deficiencies identified in the application in advance of the issuance of an action letter").

[32] *See, e.g.*, FDACDER004102.

[33] *See* FDACDER004102.

meeting to discuss the numerous issues the agency had raised regarding ADVOCATE and the avacopan NDA, including in pre-NDA communications.[34]

## D.    ADVISORY COMMITTEE MEETINGS

36.   When the FDA has concerns, uncertainties, or questions about whether and how to approve a drug, it may convene a public meeting of a specialized Advisory Committee to discuss the NDA and vote on questions posed by the agency.[35]  The Advisory Committee is comprised of outside experts – such as clinicians, academics, statisticians, and researchers – with experience and expertise in fields relevant to answering the FDA's questions.  In the case of the avacopan NDA, for instance, the FDA convened a meeting of its Arthritis Advisory Committee, which included experts with experience in treating inflammatory diseases like ANCA-associated vasculitis, the indication for which ChemoCentryx sought approval of avacopan.[36]  While the Advisory's Committee's recommendations are not binding on the FDA, the ensuing detailed clinical discussion – held by experienced individuals including those who actually treat patients for whom the drug would be prescribed – provides important information to the agency and to the public, including the medical community, as a whole.

37.   When the FDA decides to convene an Advisory Committee meeting, it will inform the sponsor well in advance of the meeting itself.  Prior to the meeting, both the FDA and the sponsor will provide background materials to the Advisory Committee, including "briefing books"[37] that summarize and present the trial data included in the NDA, along with some explanatory commentary regarding those data.[38]  The FDA shares its proposed briefing materials with the

---

[34]   FDACDER004102 at -103 ("We are currently planning to hold an advisory committee meeting to discuss this application.").

[35]   *See* U.S. Food & Drug Admin., *Guidance for Industry, Advisory Committee Meetings – Preparation and Public Availability of Information Given to Advisory Committee Members* (Aug. 2008), available at https://www.fda.gov/media/75436/download.

[36]   PX 064.

[37]   *See* U.S. Food & Drug Admin., *Guidance for Industry, Advisory Committee Meetings – Preparation and Public Availability of Information Given to Advisory Committee Members*, at 6, (Aug. 2008) available at https://www.fda.gov/media/75436/download ("This guidance uses the term 'briefing materials' to describe the package of information that we provide to advisory committee members before a meeting. The briefing materials usually contain information prepared by us and/or the sponsor (if the meeting involves an application or a particular product).").

[38]   *See, e.g.*, PX 004.

sponsor prior to the Advisory Committee meeting and provides the sponsor with an opportunity to propose edits to those materials. ChemoCentryx was provided with such an opportunity here. Once the materials are finalized, they will be posted publicly on the FDA's website two days before the meeting is scheduled to occur.

38.   At the meeting itself, both the sponsor and the FDA will present their perspectives on the data, expanding on, and supplementing, the information provided in the briefing materials. During these presentations, the members of the Advisory Committee will ask questions that elicit additional detail regarding the clinical trial data, the proposed use of the experimental therapy, and the balance of risk and benefit associated with use. Following the presentations, the Advisory Committee will provide commentary and engage in discussion and then vote on the questions posed by the FDA.[39] Following the vote a rollcall is taken and each voting member of the Advisory Committee will state their vote for the record along with an explanation of the rationale for their vote. The Advisory Committee's discussion, votes, and even the questions themselves can be quite informative regarding the clinical perspective on risk-benefit balance and likely use by prescribers. The FDA broadcasts the Advisory Committee meeting on the internet.

### E.   APPROVAL AND LABELING

39.   As discussed above, the FDA will evaluate the information submitted by the sponsor to determine if there is substantial evidence of effectiveness and what the expected or potentially likely risks associated with use of the drug are. The FDA will also review the sponsor's proposed labeling, which describes the manner in which the sponsor proposes the drug be used

---

[39]   *See* U.S. Food & Drug Admin., *Guidance for FDA Advisory Committee Members and FDA Staff: Voting Procedures for Advisory Committee Meetings* (Aug. 2008), at 4, available at https://www.fda.gov/media/75426/download ("At other advisory committee meetings, members cast a formal vote on issues related to the approvability of a product submission. In others, different questions may be posed to a committee for a formal vote. Votes can be an effective means of communicating with FDA because they provide feedback on discrete questions. These questions are generally scientific in nature and can involve a range of subjects, including evaluation of post-market safety data or pre-market assessment of a product's risk/benefit profile. Since all members vote on the same question, the results help FDA gauge a committee's collective view on complex, multi-faceted issues. FDA recognizes that many of the questions voted on by advisory committee members are complex and that the discussion that accompanies the voting is important. The discussion, together with the votes, helps inform the agency's own deliberations on scientific and regulatory matters.").

and prescribed.  After weighing the risks and benefits associated with a drug, the FDA may approve the drug with substantially the labeling sought by the sponsor.  On the other hand, if the FDA believes that risk-benefit calculus does not support the labeling sought by the sponsor – because the drug poses particular safety risks, evidence of efficacy is limited, or both or other factors – it may approve the drug with more limited labeling or refuse to approve the drug altogether.  These decisions are, of course, informed by the gravity of the condition to be treated and the morbidities associated with it.

40. In determining how a drug should be labeled, the FDA analyzes what information prescribers will need to know in order to make an informed decision about whether to prescribe the drug. This is a formal required element of the approval process, and becomes the prescribing information (labeling, informally called "package insert") that accompanies the drug when sold by the sponsor.[40] Among other things, the labeling describes what disease the drug should be used to treat; the kinds of patients for whom treatment benefits may outweigh the risks; how the drug should be administered; and so forth.[41]  In addition, the labeling describes the risks associated with treatment as well as benefits demonstrated in clinical studies – information that is designed to help healthcare providers and others make determinations about whether treatment with the drug is appropriate for a particular patient.

41. The content of a drug's labeling is very important to a sponsor in terms of marketing and selling the drug.  The content of the labeling will determine what a sponsor is able to claim in marketing and promotional materials as a demonstrated benefit of the drug, what patients have been recommended for use of the drug, and what are the known or potential safety risks of drug.

42. The format of the drug labeling is prescribed by FDA regulation.  The first section of the labeling is the 'Indications and Usage' statement.  This section describes the patient population for whom treatment is recommended, may flag subsets of that population for whom treatment is ***not*** recommended, and if needed, a brief description of how this particular drug may fit into the overall approach to treating patients with the disease.[42]

---

[40]  *See* 21 C.F.R. § 201.57 (2024), available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=201.57.

[41]  *See id.*

[42]  *See id.*

43. Another key section of labeling is the "Warnings and Precautions" section.[43] This section describes the most significant adverse effects that are likely to be associated with use of the drug and provides recommendations to healthcare providers on how to mitigate those risks. Specifically, the Warnings and Precautions section describes the "adverse reactions and other potential safety hazards that are *serious* or are otherwise *clinically significant* because they have implications for prescribing decisions or for patient management."[44] For an adverse reaction to be listed in the Warnings and Precautions section of the label it must not only be "serious," there must also be "reasonable evidence of a causal association between the drug and the adverse event,"[45] which may include imbalances in the rate of the adverse events associated with the drug versus comparator in clinical trials and the "existence of dechallenge and rechallenge experience" with the drug.[46] "Clinical significance" may be a function of both the severity of the potential injury associated with the adverse event and/or the frequency with which the adverse event is observed. Steps for mitigation of significant safety risks may also be included in the Warnings and Precautions section, such as recommendations for discontinuation and frequent monitoring that were included in the avacopan label.[47]

## F. FDA'S RELIANCE ON STUDY DATA MONITORING COMMITTEES DURING THE INVESTIGATIONAL PHASE

44. To ensure the safety of patients participating in clinical trials conducted during the investigational phase, there must be a procedure in place for monitoring the accumulating blinded study data to identify any significant safety risk associated with treatment of the

---

[43]   *See* U.S. Food & Drug Admin., *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format*" (Oct. 2011), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/warnings-and-precautions-contraindications-and-boxed-warning-sections-labeling-human-prescription.

[44]   *See id.* at 3.

[45]   *See id.*

[46]   *See id.*

[47]   *See id.* at 6-7 ("The description should be limited to the following information, and information should be included only if known and important to clinical decision making: … Steps to take to decrease the likelihood, shorten the duration, or minimize the severity of an adverse reaction. These steps could include, for example, necessary evaluation prior to use, titration and other kinds of dose adjustment, monitoring during dose adjustment or prolonged use, avoidance of other drugs or substances, or special care during comorbid events (e.g., dehydration, infection).").

experimental drug.  Study blinding means that the randomized treatment a patient has been assigned to is kept unknown to the patient, the study site investigator, and the sponsor personnel.

45.  Given that a study's blinding must remain intact to preserve study integrity, the required monitoring of participant safety cannot be performed by the sponsor, since such monitoring would require knowledge of patient treatment assignments.  Instead, that monitoring can be performed by an independent group of clinical and statistical experts, formed as a Data Monitoring Committee ("DMC", also often called a Data Safety and Monitoring Board ("DSMB") or Independent Data Monitoring Board ("IDMB")).[48] The monitoring committee receives reports of safety data, including adverse event rates summarized by the treatment group.[49] For serious adverse events in an individual participant, the monitoring committee receives the study treatment the participant was randomized to receive.[50]

46.  Blinding of Phase 3 studies is important to help avoid bias in evaluating the treatment's effects.[51] Bias could be unintentionally introduced by any of the individuals if they were not blinded to the study.  Patients and investigators could unintentionally report that a patient is improving or not, or experiencing significant adverse effects or not, influenced by whether the patient is known to be on the experimental drug or the comparator (often a placebo).  This awareness can create optimism or pessimism about the patient's progress during the study.  Sponsor personnel could

---

[48]  *See* U.S. Food & Drug Admin., *Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees* (Mar. 2006), at 1, available at https://www.fda.gov/media/75398/download.

[49]  *See id.* at 20 ("A DMC will generally review data related to the conduct of the study (that is, the quality of the study and its ultimate ability to address the scientific questions of interest), in addition to data on effectiveness and safety outcomes."); at 18 ("A second important aspect of safety monitoring in these trials is comparison of adverse event rates in each treatment arm…Because many types of adverse reactions cannot be anticipated prior to a large-scale study, the DMC should generally be provided with interim summaries by treatment arm of adverse events observed, not limited to those identified in advance.").

[50]  *See id.* at 19 ("The involvement of a DMC in the review of individual adverse event reports will vary from case to case. In some studies, it may be important for the DMC to see detailed information on all deaths or other specified events, particularly events that are likely to have been caused by the product being tested (e.g., acute liver failure in a drug study). In other studies, where many deaths or other serious events are expected, the DMC may view only the summary tabulations and comparative statistics to determine whether there appears to be an excess of an important adverse event in one of the study arms. Simple listings of adverse outcomes, especially without treatment assignments, are rarely useful for DMC discussion.").

[51]  *See* CCXI-0004491838 (U.S. Food & Drug Admin., *E9 Statistical Principles for Clinical Trials* (Sept. 1998) § II-C); *see also,* U.S. Food & Drug Admin., *E8(R1) Considerations for Clinical Studies* (Apr. 2022) § V-E, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e8r1-general-considerations-clinical-studies; and ICH, *General Considerations for Clinical Studies: E8(R1)* (May 8, 2019), available at https://database.ich.org/sites/default/files/E8-R1_EWG_Draft_Guideline.pdf.

influence the study result by asking investigators to 'reevaluate' their observations of a patient for whom the observation is contrary to what the sponsor hopes for their new treatment. Therefore, blinding of studies can minimize these potential sources of bias.

47. In addition, when studies are completed sponsor personnel are kept blinded until after all data is entered into the study database and the database is finalized ("locked"). Only after data finalization will sponsor personnel be given the codes to reveal which treatment each of the patients received and data analysis can be performed.[52] This prevents data manipulation after an analysis has been performed to provide modified data with analyses appearing to demonstrate the sponsor's new drug performs well and is safe, when in fact the initial database analyses indicated otherwise.

48. The DMC members are selected by the sponsor, with FDA concurrence, to have a broad range of experience in the conduct of large late-stage clinical studies and expertise across the expected range of issues that may arise during the study. Although the DMC members are paid for their service by the sponsor, they evaluate the data independently of the sponsor and are not subject to influence by study sponsors or have any other conflicts of interest in forming their judgments.[53]

49. The DMC has periodic, scheduled meetings for which they receive a summary of the accumulating data reporting the adverse events that have occurred, as well as reports of individual serious adverse events whenever they occur.[54] The DMC is best positioned to distinguish between adverse events that may be caused by the investigational drug versus those that are more likely to be caused by the disease being studied or simply adverse events that may be common among people and not likely related to either the drug or the disease. In a blinded study, the DMC and the independent data and statistics group managing the database should be the only individuals with access to any unblinded data or results.

---

[52] *See* U.S. Food & Drug Admin., *E6(R3) Good Clinical Practice (GCP)* § 4.2.6 (May 2023), at Section 2.11, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e6r3-good-clinical-practice-gcp; *see also,* ICH, *Guideline for Good Clinical Practice E6(R2)* (Nov. 9, 2016), available at https://database.ich.org/sites/default/files/E6_R2_Addendum.pdf.

[53] *See* U.S. Food & Drug Admin., *Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees* (Mar. 2006), at 6-10, available at https://www.fda.gov/media/75398/download.

[54] *See id.* at 11.

50. The process is structured to provide the potential for the DMC to identify patterns or trends in adverse events early on that may be associated with the drug. If the DMC's review of the accumulating data suggests that there might be a clinically significant harmful effect of the drug, they will notify the sponsor of this finding.[55] In cases where the DMC has substantial concerns about potential for the harmful effect to impact patient safety, it may recommend modifications of the trial. These can include modification of the clinical trial protocol to enhance or expand disclosures to participating doctors and patients; require frequent patient monitoring to ensure the adverse event is caught early on; and impose rules requiring the discontinuation of the study drug at the first stages of onset, all of which the DMC recommended in the ADVOCATE study. This allows for the early identification of a participant who is experiencing a mild adverse effect, enabling adjustments to the individual patient's study treatment such as a change in dose, or stopping the study treatment for the individual patient to prevent the development of a severe adverse effect. Particularly for serious diseases where there is substantial unmet medical need for new therapies, DMCs will avoid recommending study termination unless they are convinced that there is no way to mitigate the risk observed.

51. In rare cases, and as a last resort, the DMC may recommend that the study be halted completely because there is no adequate means to mitigate the risk. When a serious potential safety risk is discerned by the DMC their decision to not terminate a study does not mean that the drug's safety risk profile is "acceptable" for the indication and labeling sought by the sponsor, particularly where, as in the case of the ADVOCATE DMC, the committee has underscored the seriousness of the safety risks associated with drug and has urged the sponsor to implement significant mitigation measures. Safety concerns of the DMC, and study modification as mitigation of risk, will often be reflected in some way in the drug's labeling if approved. In my more than two decades at the FDA, I have seen a DMC with safety concerns recommend a total halt to a study only rarely. On the other hand, I have often seen DMCs allow studies to proceed even where a significant safety risk is identified that is highly likely to have an impact on labelling but can be mitigated for the patients still within the study.

---

[55]  *See id.*, at 17-19.

52. Sponsors will almost always follow significant recommendations the DMC makes and institute the revision to study conduct in the protocol.

53. When serious and unexpected adverse events are discovered, warranting the DMC to raise the concern to the sponsor, sponsors must submit this information to the FDA. If protocol amendments are required to implement the DMC's recommendations those must be submitted to the FDA. The FDA may also send the sponsor IND Information Requests to help the FDA evaluate and understand the DMC's recommendations. In my experience, the FDA will agree with the DMC's judgment in the vast majority of cases.

## G.  SPONSOR RESPONSIBILITY TO SUBMIT INFORMATION THAT IS TRUE, ACCURATE, AND DOES NOT OMIT MATERIAL FACTS

54. As the FDA explains, an NDA "tells the full story of a drug."[56] Additionally, sponsors sign and include Form FDA 356h when submitting an NDA. In signing they attest that "[t]he data and information in this submission have been reviewed and…. are certified to be true and accurate." Below this statement, and above the signature is "[w]arning: A willfully false statement is a criminal offense (18 U.S.C. § 1001)."[57] Consequently, if, after a study database is locked and study results are unblinded, a sponsor makes changes to study results, patient outcomes, or analyses, the sponsor is expected to report those changes and the impact of those changes on study results to FDA, particularly if those changes impact reported primary endpoint results.[58]

---

[56]   *See* U.S. Food & Drug Admin., *Step 4: FDA Drug Review* (Jan. 4, 2018), available at https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review.

[57]   18 U.S.C. § 1001 ("(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully — (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact").

[58]   *See* U.S. Food & Drug Admin, *E6(R3) Good Clinical Practice (GCP)* (May 2023), available at https://www.fda.gov/media/169090/download ("Deviations from the planned statistical analysis or changes made to the data analysis set after the trial has been unblinded (where applicable) should be clearly documented and justified and should only occur in exceptional circumstances (e.g., data discrepancies that must be resolved for the reliability of the trial results). Data changes should be authorised by the investigator and reflected in an audit trail. Post-unblinding data changes and deviations from the planned statistical analyses should be reported in the clinical trial report."). *See also,* ICH, *Guideline for Good Clinical Practice E6(R2)* (Nov. 9, 2016), available at https://database.ich.org/sites/default/files/E6_R2_Addendum.pdf.

## IV.    THE FDA RAISED ISSUES DURING THE IND AND NDA PHASES THAT MADE IT UNLIKELY THE FDA WOULD APPROVE AVACOPAN WITH THE BROAD LABEL FOR EFFICACY AND SAFETY CHEMOCENTRYX SOUGHT

55. ChemoCentryx developed the drug avacopan for treatment of an autoimmune disease known as ANCA-associated vasculitis ("AAV"). As part of the drug development process, ChemoCentryx's Phase 3 trial, known as ADVOCATE, was intended to be the final study testing the safety and effectiveness of avacopan to treat AAV and the primary basis for the Company's NDA seeking approval of avacopan for the treatment of AAV.[59]

56. During the IND and NDA periods, the FDA had repeatedly communicated to ChemoCentryx that there were issues with the ADVOCATE trial. These issues made it unlikely that the FDA would approve avacopan with ChemoCentryx's intended broad label for efficacy and safety. I summarize these issues here and include a timeline of communications between the FDA and ChemoCentryx as **Figure 1**, below:

   a. ChemoCentryx's complex study design -- including the administration of multiple background therapies to patients -- made it challenging to clearly interpret the ADVOCATE study results and evaluate the manner in which it should be used for the treatment of AAV.

   b. ChemoCentryx proposed to evaluate multiple secondary endpoints in the ADVOCATE study with the aim of showing "that, as a replacement for glucocorticoids, [avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids."[60] This was a key claim for ChemoCentryx. However, the FDA informed ChemoCentryx in November 2016 that "the proposed study," including the proposed secondary endpoints, "is likely not adequate to support such safety comparisons."[61] Specifically, the FDA stated that these secondary endpoints were not "validated" as markers of clinical outcomes or were not validated for vasculitis and would not support labeling

---

[59]    *See* Compl. ¶¶2, 8.
[60]    *See* FDACDER002501 at -509.
[61]    *See* PX 002 at -845.

claims about avacopan's safety or efficacy, absent thorough evidence of validity.[62] The FDA also raised statistical concerns regarding proposed analyses involving these endpoints, including that some analyses did not preserve study randomization Accordingly, the FDA informed ChemoCentryx that the agency would not consider results of these analyses in making regulatory decisions regarding avacopan and that those results would not be included in any drug label. Further, the FDA informed ChemoCentryx that there is limited long term safety data with avacopan treatment.[63]

c. ChemoCentryx's proposed non-inferiority analysis could not support claims regarding avacopan's efficacy because given the multiple background therapies administered to patients in both arms, even if avacopan had no effect, both arms could be non-inferior to each other with regard to the primary endpoint of disease remission.[64]

d. Extensive additional "non-study" glucocorticoid[65] use for the treatment of AAV beyond the planned use in the first 20 weeks confounded interpretation of the ADVOCATE study remission results.

e. Analysis of randomized subgroups raised concern about interpretation of the week 52 analysis since avacopan was shown to be efficacious only in the rituximab subgroup, which did not receive remission-maintenance standard of care therapy and could be considered undertreated.

---

[62] *See id.* ("We have concerns regarding the inclusion of SF-36 and EQ-5D-5L as secondary endpoints. You have not provided adequate data that either endpoint is a validated measure in vasculitis. If you plan to utilize data from these endpoints to support future labeling claims, you will need to provide the following information: I. Data supporting SF-36 and EQ-5D-5L as validated measures in vasculitis and their reliability to support general health status. This would likely require a 'white paper' type analysis, which includes a comprehensive literature search. II. Analyses and raw data relevant to all of the SF-36 domains specific to CCX168. III. Information or data to support that the proposed patient reported outcomes assess separate, non-overlapping elements.").

[63] *See* PX 173 at -444 ("Additionally, there is limited long term safety data with avacopan treatment.").

[64] *See* PX 002 at -844 ("Namely, we remain concerned regarding the ability to use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of your product (CCX168). As previously stated, a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids, as it would be difficult to tease out whether CCX168 is effective or whether RTX/CYC was the primary driver of the efficacy results on both treatment arms.").

[65] Glucocorticoids are a class of steroid hormones. Sometimes glucocorticoids are referred to with a more general term 'steroids' but in the setting of this dispute, they have the same meaning.

**FIGURE 1: TIMELINE OF MEETINGS AND COMMUNICATIONS BETWEEN THE FDA AND CHEMOCENTRYX CONCERNING THE ADVOCATE STUDY**



57. Moreover, independent ADVOCATE DMC and ChemoCentryx's independent consultant and expert hepatologist, Dr. Willis Maddrey, warned the Company that avacopan was associated with significant liver toxicity and angioedema safety signals, and that these signals would be of concern to the FDA.[66]  Indeed, ChemoCentryx's draft label for avacopan, submitted to the FDA in mid-2020, included both hepatoxicity and angioedema in the Warnings and Precautions section – an acknowledgment on the Company's part that both safety signals were significant.[67]

---

[66]    *See* PX 051 at -556 ("Although it is theoretically possible that concomitant medications, such as statins or Bactrim, caused the liver damage, we deem this unlikely and we feel that Investigators and patients must be warned of the potential for CCX168 to be hepatotoxic."); *see also,* Maddrey Tr. 151:15-152:10 ("In other words… the DMC believes avacopan most likely caused the liver injury here, right? A. yeah… And as we discussed, you agreed with their assessment here, correct? A. Yes. Q. and you communicated that agreement to ChemoCentryx, correct? … Yes."); PX 017; PX 021; PX 023; PX 056; PX 099; PX 171; Glassock Tr. 42:5-43:3, 51:1-78:5, 82:8-83:3, 111:16-112:15, 196:3-12, 222:15-223:3, 312:16-314:20; Goodkin Tr. 72:8-23, 96:10-111:2, 240:24-241:17; Maddrey Tr.  166:13-167:19, 221:25-222:23, 224:3-13.

[67]    CCXI-0000381553; CCXI-0000381554 ("Increase in liver function tests has been reported in clinical trials. Obtain liver function tests before initiation of therapy and monitor as clinically indicated. Angioedema has been reported."); CCXI-0000346180 at -188-89; CCXI-0000346117; PX 065.

58. As will be discussed below, it is my opinion that ChemoCentryx's communications with the FDA along with the safety warnings issued by the Company's independent advisors made it unlikely that the FDA would approve avacopan with the broad labeling for efficacy as desired by ChemoCentryx – including allowing ChemoCentryx to claim that avacopan was a replacement for glucocorticoids in the treatment of AAV – or for safety – including allowing ChemoCentryx to claim that avacopan had a safety profile superior to standard of care treatment. Moreover, it is my opinion that the unlikeliness of such an approved labeling would have been obvious to any reasonable sponsor given the substance and character of these warnings.

> A.    THE FDA WARNED CHEMOCENTRYX THAT ADVOCATE'S DESIGN WOULD MAKE INTERPRETATION OF STUDY RESULTS AND DETERMINATION OF RISK-BENEFIT CHALLENGING

59. Beginning with the Company's first interaction with the FDA concerning ADVOCATE, the July 2016 EOP2 meeting,[68] the FDA repeatedly told ChemoCentryx that the complexity of ADVOCATE's design would make the interpretation of study results and determination of avacopan's risk-benefit challenging.[69] In other words, in weighing avacopan's risk-benefit, the strength of evidence of efficacy derived from the study would likely be discounted by the substantial uncertainty about interpreting those results given its problematic design.[70] In particular, the FDA cited the significant concomitant and varying AAV treatment provided to patients.[71] That concomitant treatment included, study supplied and non-study-supplied steroids and immunosuppressants.[72] As the FDA repeatedly explained, this made it difficult to determine how much benefit avacopan was actually providing, both in terms of remitting the signs and

---

[68]    *See* FDACDER002501 at -502 ("We also refer to the meeting between representatives of your firm and the FDA on July 14, 2016.").

[69]    *See* PX 002; PX 173; PX 185; PX 186; PX 326; CCXI-0000294907.

[70]    *Id.*

[71]    *See, e.g.,* PX 002; PX 173; CCXI-0000294907 at -959 ("We note that patients in study CL010_168 received steroids outside of the protocol specified steroid taper. Some of these patients received steroids because of worsening of disease, but many also received steroids for other reasons such as adrenal insufficiency."); CCXI-0000238650.

[72]    *See* PX 002; PX 173; CCXI-0000238650. *See also,* PX 184; PX 269; PX 094.

symptoms of vasculitis and in terms of providing a steroid-sparing safety benefit.[73]  The FDA continued to express these concerns after the July 2016 EOP2 meeting, including at a November 2016 Type C meeting with ChemoCentryx prior to design finalization, and proposed alternative designs to help mitigate these issues, but ChemoCentryx chose not to heed the FDA's guidance.[74]  The FDA continued to raise this fundamental issue with ChemoCentryx even after the ADVOCATE results were known and the Company had submitted the avacopan NDA.[75]

60.  AAV is an inflammatory disease affecting the body's blood vessels.  At the time ADVOCATE was commenced, and at the start of the Class Period in November 2019, "standard of care" treatment for AAV involved a combination of steroids and immunosuppressants to induce remission of inflammation and other signs and symptoms of the disease (called the "induction" phase of treatment), and then continuing treatment with immunosuppressants to maintain remission (called the "maintenance" phase).[76]  As the FDA explained, ChemoCentryx hoped the trial would show that "as a replacement for glucocorticoids, CCX168 [i.e., avacopan] will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids."[77]

61.  As shown in **Figure 2**, below, the ADVOCATE trial randomized patients to two arms.  The so-called "standard of care" arm received a course of steroid treatment for the first 20 weeks of the trial, with dosage declining over time and reaching zero by week 20.  Patients randomized to the "avacopan" arm received avacopan for all 52 weeks of the ADVOCATE study.  In addition,

---

[73]  FDACDER002501 at -507 ("[I]t is unlikely that the efficacy of glucocorticoids alone is similar to that of glucocorticoids when added on to CYC or RTX…Therefore, with the proposed NI margin of -20%, it would be very difficult to determine if a finding of similar remission rates on the proposed comparator arms was due to the efficacy of CCX168 or to the fact that the remission rates on both arms were primarily driven by the underlying CYC or RTX (with little to no benefit provided from CCX168)."); *see also,* CCXI-0000238650.

[74]  *See* PX 002; CCXI-0000238650; Hillson Tr. 273:6-274:8, 281:23-282:12.

[75]  *See* PX 002; Hillson Tr. 281:23-282:12.

[76]  PX 004 at -288 ("The treatment strategy of patients with AAV involves a few fundamental principles. First, the treatment paradigm is comprised of 2 phases: induction and maintenance treatment. This paradigm arose from the desire to minimize exposure of potent immunosuppressants (namely, cyclophosphamide). Induction treatment typically lasts 3-6 months with the goal of establishing remission. Then, maintenance therapy is initiated to prevent relapse. The optimal duration of maintenance is unknown. The choice of therapy for induction and maintenance is tailored based on the severity of disease… For severe AAV, induction therapy involves a combination of glucocorticoids and either cyclophosphamide or rituximab. For remission maintenance, the treatment guidelines recommend low-dose glucocorticoids and either azathioprine, rituximab, methotrexate, or mycophenolate mofetil.").

[77]  *See* FDACDER002501 at -509.

patients in both arms received background therapy with immunosuppressants during the induction phase, either rituximab or cyclophosphamide.  Only patients in the cyclophosphamide cohort received "maintenance" therapy, for which they received continuing treatment with the immunosuppressant azathioprine (after completing cyclophosphamide therapy at week 13).[78]

62.  In addition according to study protocol, patients, including patients in the avacopan arm, could receive additional steroids outside of those mandated by the study protocol, ***including for treatment and management of their disease***, and still be counted as having "remitted" on their respective course of treatment.[79]  In other words, a patient in the "avacopan arm" could receive large doses of steroids specifically for the treatment of AAV, but ChemoCentryx would still count them as having achieved remission because of avacopan.

**FIGURE 2: DESIGN OF THE ADVOCATE STUDY**



Source: PX 063 at -393.

63.  The primary efficacy endpoint of the study was complete remission of AAV symptoms as measured by version 3 of the Birmingham Vasculitis Scale ("BVAS") scale at week 26 and

---

[78]  *See* PX 239.

[79]  PX 004 at -321 ("Investigators could treat study subjects with non-study supplied glucocorticoids for a variety of reasons. Specifically, for the treatment of AAV non-study supplied glucocorticoids were used to treat persistent vasculitis, worsening vasculitis, and relapse.").

remission sustained through week 52 of the study.[80] Both the ADVOCATE protocol and SAP stated that the study would be "successful" if avacopan achieved "non-inferiority" – in other words, it was statistically no worse than comparator – with respect to BVAS remission.[81]

64. The FDA repeatedly told ChemoCentryx that the administration and withdrawal of multiple background therapies in both arms of the study "complicates the interpretation of a clinically meaningful benefit" on avacopan.[82]  The FDA gave several specific examples of the manner in which the study design "complicated interpretation" of the results.[83]

65. At the July 2016 EOP2 meeting, for instance, the FDA explained that because there are "no historical placebo-controlled trials evaluating the efficacy of glucocorticoids as an add-on therapy to CYC [cyclophosphamide] or RTX [rituximab]" it would be difficult to disentangle the effect of avacopan from the effect of background therapy.[84]

66. Interpreting the study result in fact became more difficult because all patients were able to receive additional steroid doses during the entire study as the investigator deemed appropriate for treatment of their AAV, and the majority of patients in the avacopan arm did receive steroid doses.[85]  Consequently, disentangling the effect of avacopan from the effect of the additional steroids was challenging.

67. The FDA reiterated this concern at the November 2016 Type C meeting stating, "We do not agree with your revised CCX168 [avacopan] phase 3 study design…[W]e continue to recommend that you include a third arm with either no steroids [plus immunosuppressant] or rapid taper steroids [plus immunosuppressant]."[86]

---

[80]  PX 004 at -276 ("The primary endpoints were the proportion of patients achieving disease remission at Week 26 and the proportion of patients achieving sustained remission at Week 52, each evaluated using the Birmingham Vasculitis Activity Score (BVAS)").

[81]  *See* PX 239; PX 339 at -761, -869.

[82]  FDACDER002239 at -242; PX 173; *see also,* PX 094 at -113, -130.

[83]  *See, e.g.*, FDACDER002239 at -242.

[84]  FDACDER002501 at -508.

[85]  PX 339 at -851.

[86]  PX 002 at -844.

68. Again, at the March 2020 Pre-NDA Meeting with ChemoCentryx, the FDA stated, "the multiple interventions in the study (i.e., removing standard of care steroids in the first 6 months and addition of avacopan on top of standard of care in the second 6 months) complicate the assessment of the efficacy of avacopan treatment.  Reduction of glucocorticoid use may be supportive of the efficacy of avacopan but would not be the primary basis to establish efficacy... In light of the above considerations and the complexities of the clinical program, FDA indicated that external input may be required in the interpretation of the clinical benefits of the avacopan program [*i.e.*, that an Advisory Committee meeting may be convened]."[87]

69. Further, in the September 11, 2020 Day 74 Deficiency Letter the agency sent to ChemoCentryx during its NDA review, the FDA pointed out that because patients in the rituximab subgroup received no maintenance therapy, patients in that "standard of care" arm were undertreated.  The FDA pointed out that, after week 20, avacopan was being compared to no treatment at all – biasing results in favor of avacopan.  The FDA stated:

> [T]he study design of CL010_168 makes the interpretation of a clinically meaningful benefit of avacopan challenging. Study CL010_168 evaluated a prednisone taper over 26 weeks compared to avacopan for 52 weeks, in patients who received standard of care treatment with cyclophosphamide (CTX) or rituximab (RTX) for induction treatment. However, following induction, only subjects who received CTX as induction received maintenance therapy with azathioprine while patients treated with RTX for induction did not. This could potentially confound the results and bias the assessment of efficacy at Week 52. Therefore, your justification of the clinical relevance of the results will be critical for the assessment of benefit-risk and will be a review issue. [88]

---

[87]    FDACDER002239 at -242; PX 173 at -443; *see also,* PX 094 at -113.
[88]    *See* FDACDER004102 at -103.

70. It appears that Dr. Bekker[89] made this same observation in July 2016, concluding this feature of the study would favor avacopan.  In a July 13, 2016 email, Dr. Bekker wrote, "We would have a better chance of showing superiority [for the week 52 endpoint] because patients in the control group *would not be receiving any treatment for the second 6 months of the study*, whereas [patients in the avacopan arm] would receive CCX168 for the full 52 weeks."[90]

71. I note that the FDA's identification of "a review issue," and the agency's use of that phrase, is generally a concerning signal from a sponsor's standpoint.  Specifically, the FDA means that it does not at that time accept the sponsor's interpretation of study results or conclusions on an important aspect of the application. Moreover, the FDA is making clear that there is a substantial probability that it will not accept the sponsor's position even at the conclusion of the review.

72. The FDA again reiterated these same concerns in its December 14, 2020 Mid-Cycle[91] and April 23, 2021 Late-Cycle communications with ChemoCentryx.[92]

73. In my opinion, these communications put ChemoCentryx on notice that, at a minimum, the FDA would likely substantially discount the evidentiary strength of ADVOCATE's efficacy results and, as such, created significant uncertainty about whether the study would be adequate to secure approval with a broad efficacy and safety labeling as desired by ChemoCentryx, particularly when viewed against the substantial safety signal associated with avacopan that was evident in the ADVOCATE data.  Indeed, after reviewing the FDA's concerns from the July 2016 EOP 2 meeting, ChemoCentryx's own regulatory consultant, Dr. Lee Simon, told the Company, "I understand their [FDA's] reluctance, there is so much going on this proposed trial, it is hard to determine the true effect size of your drug."[93]

---

[89]  Dr. Pirow Bekker "was a full-time employee of ChemoCentryx, and he was assigned as an officer within that organization to manage a variety of trials that ChemoCentryx Corporation was carrying on at that time. And I had become acquainted with Dr. Bekker as a consequence of the previous trials that he was supervising that I also provided consulting services to ChemoCentryx." *See* Glassock Tr. 30:6-13.

[90]  CCXI-0000785052.

[91]  *See* FDACDER004109 at -270-272 ("The concerns raised in the 74 day letter remain under review.").

[92]  FDACDER004109 at -324-35; *see* CCXI-0005230168 at -172.

[93]  PX 326 at -676.

B.    CHEMOCENTRYX'S PREFERRED NON-INFERIORITY ANALYSIS
COULD NOT SUPPORT AN EFFICACY CLAIM

74.    Relatedly, the FDA repeatedly told ChemoCentryx that the Company could not "use a primary non-inferiority comparison against glucocorticoids [in the ADVOCATE study] to support the effectiveness of your product (CCX168)."[94]  This warning negatively impacted the likelihood that avacopan would be approved with a broad efficacy and safety labeling desired by ChemoCentryx because it meant that ChemoCentryx would have to rely exclusively on the claimed BVAS superiority result avacopan supposedly achieved at week 52 of ADVOCATE.  As discussed above, the FDA had repeatedly identified concerns regarding this analysis as well, including that comparator patients in the study's rituximab cohort were not administered rituximab at all after the initial 4 week course of rituximab during this 52 week period.[95]  Thus, instead of having two empirically sound efficacy results supporting approval, ChemoCentryx had only a single result to offer the FDA – one the agency had already informed the Company was problematic because of the study design – making the prospects for approval with a broad labeling as desired by ChemoCentryx that much weaker.[96] Furthermore, this single result was confounded by the fact that avacopan patients could be counted as being in remission even if they had received substantial amounts of 'non-study' steroids for treatment of AAV during the study.[97]

75.    In a clinical trial, one can either ask whether a drug is *more* efficacious than the comparator – i.e., whether it is superior[98] – or whether it is *no worse* than comparator – i.e., whether it is non-

---

[94]    *See* PX 002 at -844 ("Namely, we remain concerned regarding the ability to use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of your product (CCX168). As previously stated, a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids, as it would be difficult to tease out whether CCX168 is effective or whether RTX/CYC was the primary driver of the efficacy results on both treatment arms."); PX 002 at -844; *see also,* PX 184 at -844; PX 269 at -375.

[95]    *See* FDACDER004102.

[96]    *See* PX 002; PX 260; PX 326.

[97]    PX 004 at -323.

[98]    CCXI-0004491838 at -858 (U.S. Food & Drug Admin., *Guidance for Industry, E9 Statistical Principles for Clinical Trials*, at 18 (Sept. 1998)) ("Scientifically, efficacy is most convincingly established by demonstrating superiority to placebo in a placebo-controlled trial, by showing superiority to an active control treatment, or by demonstrating a dose-response relationship. This type of trial is referred to as a superiority trial (see Glossary).")

inferior.[99] Answering each question entails a distinct statistical test.  To evaluate superiority, one looks at whether the beneficial effect of the drug observed in the trial is statistically significantly *greater* than the effect observed for the comparator.[100] To evaluate non-inferiority, one looks at whether the observed effect of the drug is close enough to the effect of the comparator such that one can conclude, from a statistical standpoint, that there is likely no difference between them.[101] More formally, non-inferiority is demonstrated if the result observed falls within a prespecified "non-inferiority margin" representing a medically important  portion of the likely range of the effect in the comparator arm.[102]

76. As discussed above, in ADVOCATE, ChemoCentryx prespecified analyses of both BVAS non-inferiority and superiority at weeks 26 and 52.  ChemoCentryx's SAP stated that the Company would declare that the trial had successfully demonstrated avacopan's efficacy if avacopan demonstrated non-inferiority to the "standard of care" arm with respect to BVAS remission at week 26 of the study.[103] And ChemoCentryx did, in fact, present those week 26 non-inferiority results as successfully demonstrating avacopan was effective in getting patients to remission.[104]

77. However, the FDA repeatedly told ChemoCentryx that it could not "use a non-inferiority primary comparison against glucocorticoids [in the ADVOCATE study] to support the effectiveness of your product (CCX168)" because patients in *both* arms were taking multiple

---

[99]   *Id.* at 42 ("Noninferiority trial: A trial with the primary objective of showing that the response to the investigational product is not clinically inferior to a comparative agent (active or placebo control).").

[100]   U.S. Food & Drug Admin., *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry*, at 2 (Nov. 2016), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/non-inferiority-clinical-trials.

[101]   U.S. Food & Drug Admin., *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry*, at 2 (Nov. 2016), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/non-inferiority-clinical-trials ("Active controlled trials that are not intended to show superiority of the test drug but rather to show that the new treatment is not inferior to an unacceptable extent were once called clinical equivalence trials. The intent of an NI trial, however, is not to show that the new drug is equivalent, but rather that it is not materially worse than the control.")

[102]   *Id.* at 8 ("As described above, the NI study seeks to show that the amount by which the test drug (T) is inferior to the active control (C), C-T, is less than some prespecified NI margin (M). M can be no larger than the presumed entire effect of the active control in the NI study, and the margin based on the entire active control effect is generally referred to as M1.").

[103]   *See* PX 339

[104]   ChemoCentryx, Inc., *Avacopan – a C5a Receptor Inhibitor for the Treatment of Anti-Neutrophil Cytoplasmic Auto-antibody (ANCA)- Associated Vasculitis*, Arthritis Advisory Committee Meetings, at SP-9 (May 6, 2021), available at https://www.fda.gov/media/148293/download; *see* PX 076

background medications including rituximab and cyclophosphamide – standard and effective therapies for AAV.[105] Accordingly, the FDA explained that, even if avacopan had *no* beneficial effect, the two arms might show the same efficacy benefits just because they were *both* taking the effective background medications and there is not a way to determine how much efficacy, if any, the steroids provide above that of the immunosuppressants.[106] The FDA repeated this message consistently before the avacopan NDA-review phase. In my opinion FDA's concern with study interpretation of avacopan's effect became only more acute *after* the study concludes and the FDA learns that two-thirds of avacopan patients *also* took steroids, in addition to cyclophosphamide and rituximab, for treatment of their vasculitis.[107]

78. For instance, at the July 14, 2016 EOP2 meeting, the FDA told ChemoCentryx that there was no reliable estimate of the effect the steroid treatment administered to comparator patients in the "standard of care" arm (steroids plus immunosuppressant) had on induction of BVAS remission.[108] Accordingly, a non-inferiority comparison could not actually tell one whether avacopan was providing any benefit, and thus, ChemoCentryx should demonstrate BVAS *superiority* in order for avacopan to be considered for approval. The FDA stated:

> A non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids. There are no historical placebo-controlled trials evaluating the efficacy of glucocorticoids as an add-on therapy to CYC or RTX, and your determination of the extent of the contribution of glucocorticoids to the historical estimated remission rate on glucocorticoids + CYC or RTX is based on key, implausible, and unverifiable assumptions . . . . Therefore, with the proposed NI

---

[105] *See* PX 022 at -844 ("Namely, we remain concerned regarding the ability to use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of your product (CCX168). As previously stated, a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids, as it would be difficult to tease out whether CCX168 is effective or whether RTX/CYC was the primary driver of the efficacy results on both treatment arms.").

[106] FDACDER002501 at -508 ("[I]t is unlikely that the efficacy of glucocorticoids alone is similar to that of glucocorticoids when added on to CYC or RTX…Therefore, with the proposed NI margin of -20%, it would be very difficult to determine if a finding of similar remission rates on the proposed comparator arms was due to the efficacy of CCX168 or to the fact that the remission rates on both arms were primarily driven by the underlying CYC or RTX (with little to no benefit provided from CCX168).").

[107] *See infra* ¶93.

[108] FDACDER002501.

margin of -20%, it would be very difficult to determine if a finding of similar remission rates on the proposed comparator arms was due to the efficacy of CCX168 or to the fact that the remission rates on both arms were primarily driven by the underlying CYC or RTX (with little to no benefit provided from CCX168). Given these concerns, we recommend performing a superiority trial to show the benefit of CCX168 vs. glucocorticoids. [109]

79. These concerns are consistent with the long-standing FDA policy regarding non-inferiority studies, derived from FDA Regulations.[110] The FDA Guidance on NI Clinical Trials discussed that in designing active control non-inferiority studies it is essential to develop confidence that the active control will have an effect in the study, and confidence that the amount of this effect can be quantitatively estimated.[111]

80. The FDA reiterated this concern at its November 2016 Type C Meeting with ChemoCentryx. While ChemoCentryx submitted a "revised CCX168 phase 3 study design," the Company "maintained the same treatment arms and the same primary endpoint" as in the design rejected by the FDA months earlier, though ChemoCentryx did propose that the "primary endpoints will be analyzed for [both] non-inferiority and superiority."[112]  But the FDA maintained its concerns about the inclusion of a non-inferiority endpoint in the memorandum provided to the Company:

> Despite these revisions, you have not addressed our concerns as detailed in the End-of-Phase 2 (EOP2) post-meeting minutes dated August 9, 2016. Namely, we remain concerned regarding the ability to use a primary non-inferiority comparison against glucocorticoids to support the effectiveness of your product

---

[109]  *Id.* at -508

[110]  21 C.F.R. § 314(b)(2)(iv) ("If the intent of the trial is to show similarity of the test and control drugs, the report of the study should assess the ability of the study to have detected a difference between treatments. Similarity of test drug and active control can mean either that both drugs were effective or that neither was effective. The analysis of the study should explain why the drugs should be considered effective in the study, for example, by reference to results in previous placebo-controlled studies of the active control drug.")

[111]  *See* U.S. Food & Drug Admin., *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry* § III.D (Nov. 2016), available at https://www.fda.gov/media/78504/download.

[112]  PX 002 at -844.

(CCX168). As previously stated, a non-inferiority study would not be sufficient to show that CCX168 can replace glucocorticoids, as it would be difficult to tease out whether CCX168 is effective or whether RTX/CYC was the primary driver of the efficacy results on both treatment arms. Given these concerns, perform a superiority trial to show the benefit of CCX168 vs. glucocorticoids.[113]

81.   The FDA again reiterated this concern in discussions at the November 2016 Type C Meeting, stating that "the superiority analysis is critical to demonstrate efficacy and that a demonstration of non-inferiority would not be sufficient, given previously expressed concerns with the non-inferiority margin and interpretation of results from such an evaluation. ChemoCentryx agreed to the superiority analysis."[114]

82.   Moreover, at the March 2020 Pre-NDA Meeting, the FDA specifically objected to ChemoCentryx's statements in the ADVOCATE SAP that a showing of BVAS non-inferiority to standard of care would successfully demonstrate avacopan's efficacy. After chiding ChemoCentryx for failing to provide the FDA with a SAP prior to study unblinding, FDA "reiterate[d] important points made in previous communications":

> We refer you to our previous comments regarding the utility and interpretability of the non-inferiority comparisons and support for the selected margin. As such, we do not agree with your statements in your SAP which indicate that you will conclude to have a successful study based on the NI comparison alone. The determination of substantial evidence will be a review issue.[115]

---

[113]   *Id.* at -844.
[114]   *Id.*  at -846.
[115]   FDACDER002239 at -249; PX 173 at -450.

83. Notably, despite the FDA's stated objections, ChemoCentryx published this same SAP, including this same language (without noting the FDA's objections to it), a few months later in an appendix to the ADVOCATE *New England Journal of Medicine* article.[116]

84. Again, ChemoCentryx's own consultants provided guidance to the Company underscoring the FDA's concerns. For instance, after reviewing the FDA's November 2016 comments, Dr. Chao Wang, a former FDA statistician retained by ChemoCentryx as a consultant (and also a member of the ADVOCATE DMC) told Dr. Bekker, "FDA does not agree with our study objective of demonstrating non-inferiority at Week 26 or Week 52. This is why I asked what our definition of 'success' is. FDA insists that the NI [non-inferioirity] cannot rule out the possibility that both CCX168 and steroid fail in the study but the NI is demonstrated simply because it is CYC/RTX vs CYC/RTX."[117] Accordingly, Dr. Wang told Dr. Bekker, that FDA "will just ignore the NI test at W26 and W52."[118]

85. As discussed above, in my opinion, the FDA's communications with ChemoCentryx put the Company on notice that it could not "use a non-inferiority primary comparison against glucocorticoids [in the ADVOCATE study] to support the effectiveness of" avacopan and that avacopan would need to achieve BVAS superiority in order for the drug to be considered for approval. This warning negatively impacted the likelihood that avacopan would be approved with a broad efficacy and safety labeling as desired by ChemoCentryx. While ChemoCentryx reported that avacopan achieved BVAS superiority at Week 52,[119] the FDA's warnings cut the evidence ChemoCentryx could rely on to support its efficacy claims in half; the Company's only hope was that the agency would credit its Week 52 results as sufficient, even though, as discussed above, the FDA had raised concerns about those results given the "complexity" of ADVOCATE's design.

---

[116]  PX 042.

[117]  PX 260 at -978; Wang Tr. 124:14-125:21.

[118]  PX 260 at -978; Wang Tr. 126:15.

[119]  As discussed below, had ChemoCentryx disclosed the unblinded post-database lock changes it made to avacopan patients' primary endpoint outcomes, at a minimum, the FDA would have had significant concerns about the integrity of that result.

C.    THE FDA TOLD CHEMOCENTRYX THAT IT COULD NOT RELY ON THE ADVOCATE SECONDARY ENDPOINTS THE COMPANY HOPED TO USE TO SUPPORT ITS CLAIMS THAT AVACOPAN PROVIDED AN IMPROVED SAFETY PROFILE

86.    As the FDA explained at the November 1, 2016 Type C Meeting, ChemoCentryx meeting submission  "argued that, as replacement for glucocorticoids, CCX168 will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids."[120]  To support this claim, the revised ADVOCATE study design ChemoCentryx presented at that November 2016 meeting included a number of "secondary" endpoints,[121] most notably endpoints using the following instruments: (1) the "glucocorticoid toxicity index" or "GTI"; (2) two so-called patient-reported "quality of life" scales, called SF-36 and EQ-5D-5L; and (3) a number of renal endpoints.  In addition, ChemoCentryx also proposed two analyses of BVAS relapse (*i.e.*, relapsed of vasculitis symptoms) to further bolster the efficacy side of avacopan's risk-benefit profile.[122]

87.    Both before and during the NDA review period, the FDA repeatedly told ChemoCentryx that these endpoints would not support claims about avacopan's safety or efficacy and that they could not be "utilized to support regulatory or labelling decisions."[123]  Indeed, as discussed below, the FDA raised numerous issues with these endpoints throughout the avacopan development program.

88.    For instance, in the November 2016 Type C Meeting memorandum, the FDA noted that ChemoCentryx "argued that, as replacement for glucocorticoids, CCX168 will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids. However, the proposed study," including the proposed secondary endpoints, "is likely not adequate to support such safety comparisons."[124]  In particular, the FDA explained to

---

[120]    *See* PX 002 at -844.

[121]    "Secondary" does not mean of secondary importance from a labeling or marketing perspective. It means that these are prespecified endpoints examined in addition to the primary endpoint, around which the study is designed. Additionally, secondary means that the endpoints are statistically examined only after the primary endpoint has shown statistical significance.

[122]    PX 002 at -853, -55.

[123]    *Id.* at -934; PX 002 at -845.

[124]    *Id.* at -845

ChemoCentryx that none of the secondary endpoints were "validated," *i.e.*, shown to be predictive of clinical outcomes ( "direct measures of how patients, function, feel, or survive"[125]), that the agency did not believe they could support claims about avacopan's efficacy or safety and that the FDA would not consider them in making regulatory decisions or allow them in the label unless they were shown to be valid.[126]  This validation process is a rigorous review of the endpoint's content validity, reliability, construct validity, and ability to detect change; it is time-consuming and new endpoints are not validated without a substantial body of supportive evidence.

89.  With respect to the GTI endpoint, the FDA told ChemoCentryx at the November 2016 Type C Meeting that the endpoint was not validated, pointed out that it evaluated the patient outcome for only a portion of the trial (only during the period where patients in the comparator arm were receiving the mandatory steroid taper), and that GTI results "will not be utilized to support regulatory or labelling decisions":

> [T]he instrument appears to include several biomarkers, whose validity for serving as surrogate markers of clinical outcomes (direct measures of how patients function, feel, or survive) impacted by glucocorticoid use is unclear. Results from this endpoint will not be utilized to support regulatory or labelling decisions. If you choose to pursue this endpoint for either of those purposes in a phase 3 trial, the endpoint should be reviewed through the Clinical Outcome Assessment (COA) qualification program.[127]

---

[125]  *Id.*

[126]  *Id.* at -854-46 ("You have not provided adequate data that either endpoint is a validated measure in vasculitis. If you plan to utilize data from these endpoints to support future labeling claims, you will need to provide the following information: Data supporting SF-36 and EQ-5D-5L as validated measures in vasculitis and their reliability to support general health status. This would likely require a 'white paper' type analysis, which includes a comprehensive literature search…Analyses and raw data relevant to all SF-36 domains specific to CCX168…[and] Information or data to support that the proposed patient reported outcomes assess separate, non-overlapping elements.").

[127]  *Id.* at -845.

90. At that same November 2016 Meeting the FDA echoed these concerns with respect to the SF-36 and EQ-5 endpoints, stating, "We have concerns regarding the inclusion of SF-36 and EQ-5D-5L as secondary endpoints.  You have not provided adequate data that either endpoint is a validated measure in vasculitis."[128] Again, the FDA told ChemoCentryx that these endpoints would not be utilized for regulatory purposes or labeling, absent thorough validation.

91. And the FDA reiterated these same concerns with regard to ChemoCentryx's proposed renal endpoints, stating "You have included several markers of renal function, such as percent change in UACR from baseline over 52 weeks and percent change in urinary MCP-1:creatinine ratio from baseline over 52 weeks.  There does not appear to be adequate data to support the use of these endpoints to support long-term outcomes in vasculitis."[129]

92. The FDA reiterated these same concerns at the March 2020 Pre-NDA Meeting, referring ChemoCentryx back to the agency's "several other statistical comments during our previous meetings (e.g., the Preliminary Comments dated October 28, 2016) on secondary endpoints such as glucocorticoid-induced toxicity (worsening and aggregate score), SF-36 (PCS, MCS, and individual domains) and EQ-5D-5L."[130]

93. The FDA reiterated these same concerns in the Day 74 Deficiency Letter it sent to ChemoCentryx on September 11, 2020, again warning ChemoCentryx that it had not yet supplied information adequately supporting the validity of the secondary endpoints or their use in regulatory or labelling decisions.  Indeed, the FDA stated:

> [S]ome of the endpoints you are proposing may represent overlapping and ancillary benefits with respect to the core outcome measures used to support the new indication. To support the utility and the interpretability of the proposed secondary endpoints, if not already provided, provide the value of the clinically important difference between treatments and the value of the minimum important change within subjects; explain how each value was developed; and explain how

---

[128]  *Id*. at -845.

[129]  *Id*. at -846.

[130]  FDACDER002239 at -249; PX 173 at -450.

these values should be used to interpret the results. Note that redundant efficacy information/claims may not be considered appropriate for inclusion in labeling, even if those claims are supported by adequate instruments and an adequate statistical approach.[131]

94. And, again, the FDA reiterated these same concerns in the December 2020 Mid-Cycle Communication, which referred back to the Day 74 Deficiency Letter.[132]

95. In addition, the FDA raised several statistical concerns about the ADVOCATE secondary endpoints, both before and during the NDA review. For instance, in the November 2016 Type C Meeting memorandum, the FDA told ChemoCentryx that there were several such issues that rendered ADVOCATE's relapse analysis unreliable and unsuitable for regulatory consideration or labeling. First, the FDA explained that the relapse analysis should examine all patients whose vasculitis symptoms got worse, while ChemoCentryx's only included patients whose symptoms got worse after they achieved complete remission.[133] Thus, the FDA explained, ChemoCentryx's relapse analysis excluded patients who should be considered as having relapsed or flared.

96. Second, the FDA explained that the relapse analysis was statistically flawed because the analysis violated the key clinical trial principle of randomization.[134] Specifically, patients in clinical trials are randomly assigned to one of the two (or more) treatment arms; this process of random assignment helps to ensure that confounding variables are controlled and that any difference in

---

[131]  *See* FDACDER004102 at -103.

[132]  *See* FDACDER004109 at -272 ("The concerns raised in the 74 day letter remain under review."); CCXI-0005230169.

[133]  *See* PX 002 at -846- ("ChemoCentryx noted that it still wanted to carry out an additional analysis to evaluate relapse in patients who achieve remission either before or after week 26. The FDA reiterated that the proposed analysis to evaluate relapse in the subset of patients who achieve remission would be considered exploratory given that it conditions on a postrandomization variable, such that differences between arms may be due to the effect of treatment or to differences in patient characteristics. The FDA also questioned their definitions of flare vs relapse and explained that a patient may have low disease activity with flares. Flares can occur regardless of whether the patient has achieved remission. ChemoCentryx stated that they felt it was not appropriate to include patients that never achieved remission in the analysis. The FDA emphasized that the proposed analysis would be considered exploratory, and further noted that results from this analysis would not be appropriate for labeling because the analysis is not based on randomization. ChemoCentryx acknowledged the FDA's concerns, but plans to evaluate the endpoint.").

[134]  *Id.* at -846.

outcome between the arms can be attributed to treatment with the experimental drug or treatment with comparator. For instance, because patients are randomly assigned to treatment arms, in interpreting study results we have no reason to believe that patients in one arm are systematically sicker than patients in another at the start of the study. The FDA warned ChemoCentryx that its relapse analysis violated this key principle because it compared – not all randomized patients in each arm – but subgroups of patients who, for whatever reason, achieved a BVAS score of zero.[135] As the FDA explained, ChemoCentryx's relapse analysis, "condition[s] on a post-randomization variable [*i.e.,* achievement of BVAS zero], such that comparisons will be between non-randomized groups and the interpretability of results will be challenging."[136] At the November 2016 Type C Meeting, the FDA further "emphasized that the proposed analysis would be considered exploratory, and further noted that results from this analysis would not be appropriate for labeling because the analysis is not based on randomization."[137]

97. Notably, the ADVOCATE SAP prespecified two relapse analyses: (1) a comparison of the proportion of patients in each arm who relapse after achieving BVAS of zero *at week 26*; and (2) a comparison of time to relapse in each arm for patients who achieve BVAS of zero at *week 26*.[138] Neither of these prespecified analyses showed a statistically significant benefit on avacopan and in fact, the difference in the second analysis was particularly far from statistical significance.[139] However, ChemoCentryx did not report either analysis in the main text of its *New England Journal of Medicine* paper. Instead, ChemoCentryx reported only a comparison of the proportion of patients who relapse after achieving BVAS zero at any time;[140] this analysis was prespecified in the SAP, but the SAP specifically designated it as exploratory only, in contrast to the two primary analyses of relapse.[141] However, despite this fact, the *NEJM* paper does not refer to this analysis as exploratory or even mention the primary prespecified analyses at all. In its NDA, ChemoCentryx reported only the first prespecified primary relapse analysis

---

[135]  *Id.*

[136]  *Id.* at -845.

[137]  *Id.* at -846.

[138]  PX 339 at -770.

[139]  *See* Bekker Tr. 333:1-334:2, 337:6-22; PX 329 at -725; PX 330.

[140]  *See* Bekker Tr. 338:14-25; PX 042 at -645 Figure 2.

[141]  PX 339 at -770.

and omitted the second, substituting the exploratory relapse analysis for the omitted prespecified primary one.[142]

98. The FDA also raised statistical concerns about the secondary endpoints generally, as none of them were adjusted for multiplicity. At the March 2020 Pre-NDA Meeting, for instance, the FDA raised concern about "the interpretability of the [secondary endpoint] results [generally] given these tests were not multiplicity controlled (i.e., no control for type 1 error inflation over multiple tests)."[143] In other words, while ChemoCentryx characterized these results as statistically significant in favor of avacopan, it failed to appropriately adjust the threshold for declaring statistical significant to account for the fact that multiple tests had been performed. Without such adjustments, the risk of declaring a false positive as regards statistical significance is inflated beyond the prespecified and accepted threshold.

99. In my opinion, the FDA's communications with ChemoCentryx put the Company on notice that the agency did not believe ChemoCentryx could use ADVOCATE's secondary endpoints to support claims about avacopan's safety or efficacy, and that, at a minimum, it was highly unlikely the FDA would consider the results of those endpoints in deciding whether to approve avacopan or allow the Company to include the results in the avacopan label (if approved). These warnings negatively impacted the likelihood that avacopan would be approved with a broad efficacy and safety labeling as desired by ChemoCentryx because, among other things, they significantly reduced the amount of support the Company had for its "argu[ment] that, as replacement for glucocorticoids, CCX168 will provide an improved benefit-risk profile through similar efficacy and less toxicity than glucocorticoids."[144] Indeed, the FDA specifically told ChemoCentryx that ADVOCATE, including its secondary endpoints, "is likely not adequate to support such safety comparisons."[145]

100. I note that, once again, ChemoCentryx's own advisors came to similar conclusions based on the FDA's communications with the Company, and shared those conclusions with ChemoCentryx.

---

[142] PX 329 at -725, -26.

[143] FDACDER002239 at -249; PX 173 at -450.

[144] PX 002 at -845.

[145] *Id.*

For instance, after reviewing the FDA's November 2016 Type C pre-Meeting memorandum, ChemoCentryx regulatory advisor Dr. Simon told Dr. Bekker in an October 29, 2016 email, that the FDA is "clearly telling you [ChemoCentryx], that this issue of the GTI has not been validated as a DDT [drug development tool] by COA [Clinical Outcomes Assessment] and thus will not be utilized for indication or labelling thus it will not get into the labeling regardless of how impressive or not it is."[146] Dr. Simon continued,

> This entire material [the FDA's communications regarding ADVOCATE's secondary endpoints] just stated that none of these [secondary endpoints] have been validated to an acceptable state by the COA thus will be interesting but ignored for regulatory purposes and not enter into the label at all, thus if wanted then you can use it in a manuscript of course, but not for marketing purposes based on the inclusion in the label.[147]

101. Dr. Wang, a former FDA statistician, provided similar guidance to ChemoCentryx after reviewing the November 2016 meeting memorandum. In an October 30, 2016 email to Dr. Bekker, Dr. Wang explained that, in his experience, both times companies had attempted to validate patient-reported outcomes like SF-36 and EQ-5, they had failed, with one validation attempt having been "torn apart by the FDA."[148] Likewise, Dr. Wang advised that the "FDA's concern on the relapse analysis is reasonable because it is a condition analysis" and informed Dr. Bekker that he was unaware of any regulatory precedent that would support the use of such an analysis.[149]

---

[146]  CCXI-0000364662 at -664.

[147]  CCXI-0000364662 at -664. As to ChemoCentryx's relapse analysis, Dr. Simon stated that the FDA's comments "will require a total reformatting of your stats approach."

[148]  PX 260 at -974.

[149]  *Id.*

D.     THE FDA TOLD CHEMOCENTRYX THAT EXTENSIVE STEROID USE
       BY AVACOPAN PATIENTS FOR THE TREATMENT OF AAV RAISED
       CONCERNS ABOUT INTERPRETABILITY OF, AND BIAS TO, THE
       BVAS EFFICACY RESULTS

102.  During the NDA review, the FDA learned that the use of 'non-study' glucocorticoids had been widespread in both randomized groups and, in particular, that there had been widespread use of steroids by avacopan patients throughout the study for the purposes of actually treating and managing their vasculitis.[150]  Indeed, as the FDA highlighted in the briefing materials released prior to the May 2021 Advisory Committee meeting, nearly *two-thirds* (63.9%) of avacopan patients required treatment with glucocorticoids to treat their vasculitis and, in particular, "[a] similar number of patients in each treatment arm received glucocorticoids for persistent vasculitis (n=85 [51.8%] in the prednisone arm, n=80 [48.2%] in the avacopan arm), worsening vasculitis (n=29 [17.7%] in the prednisone arm, n=31 [18.7%] in the avacopan arm), and maintenance of remission (n=26 [15.9%] in the prednisone arm, n=32 [19.3%] in the avacopan arm)."[151] As FDA explained, these data raised serious concerns about whether avacopan was steroid-sparing in any clinically meaningful sense, with FDA stating that "it is not clear how much reduction in glucocorticoids would be considered clinically meaningful and if the protocol-specified higher dose of glucocorticoids is required for control of disease activity,"[152] which further complicated interpretation of any non-inferiority comparisons.  Notably, this widespread usage is in tension with (or at least surprising in light of) the ADVOCATE protocol's mandate that non-study glucocorticoids "must be avoided as much as possible during the study."[153]  The FDA raised concerns and questions about this issue during the review process.

103.  This concern magnified  concerns going back to 2016 that the background therapies administered to patients in ADVOCATE had the potential to onfound results and "complicates the interpretation

---

[150]  For example, as restated in the September 2020 NDA Information Request Response, the FDA wrote, "We note that patients in study CL010_168 received steroids outside of the protocol specified steroid taper. Some of these patients received steroids because of worsening of disease," and asked ChemoCentryx to "[p]rovide a table of all patients who received steroids above the protocol specified taper" and to "[i]nclude the type of steroid, dose, duration, and reason for treatment," as well as, if available, "case summaries of these patients." *See* CCXI-0000295034.

[151]  PX 004 at -321.

[152]  *Id*. at -278.

[153]  PX 239 at -428, -534; CCXI-0000024447.

of a clinically meaningful benefit due to continued avacopan treatment."[154]  Indeed, as early as July 2016, the FDA urged ChemoCentryx to enroll a third arm in the trial with no steroid use in order to control for this potentially confounding effect.[155]

104.  FDA issued several Information Requests (IRs) to ChemoCentryx – including IR 4 (September 9, 2020), IR 8 (October 29, 2020), IR 13 (February 8, 2021), and IR 19 (March 25, 2021) – that sought information regarding, or highlighted, steroid use by avacopan patients, clearly signaling agency concern about this issue.[156]  For instance, in IR 4, FDA stated, "We note that patients in study CL010_168 received steroids outside of the protocol specified steroid taper.  Some of these patients received steroids because of worsening of disease, but many also received steroids for other reasons, such as adrenal insufficiency."[157]  Likewise, in IR 13, the FDA asked ChemoCentryx to "[p]rovide an analysis of all patients in both treatment arms who received extra steroids for vasculitis, including but not limited to worsening vasculitis, persistent vasculitis, relapse, and maintenance of remission."[158]

105.  The FDA also sent ChemoCentryx several IRs signaling concern that avacopan amplified the (positive and negative) effects of steroids by boosting the concentration of steroids in the blood.  In my opinion this reflects further concern that steroid use by avacopan patients for the treatment of their vasculitis– even at nominally lower doses – could confound efficacy comparison.  Moreover, in my opinion it reflects more fundamental concerns that avacopan was not even steroid-*sparing*, let alone a steroid replacement, in a clinically meaningful way.  In IRs 10 (November 23, 2020) and 12 (January 26, 2021), the FDA asked ChemoCentryx to provide additional data concerning avacopan's impact on inhibiting an enzyme called CYP3A4, an enzyme that is responsible for metabolizing steroids; inhibition of that enzyme increases the concentration of steroids in a patient's bloodstream.[159]  And in IR 19 the FDA reiterated its concern about avacopan's amplifying effect on steroid use, highlighting data in prior clinical

---

[154]  PX 173 at -443.

[155]  CCXI-0000238650 at -656-57.

[156]  CCXI-0004098253; CCXl-0001541165; CCXI-0001840816; CCXI-0002196853; CCXI-0000294907 at -034, 5059; PX 191; PX 192.

[157]  CCXI-0004098253 at -254; CCXI-0000294907 at -034.

[158]  CCXI-0001840816 at -817; PX 191 at -855.

[159]  CCXI-0001541139; CCXI-0001541147; CCXI-0000294907 at -018-19; CCXI-0002770629.

trials showing that average steroid levels in the blood were higher in patients taking avacopan than in patients not taking avacopan.[160]

106. Further, in the April 2021 Late Cycle communication, the FDA "note[d] several areas of concern" with the avacopan NDA, "including the use of non-study supplied glucocorticoids in both treatment arms . . . which may impact the interpretation of the noninferiority and superiority assessments."[161]

107. Notably, the ADVOCATE DMC also repeatedly warned ChemoCentryx – going back to at least mid 2018 – that widespread steroid administration to avacopan patients for the treatment of their disease could confound the study results.  For instance, at a March 12, 2019, DMC meeting, the Chair of the DMC, Dr. David Goodkin highlighted reports of multiple avacopan patients receiving high doses of steroids ("20 milligrams or more"), "noting low BVAS scores in [the avacopan arm] could be due to steroids in some cases impacting the ultimate . . . efficacy analysis."[162]  As Dr. Goodkin explained in his testimony:

> We warned the sponsor on several occasions, "Hey, listen, the avacopan group, the patients are getting a lot -- you know, 20 milligrams or more daily steroid. That is a concern. It's going to diminish the chance of seeing a benefit of avoiding steroids, and it also could artificially make it look like the avacopan is doing better than it should just from avacopan alone because they're getting bailed out with steroid."[163]

108. Likewise, Dr. Glassock testified that the DMC expressed concerns to ChemoCentryx about "Avacopan patients receiving steroids in Advocate, including specifically for the treatment of

---

[160]   PX 192 at -058.

[161]   FDACDER004109 at -327; CCXI-0000212169 at -172.

[162]   PX 020 at -915.  Likewise, on June 6, 2018, DMC recommendations delivered to ChemoCentryx, the Committee stated, "A number of patients assigned to CCX168 treatment have been prescribed >= 20 mg of daily prednisone."  After noting the confounding effects of steroid use by multiple avacopan patients, "The DMC again suggests that you remind the sites assertively of the prednisone guidance in the protocol and the need to reserve prednisone rescue for clear instances of disease worsening."  PX 008 at -006.

[163]   Goodkin Tr. 226:12-19.

vasculitis"[164] because "patients in the avacopan arm could be experiencing vasculitis remission… at least not solely because they were taking avacopan, but because they were also receiving steroids."[165]  Accordingly, Dr. Glassock explained "any use of steroids in the Avacopan arm might . . . confound the efficacy assessment of the trial.  And although we were primarily concerned with safety, if the trial loses its ability to show an efficacy endpoint, then we have to be concerned about the patients who are randomized in the trial that may not be sufficiently statistically designed to show a difference."[166]  For these reasons, Dr. Glassock explained that the DMC "strongly encouraged" ChemoCentryx "to minimize the use of steroids to the maximum extent possible within the limits of good patient care so that the confounding effects of excess steroids in the Avacopan group did not interfere with the ability to demonstrate efficacy in this trial."[167]

109.  In my opinion, the FDA's communications with ChemoCentryx, particularly in concert with the earlier repeated warnings from the ADVOCATE DMC, put the Company on notice that the agency was seriously concerned that widespread use of steroids by avacopan patients to treat their disease would confound interpretation of ADVOCATE's BVAS results and potentially bias them in favor of avacopan.  Again, this concern had a negative impact on the likelihood that avacopan would be approved with a broad labeling for safety and efficacy as desired by ChemoCentryx because it cast further doubt on ADVOCATE's ability to meaningfully demonstrate avacopan's efficacy.

> E.    THE FDA TOLD CHEMOCENTRYX THAT UNDERTREATMENT OF PATIENTS IN ADVOCATE'S COMPARATOR ARM RAISED CONCERNS ABOUT INTERPRETABILITY OF, AND BIAS TO, THE BVAS EFFICACY RESULTS

110.  As discussed above, patients in both arms of the ADVOCATE study – both the prednisone arm and avacopan arm – received one of two different concomitant immunosuppressant treatments: (1) cyclophosphamide for the first 13 weeks of the study followed by maintenance therapy with

---

[164]  *Id*. 199:4-7.

[165]  *Id*. 200:2-5.

[166]  *Id*. 201:8-21.

[167]  *Id*. 200:8-15.

azathioprine throughout the remainder of the study; or (2) a single course (four doses) of rituximab for the first month of the study without further administration of any immunosuppressant as a maintenance therapy.[168]  Patients in the prednisone group received only a steroid taper for the first 20 weeks of the study, while patients in the avacopan arm received avacopan for all 52 weeks of the study as the randomized treatment.  Thus, in the rituximab cohort of the prednisone arm of the ADVOCATE study (the patients against whom avacopan was to be compared) received no treatment at all (outside of non-study supplied treatment) for the last six months of the study.  *See* **Figure 2**, above.  Notably, approximately two-thirds of the patients in the ADVOCATE study were assigned to the rituximab cohort.  For these patients, avacopan treatment in the second half of the study was compared with no treatment at all; it was this comparison that was reflected in the critical week 52 superiority result reported by ChemoCentryx.

111. In the avacopan NDA, ChemoCentryx reported that, at week 52 of the ADVOCATE study, avacopan had achieved the BVAS sustained remission superiority result the FDA had said was required for the drug to be considered for approval.[169]  However, there was an important difference between those patients who were assigned to the cyclophosphamide cohort, and received maintenance therapy, and the majority of ADVOCATE patients assigned to the rituximab cohort, who received no maintenance therapy.  Specifically, avacopan *failed* to achieve BVAS superiority in the study in the cyclophosphamide subgroup – i.e., against the patients who actually received standard of care maintenance therapy.[170]  The numerical difference in BVAS remission rates in this group between arms was quite small – just 3%.[171]  Likewise, in the rituximab subgroup, remission rates between the avacopan and prednisone arms were similar for the first 26 weeks of the study.[172]  Avacopan only achieved statistically superior BVAS sustained remission in the rituximab subgroup during the second half of the ADVOCATE

---

[168]  PX 239 at -425-26; PX 042 at 3-4.

[169]  PX 329 at -717.

[170]  PX 004 at -278.

[171]  *Id* at -311.

[172]  PX 004 at -285 ("Superiority of the avacopan arm over the prednisone arm was not achieved for remission at Week 26.").

study, an analysis that compared avacopan to no treatment at all.[173] Because the rituximab subgroup was almost twice as large as the cyclophosphamide-azathioprine subgroup, the aggregate result was dominated by the rituximab subgroup and, as a result, ChemoCentryx reported that avacopan achieved statistically significant BVAS sustained remission superiority to "standard of care."[174] As the FDA pointed out, the fact that ADVOCATE failed to demonstrate the requisite degree of efficacy in the subgroup actually receiving standard of care maintenance therapy undermines the clinical meaningfulness of the critical BVAS superiority result.[175]

112. As discussed above, ChemoCentryx personnel and consultants were apparently cognizant of this issue. Again, even before ADVOCATE commenced, Dr. Bekker observed in a July 13, 2016 email that ChemoCentryx "would have a better chance of showing superiority [for the week 52 endpoint] because patients in the control group *would not be receiving any treatment for the second 6 months of the study*, whereas [patients in the avacopan arm] would receive CCX168 for the full 52 weeks."[176] And after ADVOCATE concluded, ADVOCATE principal investigator Dr. David Jayne told ChemoCentryx CEO Tom Schall in a June 1, 2020 email that he did not want to present separate BVAS results for the cyclophosphamide and rituximab subgroups at a medical conference because he was concerned it "would attract criticism" about ADVOCATE. Dr. Jayne wrote,

---

> The bigger difference with rituximab could be viewed as a problem with the trial design because there was less maintenance in the rituximab group *than would be*

---

[173] PX 004 at -347 ("Subgroup analyses showed a greater treatment difference in sustained remission in the RTX subgroup ("71.0% in the avacopan arm vs. 56.1% in the prednisone arm) who did not receive standard of care maintenance therapy, while no treatment difference was observed in the CYC subgroup (55.9% in the avacopan arm vs. 52.6% in the prednisone arm).").

[174] *See, e.g.*, PX 076; PX 317 at -2.

[175] PX 004 at -279, -347 ("The result of the subgroup analysis suggests the possibility that avacopan was efficacious only in the population who did not receive standard-of-care maintenance immunosuppression therapy and may be considered undertreated, raising questions about the adequacy of the comparisons and clinical meaningfulness of the avacopan effect at Week 52.").

[176] CCXI-0000762728 at -728 (emphasis added).

*normal* (i.e. a 6 month treatment) and would attract criticism that we were not using 'standard of care.'[177]

113. Moreover, at the time that ChemoCentryx was designing the ADVOCATE study, several prospective investigators whom the Company approached hoping to recruit their treatment centers into the study warned ChemoCentryx that failure to provide maintenance therapy in the rituximab cohort of the study – specifically, maintenance with rituximab, which had been demonstrated to be highly effective in eliminating relapse of vasculitis symptoms – was not "standard of care." Indeed, ChemoCentryx's former Chief Medical Officer, Dr. Jan Hillson, testified that, even at the time ADVOCATE was being designed, "this is standard of care to provide rituximab maintenance to these vasculitis patients."[178]

114. In fact, the FDA did criticize ADVOCATE on this basis. In the September 11, 2020 Day 74 Deficiency Letter to ChemoCentryx, the FDA specifically identified the absence of maintenance treatment in the rituximab subgroup as "potentially confound[ing]" and "bias[ing]" ADVOCATE's reported BVAS superiority result at week 52 and warned the Company that this would be a "review issue":

> As discussed at pre-submission communications, the complexity of the study design of CL010_168 makes the interpretation of a clinically meaningful benefit of avacopan challenging. Study CL010_168 evaluated a prednisone taper over 26 weeks compared to avacopan for 52 weeks, in patients who received standard of care treatment with cyclophosphamide (CTX) or rituximab (RTX) for induction treatment. However, following induction, only subjects who received CTX as induction received maintenance therapy with azathioprine while patients treated with RTX for induction did not. This could potentially confound the results and bias the assessment of efficacy at Week 52. Therefore, your justification of the

---

[177] PX 109 at -579 (emphasis added).
[178] Hillson Tr. 352:23-353:7.

clinical relevance of the results will be critical for the assessment of benefit-risk and will be a review issue.[179]

115. Again, the FDA reiterated this concern in the December 2020 Mid-Cycle Communication and in the April 2021 Late-Cycle Communication, in which the FDA again stated:

> As addressed in the filing letter and discussed at pre-submission communications, the complexity of the study design of CL010_168 makes the interpretation of a clinically meaningful benefit of avacopan challenging. Study CL010_168 evaluated a prednisone taper over 20 weeks compared to avacopan for 52 weeks in patients who received standard of care treatment with cyclophosphamide (CYC) or rituximab (RTX) for induction treatment, followed by azathioprine maintenance treatment in the CYC group only. We note several areas of concern, including the use of non-study supplied glucocorticoids in both treatment arms, and the lack of maintenance in patients who received RTX induction therapy, which may impact the interpretation of the noninferiority and superiority assessments.[180]

116. In my opinion, the FDA's communications with ChemoCentryx, particularly in concert with the Company's own acknowledgments and feedback from prospective study investigators, put the Company on notice that the agency was seriously concerned that undertreatment of patients in the ADVOCATE study as compared to standard of care would confound interpretation of the study's BVAS results and potentially bias them in favor of avacopan. Again, this concern had a negative impact on the likelihood that avacopan would be approved with a broad labeling for safety and efficacy as desired by ChemoCentryx because it cast further doubt on ADVOCATE's ability to meaningfully demonstrate avacopan's efficacy, just as the FDA had explained in numerous pre-NDA meetings.

---

[179]  *See* FDACDER004102 at -103.

[180]  FDACDER004109 at -327; CCXI-0004219804 at -808.

F.    SIGNIFICANT CONCERNS ABOUT AVACOPAN'S ASSOCIATION WITH HEPATOXICITY AND ANGIOEDEMA PUT CHEMOCENTRYX ON NOTICE THAT IT WAS UNLIKELY AVACOPAN WOULD BE APPROVED WITH A BROAD LABEL FOR SAFETY AND EFFICACY

117.    The ADVOCATE DMC and Dr. Willis Maddrey – a leading expert in liver toxicity – raised serious concerns about avacopan's safety profile, including specifically flagging that FDA would be concerned by these troubling safety signals.[181]  These warnings, which highlighted several strands of evidence the FDA standardly views as giving rise to a substantial safety signal, put ChemoCentryx on notice that it was unlikely avacopan would be approved with a broad labeling as desired by ChemoCentryx for efficacy and safety.  This is particularly so given the small size of the safety database and FDA's warnings to ChemoCentryx that "there is limited long term safety data with avacopan treatment."[182]

118.    The FDA views hepatotoxicity as a significant serious drug side-effect – one which, although rare, can lead to death, absent transplantation – and can severely restrict the use of drugs with potential to cause serious liver injury.  Indeed, the FDA views liver toxicity as sufficiently concerning in development of new drugs that the agency has issued a Guidance for Industry Drug-Induced Liver Injury: Premarketing Clinical Evaluation ("Guidance on Drug-Induced Liver Injury").[183]  Drug-induced-liver-injury ("DILI") has, for decades, been the most frequent single cause of safety-related withdrawals of marketed drugs.[184]  An estimated 32% (15 of 47) of drugs withdrawn between 1975 and 2007 were withdrawn due to hepatotoxicity.[185]  In addition, the FDA has repeatedly refused to approve, or significantly limited the use of, drugs that evince a

---

[181]    Maddrey Tr. 196:1-10 ("I want to make sure that – that I understand exactly what you did communicate to the DMC about your concern. And your concern was that, if avacopan had been administered to the patients in the cases that, for you, were clear instances of serious drug-induced liver injury, that would raise a troubling liver signal and would be an FDA concern; is that correct?... THE WITNESS: Yes. Yes."); *id*. 198:3-9; Goodkin Tr. 72:15-23, 271:16-24.

[182]    FDACDER002239 at -243; PX 173 at -444.

[183]    *See* PX 008 at -009-036.

[184]    *Id.* at -013.

[185]    *See* Arie Regev, *Drug-induced liver injury and drug development: industry perspective*, 34(2) SEMINARS IN LIVER DISEASE 227, 227 (2014).

potential to cause liver injury in pre-marketing studies.[186] Consequentially, drug developers are generally alert for adverse event signals of potential hepatotoxicity while conducting studies in the IND period. In the case of avacopan, DMC Chair Dr. David Goodkin noted that such concerns are heightened in AAV patients, since the possibility of life-saving transplantation in cases of severe DILI may not be an option, given their condition.[187]

119. As FDA guidance explains, "Most of the drugs withdrawn from the market for hepatotoxicity have caused death or transplantation at frequencies in the range of ≤1 per 10,000, so that a single case of such an event rarely would be found even if several thousand subjects were studied. Severe DILI cases rarely have been seen in drug development programs of significantly hepatotoxic drugs."[188] As such, "[o]nly the most overt hepatotoxins can be expected to show cases of severe DILI in the 1,000 to 3,000 subjects typically studied [in pre-marketing studies like ADVOCATE] and described in a new drug application (NDA)."[189] For this reason, in evaluating an experimental drug's liver toxicity in the context of an NDA review, the FDA places significant importance on individual cases of liver injury in patients, including focusing on their severity and whether they provide reasonable evidence of causality. Moreover, while the FDA routinely views an increase in the rate of a particular adverse event associated with an experimental drug as a potential safety signal even in the absence of a formally statistically significant difference, this is particularly so in the context of liver injury because it is so rare. As a corollary to this, observing cases of serious liver injury or significant imbalances in liver-

---

[186] *See* PX 008 at -013 ("DILI has been the most frequent single cause of safety-related drug marketing withdrawals for the past 50 years (e.g., iproniazid), continuing to the present (e.g., ticrynafen, benoxaprofen, bromfenac, troglitazone, nefazodone)."), available at https://www.fda.gov/media/116737/download; *see also,* Arie Regev, *Drug-induced liver injury and drug development: industry perspective*, 34(2) SEMINARS IN LIVER DISEASE 227, 227 (2014) ("Drug-induced liver injury (DILI) has been a major cause of drug withdrawal, nonapproval, and regulatory action in the past 50 years. According to a recent review, of 47 drugs withdrawn during the period 1975 to 2007, 15 (32%) involved hepatotoxicity. As a result, DILI has been a major concern for drug makers and has remained a leading cause for attrition during drug development.").

[187] PX 013 at -253 ("There is an additional urgency to consider for CL010_168. When drug hepatotoxicity results in critical hepatic necrosis, patients can generally be saved by liver transplantation. It is a distinct possibility, however, that the ravages of vasculitis and/or multiple concomitant illnesses may hinder or even eliminate the candidacy of some of the CL010_168 patients to receive an allograft should they develop critical hepatic insufficiency. Furthermore, immunosuppression following transplant will likely present a complex calculus for AAV patients. In the potential absence of this emergency transplantation safety net, it is even more important that hepatotoxicity be detected early and offending agents discontinued promptly."); Goodkin Tr. 154:18-155:20.

[188] PX 008 at -013.

[189] *Id.*

related adverse events in pre-marketing studies, particularly ones as small as ADVOCATE, will significantly heighten the FDA's concern about a drug's liver toxicity.

120. Importantly, FDA guidance makes clear that the agency does ***not*** require "definitive" evidence of causality to conclude that there is a worrisome liver toxicity signal associated with a drug.[190] Indeed, the FDA will even require the inclusion of a safety signal in the Warnings and Precautions section of the drug label – reserved for "adverse reactions and other potential safety hazards that are *serious* or are otherwise *clinically significant* because they have implications for prescribing decisions or for patient management" – if there is "***reasonable*** evidence" of causality (and specifically notes that "definitive" evidence is not required).[191]

121. The DMC and Dr. Maddrey identified on avacopan multiple strands of evidence that the FDA typically views as giving rise to a substantial liver toxicity signal, including (1) a significant imbalance in the rate of serious hepatobiliary and combined (serious and non-serious) hepatobiliary adverse events (*i.e.*, cases of liver *injury*, as distinct from cases of liver *abnormality*) in patients taking avacopan;[192] (2) cases of serious DILI in patients taking

---

[190] PX 052 at -10; *see also*, PX 008 at -012-029.

[191] U.S. Food & Drug Admin., *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/warnings-and-precautions-contraindications-and-boxed-warning-sections-labeling-human-prescription. ("The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management. To include an adverse event in the section, there should be reasonable evidence of a causal association between the drug and the adverse event, but a causal relationship need not have been definitively established.").

[192] Maddrey Tr. 332:14-333:16 ("And it says: The FDA has added serious cases of hepatic injury have been observed in patients taking TAVNEOS – that's avacopan – A. Yeah… during controlled trials, treatment with TAVNEOS was associated with a higher incidence of transaminase elevations and hepatobiliary events, including serious and life-threatening events… And do you see that the FDA struck out ChemoCentryx's claim that causality attribution was confounded by coadministration of other medications…known to increase liver function tests, as well as comorbidities…Q. … And again, the FDA's assessment of the seriousness of the liver risk on avacopan is consistent with the advice that you provided to ChemoCentryx in 2018 and 2019, correct?... THE WITNESS: Yeah … I think so."); *see also,* Goodkin Tr. 70:14-71:2, 141:12-143:18; Glassock Tr. 116:11-117:21.

avacopan, including cases of cytolytic hepatitis, cholestasis,[193] cholestatic hepatitis,[194] and cases meeting Hy's Law criteria;[195] (3) multiple cases of liver injury and abnormality involving positive rechallenges and dechallenges on avacopan;[196] and (4) an imbalance in the rate of discontinuations due to abnormal liver function in patients taking avacopan.[197]  Again, as the DMC and Dr. Maddrey explained, it is "remarkable" and "troubling" to see such strong evidence of liver toxicity in such a small sample of patients.[198]  These signals led the DMC to recommend substantial modifications to the ADVOCATE study, including imposing a rule requiring discontinuation of study drug at the beginning stages of abnormal liver function, which, as the DMC noted, would be a "red flag" for regulators.[199]

---

[193]  PX 009 at -653 ("B. Ilson reviewed liver-related TEAEs noting 11 patients fall under this category. 4 patients with elevated liver enzymes, 2 with hepatic cytolysis, 1 with increased hepatic enzymes, 1 with cytolytic hepatitis and cholestatic hepatitis, 1 with hepatic function disorder specifically a Hy's Law case, 1 with a liver nodule, and 1 with hydropic decompensation. The hydropic decompensation was miscoded as a liver abnormality when it should have been coded as 'increase in peripheral edema.'").

[194]  *Id*.

[195]  Maddrey Tr. 275:24-276:8 ("Okay. So let's take a step back now and look at the totality of the evidence of liver toxicity and what it means in the report here. So just to sum up: We saw two Hy's Law cases on avacopan that are probably correct or possibly caused by study drug, correct? … THE WITNESS: Yes …Q. That's what we saw in your report? A. Yeah."); *see also,* PX 012 at -594; Goodkin Tr. 141:23-143:7, 143:24-144:7; Glassock Tr. 116:23-117:21.

[196]  *See* Maddrey Tr. 132:18-133:5 ("Q. … we'll see this patient [430-002] was on avacopan. So this would be another case of hepatic cytolysis on avacopan, correct? … A. Correct, as you stated. … Q. And again, liver function returned to normal when avacopan was stopped, correct? A. Yes. … Q. So -- so this is a positive dechallenge case? A. A positive dechallenge case would be, I think, the right conclusion to draw."); *see also id.* 248:1-249:6 ("Q. And do you see that this patient [206-004] experienced significantly elevated liver enzymes? A. Yes. … Q. And you scored this as 'probably caused by avacopan, if administered'? A. Yeah. … Q. Okay. And do you see that this case was a positive dechallenge? A. And resolved after withdrawal of the study drug. …."); PX 008 at -005; PX 011; Goodkin Tr. 124:21-125:13, 144:9-15; Maddrey Tr. 130:14-131:20, 160:21-161:5.

[197]  Maddrey Tr. 181:1-10 ("Q. … if there were an imbalance in drug discontinuations between the avacopan arm and the comparator arm, that would be a liver toxicity signal, correct? … THE WITNESS. If the imbalance was because the patients were withdrawn because of liver issues, that would be correct."); PX 020 at -914; Goodkin Tr. at 134:20-24, 216:12-217:9; Glassock Tr. at 220:16-221:19; Maddrey Tr. at 178:4-13.

[198]  PX 051 at -556 ("It is remarkable to observe cases of marked drug-induced liver injury this early in a new drug's development."); Maddrey Tr. 54:9-55:1, 150:23-152:10, 193:21-196:10, 238:20-239:15; PX 017 at -205 ("Dr. Maddrey acknowledged that it is disconcerting to see liver toxicity for a new compound this early in its development."); Goodkin Tr. 89:8-24, 90:9-91:7.

[199]  PX 022 at -208 ("It was noted that the protocol was amended which is a huge red flag to regulators"); Goodkin Tr. 216:18-24 ("The reason we put these stopping rules in is we never wanted to see another Hy's Law case. We didn't want people to keep getting medicine if these enzymes are on the way up. But as an -- as an outcome, if we stop it at the first sign of danger, we're not going to get more of these Hy's Law cases.  We're trying to prevent it."); *id*. at 348:5-8 ("The red flag would be that first it was amended to monitor liver function tests more often. Then it was amended with four paragraphs of stopping rules in Section 7.2.4.6."); *id*. at 79:1-21; PX 010 at -012.

---

122. At the time that the DMC became alarmed by the hepatotoxicity signals and recommended ChemoCentryx modify the protocol to improve safety monitoring, ChemoCentryx also notified the FDA in a submission to IND of the Hy's Law event and the Safety Notice to Investigators.[200]The FDA asked for additional information from ChemoCentryx related to hepatotoxicity and the study.[201] ChemoCentryx's response to the FDA included informing FDA that they had instituted increased safety monitoring in the study and that they had contracted with Dr Maddrey, a hepatotoxicity expert, for his expertise.[202] In my opinion it is troubling that there is no evidence that ChemoCentryx ever submitted any report or other communications from Dr Maddrey detailing his assessment of the hepatic injury events and potential for avacopan to be the cause. The FDA never referred to Dr Maddrey's report at the Advisory Committee when describing the information to the committee, which is surprising to me to not have done if, in fact, the report had been provided to FDA. In my experience fully and appropriately responsible drug development companies would have submitted any report about the hepatotoxicity from an expert hepatologist the company itself had contracted for. Considering the serious concerns that arose about hepatoxicity my experience is that companies make efforts to be fully transparent with FDA.

123. **Hepatobiliary Adverse Events.** The FDA categorizes and evaluates adverse events using the Medical Dictionary for Regulatory Activities, or "MedDRA."[203] MedDRA organizes individual adverse events (a symptom, sign, diagnosis, etc.) into categories that have a common etiology,

---

[200] PX 008; PX 062.

[201] CCXI-0001533272 at -273.

[202] CCXI-0001665849 at -857 ("a. Please reference Investigator's Brochure Edition 7.0 submitted to IND 120784 June 28, 2017. The updated Investigator's Brochure, Edition 8.0 is being prepared and will be submitted to IND 120784, as well as to IND 132321 and IND 123187 via cross-reference. b. Please reference Protocol CL011_168, Amendment 3.0 and accompanying Patient Informed Consent Master Template included in this submission to IND 132321. This protocol safety amendment contains the DMC requested increased patient safety surveillance, (please see the Time & Events Table, and Section 6.0 Study Procedures); and instructions to the Investigators in the event of observed elevations in transaminases and/or bilirubin are located in Section 4.4 Removal of Patients from Therapy, and Section 7.2.4.6 Laboratory Abnormalities. c. Willis C. Maddrey, M.D., University of Texas Southwestern Medical Center, an independent expert in drug induced liver injury, has been retained to provide his hepatology expertise.").

[203] U.S. Food & Drug Admin., *Questions and Answers on FDA's Adverse Event Reporting System (FAERS)*, available at https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers ("Adverse events and medication errors are coded using terms in the Medical Dictionary for Regulatory Activities (MedDRA)External Link Disclaimer terminology."); *see also,* MedDRA, *Medical Dictionary for Regulatory Activities*, available at https://www.meddra.org/; Wang Tr. at 65:13-19.

function, or manifestation site called System Organ Classes ("SOC").  The "Hepatobiliary System Organ Class" is the MedDRA SOC comprising adverse events of liver injury.[204] Accordingly, the FDA views an imbalance in the rate of hepatobiliary adverse events as a substantial signal of liver toxicity in an experimental drug.[205]  The DMC repeatedly pointed to the imbalance in adverse hepatobiliary events associated with avacopan as evidence of the drug's liver toxicity.  The ADVOCATE protocol prespecified that adverse events will be evaluated using MedDRA[206] and ChemoCentryx's analyses showed that avacopan patients experience serious adverse hepatobiliary events at six times the rate of "standard of care" patients (3.6% on avacopan vs. 0.6% on comparator).[207]  Likewise, ChemoCentryx's analyses showed that avacopan patients experienced combined adverse hepatobiliary events (both serious and non-serious adverse events) at more than three times the rate of patients on "standard of care" (6% vs 1.8%).[208]  The FDA cited both imbalances in concluding that a liver safety signal was observed on avacopan.[209]

124. **DILI, Including Hy's Law.**  Both Dr. Maddrey and the DMC highlighted the imbalance in cases of severe DILI had been observed in patients taking avacopan, including cases of hepatitis and extreme liver abnormality meeting Hy's Law criteria (several of which involved positive rechallenge or dechallenge to avacopan – e.g., patients 326-002, 429-004, and 430-002, all cited by the DMC and Dr. Maddrey), as providing substantial evidence of avacopan's liver toxicity.[210] As Dr. Maddrey pointed out, "two or three cases from the study represent clear instances of serious drug induced liver injury and will be FDA concerns."[211]  These cases of DILI included

---

[204]  MedDRA, *Introductory Guide: MedDRA Version 17.1* (Sept. 2014) at 23, available at https://admin.meddra.org/sites/default/files/guidance/file/intguide_17_1_english.pdf.

[205]  PX 008 at -025.

[206]  PX 201 at -315; PX 239 at -439.

[207]  FDA guidance defines a "serious adverse event" or SAE as an adverse with event any of the following outcomes: death, a life-threatening adverse event, requires inpatient hospitalization (not required as part of the treatment) or prolongation of existing hospitalization, a persistent or significant disability or incapacity, or cancer, or a congenital anomaly or birth defect. PX 004 at -282, -349; PX 167 at -900; *see also,* PX 020 at -914; Glassock Tr. at 186:20-187:16; Goodkin Tr. 214:15-25.

[208]  PX 004 at -282; *see also,* PX 167 at -900.

[209]  PX 004 at -282.

[210]  PX 012 at -594-96; PX 009 at -653-54; Goodkin Tr. 141:23-143:7, 143:24-144:7; Glassock Tr. 116:23-117:21; Maddrey Tr. 130:14-131:20, 133:4-13.

[211]  PX 017 at -205; *see* Maddrey Tr. 193:21-194:18, 196:1-10.

two events on avacopan that the DMC and Dr. Maddrey flagged as meeting Hy's Law criteria (one in the ADVOCATE trial, which involved serious cytolitic hepatitis and cholestasis, with positive dechallenge to avacopan and one in a prior study of avacopan.).[212]

125.   Hy's Law refers to hepatic injury sufficient to impair hepatic function, manifested through significant elevations in both aminotransferase and bilirubin levels.[213]   Most patients who have a Hy's Law adverse event will recover upon drug discontinuation, but it is estimated that perhaps 10% of patients will progress to liver failure and either death or receiving a liver transplant even if drug administration is stopped.[214] When a drug under investigation causes liver enzyme elevations that meet the criteria of Hy's Law it can lead to halting the development of the drug or implementing additional safety measures to mitigate risk.  In its *Guidance for Industry Drug-Induced Liver Injury*, the FDA writes that "[f]inding one Hy's Law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI when given to a larger population."[215] The FDA further notes that "the finding of two Hy's Law cases, and probably even one, is a strong predictor of a significant risk of severe liver injury."[216]  It is important to point out that, contrary to suggestions by Drs. Schall and Bekker of ChemoCentryx,[217] the FDA does not require "definitive" evidence of causality by the investigational drug to conclude that a case meets Hy's Law criteria, as discussed above.

---

[212]   Maddrey Tr. 275:24-276: 8 ("Okay. So let's take a step back now and look at the totality of the evidence of liver toxicity and what it means in the report here. So just to sum up: We saw two Hy's Law cases on avacopan that are probably correct or possibly caused by study drug, correct? … THE WITNESS: Yes…Q. That's what we saw in your report? A. Yeah."); Maddrey Tr. 260:8-262:14 ("Q. And on 145 is Patient 301-301, and this was the other Hy's Law case that you discussed with the DMC? A. Yeah…Q. Well, and what we see here is that a liver biopsy was performed, and that there, in fact, was injury to this patient's liver, correct? …Yeah. Now I never saw that biopsy, but they said a mixed pattern of injury with cholangitis or cholestasis… And you concluded here that this injury was possibly related to the avacopan, if administered. Do you see that? … A. yeah, yeah."); *see also* Maddrey Tr. 277:3-7 ("Q. And we saw at least two cases of cytolytic drug-induced hepatitis on avacopan that were probably or possible related to study drug, correct? … THE WITNESS: Yeah."); PX 056.

[213]   *See* PX 008 at -005.

[214]   *See* PX 008 at -016; *See also,* PX 017 at -205 (Medpace Meeting Minutes ChemoCentryx CL010_168, between DMC members and Dr. Willis Maddrey, December 19, 2018) ("W. Maddrey stated that he is a little worried about this drug. Two or three cases from the study represent clear instances of serious drug induced liver injury and will be FDA concerns. One case showed moderate liver injury on biopsy. He pointed out that one in ten of such Hy's Law cases will die. If there is even one such death on CCX168 the program must not go forward.").

[215]   *See* PX 008 at -016.

[216]   *See id.* at -018.

[217]   PX 027 at -672; PX 026 at -224; PX 064 at 139:9-140:9.

Instead, it is well understood that FDA applies this guidance such that a reasonable causal connection between the adverse event and a drug – suggesting that the drug is the likeliest explanation of the injury – is sufficient to characterize the event as a Hy's Law case.[218]  Both the DMC and Dr. Maddrey advised ChemoCentryx that such a reasonable causal connection, at a minimum, was observed in the case of avacopan.[219]  Even putting this aside, as discussed above, in pre-marketing studies, the occurrence of a case of liver injury on the experimental drug meeting Hy's Law laboratory criteria (i.e., the requisite elevations in aminotransferase and bilirubin) is sufficient to trigger significant FDA concern about hepatotoxicity, as the FDA pointed out in both the Advisory Committee briefing materials and in comments at the Advisory Committee meeting.[220]

126.  Indeed, the regulatory record is replete with examples of why the FDA views even a single case of liver injury meeting Hy's Law laboratory criteria as giving rise to serious safety concerns.  For instance, Temple (2006) describes the experience with troglitazone (REZULIN) which showed only two cases, a 0.1% rate, of Hy's Law hepatic injury preapproval (compared with 0.6% in the ADVOCATE study), but foreshadowed the 1 in 10,000 rate of serious liver injury in the post-approval period.[221] Troglitazone was approved for marketing as the first drug in a new mechanism of action drug class and a major advance in treatment of diabetes.  However, it was withdrawn from the market due to the hepatotoxicity when a second drug in the same class was approved and was seen to not have the same hepatotoxicity risk.[222]

127.  **Positive Rechallenges and Dechallenges**.  A positive dechallenge to an experimental drug occurs when there is a partial or complete disappearance of an adverse experience after withdrawal of the drug.[223]  The FDA considers positive dechallenges to be significant evidence

---

[218]  PX 008 at 014-24.

[219]  PX 008 at -005; PX 013; PX 096 at -453; Maddrey Tr. 67:17-73:23; Goodkin Tr. 86:16-87:6; Glassock Tr. 75:19-78:5.

[220]  PX 004 at 282-83; PX 064 at 112:6-113:21.

[221]  Robert Temple, *Hy's law: predicting serious hepatotoxicity*, 15(4) PHARMACOEPIDEMIOLOGY & DRUG SAFETY 241 (Apr. 2006).

[222]  PX 008 at 8034-035.

[223]  *See* Glassock Tr. 68:20-69:5 ("at the bottom there is a section that says "Decision to Stop Drug Administration." Do you see that? A. Yes. Q. Is that also called a dechallenge? A. Yes. Q. So is a positive dechallenge where a drug is stopped and then the adverse event abates? A. That's generally the observation that

of drug toxicity.[224]  A positive rechallenge is a recurrence of similar signs and symptoms upon reintroduction of the drug, with the reintroduction occurring after a positive dechallenge.[225]  The FDA considers a positive rechallenge to be even stronger evidence of toxicity.[226]  The DMC and Dr. Maddrey likewise explained that a positive rechallenge is "gold-standard" evidence of drug toxicity.[227]  In ADVOCATE, the DMC and Dr. Maddrey identified two cases of positive rechallenge on avacopan (including a case of hepatitis with marked elevations of liver function and a positive rechallenge to avacopan alone), notwithstanding the small patient population and the fact that liver injuries are not typically rechallenged.[228]  As discussed below, the FDA highlighted the case of hepatitis involving positive rechallenge in concluding that a liver toxicity signal was observed on avacopan.[229]  In addition to these two positive rechallenges, there were also 5 cases of liver injury involving positive dechallenge to avacopan, including one case of cytolytic hepatitis meeting Hy's Law criteria discussed above.[230]  Moreover, while there were

---

would be consistent with a dechallenge, yes."); *see also,* U.S. Food and Drug Admin., *Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines*, at 35 (Mar. 2001), available at https://www.fda.gov/media/72504/download/.

[224]  *See* U.S. Food and Drug Admin., *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format*, at 3 (Oct. 2011), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/warnings-and-precautions-contraindications-and-boxed-warning-sections-labeling-human-prescription; PX 052 at p. 6; Goodkin Tr. at 86:13-87:6.

[225]  U.S. Food and Drug Admin., *Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines*, at 35 (Mar. 2001), available at https://www.fda.gov/media/72504/download/.

[226]  Glassock Tr. 160:13-17 ("Q. And again, the significance of a rechallenge is that it's gold standard evidence of a drug's liver toxicity, correct? … THE WITNESS: Yes.").

[227]  PX 023 at -851; Glassock Tr. 107:10-13 ("Q. And again, as we said, a positive rechallenge is gold standard evidence establishing a drug's liver toxicity, correct? A: Yes."); *id.* at 73:15-74:6, 218:12-17; Goodkin Tr. 86:9-15 ("Q: And so just to kind of sum that up, this positive rechallenge is another clear signal, a gold standard signal or indicator of liver toxicity associated with avacopan; correct? A.  It's the gold standard of trying to link to a given culprit.  It really is -- now we have sort of a smoking gun."); *id.* at 85:2-87:7, 120:16-19; Maddrey Tr. at 52:1-15, 123:25-124:8 ("it's as close to gold as you can get.  If you have something that happens to you and I remove it and you get back to normal or near normal and I give it to you again and you get exactly what you had before, that's a positive rechallenge").

[228]  Maddrey Tr. 129:3-131:2("So we just said that, at this point, there are now two cases of positive rechallenge on avacopan, correct? A. Yes."); Glassock Tr. 104:20-24 ("Q. So now we have two cases of positive rechallenge on Avacopan. We have patient 812-001 who was discussed on the first page and patient 429-004, correct? A. Yes."); Goodkin Tr. at 103:6-104:3, 119:10-120:15, 125:3-15, 144:9-15, 192:3-6; Glassock Tr. at 107:7-9, 109:10-110:8.

[229]  PX 004 at -282-83 ("One patient had an SAE of hepatocellular injury with increase in liver enzymes upon rechallenge with avacopan.").

[230]  PX 098; Glassock Tr. 185:19-186:3.

Expert Report of Marc Walton                                                    Case No. 4:21-cv-03343 | Page 64 of 87

multiple cases of positive rechallenge and dechallenge on avacopan, there were no cases of negative rechallenge or dechallenge on avacopan.

128. **Liver-Related Discontinuations**. The FDA guidance also makes clear that it is essential to evaluate liver-related discontinuations in evaluating the full picture of a drug's liver toxicity (and safety profile generally).[231] This is particular true in the case of avacopan since as discussed, ADVOCATE was modified to mandate discontinuation of study drug upon early signs of liver abnormality.[232] Five patients discontinued avacopan due to adverse heptobiliary events compared with zero patients in the "standard of care" arm.[233] Seven avacopan patients discontinued the study due to increased liver function tests versus two standard of care patient – more than three-fold higher.[234] As discussed below, the FDA cited this imbalance in concluding that a liver safety signal was observed on avacopan.[235]

129. In addition to guidance ChemoCentryx received from its consultants, the FDA also signaled to the Company concern about avacopan's hepatotoxicity both before and during the NDA-review period. On August 2, 2018, after ChemoCentryx notified the FDA that a safety notice to investigators was issued, the agency sent the Company an IND IR asking ChemoCentryx to provide the agency with adverse liver event data on avacopan, as well as the Company's "plans to mitigate the risk of liver injury in your AAV clinical development program."[236] In response ChemoCentryx informed FDA that it was amending the ADVOCATE protocol (in response to the DMC's concerns) and had contracted with Dr Willis Maddrey for his assessment and advice.[237] Likewise, in the April 2021 Late-Cycle Communication, the FDA reiterated that the potential hepatotoxicity of avacopan remained a substantive review issue.[238]

---

[231] PX 008 at -018-21.

[232] PX 201 at -291, -338; PX 239 at -416, -499-500.

[233] PX 166 at -258.

[234] PX 004 at -283 ("AEs associated with hepatic abnormalities led to drug discontinuation in 7 patients in the avacopan arm and 2 patients in the prednisone arm.").

[235] PX 004 at -333-434, -336-37.

[236] CCXI-0001533272 at -273.

[237] CCXI-0001658827 at -827, -843, -845.

[238] FDACDER004109 at -327.

130. Notably, ChemoCentryx itself recognized that avacopan's hepatotoxicity signal would be a regulatory concern, as it included hepatotoxicity in the Warnings and Precautions section of the draft label it submitted with the NDA in July 2020.[239]

131. **Angioedema.** The ADVOCATE DMC also warned ChemoCentryx that avacopan was associated with a significant angioedema safety signal.[240] Again, this signal further put ChemoCentryx on notice that avacopan would not be approved with a broad label for safety and efficacy as ChemoCentryx had sought.[241] Angioedema is an extremely serious, potentially fatal, allergic reaction. Accordingly, angioedema is an adverse event of particular concern for the FDA in the drug development context. Indeed, FDA guidance specifically singles out angioedema (and liver toxicity) – even a single instance of this adverse event – for reporting to the agency because it is uncommon and known to have strong associations with drug exposure.[242] As DMC Chair Dr. Goodkin explained in commenting on this guidance, "Clearly, regulators take early possible signals of angioedema or hepatotoxicity, even a single instance, very seriously."[243] Dr. Goodkin is correct.

132. As Dr. Goodkin further explained, "[a]ngioedema can be life threatening if the airway is compromised," and as such, the DMC also urged ChemoCentryx to amend ADVOCATE materials and issue emphatic warnings to study participants about the risk of angioedema associated with avacopan.[244] Dr. Goodkin stated in a March 2, 2018 email to ChemoCentryx CMO Dr. Hilson that ChemoCentryx needed to issue particularly urgent warnings about this

---

[239]   CCXI-0000494148; CCXI-0000494149

[240]   PX 021; PX 216 at -927; PX 023.

[241]   PX 102 at -432; *see also,* PX 021 at -327; PX 031; PX 036 at -225 (unanimous letter from DMC stating, "Please share the draft label proposed with the DMC. If the proposed wording clearly and fairly addresses the issue[] of … angioedema, it would put our minds at ease and move us to resolution."); Glassock Tr. 289:8-12, 300:15-301:22 ("Q. In other words, from the DMC's perspective, the proposed label for Avacopan must acknowledge the hepatotoxicity of Avacopan and the angioedema risk? A. Yes.").

[242]   PX 102 at -432-33; *see also,* U.S. Food & Drug Admin., *Guidance for Industry and Investigators Safety Reporting Requirements for INDs and BA/BE Studies*, at 4 (Dec. 2012), available at https://www.fda.gov/files/drugs/published/Safety-Reporting-Requirements-for-INDs-%28Investigational-New-Drug-Applications%29-and-BA-BE-%28Bioavailability-Bioequivalence%29-Studies.pdf ("FDA makes clear the meaning of reasonable possibility by providing the following examples of types of evidence that would suggest a causal relationship between the drug and the adverse event. … A single occurrence of an event that is uncommon and known to be strongly associated with drug exposure (e.g., angioedema, hepatic injury, Stevens-Johnson Syndrome.").

[243]   *Id.* at -433.

[244]   Goodkin Tr. 44:22-45:3; PX 021 at -327.

issue, "[i]t was the Committee's clearly stated intention that every patient must be warned about angioedema include the message above about the need for urgent ambulance transport in the event of angioedema with difficulty breathing . . . . We do not want 'standard' communications going to the sites."[245]

133. In particular the DMC flagged two avacopan patients in ADVOCATE experienced angioedema versus none in the comparator arm.[246] One of the cases was a serious adverse event requiring hospitalization and the other was a positive rechallenge to avacopan.[247] The DMC pointed out that this was a strong angioedema signal, particularly given the small size of the study. For instance, in a May 2020 email to ChemoCentryx CMO Dr. Kelleher, Dr. Goodkin wrote, "Two episodes of angioedema on avacopan during ADVOCATE among only ~160 patients randomized to drug is remarkable and I believe that prescribers and patients need to be made aware of this."[248] Likewise, in a March 2021 letter to ChemoCentryx objecting to the Company's reporting of avacopan safety data in the *New England Journal of Medicine*, the DMC wrote, "The occurrence of two cases of angioedema among 166 patients exposed to avacopan in this study [ADVOCATE] is a clear signal of angioedema risk. Clinicians should be made aware of the risk and all patients starting avacopan should be warned of the symptoms that must prompt immediate cessation of the drug and medical attention."[249]

G.   CHEMOCENTRYX'S CHANGING OF PRIMARY OUTCOME DATA IN ADVOCATE FOLLOWING AN UNBLINDED POST-DATABASE-LOCK REVIEW SHOULD HAVE BEEN DISCLOSED TO THE FDA AND UNDERMINES THE INTEGRITY OF THE REPORTED BVAS RESULT

134. On November 5, 2019, the ADVOCATE study was unblinded. On November 8, 2019, ChemoCentryx statistician Huibin Yue sent Dr. Bekker unblinded results of the prespecified analyses in the ADVOCATE study.[250] These results showed that avacopan failed to achieve

---

[245]   PX 021 at -327.

[246]   PX 012 at -593("D. Goodkin noted the two cases of angioedema were patients in group 1 [avacopan arm]"); PX 023 at -851; PX 009 at -655.

[247]   PX 009 at -655.

[248]   PX 023 at -851; Goodkin Tr. 241:5-17 (testifying that the DMC agreed with the position expressed).

[249]   PX 031 at -437.

[250]   PX 040 at -344.

statistically significant BVAS superiority in the study – the result the FDA had told ChemoCentryx was a predicate to drug approval – including at 52 weeks.[251]  The table of the week 52 analysis result showed that 90 patients in the prednisone group had achieved sustained remission, compared to 104 patients in the avacopan group, and that the result was not statistically significant.[252]

135.  The next day, on November 9, 2019, Bekker sent an email asking Huibin Yue to confirm the BVAS results showing avacopan had failed to achieve superiority.[253]  Bekker wrote, "Regarding sustained remission at Week 52, it is of course of paramount importance that the data are correct (especially the p-value for superiority).  [Study personnel] must verify these results ASAP.  We cannot afford to miss a superiority outcome here."[254]

136.  Subsequently, Huibin Yue confirmed that the non-superior BVAS result reported to Bekker was calculated correctly (i.e., there were no errors in the statistical programming), and the study CRO confirmed that all of the remission data had been entered into the clinical trial database correctly (i.e., there were no data-entry errors between the database and the remission forms completed by the study adjudicators).[255]  Following confirmation that neither programming nor data entry errors were responsible for the failed ADVOCATE BVAS result, Bekker and Yue began reviewing unblinded ADVOCATE data to look for cases that "need to be revisited."[256]  On November 12, 2019, Yue sent Bekker a spreadsheet containing unblinded ADVOCATE data, including patient treatment assignment, the patient's BVAS remission status (i.e., whether or not remission was achieved at week 26 or 52), and the patient's steroid use history.[257]  After reviewing these unblinded data, Bekker identified 9 patients he wanted readjudicated.[258]  This included 5 patients whose week 52 outcome would be changed from 'not in sustained remission' to 'sustained remission.'  All 5 of these patients were receiving avacopan.[259]

---

[251]  PX 041 at -685, -700, -701.

[252]  PX 041 at -685.

[253]  PX 043 at -877

[254]  *Id.* at -878.

[255]  PX 044 at -904; PX 045 at -942.

[256]  PX 046 at -939.

[257]  PX 046.

[258]  PX 047 at -668.

[259]  *Id.*

137. On November 13, 2019, the next day, Yue emailed Dr. Chao Wang – ChemoCentryx's statistical consultant on the ADVOCATE study, a member of the DMC, and a former FDA statistician – and confirmed that changing the BVAS remission outcomes for these 5 avacopan patients would change the BVAS remission result at week 52 from failure to achieve superiority to achieving superiority.[260]  That same day, Bekker and Yue prepared a table of proposing that BVAS remission results for these avacopan patients be readjudicated and identifying a proposed rationale for changing their outcomes from failure to success.[261]  On November 14, 2019, this table, including Bekker's proposed change to their outcomes and the rationale for those changes, was sent to Dr. David Jayne – the study principal investigator and also the chair of its Adjudication Committee –  with a request to perform the proposed re-adjudication.[262]  Notably, Dr. Jayne observed that the Adjudication Committee had previously agreed with ChemoCentryx's former Chief Medical Officer, to consistently apply a specific rule to determine whether a patient should be treated as a non-remitter because of steroid use and that Bekker was now asking that a different rule be applied.[263]  Ultimately, Dr. Jayne acceded to Bekker's request and applied this different rule to *just* the patients proposed for readjudication.  Dr. Jayne testified that he did *not* readjudicate all of the patients in the ADVOCATE study using the criteria described by Dr. Bekker.[264]

138. After the database was modified the data analysis again showed 90 patients with sustained remission in the prednisone group but now there are 109 patients in the avacopan group with sustained remission, and a statistically significant p-value.  This was the result published in the *New England Journal of Medicine* reporting the study and was submitted in the NDA.[265]

---

[260]  Wang Tr. 110:25-113:17; PX 258 at 950-51; PX 243.

[261]  PX 047 at -668.

[262]  Yue Tr. 255:6-257:16; PX 048.

[263]  PX 048 at -136.

[264]  Jayne Tr. 159:10-23.

[265]  PX 080 at -615, -620-21; PX 329 at -717.

139. Dr. Chao Wang testified that changes to an outcome measure for a study's primary endpoint made after an unblinded review of the data should be reported both to the FDA and publicly, particularly where those changes affect the success or failure of the study's primary outcome.[266]

140. Changing study data after the database has been 'locked' and an unblinded analysis performed occurs infrequently.  The FDA-ICH guidance E6(R3) Good Clinical Practice includes sections on the importance of data verification and other 'clean-up' activities being thorough prior to finalizing the database and unblinding the study data.  The Guidance recognizes that this may be needed, "…changes made to the data analysis set after the trial has been unblinded…should be clearly documented and justified and should only occur in exceptional circumstances (e.g., data discrepancies that must be resolved for the reliability of the trial results). Data changes should be authorised by the investigator and reflected in an audit trail. Post-unblinding data changes… should be reported in the clinical trial report."[267]  These changes should include reporting both the trial result initially obtained, the changes made, and the impact of those changes on the trial result.  The clinical study report is a key part of an NDA submission and would ensure the FDA and other regulatory agencies are fully informed.

141. In my opinion the failure to report in detail the process, with documentation, of any changes to the 'locked' clinical database after an unblinded analysis has occurred raises concerns about the integrity of the study as whole.  This is particularly concerning when the changes are made to the primary endpoint data and change the study result from not-statistically-significant to statistically significant, as occurred with ADVOCATE.  The ADVOCATE protocol, adhering to standard good clinical practice, called for all adjudication of data to be completed and entered into the database prior to database lock and unblinding;[268] this protocol mandate was violated here.  I view these events as particularly egregious here as the changes led to a 'failure of study' becoming a 'successful study' for the key endpoint that would be necessary to support NDA

---

[266] Wang Tr. 80:6-81:1; Glassock Tr. 317:2-319:5, 339:22-340:4 ("Q. So it would be scientifically improper for a sponsor to learn the unblinded results of a trial and then start changing patient scores? A. Yes. Q. If the medical community learned that such a thing had taken place, would that substantially undermine the medical community's confidence in the integrity of the results? A. Very substantially.").

[267] U.S. Food & Drug Admin., *E6(R3) Good Clinical Practice (GCP)*, at 39 (May 2023), available at https://www.fda.gov/media/169090/download. *See also,* ICH, *Guideline for Good Clinical Practice E6(R2)* (Nov. 9, 2016), available at https://database.ich.org/sites/default/files/E6_R2_Addendum.pdf.

[268] PX 239 at -492.

approval. Disclosure of the changes to FDA could have significantly undermined confidence in the efficacy of avacopan. It might have led to avacopan not being approved at that time given the host of additional concerns about that result the agency had expressed.

**V.    THE FDA'S ADVISORY COMMITTEE MEETING BRIEFING MATERIALS AND THE ISSUES RAISED DURING THE MEETING ITSELF REPEATED THE SAME CONCERNS FDA AND OTHERS HAD RAISED PREVIOUSLY WITH CHEMOCENTRYX IN PRIVATE COMMUNICATIONS**

142. As discussed above, on May 6, 2021 the FDA held an Advisory Committee meeting to discuss the avacopan NDA. On May 4, 2021, the FDA published briefing materials in advance of that Advisory Committee meeting.[269] As discussed below, the concerns and issues regarding avacopan and ADVOCATE reflected in the May 4, 2021 briefing materials and in the May 6, 2021 Advisory Committee discussion reflect the same concerns and issues communicated to ChemoCentryx during the investigation and NDA review phases by the FDA and others discussed above.

A.    THE COMPLEXITY OF ADVOCATE'S DESIGN MADE INTERPRETATION OF RESULTS AND DETERMINATION OF RISK-BENEFIT CHALLENGING

143. The May 4, 2021 FDA Briefing Document summarized relevant regulatory history regarding avacopan, including summarizing, quoting and citing the July 2016 EOP2, November 2016 Type C, and March 2020 Pre-NDA meetings discussed above.[270] That Briefing Document stated, "[a]lthough primary efficacy comparisons were statistically significant, the review team has identified several areas of concern, raising uncertainties about the interpretability of these data and the clinical meaningfulness of these results," citing the administration and withdrawal of multiple background therapies in both arms of the study (including non-study-supplied steroids) and the undertreatment of patients in the rituximab cohort.[271] As discussed, these were issues the

---

[269]    U.S. Food & Drug Admin., *May 6, 2021: Meeting of the Arthritis Advisory Committee Meeting Announcement*, available at https://www.fda.gov/advisory-committees/advisory-committee-calendar/may-6-2021-meeting-arthritis-advisory-committee-meeting-announcement-05062021.

[270]    PX 004; *see also,* DX 108.

[271]    PX 004 at -278.

FDA raised privately with ChemoCentryx in the investigational and/or NDA-review phases, including in connection with the July 2016 EOP2, November 2016 Type C, and March 2020 Pre-NDA meetings, the Day 74 Deficiency Letter, and Mid- and Late-Cycle Communications. Indeed, the FDA Briefing Document specifically points this out, stating that "during the avacopan clinical development, including the phase 3 design stages, the Agency communicated many of the concerns with the design of Study CL010_168."[272]

144. Some Advisory Committee members voiced the difficulty in interpreting the study. For example, Dr Pisetsky stated "[t]he use of just a single cycle [of rituximab] I think then creates this uncertainty in how to interpret those data."[273]

## B. ADVOCATE'S NON-INFERIORITY RESULTS DID NOT SUPPORT AVACOPAN'S EFFICACY

145. In the May 4, 2021 Briefing Document, the FDA repeated the same concerns it had previously expressed throughout the investigation and NDA review phases to ChemoCentryx regarding the interpretability, soundness, and meaningfulness of ADVOCATE's BVAS non-inferiority result, which ChemoCentryx had cited in support of avacopan's efficacy. For instance, the Briefing Document reiterated the FDA's same concern it had expressed in "pre-submission communications" that the multiple background treatments for AAV administered to patients would make it difficult to tell whether a non-inferiority analysis showed avacopan was actually providing an efficacy benefit:

> In pre-submission communications, FDA stated that a noninferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids as it would be difficult to establish whether avacopan is effective or whether

---

[272]  PX 004 at -279.
[273]  PX 064 at 238:7-239:5.

rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms. [274]

146. Likewise, the Briefing Document cited the same issues FDA had previously expressed regarding identifying an appropriate non-inferiority margin:

There are several issues with the Applicant's proposed method to derive the non-inferiority margin. First, there are no historical placebo-controlled trials evaluating the efficacy of glucocorticoids as an add-on therapy to CYC or RTX. Thus, the Applicant relied on single arm results from various different studies. Second, the relevance of many of the historical studies cited for the setting of the proposed NI study is questionable because of potential differences in important factors such as the patient population (e.g., several studies included patients with necrotizing crescentic glomerulonephritis, polyarteritis nodosa), standard of medical care, and treatment regimen (e.g., rate and amount of glucocorticoid tapering). Even the definition of 'remission' and the time point of endpoint assessment were not consistent. Third, the determination of the extent of the contribution of glucocorticoids to the historical estimated remission rate on glucocorticoids + CYC or RTX is based on key, implausible, and unverifiable assumptions; it is unlikely that the efficacy of glucocorticoids alone is similar to that of glucocorticoids when added on to CYC or RTX. Therefore, with the proposed NI margin of -20%, it would be very difficult to determine if a finding of similar remission rates on the proposed comparator arms was due to the efficacy of avacopan or to the fact that the remission rates on both arms were primarily driven by the induction treatment with cyclophosphamide or rituximab (with little to no benefit provided from avacopan)."[275]

---

[274] PX 004 at -278, -284, -346.

[275] PX 004 at -306.

C.    ADVOCATE'S SECONDARY ENDPOINT RESULTS DID NOT SUPPORT CLAIMS ABOUT AVACOPAN'S EFFICACY OR SAFETY

147.  The FDA's May 4, 2021 Briefing Document also reiterated the very same concerns the agency had privately expressed to ChemoCentryx on numerous occasions about the validity and statistical soundness of ADVOCATE's key secondary endpoints.

148.  For instance, with regard to ADVOCATE's GTI endpoint, the Briefing Document repeated the same concerns the FDA expressed at the November 2016 Type C Meeting and subsequent communications. The FDA reiterated its concern that GTI was not validated stating, "GTI is a novel instrument for which there is no regulatory precedent, and a minimally clinically important difference (MCID) has not been established in AAV."[276] The Briefing Document further stated,

> The GTI is a clinician-reported instrument and is not considered a direct measure of how a patient feels, functions, or survives. The GTI does not include the patients' perspectives, rather it is a measure of clinician-reported outcomes and biomarkers. The clinically meaningful within-patient change is not known. Certain rare but serious events … are omitted from the GTI score.[277]

149.  The FDA's May 4, 2021 Briefing Document also repeated the FDA's concern that GTI was assessed for only the first 26 weeks of the ADVOCATE study. The Briefing Document stated,

> [D]ifferences in GTI between the treatment groups may reflect the study design which specified the prednisone doses to be used in the control group, rather than dosing glucocorticoids based on Investigator assessment of active disease. GTI was not assessed at later time points to assess the effects of glucocorticoids after completion of the pre-specified prednisone taper. In the case of Study CL010_168, where differences in glucocorticoid use were pre-specified in the

---

[276]  PX 004 at -280.

[277]  *Id.* at -317.

protocol, the GTI does not provide information beyond that of the cumulative glucocorticoid doses to further inform the effect of avacopan.[278]

150. The FDA also repeated its previously expressed warnings that the validity of ADVOCATE's SF-36 and EQ-5D-5L endpoints were not validated for use in AAV, including because they reflect change in patient health unrelated to vasculitis. The Briefing Document stated that these instruments were "not specific to the assessment of vasculitis… The clinical meaningfulness of these improvements and differences [in scores] between the avacopan and prednisone arms are unclear"[279]

151. Similarly, the FDA reiterated its previously expressed concerns that the renal endpoints used in ADVOCATE were not validated for use in AAV and their meaning and import were unclear in that population. With respect to one of the renal endpoints, the eGFR endpoint, the FDA stated, for instance, that results on this endpoint "may not be relevant to the assessments of this renal endpoint in the avacopan program, as ANCA-associated vasculitis is a disease that leads to acute kidney injury where the goal of treatment is relatively large improvements in kidney function over a relatively short period of time."[280] Likewise, with respect to another renal endpoint, called UACR, the FDA Briefing Document stated, "[i]t is challenging to interpret the clinical significance of percent change in albuminuria in a population that includes patients with near-normal albuminuria levels at baseline. In addition, the Applicant did not provide data supporting the use of UACR as a surrogate for clinical outcomes in ANCA-associated vasculitis; however, it seems unlikely that the difference seen at Week 4 but not at later timepoints would predict a meaningful clinical benefit of avacopan over prednisone."[281]

152. The FDA briefing document also repeated the same statistical concerns the agency had raised with respect to ADVOCATE's secondary endpoints. With respect to the BVAS relapse analysis ChemoCentryx reported, the FDA Briefing Document reiterated the same criticisms that the

---

[278]  *Id.* at -280, -348.

[279]  *Id.* at -326.

[280]  PX 064 at 109:12-18.

[281]  PX 004 at -329.

analysis was not randomized and omitted patients who should be deemed to have worsening of their vasculitis.  The Briefing Document stated, for instance, that the relapse analysis

> is limited, as it depends on post-randomization variables, i.e., having first achieved remission and the timing of the remission. As a result, the subset of subjects included in this analysis and the time those subjects are at risk for relapse can no longer be assumed to be similar across treatment arms. The advantages of randomization are eliminated because the treatment arms are no longer balanced with respect to possible confounders, leading to potentially biased comparisons between treatment arms and limiting the interpretability of these results. For example, remission may be achieved in different types of patients in the two treatment arms. Thus, when the treatment arms are compared with respect to relapse, differences cannot be attributed to the treatment, but rather to differences in the characteristics of the subset of patients included in the analysis. For these reasons, these results are considered exploratory only.[282]

Likewise, the FDA also repeated its concerns regarding ChemoCentryx's failure to adjust the secondary endpoint results for multiplicity in the Briefing Document.  For instance, the FDA stated, "No secondary endpoints were adjusted for multiplicity. … When there is more than one study endpoint, care must be taken to ensure that the evaluation of multiple hypotheses does not lead to inflation of the study's overall Type I error probability.  The inflation of the Type I error rate can be quite substantial if there are many comparisons.  Hence, a nominal significance achieved by a secondary endpoint should be interpreted with caution."[283]

153. At the Advisory Committee meeting the FDA expanded upon the concerns identified in the Briefing Document with the relapse analysis reported by ChemoCentryx.  The FDA pointed to the time to remission analysis that the FDA advised ChemoCentryx to perform at the July 2016 EOP2 meeting and was shown at the Advisory Committee meeting after Dr Nason on the

---

[282] *Id.* at -324.

[283] *Id.* at -308.

committee requested it.[284]  This analysis showed that, at least numerically, "standard of care" patients remitted more quickly than avacopan patients.[285]  The FDA cited this analysis as further underscoring the issue with the relapse analysis the agency had identified from the outset: "patients on the prednisone arm appear to achieve remission faster than those on avacopan, and therefore are at risk for relapse for a longer duration of time, raising questions about the interpretability of the relapse exploratory endpoint."[286]

> D.    EXTENSIVE STEROID USE BY AVACOPAN PATIENTS FOR THE TREATMENT OF AAV RAISED CONCERNS ABOUT INTERPRETABILITY OF THE BVAS EFFICACY RESULTS

154. The FDA's May 4, 2021 Briefing Document also brought out the concerns the agency had and that the ADVOCATE DMC had previously expressed to ChemoCentryx concerning avacopan patients' extensive use of steroids for the treatment for the treatment of vasculitis.  The Briefing Document pointed out that, as a result of widespread steroid use in the avacopan arm including to treat vasculitis, ADVOCATE was "more accurately described as" an  assessment of "avacopan plus potentially lower doses of glucocorticoids compared to higher doses of glucocorticoids," rather than an evaluation of avacopan against standard of care steroid treatment.[287] The clinical significance of the difference between the groups in steroid dosage was unclear, especially since the higher doses received by the "standard of care" group were study-mandated and might not be needed for disease control.[288]  The Briefing Document explained, "At this time, it is not clear how much reduction in glucocorticoids would be considered clinically meaningful and if the protocol-specified higher dose of glucocorticoids is required for control of disease activity."[289]

---

[284]  PX 064 at 78:9-79:6.

[285]  PX 329; ChemoCentryx, Inc., *Avacopan – a C5a Receptor Inhibitor for the Treatment of Anti-Neutrophil Cytoplasmic Auto-antibody (ANCA)- Associated Vasculitis*, Arthritis Advisory Committee Meetings, at TR-29 (May 6, 2021), available at https://www.fda.gov/media/148293/download.

[286]  PX 064 at 108:18-21.

[287]  PX 004 at -347.

[288]  *Id.*at -347.

[289]  *Id.*at -278.

155. The FDA Briefing Document expressed FDA's concerns that the use of non-study supplied steroids by avacopan patients complicated interpretation of the ADVOCATE results and cast doubt on avacopan's clinical benefit.  For instance, the Briefing Document stated:

> While only the prednisone group was intended to receive the protocol-specified prednisone taper, 87% of patients in the avacopan treatment group also received glucocorticoids during the study for vasculitis, adrenal insufficiency, and other clinical conditions.…Further, glucocorticoid use from Week 26 to Week 52 was similar between the prednisone and avacopan groups. Therefore, the increased glucocorticoid use in the prednisone arm compared to the avacopan arm was limited to the period of the first 20 weeks of the study. The clinical relevance of the differences in the nominal glucocorticoid doses used from Week 0 to 26 between the prednisone and avacopan arms is uncertain, as it may be an artifact of the study design rather than a reflection of avacopan's control of disease activity.[290]

156. The FDA reiterated its concerns about avacopan's potential to amplify the effect of steroids (through its inhibition of the CYP3A4 enzyme responsible for metabolizing steroids) as further increasing the uncertainty of the clinical significance of any nominal difference in dosage between the two arms.[291]

157. Critically, the FDA Briefing Document pointed out that nearly two-third of avacopan patients (63.9%) "received glucocorticoids for vasculitis."[292] Moreover, the FDA explained that "[i]n both parts of the study, across treatment arms, the proportion of patients requiring non-study supplied glucocorticoids was similar for treatment of worsening vasculitis, persistent vasculitis, and remission."[293]  Again, the FDA cited these data as creating significant uncertainty regarding claims that avacopan replaced or even meaningfully spared steroid use.

---

[290]  *Id.* at -279 to -280.
[291]  *Id.* at -284.
[292]  *Id.* at -321.
[293]  *Id.* at -322.

158.  Indeed, the FDA Briefing Document highlighted that even though avacopan patients received extensive steroids for treatment of vasculitis, ChemoCentryx would still count such patients as having successfully achieved remission due to avacopan in the reported BVAS results.[294]  The FDA Briefing Document explained that "[t]hese cases highlight how challenging it is to interpret the glucocorticoid use and the contribution to therapeutic benefit in this study."[295]

159.  Discussion at the Advisory Committee made clear that not only was steroid usage, including for the purpose of treating vasculitis, widespread in the avacopan group, but that the numerical differences in dosages between arms reported by ChemoCentryx may have understated the clinical import of avacopan patients' steroid use.  Committee member Dr. Chung explained, this measure was an "underestimation, in some respects, of how much prednisone or the potential impact of prednisone for particular participants."[296] Committee discussion made clear that, from a clinical perspective, this was particularly significant since steroids are used at low doses for maintenance therapy.  Dr. Dellaripa explained, for instance, that "many of us have used in clinical practice low doses of steroids to keep people in remission, or theoretically to keep them in remission."[297] Accordingly, even low dose steroid use in the avacopan arm could have provided significant BVAS benefit.

160.  Moreover, Advisory Committee discussion indicated, from a clinical perspective, that ChemoCentryx's attribution of sustained remission to avacopan despite significant steroid administration to avacopan patients made conclusions about efficacy unclear. Dr. Chung stated:

> [W]hat troubles me more about the out-of-study glucocorticoid use is that participants who received a significant amount of outside glucocorticoid use still could be counted as a responder. …[T]he true efficacy and the true effect of avacopan compared to prednisone is just not well verified by this study. I think my other concern is also that it appears from the sponsor, or the applicant, that the

---

[294]  *Id.* at -323.  The FDA Briefing Document stated that as long as the non-study glucocorticoid was not received within 4 weeks prior to the week 26 or week 52 assessment, those glucocorticoids were ignored for endpoint purposes.

[295]  *Id.* at -324.

[296]  *Id.* at 228:10-17

[297]  *Id.* at 133:17-134:4

goal for avacopan would be for it to be used in the absence of glucocorticoids from initial remission induction therapy. And I am hesitant with that because there was a significant amount of glucocorticoid use in the avacopan arm after" the prednisone arm completed the initial taper period.[298]

161. Dr Becker (chair of the committee) summarized the discussion at the end of Question 1: "The use of additional non-study supplied glucocorticoids, I think everyone acknowledged being a challenge in the sense that it made it somewhat hard to interpret the data, not only because patients were on glucocorticoids, but they were quite varied in their presentation and their clinical treatment courses, and their baseline clinical statuses."[299]

     E.     UNDERTREATMENT OF PATIENTS IN ADVOCATE'S COMPARATOR ARM RAISED CONCERNS ABOUT INTERPRETABILITY OF, AND BIAS TO, THE BVAS EFFICACY RESULTS

162. The FDA Briefing Document reiterated the concerns the agency had previously expressed to ChemoCentryx that the failure to provide maintenance therapy to patients in the rituximab subgroup resulted in undertreatment of patients in the "standard of care arm" and that "[t]his could potentially confound the results and bias the assessment of efficacy at week 52."[300] In particular, the FDA explained that ADVOCATE failed to show that avacopan was efficacious in the subgroup of patients who *did* receive standard of care maintenance therapy and only showed an effect (which was responsible for the overall reported effect) when compared with patients who received no such standard treatment. This was the very finding that Dr. Jayne privately expressed concern would "attract criticism" regarding the ADVOCATE results.[301] The Briefing Document stated:

---

[298]  *Id.*at 227:15-228:9

[299]  *Id.*at 253.

[300]  FDACDER004102 at -103.

[301]  PX 109 at -579.

> Based on the data, there is no evidence of clinically meaningful treatment effect in the cyclophosphamide induction subgroup. Further, the treatment comparison in the complementary rituximab induction subgroup may not be considered meaningful because these patients did not receive maintenance therapy, i.e., due to undertreating of patients, the effect observed in the rituximab subgroup may not represent a clinically meaningful treatment effect compared to standard of care. Thus, the observed superiority at Week 52 may be a result of the treatment difference in the subgroup receiving induction with rituximab.[302]

163. The Advisory Committee discussed this issue in detail, providing important clinical context. Advisory Committee member Dr. Chung explained, "the need for remission maintenance [with rituximab], or the use of remission maintenance [with rituximab] during the time [that ADVOCATE was designed], was truly standard of care…I don't think many of us thought that we could just treat with one dose of rituximab."[303] Dr. Chung further stated, "I think the sponsor has also indicated that rituximab was not approved for remission maintenance until after the trial commenced. But I would say that the studies that showed efficacy for rituximab for remission maintenance were published before this trial protocol was finalized. So I will say that I was quite surprised that there wasn't a remission maintenance aspect to the rituximab arm for this study."[304]

164. Likewise, Advisory Committee member Dr. Lewis stated, "Basically, although the company only showed us the rituximab data, clearly the cyclophosphamide group did not show a benefit; so avacopan won over, essentially, nothing [in the group of patients not receiving standard maintenance treatment]. And I don't think many of us practice with no maintenance therapy in this disease, nor is that the guidelines for many of our societies."[305]

---

[302] PX 004 at -278-79.
[303] PX 064 at 246:12-20.
[304] *Id*. at 247:2-10.
[305] *Id*. at 255:19-256:3.

165. Further discussion also made clear that undertreatment of patients in the rituximab cohort also confounded comparisons of steroid use between the arms because maintenance treatment for those patients would likely have further reduced the need for steroids in both arms. For instance, the clinicians on the Committee answer affirmatively in response to the question: "[I]f rituximab, for instance, was repeated [as maintenance therapy], would you expect that there would be less steroid use in those people then, because perhaps that would avoid . . . sort of counterfactual, but that the people historically who might have gone to an additional dose of steroids might instead get that additional dose of rituximab."[306]

## F.   HEPATOTOXICITY AND ANGIOEDEMA SAFETY SIGNALS RAISED CONCERNS ABOUT AVACOPAN'S RISK-BENEFIT PROFILE

166. The FDA's May 4, 2021 Briefing Document also repeated the safety concerns previously raised by ChemoCentryx's advisors, including the ADVOCATE DMC and Dr. Maddrey, and the FDA itself. The Briefing Document repeated the FDA's private warnings to ChemoCentryx that the avacopan safety database was limited[307]. The Briefing Document stated that a safety signal on avacopan had been observed with respect to both hepatotoxicity and angioedema, despite that small database.[308] In particular, the FDA specifically identified as evidence of hepatotoxicity the same toxicity signals identified by the ADVOCATE DMC and Dr. Maddrey, including imbalances in hepatobiliary adverse events; imbalances in liver-related discontinuations; liver-related positive rechallenges on avacopan; cases of DILI on avacopan, including a case meeting Hy's Law laboratory criteria.[309]

167. For instance, the Briefing Document stated, "The safety data in Study CL010_168 was small with 166 patients exposed to at least 1 dose of avacopan and 134 patients who received study drug for > 6 months."[310] Nevertheless, the Briefing Document explained:

---

[306] *Id*. at 241:15-242:2.

[307] PX 004 at -283.

[308] PX 004 at -282-83, -349 ("Given the small safety database, conclusions are limited, however, imbalances in hepatotoxicity, liver enzyme evaluations, and angioedema are observed despite the small sample size.").

[309] *Id*. at -283.

[310] *Id*. at -349.

More patients in the avacopan arm experienced AEs related to hepatic abnormalities and hypersensitivity events. The proportion of patients with hepatobiliary AEs and SAEs were greater in the avacopan group (6.0% and 3.6 %, respectively) as compared to the prednisone group (1.8% and 0.6%, respectively). Hepatobiliary SAEs included one patient with a liver biopsy consistent with drug induced liver injury and one patient with increased liver enzymes upon positive rechallenge with avacopan, suggesting potential hepatotoxicity. AEs associated with hepatic abnormalities led to drug discontinuation in 7 patients in the avacopan arm and 2 patients in the prednisone arm. As for hypersensitivity, 2 patients in the avacopan arm experienced angioedema, and no patients in the prednisone arm experienced angioedema. There was an additional case of rash and fever in the avacopan arm that resolved after discontinuation of avacopan. Although the database is small, there is a greater incidence of hepatotoxicity and hypersensitivity with avacopan.[311]

168. Discussion at the Advisory Committee meeting underscored the significance of the liver signal associated with avacopan, including the import of the Hy's Law case (including contradicting the notion that the FDA does not consider a case meeting Hy's Law laboratory criteria to be a worrying signal of a drug's liver toxicity).  For instance, Advisory Committee member Dr. Lewis, asked, "with even such a small safety set, breaking Hy's law and the liver signals that we're seeing… I wondered what the FDA's view was, potentially, detecting a signal like this, even though the exposure is a very small group. Does that heighten your concern?"[312]  A senior FDA hepatologist, Dr. Hayashi, responded:

Yes, it did, and it does weigh on my mind. You have an exposure here that's about 160 some odd patients. That is small. For DILI risk of significance, like a Hy's law case, it's really one or two in a large trial of, like, a thousand, is enough for us

---

[311]    *Id.*

[312]    PX 064 at 136:22-137:5, 138:4-7.

to be concerned that that drug will have problems postmarketing. So to answer your question, yes, it is a small set. And for the realm of DILI, it is a concern.[313]

169. At the Advisory Committee meeting, the FDA also reiterated its concern about avacopan's propensity to amplify the effect of certain drugs (by way of its CYP3A4 inhibiting activity) in discussing avacopan's hepatotoxicity.  Specifically, the FDA noted that avacopan could have contributed to liver injury in some patients by enhancing the hepatotoxic propensity of concomitant drugs.[314]

## VI.   THE FDA APPROVED LABEL WAS FAR NARROWER THAN THE ONE CHEMOCENTRYX SOUGHT AND REFLECTED THE CONCERNS ABOUT WHICH THE COMPANY HAD WARNED THROUGHOUT AVACOPAN'S DEVELOPMENT

170. Following the Advisory Committee meeting, the FDA advised ChemoCentryx that it continued to have concerns as were brought out at the Advisory Committee meeting.  The FDA requested ChemoCentryx consider the discussion at the Advisory Committee meeting and how that should affect the indication for labeling and inform the use of avacopan.[315]

171. In October 2021, the FDA approved avacopan for marketing in the U.S., with a far more limited label than the one ChemoCentryx had initially submitted in connection with its NDA.[316]

172. For instance, ChemoCentryx had sought approval of avacopan "for the treatment of adult patients with …ANCA associated vasculitis...." with no stated limitations of use.[317]  Reflecting the FDA's concerns about avacopan's efficacy, safety, and ability to replace steroids, however, the approved indication was limited to "adjunctive treatment" to standard of care in "severe active" AAV patients, specifically noting that avacopan was *not* a replacement for steroids:

---

[313]   *Id*. at 138:15-139:2.
[314]   PX 064 at 104:18-105:7.
[315]   CCXI-0004222144.
[316]   FDACDER002300
[317]   CCXI-0000381553; CCXI-0000381554.

> TAVNEOS is indicated as an adjunctive treatment of adult patients with severe active anti-neutrophil cytoplasmic autoantibody (ANCA)-associated vasculitis … in combination with standard therapy including glucocorticoids. TAVNEOS does not eliminate glucocorticoid use."[318]

173. The approved label also reflected the warnings ChemoCentryx had received concerning the serious safety signals observed on avacopan for hepatotoxicity and angioedema.  For instance, the FDA added a new "Recommended Evaluations Prior to Treatment Initiation" section which recommends liver function test and hepatitis screening prior to initiating treatment with avacopan, consistent with the advice provided by DMC and Dr. Maddrey in 2018 and 2019.[319] The FDA also added a statement in the Warnings and Precautions section that states avacopan "is not recommended for patients with active, untreated and/or uncontrolled chronic liver disease."[320] This section was also consistent with the advice provided by DMC and Dr. Maddrey in 2018 and 2019.[321]

174. Both liver toxicity and angioedema were included in the Warnings and Precautions section of the label.  Whereas the label ChemoCentryx submitted discussed only elevations in liver function tests (i.e., liver abnormality), the FDA expanded the label to warn of the potential for "serious cases of hepatic injury" on avacopan and to reflect the increase in hepatobiliary adverse events (i.e., liver injury) observed on the drug:

> Serious cases of hepatic injury have been observed in patients taking TAVNEOS. During controlled trials, the TAVNEOS treatment group had a higher incidence of

---

[318]  FDACDER002300 at -319.

[319]  *Id.*; Maddrey Tr. 330:5-23 ("Q. And you see the FDA has added "Recommended Evaluations Prior to Treatment Initiation"? A. Yes. Q. And it says: Before begin -- before initiating -- A. Yes. Q. -- the trade name of the drug, consider performing the following evaluations: Liver Function Tests --A. Yes. Q. -- and Hepatitis B Serology. Do you see that? A. And that's standard procedure for the agency. Q. Right. And this increased testing prior to administration, that's consistent with the advice that you provided to ChemoCentryx back in 2018 and 2019, correct? A. Yes").

[320]  FDACDER002300 at -320.

[321]  Maddrey Tr. 331:3-333:16.

transaminase elevations and hepatobiliary events, including serious and life-threatening events [see Adverse Reactions 6.1].[322]

175. Moreover, the FDA eliminated language ChemoCentryx included asserting that "[c]ausality attribution was confounded" by concomitant drugs and comorbidities – again, reflecting the DMC's and Dr. Maddrey's warnings to ChemoCentryx during the investigation and NDA-review period.[323]

176. Further, the FDA also added recommendations for liver monitoring during treatment with avacopan, just as the ADVOCATE DMC recommended in June 2018.  The label recommended monthly testing for at least the first 6 months of use.[324]  The FDA also added the same discontinuation guidance that the DMC had urged ChemoCentryx to implement in December 2018, following its meeting with Dr. Maddrey.[325]

177. The FDA's edits to the label also urged health care providers to weigh "the risk and benefit before administering this drug to a patient with liver disease" and urged providers to "[m]onitor patients closely for hepatic adverse reactions." [326]

178. The FDA also added disclosures concerning the two events of angioedema observed in the ADVOCATE study, noting that one event was serious and required hospitalization.[327]

179. Reflecting its concerns about study design, the FDA removed p-values for the BVAS non-inferiority results and removed those results from a summary table altogether.[328]  Moreover, while ChemoCentryx proposed presentation of ADVOCATE's secondary endpoint results, the FDA removed them entirely from the label.[329]

---

[322]  FDACDER002300 at -320.

[323]  PX 065 at -399; *see* Maddrey Tr. 332:7-334:25.

[324]  FDACDER002300 at -320.

[325]  PX 008 at -8006 ("The DMC suggests that you also consider sharing and following the FDA guidance on when to discontinue an investigational drug in the face of drug-induced liver injury"); *see* PX 017 at -206; Maddrey Tr. 332:7-334:25.

[326]  FDACDER002300 at -320.

[327]  PX 065 at -392; *see* FDACDER002300 at -320; Glassock Tr. 289:2-12.

[328]  PX 065 at -406; *see* FDACDER002300.

[329]  PX 065 at -408; *see also,* FDACDER002300.

180. In addition to requiring this narrow labeling, the FDA also required ChemoCentryx to conduct a post-marketing study at least five years in duration, to evaluate safety outcomes, particularly hepatotoxicity and serious hypersensitivity reactions (angioedema and analphylaxis).[330]

Marc Walton, MD PhD

September 25, 2024

---

[330] PX 300; *see also,* FDACDER002300 at -314.

**APPENDIX A: CURRICULUM VITAE**

*Curriculum Vitae:  Marc K. Walton M.D., Ph.D.*                                      1

## MARC KENNETH WALTON  M.D., Ph.D.

**CONTACT INFORMATION:**

Cell:  301-254-8558
Email:  marcwalton@mkwconsults.llc

**EXPERIENCE**

I have extensive experience across all stages of clinical development and regulatory review/decision-making for 30 years with both small molecule and biologic protein drugs for a wide range of medical disorders.  My approach while at Janssen Research and Development and the US FDA has been to consider the overall development program and formulate strategies that can be both efficient and successful in bringing new treatments to market for patients and health care providers.

Most recently I was a Senior Scientific Director within Janssen Research and Development, advising development teams across all therapeutic areas within Janssen.  My expertise includes developing strategy for a drug development program, regulatory science, and interactions with regulatory agencies.  My advice aided project teams to develop effective clinical trials at all stages of the clinical development program, applying and maximizing the advantages of innovative methods to efficiently and expeditiously answer the important questions at each stage. I collaborated with the project teams to employ adaptive design clinical trial methods, clinical pharmacology methods, platform trials, biomarker strategies, and choosing clinical outcome endpoints.  When development of new, or refinement of existing, endpoints was needed I guided project teams to understand and acquire the evidence to support regulatory acceptance.  I have substantial experience in rare disease drug development, both at Janssen and while at FDA.

Prior to Janssen R&D I had 21 years of broad ranging experience at FDA including extensive direct clinical review and supervision of review for drug development programs, regulatory review decisions, and advice to both sponsors and internal groups regarding clinical development strategies.  My FDA experience includes developing FDA policy, both overarching FDA policies and clinical trial design and development program policies.  I developed and promoted innovative processes to advance regulatory science tools through FDA collaboration with industry, academic, and other government agencies.  I developed the CDER/CBER Drug Development Tool Qualification program and led the Biomarker Qualification program.  My experience in the entire spectrum of disease areas and types of drug products (small molecule, biologic proteins, cell and gene therapy products) enables me to address complexities in a development program by adapting solutions formulated in a different disease area for similar circumstances.  I have been successful at mentoring agency staff in developing critical thinking skills for review work, leadership abilities, and skills to work collaboratively with diverse staff within agency and with external organizations.

I have also served as an FDA Expert Witness in Federal Court cases advising Assistant US Attorneys providing depositions and in-court testifying.

*Curriculum Vitae: Marc K. Walton M.D., Ph.D.*                                  2

10/2023 to current          Principal
                            MKWalton Consulting LLC


- Independent consulting to pharmaceutical firms regarding the clinical-scientific and regulatory strategies for development of therapies.


10/2014 to 9/2023           Senior Scientific Director and Janssen Fellow
                            Quantitative Sciences
                            Janssen Research and Development, Inc.


- Co-chair of QSTEPS program for Quantitative Sciences which reviews and advises on Janssen drug development programs to promote efficient and successful programs
- Advisor across all therapeutic areas regarding drug development strategy, clinical trial design, and regulatory science interactions.  My advice guided teams in designing clinical trials that would efficiently answer the most important questions about the product at each stage in development and contribute to an integrated development program.
- I prepared teams for submissions to, and meetings with, regulatory agencies to clearly and effectively present the scientific rationale and strengths for the proposed studies.
- Member of Janssen Development Committee
- Janssen representative to multiple external working groups


3/08 to 9/14                Associate Director for Translational Medicine
                            Office of Translational Science
                            Center for Drug Evaluation and Research, FDA


- Developed policies and procedures to advance development of biomarkers for acceptance in regulatory review in formulating and leading the Biomarker Qualification Program as well as collaborating in creation of the comprehensive Drug Development Tool (DDT) program.
- Mentored Biomarker Qualification Program staff in achieving comprehensive biomarker development and evaluation review in matrixed multi-discipline project-specific teams and promoting effective functioning of teams
- Consultant to regulatory review divisions relating to use of biomarkers at all stages of clinical development, co-development of test and drug, and determination whether to accept biomarker for use in drug development program for critical uses as proposed by drug sponsor
- Developed and finalized clinical trial and policy guidances as part of the core working group for FDA guidances (e.g., Adaptive Design, Non-Inferiority, Multiple Endpoints, Enrichment Studies, Expedited Programs for Serious Conditions, In Vitro Companion Diagnostic Devices, Labeling for Products Approved Under Accelerated Approval)
- Facilitate the development of rare disease therapeutics (in collaboration with Associate Director for Rare Diseases, CDER) through collaboration with NIH-Therapeutics

of Rare and Neglected Disease Program (NCATS), National Organization for Rare Diseases (NORD), multiple disease-specific patient advocacy organizations; through FDA guidances (e.g., Rare Diseases:  Common Issues in Drug Development); and through public workshops and conferences, including promoting initiation of natural history studies

- Developed new CDER collaboration pathway (Critical Path Innovation Meeting, CPIM) for CDER to discuss with private industry and other organizations innovative directions for drug development and regulatory science proposed by the organizations, and for CDER to guide them in effectively advancing their goals
- Advanced the development of clinical trial endpoints:  Developed clinical trial outcome assessment categorization framework adopted by the Study Endpoints and Labeling Development staff (SEALD, CDER) in collaboration with Capt. Laurie Burke (PHS) director of SEALD;  lead or presented in educational programs to apply principles of measurement to clinical trial endpoints (e.g., Co-chair of CDER public workshop on Measurement in Clinical Trials:  Clinical Outcome Assessments, DIA workshops)
- Continued serving as FDA Expert Witness supporting US Dept. of Justice in legal cases relating to sale of unapproved drug products, and as FDA Fact Witness in additional specific legal proceedings; includes advising Assistant US Attorneys, depositions, and testifying in federal court trials

11/2006 to 3/2008          Senior Medical Policy Advisor
                                       Office of Policy
                                       Office of the Commissioner, FDA

- Evaluated, recommended, and coordinated policies relating to a diverse range of matters under FDA jurisdiction
- Represented FDA on programs of other HHS agencies (e.g., CMS coverage with study policy, NIH CTSA program, AHRQ Meta-analysis for Comparative Effectiveness guidelines)
- Organizing committee for FDA Open Public Meeting on Sentinel Program
- Continued serving as FDA Expert Witness supporting US Dept of Justice in legal cases concerning sale of unapproved drug products, and as FDA Fact Witness in additional specific legal proceedings

10/2005 to 10/2006        Deputy Director, Division of Neurological Products
                                               Assigned during reorganization and consolidation of OND
                                       Office of New Drugs
                                       Center for Drug Evaluation and Research, FDA

- Supported the Division Director in the conduct of all work under DNP jurisdiction.
- Guided the division as they incorporated biological protein products into the portfolio
- Served as FDA Expert Witness supporting US Dept of Justice in legal cases relating to sale of unapproved drug products

*Curriculum Vitae: Marc K. Walton M.D., Ph.D.*                                             4

10/2003 to 10/2005          Director, Div of Therapeutic Biologic Internal Medicine Products
                            Office of Drug Evaluation 6, OND
                            Center for Drug Evaluation and Research, FDA

- Supervision of review staff for all INDs, BLAs, consults to other Divisions and Centers for biological therapeutic protein products for all medical indications except oncology during the period of transfer of biological therapeutic protein products from CBER to CDER
- Emphasized to team leaders and primary reviewers importance of planning for strong foundation of late stages of development during early stage as part of IND review
- Mentoring division staff regarding advising sponsors on enhancing strategic design of clinical program relating to issues such as use of pharmacodynamic markers, selection of efficacy endpoints, and development of new outcome assessments when needed
- Decisions on IND clinical holds, removal of holds, BLA approvals
- Member of multiple Agency policy and regulation working groups
- Ensured review staff maintained high level of work quality as the transition from policies and procedures of CBER to those of CDER was implemented
- Maintained division morale during the period of uncertainty for review staff regarding their future, and experienced only minimal loss of staff during the transition
- Advised and supported Director of OND to enable smooth implementation of the final transition involving redistribution of all INDs, BLAs, and other work to OND divisions, as well as all staff

4/2003 to 10/2003          Acting Deputy Director, Div. of Clinical Trial Design & Analysis
9/1996 to 4/2003           Chief, General Medicine Branch
7/1995 to 9/1996           Acting Chief, General Medicine Branch
9/1993 to 7/1995           Medical Officer (Primary Clinical Review)

                            Division of Clinical Trial Design and Analysis
                            Office of Therapeutics Research and Review
                            Center for Biologics Evaluation and Research, FDA

- Supervised medical officers in review of INDs, BLAs, labeling, consults, clinical reviews, memoranda to other components of Agency, interagency collaborations
- Mentoring of medical officers in evaluating drug development strategies for IND programs with attention to early planning for scientific needs of late stage program
- Mentoring of team leaders and reviewers to develop leadership skills, and to act as lead representative of FDA at sponsor meetings
- Responsible for all regulatory files relating to biological therapeutic agents for multiple clinical areas, including neurology, cardiology, vascular, pulmonary, endocrine, metabolic, ophthalmology, and hematologic areas
- Responsible for regulatory oversight for diverse types of biological products, including therapeutic proteins, cell-based therapies, and gene-based therapies

*Curriculum Vitae:  Marc K. Walton M.D., Ph.D.*                                                5

- Primary medical review of IND and BLA applications for multiple products for neurological uses

7/86 to 9/93                Senior Staff Fellow
                            Laboratory of Neurophysiology, NINDS
                            National Institutes of Health (Bethesda, MD)

Conducted laboratory research investigating the physiology of the developing nervous system using electrophysiological and video microscopy techniques.  The research focused on the development, differentiation and cellular distribution of ion channels and transmitter receptors, their effects upon intracellular ion levels in embryonic neurons, and the changes in these properties as neurons differentiate.  My research showed that early embryonic spinal cord cells develop a common set of excitable membrane properties that are widespread throughout the population, appearing on cells in a specific sequence, implying their importance in the process of neuronal differentiation.

7/83 to 6/86                Resident
                            Dept. of Neurology
                            University of Rochester (Rochester, NY)

7/82 to 6/83                Medical Intern
                            Rush-Presbyterian-St. Lukes Medical Center
                            Rush University (Chicago, IL)

**EDUCATION**

9/1975 to 6/1982            University of Chicago (Chicago, IL)
                            PhD - 6/81  in Physiology/Pharmacology
                            MD - 6/82

9/1971 to 6/1975           Franklin and Marshall College (Lancaster, PA)
                            BA, Magna cum laude - 6/75   Major:  Chemistry

**LICENSE**                 Medical License in Maryland 1985-2022,
                                    not renewed upon move to Pennsylvania

**PROFESSIONAL SOCIETY MEMBERSHIPS**
                            American Academy of Neurology
                            American Society for Experimental Neurotherapeutics
                                    (ASENT) *(previously)*
                                    Two terms on Board of Directors,
                                    Meeting Program Committee  2001-2015
                            Society for Clinical Trials
                                    Program Committee for 2014-16, 2018 Annual Meetings

International Society for CNS Clinical Trials
and Methodology (ISCTM)
International Society For Pharmacoeconomics
and Outcomes Research  (ISPOR)   *[Previously]*
Clinician Reported Outcome Assessment Task Force


## POST-FDA AWARDS AND HONORS

Janssen Innovation Leadership Award May 2017
Janssen Encore Award related to Multiple Endpoints May 2017
International Society For Pharmacoeconomics and Outcomes Research (ISPOR)
Task Force Chair Service Award 2017
Fellow, Society for Clinical Trials 2016
Janssen Fellow 2015


## FDA AWARDS AND HONORS

Individual Awards        CBER Public Health Achievement Award September 1996
FDA Commendable Service Award June 1999
FDA Outstanding Service Award 2003
CDER Leadership Excellence Award May 2005
Office of Criminal Investigations Recognition, September 2009
Center for Tobacco Products Special Recognition, June 2010
Numerous FDA Group Awards


## FDA GUIDANCE WRITING COMMITTEES

Non-Inferiority Clinical Trials Guidance (Draft Guidance:2010)
Adaptive Design Trials Guidance (2010); Clinical chair
Multiple Endpoints in Clinical Trials Guidance (2017); Chair (prior to leaving FDA)
Enrichment Strategies for Clinical Trials Guidance (2012)
Rare Diseases:  Common Issues in Drug Development Guidance (2015)
Natural History Studies in Rare Disease Guidance (Completed after leaving FDA)
Critical Path Innovation Meetings Guidance (2015)
Qualification Process for Drug Development Tools Guidance (2014)
Expedited Programs for Serious Conditions (2014)
Labeling for Human Prescription Drug and Biological Products Approved Under Accelerated
Approval (2014)

*Curriculum Vitae:  Marc K. Walton M.D., Ph.D.*                                                    7

**OTHER FDA COMMITTEES AND WORKING GROUPS**
          (Selected)

FDA Working Group for Expanded Access Regulation Revision
FDA Working Group for Medical Necessity Guidance
FDA Active Control Studies Working Group
CDER Data Monitoring Committee Advisory Group;  Co-Chair
CDER Adaptive Design/NonInferiority Advisory Group
CDER Neuropathy Endpoints Working Group
CDER Pharmacologic Classification Immunomodulators Working Group


**PUBLICATIONS (Journals and Book Chapters)**

**Walton, M.** and Fozzard HA (1979).  The relation of $V_{max}$ to $I_{Na}$, $G_{Na}$, and $h$ in a model of the cardiac Purkinje fiber.  Biophysical J. 25:407-420.

Fozzard, H.A., Levin DN, and **Walton M,** (1982).  Control of conduction velocity  in cardiac Purkinje fibers.  In: International Symposium on Normal and Abnormal Conduction in the Heart. Futura Pub. Co.

**Walton, M.K**. and Fozzard HA (1983).  Experimental study of the conducted action potential in cardiac Purkinje strands.  Biophysical J. 44:1-8.

**Walton M.K**. and Fozzard HA (1983).  The conducted action potential:  Models and comparison to experiments.  Biophysical J. 44:9-26.

Williford, D.J., **Walton MK**, and Sheu SS .  Fluorescence digital imaging microscopy - Spatial distribution of $Ca^{2+}$ and $H^+$ in single cells.  In:  Microcompartmentation, D.P. Jones (ed.).  CRC Press: Boca Raton, Fla. 1988.

**Walton M.K**., Schaffner AE, and Barker JL (1993).  Sodium channels, $GABA_A$ receptors and glutamate receptors develop sequentially on embryonic rat spinal cord cells.  J. Neurosci. 13:2068-84.

**Walton, M.K**., and Weiss, K.D.  Clinical Studies in the Development of Biologic Therapeutic Products.  In:  Biologic Development:  A Regulatory Overview, M. Mathieu (ed.), Edition 2. PAREXEL: Waltham MA (1997).

Stolman DS., Rieves RD, Raczkowski VF, **Walton MK,** and Siegel JP.  Design issues in clinical trials of thrombolytic and antithrombotic agents.  In:  New therapeutic agents in thrombosis and thrombolysis, A.A. Sasahara and J. Loscalzo (ed.).  Marcel Dekker: N.Y. (1997) & Edition 2 (2003).

*Curriculum Vitae:  Marc K. Walton M.D., Ph.D.*                                    8

Li Y-X, Schaffner A.E., **Walton M.K.,** and Barker J.L. (1998).  Astrocytes regulate developmental changes in the chloride ion gradient of embryonic rat ventral spinal cord neurons in culture.  J. Physiol. 509.3: 847-858.

Nelson R., Schaffner A.E., Li Y-X., and **Walton M.K.** (1999).  Distribution of GABAC-like responses among acutely dissociated rat retinal neurons.  Visual Neurosci. 16:179-190.

**Walton M.K.,** (2002).  Endpoint Considerations for Clinical Trials.  ALS and other motor neuron disorders Suppl 1:S3-6.

**Walton M.K**., (2004) Use of surrogate markers.  Amyotroph Lateral Scler Other Motor Neuron Disord.  5:Suppl 1:103.

Cote TR, Mohan AK, Polder JA, **Walton MK,** and Braun MM., (2005).  Botulinum toxin type A injections: adverse events reported to the US Food and Drug Administration in therapeutic and cosmetic cases.  J Am Acad Dermatol. 53:407-15.

**Walton M.K.**  Selection and Interpretation of Endpoints in Multiple Sclerosis Clinical Trials. In:  Multiple Sclerosis Therapeutics, Third Edition, J.A. Cohen and R. Rudick (ed.).  Informa Healthcare: UK (2007).

Rudick RA, Polman CH, Cohen JA, **Walton MK,** Miller AE, Confavreux C, Lublin FD, Hutchinson M, O'Connor PW, Schwid SR, Balcer LJ, Lynn F, Panzara MA, Sandrock AW, (2009).  Assessing disability progression with the Multiple Sclerosis Functional Composite. Mult Scler.  15(8):984-97.

**Walton M.K.,** (2009) Addressing and advancing the problem of missing data.  J Biopharmaceutical Stat. 19:945-956.

Bai JP, Bell R, Buckman S, Burckart GJ, Eichler HG, Fang KC, Goodsaid FM, Jusko WJ, Lesko LL, Meibohm B, Patterson SD, Puig O, Smerage JB, Snider BJ, Wagner JA, Wang J, **Walton MK**, Weiner R, (2011).  Translational biomarkers: From preclinical to clinical.  A report of the 2009 AAPS/ACCP Biomarker Workshop.  AAPS J.  13(2):274-83.

Woodcock J, Buckman S, Goodsaid F, **Walton MK,** Zineh I, (2011).  Qualifying biomarkers for use in drug development:  A US Food and Drug Administration overview.  Expert Opin. Med. Diagn. 5(5):369-374.

**Walton M.K.**  Selection, interpretation, and development of endpoints in multiple sclerosis clinical trials. In:  Multiple Sclerosis Therapeutics, Fourth Edition, J.A. Cohen and R. Rudick (ed.).  Cambridge University Press: UK (2011).

Benedict RH, **Walton MK**,  (2012).  Evaluating cognitive outcome measures for MS clinical trials: what is a clinically meaningful change?  Mult. Scler. 18(12):1673-9.

Cedarbaum JM, Stephenson D, Rudick R, Carrillo MC, Stebbins G, Kerr D, Heemskerk J, Galpern WR, Kaufmann P, Cella D, Isaac M, **Walton MK**  (2015).  Commonalities and Challenges in the Development of Clinical Trial Measures in Neurology.  Neurotheraputics 12(1):151-69.

Weinshenker BG, Barron G, Behne JM, Bennett JL, Chin PS, Cree BA, de Seze J, Flor A, Fujihara K, Greenberg B, Higashi S, Holt W, Khan O, Knappertz V, Levy M, Melia AT, Palace J, Smith TJ, Sormani MP, Van Herle K, VanMeter S, Villoslada P, **Walton MK**, Wasiewski W, Wingerchuk DM, Yeaman MR (2015).  Challenges and Opportunities in Designing Clinical Trials for Neuromyelitis Optica.  Neurology 84(17):1805-15.

Paczesny S, Hakim FT, Pidala J, Cooke K, Lathrop J, Griffith LM, Hansen J, Jagasia M, Miklos D, Pavletic S, Parkman R, Russek-Cohen E, Flowers MED, Lee S, Martin, P, Vogelsang G, **Walton M,** Schultz KR, (2015). National Institutes of Health Consensus Development Project on Criteria for Clinical Trials in Chronic Graft-versus-Host Disease: III. The 2014 Biomarker Working Group Report.  Biol Blood Marrow Transplant 21(5):780-92.

**Walton MK**, Powers JH, Hobart J, Patrick DL, Marquis P, Vamvakas S, Isaac M, Cano S, Burke L, (2015).  Clinical Outcome Assessments:  Conceptual Foundation.  Report of the ISPOR Clinical Outcomes Assessment Emerging – Good Practices for Outcomes Research Task Force. Value in Health 18(6):741-52.

**Walton MK**, Pariser AR.  Natural History Studies.  Chapter 13 in: The Patient Group Handbook: A Practical Guide for Research and Drug Development.  A. Hall and N Sireau (ed.). CreateSpace:  UK (2016)

Miller E, Gallo P, He W, Kammerman LA, Koury K, Maca J, Jiang Q, **Walton MK**, Wang C, Woo K, Fuller C, Jemiai Y, (2017).  DIA's Adaptive Design Scientific Working Group (ADSWG): Best Practices Case Studies for ''Less Well-understood'' Adaptive Designs.  Ther Innov Reg Science 51(1) 77-88.

Powers JH, Patrick DL, **Walton MK,** Marquis P, Vamvakas S, Isaac M, Piault E, Cano S, Burke L, (2017).  Clinician-Reported Outcome (ClinRO) Assessments of Treatment Benefit: Report of the ISPOR Clinical Outcome Assessment Emerging Good Practices Task Force.  Value in Health 20(1) 2-14.

Neal B, Perkovic V, Mahaffey KW, Fulcher G, Erondu N, Desai M, Shaw W, Law G, **Walton MK**, Rosenthal N, de Zeeuw D, Matthews DR, (2017).  Optimizing the analysis strategy for the CANVAS Program: A prespecified plan for the integrated analyses of the CANVAS and CANVAS-R trials.  Diabetes Obes Metab 19(7) 926-935.

Perry B, Herrington W, Goldsack JC, Grandinetti CA, Vasisht KP, Landray MJ, Bataille L, DiCicco RA, Bradley C, Narayan A, Papadopoulos EJ, Sheth N, Skodacek K, Stem K, Strong TV, **Walton MK**, Corneli A, (2018).  Use of Mobile Devices to Measure Outcomes in Clinical Research, 2010–2016: A Systematic Literature Review.  Digit Biomark 2:11–30.

Dimairo M, Coates E, Pallmann P, Todd S, Julious SA, Jaki T, Wason J, Mander AP, Weir CJ, Koenig F, **Walton MK**, Biggs K, Nicholl J, Hamasaki T, Proschan MA, Scott JA, Ando Y, Hind D, Altman DG, (2018).  Development process of a consensus-driven CONSORT extension for randomised trials using an adaptive design.  BMC Med. 16(1):210-230.

**Walton MK**, Cappelleri JC, Byrom B, Goldsack JC, Eremenco S, Harris D, Potero E, Patel N, Flood E, Daumer M, (2020).  Considerations for development of an evidence dossier to support the use of mobile sensor technology for clinical outcome assessments in clinical trials.  Contemp Clinical Trials 91: 105962  [1-12] .

Dimairo M, Pallmann P, Wason J, Todd S, Jaki T, Julious SA, Mander AP, Weir CJ, Koenig F, **Walton MK**, Nicholl JP, Coates E, Biggs K, Hamasaki T, Proschan MA, Scott JA, Ando Y, Hind D, Altman DG; ACE Consensus Group, (2020).  The Adaptive designs CONSORT Extension (ACE) statement: a checklist with explanation and elaboration guideline for reporting randomised trials that use an adaptive design.  BMJ 369:m115 [1-31]  and  BMC 21:528 [1-34]

Harman NL, Gorst SL, Williamson PR, Barnathan ES, Baughman RP, Judson MA, Junk H, Kampstra NA, Sullivan EJ, Victorson DE, **Walton M**, Al-Hakim T, Nabulsi H, Singh N, Grutters JC, Culver DA, (2021).  Scout - sarcoidosis outcomes taskforce. A systematic review of outcomes to inform the development of a core outcome set for pulmonary sarcoidosis. Sarcoidosis Vasc Diffuse Lung Dis 38(3).

Harman NL, Gorst SL, Williamson PR, Barnathan ES, Baughman RP, Judson MA, Junk H, Kampstra NA, Sullivan EJ, Victorson DE, **Walton MK**, Al-Hakim T, Nabulsi H, Singh N, Grutters JC, Culver DA, (2021).  Identifying a core outcome set for pulmonary sarcoidosis research – the Foundation for Sarcoidosis Research – Sarcoidosis Clinical OUtcomes Taskforce (SCOUT).  Sarcoidosis Vasc Diffuse Lung Dis 39(3); e2022030.

Polverejan E, O'Kelly M, Hefting N, Norton JD, Lim P, **Walton MK**, (2023).  Defining Clinical Trial Estimands: A Practical Guide for Study Teams with Examples Based on a Psychiatric Disorder.  Ther Innov Regul Sci. May 27:1-29.


**INIVITED PUBLIC TALKS**
            (Over 120 talks delivered; partial list shown to illustrate range of topics)

"Endpoints in therapeutic development for multiple sclerosis", November 1995.  Conference on Evaluation of Multiple Sclerosis Lesion Load sponsored by the Multiple Sclerosis Societies of U.S. and Canada (Montreal, Canada).

"Overview of the therapeutic development process" and panel discussions, May 1996.  ALS Research Forum at Annual Leadership Conference of the National ALS Association (Bethesda, MD).

"Selected Issues in Clinical Development of Therapeutic Vaccines for Addiction", July, 1997. NIDA Workshop on the Development of Peripheral Blocking Agents for Addiction (Rockville, MD).

"Timing of Endpoint Measurement", August 1999.  Duke Clinical Research Institute Workshop Acute Coronary Syndromes (College Park, MD).

"Observations on Biomarkers:  Profits, Pitfalls, and Regulatory Implications" (November 1999). European Federation for Pharmaceutical Sciences Conference "Optimizing Drug Development: Streamlining Proof of Concept" (Basel, Switzerland).

"Combination Therapies for Treatment of Acute Stroke", February 2000.  Duke Clinical Research Institute Workshop on Neuroprotection in Acute Cerebral Ischemia (Pinehurst, NC)

"Accelerated Approval:  Opportunities and Hurdles" March 2000.  BIO 2000 Annual Meeting (Boston, MA).

"Clinical Trial Design Issues in Gene Therapy" May 2000.   Advances in Cardiovascular Pharmacology Symposium:  Protocol Design and Methodology (Washington, DC).

"Uses of MR Imaging in Clinical Development", April 2001.  PhRMA Spring Biologics & Biotechnology Committee Meeting (Scottsdale, AZ).

"Ensuring Participant Safety and Study Quality:  Clinical Monitoring of Gene Transfer Studies", Keynote Session Speaker at DIA Conference GCP Audits and Surviving an FDA Inspection, May 2001 (Philadelphia, PA).

"Selection of Appropriate Control", November 2001.  DCRI Workshop: Challenges in Trials for Peripheral Vascular Disease (McLean, VA).

"Accelerating Drug Development:  Tradeoffs in a Proposed Bayesian Approach", May 2003. CDER Workshop on Bayesian Approaches to Accelerate Findings in Phase 2 Studies (Rockville, MD).

"Phase 2:  An Essential Juncture in Therapeutic Development", March 2004.  ASENT Annual Meeting (Washington, DC)

"Biomarkers in Therapeutic Development Programs", April 2004.  NINDS Workshop on Biomarkers in Multiple Sclerosis (Bethesda, MD).

"Clinical Perspective on Primary Endpoints", October 2004.  PhRMA Challenges of Multiple Endpoints Workshop

"Therapeutic Development Amidst Complexity:  Combination Therapy And Concomitant Use", February 2005.  Rheumatoid Arthritis:  Clinical Trial Design and Outcomes Conference (Washington, DC).

"Assessment of Dose-Response:   Uses in Drug Development", February 2006.  International Society for CNS Clinical Trials and Methodology Annual Meeting (Washington, DC)

"Biomarkers and Surrogates:  Underpinnings and Clinical Trial Applications", March 2006.  ASENT Eighth Annual Meeting (Washington, DC)

"Adaptive Design Trial Issues:  Goals and Needs", November 2006.  FDA-PhRMA Conference on Adaptive Design Clinical Trials (Washington, DC)

"Neurodegenerative Disorder Therapeutics:  Process and Product Amid Complexity", February 2007.  ISCTM Satellite Meeting:  Neuroprotective Clinical Trials in Parkinson's Disease (Arlington, VA).

"Post-Marketing Safety Information on Medical Products:  The Sentinel Program", November 2007.  NCI – Surveillance Epidemiology and End Results Program Manager & PI Annual Meeting (Bethesda, MD).

"Equivalence, Similarity, and Non-inferiority", March 2008.  Clinical Trials in Neurotherapeutics Symposium at ASENT  10th Annual Meeting (Washington, DC)

"Biomarkers in Drug Development:  Progress, Problems and a Path to the Future", May 2009.  AAPS Workshop on Translational Biomarkers for Accelerating Drug Development:  From Preclinical to Clinical (Baltimore, MD)

"Overview of FDA Guidance on Adaptive Design Clinical Trials", May2010.  DIA Webinar

"Biomarker Qualification:  Principles, Process, Progress", June 2010.  DIA Annual Meeting

"Biomarker Qualification:  What it Means, What it is For, What it is Not", February 2011.  International Society for CNS Clinical Trials and Methodology Workshop (Washington, DC)

"Outcomes Targeted for Labeling:  What Works and What Doesn't?", March 2011. Annual Patient Reported Outcome Consortium Annual Workshop (Silver Spring, MD; co-presented with Laurie Burke, SEALD, CDER FDA)

"Assessments and Endpoints:  Demonstrating Effectiveness", June 2011.  Clinical Evaluation in Rare Diseases Workshop (Washington, DC)

"Genomic Biomarkers in Drug Development and Medical Practice", July 2011.  IOM Roundtable (Washington, DC)

"Natural History Studies:  Critical knowledge supporting therapy development", October 2011.  NORD – DIA Rare Disease Conference (Washington, DC)

*Curriculum Vitae:  Marc K. Walton M.D., Ph.D.*                                    13

"Biomarkers and Surrogates:  Appraising Persuasiveness", November 2011.  EveryLife Foundation Surrogate Endpoints Conference (Washington, DC)

"Clinical Trial Outcome Assessments:  Characteristics Guide Evaluation", December 2011.  Multiple Sclerosis Functional Composite Task Force Meeting (Washington, DC)

"Natural History Studies:  Form Follows Purpose", May 2012.  NIH-FDA Natural History Studies Conference (Bethesda, MD)

"Clinical Trial Outcome Assessments:  Characterizing, Adopting, and Applying", June 2012.  Measurement Methods in the Development of Improved Analgesic Treatments Conference (Washington, DC)

"ISO:  A New Outcome Assessment:  Everything Starts with the Disease", October 2012.  DIA Workshop on Clinical Trial Endpoints:  Methods and Practice in Developing Measurements (Washington, DC)

"Historical Controls for Clinical Trials:  Contemplation on Use in Drug Development", December 2012.  FDA Small Clinical Trials Course for Investigators (White Oak, MD)

"Efficacy Endpoints:  Clinical, Biomarker, and Surrogate", February 2013.  Peripheral Neuropathy Workshop (White Oak, MD)

"Constructing and Evaluating a Clinical Outcome Assessment:  Knowing what we want to measure, measuring well, understanding what we measured", March 2013.  MS Outcome Assessment Consortium Workshop (White Oak, MD)

"Biomarkers in Drug Development", April 2013.  Clinical Study Design for Rare Diseases Symposium (Washington, DC) and April 2013 at Muscular Dystrophy Association Science Conference  (Washington, DC)

"New COA Development:  Characteristics and Means", April 2013.  Coalition Against Major Disease's Alzheimer Disease Clinical Outcome Assessment Workshop (Washington, DC)

"Biomarkers and Surrogates:  Consideration of Persuasiveness", May 2013.  EveryLife Foundation Rare Disease Workshop (Washington DC)

"Historical Controls for Clinical Trials:  Use in Drug Development", September 2013.  FDA-Industry Annual Workshop (Washington, DC)

"Adoption and Use of Biomarkers in Clinical Trials", December 2013.  Cardiac Safety Research Consortium Meeting (Washington, DC)

"Foundational Science", January 2014.  Complex Issues in Developing Drug and Biological Products for Rare Diseases: FDA Public Meeting (White Oak, MD)

"Enrichment in Clinical Trials:  Fundamental Concepts", January 2014.  FDA-Statistics Association Seminar (White Oak, MD)

"Introduction to Clinical Outcome Assessments:  Development and Transportability", February 2014.  American Society for Experimental Neurotherapeutics Annual Meeting (Bethesda, MD)

"Natural History Studies:  Critical Knowledge Supporting Therapy Development", October 2014.  NORD Rare Disease Summit (Alexandria, VA)

"Biomarkers in Drug Development", December 2014.  NIH-NIDDK Workshop on Building Better Biomarkers (Bethesda, MD)

"Biomarkers in Drug Development:  Types, Uses, and Evaluation of Surrogates", December 2014, 2015, 2016.  Georgetown U. CERSI Course:  Introduction to Regulatory Science (Washington DC Webinar)

"Trial Modeling and Simulation:  A Path to Robust Creative Design", May 2015.  Society for Clinical Trials Annual Meeting (Arlington, VA)

"Endpoints in Alzheimer's Disease Clinical Trials:  Fundamentals and Potential Paths", February 2016.  ISCTM Annual Meeting Alzheimer's Disease Working Group (Washington, DC)

"Assessing and Supporting Outcome Assessments:  Categories, Context, and Evidence", September 2016.  CTTI Mobile Technology Endpoints Workshop (Silver Spring, MD).

"If the Estimand is the Answer, What is the Question?"  November 2016.  Society for Clinical Trials – Quantitative Science in Pharmaceutical Industry Innovation Workshop (Rockville, MD).

"Natural History Studies:  Critical Knowledge Supporting Therapy Development" January 2017.  Precision Medicine World Conference (Mountain View, CA).

"Accelerating the Appropriate Use of Mobile Technology in Clinical Trials through Novel Endpoint Recommendations:  Recommendations and Tools" June 2017.  Clinical Trials Transformation Initiative Public Webinar Series.

"Multiple Endpoints: A Perspective Informed by 'Both Sides" September 2017.  5th Annual Duke-Industry Statistics Symposium (DISS, September 2017, Durham, NC)

"Outcome Assessments and Endpoints:  Categories, Context, and Applicability" April 2018.  Endpoints in Sarcoidosis Meeting, Foundation for Sarcoidosis Research (Chicago, IL)

"Technology Enabled Clinical Endpoint Innovation:  Foundational Concepts and Pathway for Development" October 2018.  ISCTM Autumn Meeting )Marina del Rey, CA).

**APPENDIX B: DOCUMENTS RELIED UPON**

## Case Documents

- Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws, *Jonnie Homyk, individually and on behalf of all others similarly situated v. ChemoCentryx, Inc. and Thomas J. Schall*, Master File No. 4:21-cv-03343-JST, Case No. 4:21-cv-04357, March 28, 2022.

## Websites and Publicly Available Information:

- MedDRA, *Introductory Guide: MedDRA Version 17.1* (Sept. 2014), available at https://admin.meddra.org/sites/default/files/guidance/file/intguide_17_1_english.pdf.

- MedDRA, *Medical Dictionary for Regulatory Activities*, available at https://www.meddra.org/.

- ICH, *General Considerations for Clinical Studies: E8(R1)* (May 8, 2019), available at https://database.ich.org/sites/default/files/E8-R1_EWG_Draft_Guideline.pdf

- ICH, *Guideline for Good Clinical Practice E6(R2)* (Nov. 9, 2016), available at https://database.ich.org/sites/default/files/E6_R2_Addendum.pdf.

- U.S. Food & Drug Admin., *Background: FDA Good Guidance Practices*, available at https://www.fda.gov/about-fda/reports/background-fda-good-guidance-practices.

- U.S. Food & Drug Admin., *Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff, Good Review Practice* (Dec. 2017), available at https://www.fda.gov/media/94850/download.

- U.S. Food & Drug Admin., *Development & Approval Process | Drugs*, available at https://www.fda.gov/drugs/development-approval-process-drugs.

- U.S. Food & Drug Admin., *E3 Structure and Content of Clinical Study Reports* (July 1996), available at https://www.fda.gov/media/71271/download.

- U.S. Food & Drug Admin., *E6(R3) Good Clinical Practice (GCP)* (May 2023), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e6r3-good-clinical-practice-gcp.

- U.S. Food & Drug Admin., *E8(R1) Considerations for Clinical Studies* (Apr. 2022), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e8r1-general-considerations-clinical-studies.

- U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products for Industry – Draft Guidance* (Dec. 2017), available at https://www.fda.gov/media/109951/download.

- U.S. Food & Drug Admin., *Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees* (Mar. 2006), available at https://www.fda.gov/media/75398/download.

- U.S. Food & Drug Admin., *Guidance for FDA Advisory Committee Members and FDA Staff: Voting Procedures for Advisory Committee Meetings* (Aug. 2008), available at https://www.fda.gov/media/75426/download.

- U.S. Food & Drug Admin., *Guidance for Industry Advisory Committee Meetings – Preparation and Public Availability of Information Given to Advisory Committee Members* (Aug. 2008), available at https://www.fda.gov/media/75436/download.

- U.S. Food & Drug Admin., *Guidance for Industry and Investigators, Safety Reporting Requirements for INDs and BA/BE Studies* (Dec. 2012), available at https://www.fda.gov/media/79394/download.

- U.S. Food & Drug Admin., *IND Meetings for Human Drugs and Biologics* (May 2001), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/ind-meetings-human-drugs-and-biologics-chemistry-manufacturing-and-controls-information.

- U.S. Food & Drug Admin., *Information Request and Discipline Review Letters Under Prescription Drug User Fee Act, Guidance for Industry* (Nov. 2001), available at https://www.fda.gov/media/77409/download.

- U.S. Food & Drug Admin., *Laws Enforced by FDA*, available at https://www.fda.gov/regulatory-information/laws-enforced-fda.

- U.S. Food & Drug Admin., *New Drug Application (NDA)*, available at https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

- U.S. Food & Drug Admin., *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry* (Nov. 2016), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/non-inferiority-clinical-trials.

- U.S. Food & Drug Admin., *PDUFA reauthorization performance goals and procedures fiscal years 2018 through 2022*, available at https://www.fda.gov/media/99140/download.

- U.S. Food and Drug Admin., *Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines* (Mar. 2001), available at https://www.fda.gov/media/72504/download/.

- U.S. Food & Drug Admin., *Questions and Answers on FDA's Adverse Event Reporting System (FAERS)*, available at https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers.

- U.S. Food & Drug Admin., *Special Protocol Assessment, Guidance for Industry* (Apr. 2018), available at https://www.fda.gov/media/97618/download.

- U.S. Food & Drug Admin., *Step 4: FDA Drug Review* (Jan. 2018), available at https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review.

- U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective*, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

- U.S. Food & Drug Admin., *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/warnings-and-precautions-contraindications-and-boxed-warning-sections-labeling-human-prescription.

- U.S. Food & Drug Admin., *What We Do*, available at https://www.fda.gov/about-fda/what-we-do.

- U.S. Food & Drug Admin., Good Review Practice: Good Review Management Principles and Practices for Effective IND Development and Review, (Apr. 2013), available at https://www.fda.gov/media/85790/download.

## Public FDA ChemoCentryx Documents

- ChemoCentryx, Inc., *Avacopan – a C5a Receptor Inhibitor for the Treatment of Anti-Neutrophil Cytoplasmic Auto-antibody (ANCA)- Associated Vasculitis* (May 6, 2021), Arthritis Advisory Committee Meetings, available at https://www.fda.gov/media/148293/download.

- U.S. Food & Drug Admin., *May 6, 2021: Meeting of the Arthritis Advisory Committee Meeting Announcement*, available at https://www.fda.gov/advisory-committees/advisory-committee-calendar/may-6-2021-meeting-arthritis-advisory-committee-meeting-announcement-05062021.

## Academic Articles

- Arie Regev, *Drug-induced liver injury and drug development: industry perspective*, 34(2) SEMINARS IN LIVER DISEASE 227, 227 (2014).

- Robert Temple, *Hy's law: predicting serious hepatotoxicity*, 15(4) PHARMACOEPIDEMIOLOGY & DRUG SAFETY 241 (Apr. 2006).

## Legal Statutes:

- 18 U.S.C. § 1001

- 21 C.F.R. § 312.47 (2024)

- 21 C.F.R. § 314(b)(2)(iv)

- 21 C.F.R. § 201.57 (2024)

- 21 C.F.R. § 314.50

Depositions:

- Deposition of Petrus Bekker, July 26, 2024

- Deposition of Richard Glassock, December 1, 2023

- Deposition of David Goodkin, January 30, 2024

- Deposition of Jan Hillson, March 21, 2024

- Deposition of David Jayne, March 18, 2024

- Deposition of Willis Maddrey, December 15, 2023

- Deposition of Chao Wang, May 23, 2024

- Deposition of Huibin Yue, May 10, 2024

## Exhibits:

| | | | |
|---|---|---|---|
| DX 108 | PX 036 | PX 065 | PX 064 |
| PX 009 | PX 040 | PX 239 | PX 186 |
| PX 010 | PX 027 | PX 258 | PX 063 |
| PX 011 | PX 076 | PX 080 | PX 102 |
| PX 008 | PX 329 | PX 096 | PX 216 |
| PX 013 | PX 243 | PX 326 | PX 051 |
| PX 017 | PX 041 | PX 094 | PX 167 |
| PX 020 | PX 098 | PX 048 | PX 171 |
| PX 012 | PX 044 | PX 109 | PX 099 |
| PX 022 | PX 056 | PX 043 | PX 185 |
| PX 023 | PX 046 | PX 052 | PX 166 |
| PX 026 | PX 191 | PX 062 | PX 184 |
| PX 021 | PX 330 | PX 173 | PX 201 |
| PX 031 | PX 317 | PX 045 | PX 300 |

- PX 192
- PX 042
- PX 339
- PX 002

- PX 269
- PX 260
- PX 047
- PX 004

## Produced Documents:

- CCXI-0000212169
- CCXI-0001541139
- CCXI-0000024447

- CCXI-0001840816
- FDACDER002300
- CCXI-0001533272

- FDACDER004109
- CCXI-0000494148
- CCXI-0000364662

- CCXI-0000294907
- CCXI-0001665849
- CCXI-0001658827

- CCXI-0002770629
- FDACDER004102
- CCXI-0000238650

- CCXI-0004491838
- CCXI-0000494149
- CCXI-0002196853

- CCXI-0000346180
- CCXI-0005230169
- CCXI-0000295034

- CCXI-0004222144
- CCXI-0004219804
- CCXI-0004098253

- CCXI-0000381553
- FDACDER002239
- CCXI-0001541147

- CCXI-0000785052
- CCXI-0000346117
- CCXI-0005230168

- CCXl-0001541165
- FDACDER002501

- CCXI-0000381554
- CCXI-0000762728