# Attachment 31

# Uslaner Declaration Ex. 65

# (ECF No. 303-33)

# Exhibit 65

FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

JONNIE HOMYK, et al.,                    No. 4:21-CV-03343-JST

        Plaintiffs,

    vs.

CHEMOCENTRYX, INC., et al.,

        Defendants.

_____

VIDEOTAPED DEPOSITION of

CATHERINE "CASS" LEE KELLEHER, M.D.

WESTLAKE VILLAGE, CALIFORNIA

WEDNESDAY, APRIL 24, 2024

Reported by

Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

A    That's a very long conversation but I was hired to close the ADVOCATE study.

Q    Hired to close the ADVOCATE study.

What does "close the ADVOCATE study" mean?

A    The ADVOCATE study was finishing and they needed somebody to take the lead on the closure committee to close the study, clean the data.

Q    And just for those of us who don't have experience in clinic trials or medicine, when you say close the trial, what exactly does that mean?

A    They means that the trial ends, okay, the data is received -- the data is cleaned several months and then the data is submitted for analysis and then the data is analyzed.

Q    Did you work on the ADVOCATE study throughout your tenure at ChemoCentryx?

A    No.

Q    At what point did you stop working on the ADVOCATE study?

A    I think it was the spring or summer of 2020.

Q    Spring or summer of 2020.  Okay.

And as Senior Vice President of Drug Development, you were the most senior medical officer in ChemoCentryx, correct?

A    No, that would be Pirow Bekker.

Q    Pirow Bekker at that time, 2019 to May -- to March of 2021, was not a ChemoCentryx employee, correct?

A    He was a ChemoCentryx employee.  He was meeting with Tom Schall, as far as I know, every week.  I was on some of those calls.  He was actively involved the whole time I was.

Q    Your understanding is Pirow Bekker was actually a ChemoCentryx employee at that time?

A    Yes, or consultant.

Q    He was a consultant?

A    Yeah.

Q    Consultants aside, you were the most senior medical officer that was a ChemoCentryx employee, correct?

A    Correct.  Except for Pirow, yeah.

Q    Who was not a ChemoCentryx employee.

MS. JOHNSON:  Objection; foundation.

BY MR. ALEXANDER:

Q    You can answer.

A    Can I answer that?

He was a consultant but in a consultant role he was operating at the Chief Medical Officer.

Q    Did you report to Pirow Bekker?

Page 54

quiet."

Do you see that?

A    Yes.

Q    Did Schall ever tell you that you were too vocal about your views?

A    Yes.

Q    With respect to what?

A    Safety.

Q    Safety.  Okay.

And in what -- what, specifically, about safety did he tell you that you were too vocal about?

Let me -- let me withdraw that.

By safety you mean, obviously, avacopan safety, correct?

A    Yes.

Q    And what about avacopan safety did Schall tell you that were too vocal about?

A    Liver.

Q    And in what respect were you too vocal about liver?

A    I took -- I talked about it.

Q    You talked about concerns about the liver safety signal.

A    Yes.

Q    And Schall thought you were being too vocal in talking about that liver safety signal.

MS. JOHNSON:  Objection; foundation.

BY MR. ALEXANDER:

Q    Correct?

A    Correct.

Q    What did he tell you, if you can remember?

A    Well, I received an Email that said nobody is allowed to talk externally from the company except Pirow and I about any safety issues.

Q    We are going to look at that in a minute.

What was it that you said to Tom Schall that elicited that response from him?

A    Not to talk about liver?

Q    Yes.

A    Well, that is a very big question.  Can you be more specific.

Q    Maybe there were a number of things, but can you identify anything in particular or maybe one of several things that elicited the response from Schall after you raised the liver safety issue, Dr. Kelleher, don't talk about this, you are being too vocal?

MS. JOHNSON:  Object to the form, foundation.

Page 56

THE WITNESS:  I am thinking.

BY MR. ALEXANDER:

Q     Take your time.

A     There were several occasions when I advised Tom, which was my job, on how he should present the liver data in his communications externally.

Q     What did you advise him to do?

A     I advised him that he needed to get out there, that there was a difference in liver between the treatment arm of ADVOCATE and the placebo arm, and to call out certain cases to say that it's not clear.

You know, there was one very particular case whether that was related to drug -- which it wasn't clear -- and that it's being monitored, it's mitigated, and we will follow it along.

And I advised him that this is common among drugs that we have liver.  It's not an unusual thing and we just get it out there early.

Q     And his response to that was?

A     "Thank you."

Q     And then his response was you're being too vocal.

MS. JOHNSON:  Objection to the form.

Page 57

THE WITNESS:  At some point because I was pushing for it into different things that I got told to stop talking about at meetings.

I would bring it up at meetings and whatnot, internal meetings.

BY MS. JOHNSON:

Q    Right.  Understood, understood.

And we just said before that Dr. Schall would tell you to refrain from expressing your views, including views about safety data over Email, correct?

MS. JOHNSON:  Object to form.

BY MR. ALEXANDER:

Q    Do you recall that?

A    No.  Say that again.

Q    Let me ask you this because this is an absolutely different question.

Did Schall ever tell you to refrain from expressing your views, for instance, to stop discussing certain issues, like safety issues, over Email?

Do you recall that?

MS. JOHNSON:  Object to the form, vague.

THE WITNESS:  No, but I would never -- I would not discuss safety issues over Email.  In

this was in our -- this was the positive rechallenge case.

I just needed to make sure it was the same one.

Q    Yes, yes, I understand.

A    But -- but this is not my causality assessment.

My causality assessment was the same but I didn't use their tool.  I just used clinical judgment and the fact that it was a positive rechallenge.

Q    Right.

So the hepatologist here agreed with you, he agreed with the DMC, he agreed with Dr. Maddrey, and that this was a case of positive rechallenge on avacopan, correct?

A    Correct.

Q    You can put that aside for now.  We are going to come back to that, I think.

Do you recall whether -- by the way, do you recall whether the site investigator -- the doctor who actually treated the patient, whether the site investigator's assessment was made available to you for this patient for 429-004?

A    It would have been in the CIOMS, so I

Page 144

events in ADVOCATE for the hepatobiliary organ class.

Do you see that?

A    Yes.

Let me preface this by saying this was me doing it by hand.  It also has to be done officially on an TFL looking for everything for an official readout.  This is me doing it by hand to get my understanding of the data but it's not official.

Q    Got it.  That is not -- that is absolutely fine, completely understood.

Do you see there are seven serious adverse hepatobiliary events in --

A    Yes.

Q    Let me -- sorry.  Let me finish my question.

There are seven serious adverse hepatobiliary events in patients taking avacopan compared with one event in patients talking the comparator.

Do you see that?

A    That's correct.

Q    Do you recall if that difference was statistically significant?

A    You don't do statistical significance on

safety data.  These are SAEs.

So generally, what we report is anything with a 1 percent difference between treatment arms and elevated in the treatment arm as opposed to standard-of-care arm.

Q    Who told you that you don't test for statistical significance in adverse events?

A    Because -- no one has told me that that is how we did this study.  We look for everything with a 1 percent difference.

Q    Have you ever done a clinical trial like that before?

A    Yeah.

It's very unusual to do.  The numbers often won't be big enough.  You can do it to statistical significance but often it's not necessary and we use the 1 percent difference because sometimes the numbers are so small and you would miss a lot if you use statistical significance.

Q    Right.

A    So we don't use it.  We use the 1 percent difference.

Q    Right.

The numbers are typically too small but

when you actually do find a statistically significant difference, that is actually surprising given the fact that the N is so small, correct?

MS. JOHNSON:  Objection to form.

THE WITNESS:  I am not a statistician.  I couldn't comment on how this -- if there were stats done on this or what they showed.

BY MR. ALEXANDER:

Q    What I'm asking you is just a corollary to what you just said.

Normally, you don't look for statistical significance because the assumption is that the Ns are too small, correct?

A    Well, you don't need to.  That's obviously significant.  You don't need to do statistical significance to realize --

Q    So this --

A    -- that is significant.

Q    Got it.

This was obvious to you --

A    Yeah.

Q    -- that this difference is statistically significant.

A    Not statistically significant, significant.  I don't do stats.

Page 147

It's a 1 percent difference and, in fact, it's a 3 percent difference, so yes.

Q    Clinically significant.

MR. ALEXANDER:  Object to form.

BY MR. ALEXANDER:

Q    Well, significant in what sense?

A    It's a safety signal.

Q    Yeah, it's a safety signal.

You don't know whether a test of statistical significance was done.

A    I don't remember.

We didn't need it if it was done.

Q    It's clearly a signal whether or not there was statistical significance done.

A    Yes.

Are you giving me another one now?

Q    I am.

A    Are we almost done?

(Deposition Exhibit PX-218 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALEXANDER:

Q    This is an Email, PX-218, Dr. Kelleher.

A    Uh-huh.

Page 159

transaminase levels, it was unlikely that another Hy's Law case would emerge."

Do you see that?

A    Yes.

Q    And the DMC is pointing out here that statistically significant more avacopan patients discontinued --

A    They're not saying it's statistically significant.

Yeah, go ahead.

Q    Let me -- we will get to that next.  So let me -- I understand what you are saying.  Let me say it this way.

The DMC is pointing out that seven avacopan patients discontinued because of abnormal liver function while only one in the comparator group did, correct?

MS. JOHNSON:  Objection; foundation.

THE WITNESS:  Correct.  That's what they're reporting in this document.

BY MR. ALEXANDER:

Q    And you characterized a similar imbalance before when we were looking at it as a signal -- a safety signal.

Page 160

A    That's correct.

Q    And then do you see in item 4,

"R. Glassock inquired if

Dr. Kelleher of ChemoCentryx was

aware of the special unscheduled

meeting of the DMC with

Dr. Maddrey, an independent expert

who reviewed unblinded data.

"R. Glassock recalled minutes

being taken during the ad hoc

meeting with Dr. Maddrey and stated

that (Action Items) these meeting

minutes should be sent to

ChemoCentryx by Medpace along with

the other DMC Closed session

minutes, once the study is

completed and the sponsor is

unblinded."

Do you see that?

A    Yes.

Q    Do you know why the DMC wanted to know if you knew about the meeting or had reviewed the minutes?

MS. JOHNSON:  Objection; foundation.

THE WITNESS:  I don't know what they were

A    Pages.  It's not thousands of patients.

The TLFs that we really use for safety are the SAEs by decreasing order of frequency, treatment arm versus placebo.  It's usually a couple of pages, and the same for AEs from that week that we could do everything else.

Q    Is that in the CSR?

A    It should be.

Q    All right.

A    And it's all the terms.  You can't take any out.  It has to be all there.

Q    Got it.  Got it.

So what I was -- just to bring this subject back to discontinuations, I just want to stay with that for a second.

Do you see that this is an output table of data from the ADVOCATE study dated November 8, 2019?

MS. JOHNSON:  Object to the form.

BY MR. ALEXANDER:

Q    You are looking for the date?

A    Yes.

Q    It's the very bottom.  It says "Run date."

A    Oh, November 18.

Q    Yep.

You see the title of this output table is

"Summary of Treatment -- Emergent Adverse Events Leading to Discontinuation of Study Medication, Avacopan/Placebo, by System Organ Class and Preferred Term Safety Population."

Do you see that?

A    Yes.

Q    And do you see that five avacopan patients discontinued because of hepatobiliary disorders compared with zero in the comparator group?

A    Yep.

Q    Again, do you know that this difference is statistically significant?

A    It would be expected because we had very clear stopping -- stopping, and we had -- I mean there wasn't a question of a liver problem.

So not unexpected, we stopped it if the liver enzymes went up.

Q    Right.

But and so were you aware of this imbalance against avacopan?

A    Oh, I am sure I -- it's all been written up.  I wrote a summary of safety.  It would have been in there.

Q    Again, you said it's not surprising because you had a liver problem, correct?

Page 169

MS. JOHNSON:  Object to form.

THE WITNESS:  We knew there was a liver signal.  There were stopping directions for liver.

This predated me but the stopping directions for liver were in -- added per the DMC. This way predated me, so that people were told to stop if their liver enzymes went up.  So you would have expected this to have -- this isn't a big surprise.

BY MR. ALEXANDER:

Q    That is statistically significant for avacopan patients.

A    I wouldn't say statistically significant. I would say it's increased by 3 percent -- not 3 percent but whatever the percent is, but whatever.

They don't use -- statistically significant in safety is very confusing for people. It's is there a safety signal or not and that is an approach, but yeah.

Q    And you would consider this a safety signal, correct?

A    I wouldn't consider it a safety signal.  I would consider it the number -- the safety signal is based on SAEs and different things.

I would -- we report all discontinuations.

Page 246

Q    I do.

A    Good.

(Deposition Exhibit PX-228 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALEXANDER:

Q    I take it this is not one of the documents that you reviewed in preparation for your deposition today.

MS. JOHNSON:  Object.

THE WITNESS:  No, but this --

BY MR. ALEXANDER:

Q    Let's go through it.

A    I didn't get a copy of this.

Q    So let's take a look, Dr. Kelleher, just at the cover page and then we will go through it. Okay?

A    Yeah.

Q    This is an Email -- PX-228 is an Email from you to Bekker and Huibin Yue dated May 29, 2020.

Do you see that?

A    Yeah.

Q    Do you see that the subject is "comments

Page 247

on NEJM paper"?

A     Yeah.

Q     And do you see there is an attachment?

A     Yeah.

Q     It says, "ADVOCATE paper NEJM for submission (002_CLK (002)."

Do you see that --

A     Yep.

Q     -- the attachment?

A     Yeah.

Q     "CLK," those are your initials?

A     Yeah.

Q     And then you write,

"Hi Both,

"My comments in the attached. Again, would recommend standard liver language that we apply across all documents for consistency of messaging.  If you want me to create this please let me know."

Do you see that?

A     Yes.

Q     Let's turn to page 641, please.

On page 461, do you see it's the second paragraph on the page.

Page 248

There is a line in the actual body of the text that says,

"Six subjects in the prednisone group and 9 in the avacopan group had serious hepatic system adverse events (Table 3)."

Do you see that?

A    Yes.

Q    And you have a comment on that language.

Do you see the comment?

A    Yes.

Q    You write,

"Recommend to consider add language around the re-challenge case as this was possibly related to avacopan, could not rule out a causal relationship, also would add that re-challenge done before LFT down to baseline as per language in other documents."

Do you see that?

A    Yes.

Q    Rechallenge case, of course, that refers to the same rechallenge case we have been -- on avacopan that we have been discussing pretty much

**Page 249**

all day, correct?

A    Yep.

Q    That is patient 429-004, the patient who experienced hepatic cytolysis on avacopan, correct?

A    Correct.

Q    And causal relationship means, in other words, that avacopan caused the liver injury, correct?

A    Yes.

Q    And the other documents you're referring to here, those are the CIOMS report, correct?

A    CIOMS, but I also had written a summary of safety where I outlined all of the causality.

Q    You are not referring to any public documents.

A    Huh-uh.

Q    You have got to say "no" or --

A    No.

Q    And you sent these comments to Tom Schall, as well?

A    So this is interesting.  I do not remember this because originally, this paper was going to be authored by me and I thought it was dead and I didn't even know there was a paper until somebody called and said it's been published.

Page 250

Q    Wow.

A    So I thought this was dead in the water from my comments, but I also mentioned rechallenge later in this -- several places in this.

I also would have put in -- that's why I am mystified because I -- this is completely different than the one that was probably published because I would have all added -- you would also add the serious case with who met criteria for Hy's Law.

Q    You would have added that, as well.

A    Yeah, of course, but I would have added that in my notes.  That's why I am mystified why it's -- I don't remember this.  This might have been a very, very early thing and then I never heard about it and then I got called and said guess what, they published the paper.

Q    Do you know who made the decision not to implement your comments here?

A    No.

Q    Do you recall that you sent these comments to Dr. Schall?

A    I don't recall who I sent them to.

Q    Let me ask you --

A    I supplied liver language for multiple documents multiple times verbally, just so I know,