**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiff Indiana Public Retirement System and Lead Counsel for the Class*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| JONNIE HOMYK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CHEMOCENTRYX, INC. et al.,<br><br>Defendants. | Master File No. 4:21-cv-03343-JST *and related case*, No. 4:21-cv-04357<br><br>**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Honorable Jon S. Tigar<br>Date: October 29, 2026<br>Time: 2:00 p.m. |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ii

NOTICE OF MOTION 1

STATEMENT OF ISSUES TO BE DECIDED 1

MEMORANDUM OF POINTS AND AUTHORITIES 2

I. INTRODUCTION 2

II. PROCEDURAL AND FACTUAL BACKGROUND 4

III. ARGUMENT 7

A. Lead Plaintiff and Lead Counsel Have Adequately Represented the Class 9

B. The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel 9

C. The Relief That the Settlement Provides for the Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation 10

1. The Amount of the Proposed Settlement 11

2. The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation 12

3. The Duration of Continued Litigation 14

4. The Other Rule 23(e)(2)(C) Factors Support Final Approval 15

D. The Settlement Treats Class Members Equitably 16

E. Additional Factors Considered by the Ninth Circuit Support Approval of the Settlement 17

IV. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE 18

V. NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS 21

CONCLUSION 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ........ 14, 17

*In re AOL Time Warner, Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ........ 14

*Azar v. Blount Int'l, Inc.*,
2019 WL 7372658 (D. Or. Dec. 31, 2019) ........ 12

*In re Bluetooth Headset Products Liability Litigation*,
654 F.3d 935 (9th Cir. 2011) ........ 9, 10

*Churchill Vill. L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ........ 8, 17, 22

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........ 8, 18

*Destefano v. Zynga, Inc.*,
2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ........ 11, 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........ 9

*In re Extreme Networks, Inc. Sec. Litig.*,
2019 WL 3290770 (N.D. Cal. July 22, 2019) ........ 12

*Garner v. State Farm Mut. Auto. Ins. Co.*,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ........ 7, 8

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........ 8, 9, 10, 11

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ........ 14, 18

*Indiana Public Ret. Sys. v. ChemoCentryx, Inc.*,
No. 25-5859 (9th Cir.) ........ 3, 6

*Int'l Bhd. of Elec. Workers Loc. 697 Pension Fund v. Int'l Game Tech., Inc.*,
2012 WL 5199742 (D. Nev. Oct. 19, 2012) ........ 12

*Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 1:02-cv-05893 (N.D. Ill.) ........ 15

*Kendall v. Odonate Therapeutics, Inc.*,
2022 WL 1997530 (S.D. Cal. June 6, 2022) .......... 12

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) .......... 17

*Knapp v. Art.
com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017). .......... 13

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) .......... 9

*Leventhal v. Chegg, Inc.*,
2025 WL 1481382 (N.D. Cal. May 21, 2025) .......... 22

*In re LinkedIn User Priv. Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015) .......... 14

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) .......... 22

*In re Lyft Inc. Sec. Litig.*,
2023 WL 5068504 (N.D. Cal. Aug. 7, 2023) .......... 21

*In re Lyft, Inc. Sec. Litig.*,
2022 WL 17740302 (N.D. Cal. Dec. 16, 2022) .......... 12

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000), *as amended* (June 19, 2000) .......... 11

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) .......... 17

*Officers for Justice v. Civil Service Commission of City and County of San Francisco*,
688 F.2d 615 (9th Cir. 1982) .......... 8, 11

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......... 18

*In re Oracle Sec. Litig.*,
1994 WL 502054 (N.D. Cal. June 18, 1994) .......... 18

*In re Plantronics, Inc. Sec. Litig.*,
No. 4:19-cv-07481-JST (N.D. Cal.) .......... 21

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) .......... 9

*Spann v. J.C. Penney Corp.*,
314 F.R.D. 312 (C.D. Cal. 2016) .......... 22

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ....................7

*Taylor v. Google LLC*,
2026 WL 628161 (N.D. Cal. Mar. 5, 2026)....................10

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) ....................12, 14

*Vataj v. Johnson*,
2021 WL 1550478 (N.D. Cal. Apr. 20, 2021) ....................12

*Velazquez v. Int'l Marine & Indus. Applicators, LLC*,
2018 WL 828199 (S.D. Cal. Feb. 9, 2018) ....................15

*Vivendi Universal, S.A. Sec. Litig.*,
No. 1:02-cv-5571 (S.D.N.Y.)....................15

*Yaron v. Intersect ENT, Inc.*,
2021 WL 5184290 (N.D. Cal. Nov. 5, 2021) ....................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23....................8, 18, 22

Fed. R. Civ. P. 23(e) .................... *passim*

Rule 23(e)(2)....................1, 8, 9, 10

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure and the Court's Order Granting Preliminary Approval of Class Action Settlement and Providing for Notice of Settlement (as Modified) (Dkt. No. 368) ("Preliminary Approval Order"), Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "Indiana") will and hereby does move the Court, before the Honorable Jon S. Tigar, on October 29, 2026, at 2:00 p.m. Pacific time by Zoom videoconference, or at such other location and time as set by the Court, for (1) entry of a judgment granting final approval of the proposed settlement of this Action (the "Settlement") and (2) entry of an order granting approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

This Motion is based on the following Memorandum of Points and Authorities, the accompanying Declaration of Jonathan D. Uslaner in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Uslaner Declaration" or "Uslaner Decl.") and its exhibits, all other prior pleadings and papers in this Action, arguments of counsel, and any additional information or argument that may be required by the Court.

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether the Court should approve the proposed Settlement of this securities class action as fair, reasonable, and adequate under Rule 23(e)(2); and

2. Whether the Court should approve the Plan of Allocation as fair and reasonable.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Lead Plaintiff is pleased to present to the Court the proposed $69,000,000 all-cash Settlement of this Action for final approval. On June 26, 2026, the Court preliminarily approved the Settlement and authorized notice to the Class. Notice of the Settlement has been disseminated to Class Members, and the Settlement Amount has since been deposited into an Escrow Account, where it is earning interest. The Settlement Amount is multiples above the median recovery in securities class action settlements—a particularly remarkable result given this case is pending on appeal following dismissal at summary judgment.

The proposed Settlement is the product of Lead Plaintiff's extensive efforts over more than five years of hard-fought litigation. Lead Plaintiff, among other things: (i) filed a detailed Amended Consolidated Class Action Complaint; (ii) defeated Defendants' motion to dismiss; (iii) completed fact discovery, which included the exchange and review of more than 8 million pages of documents, 21 fact depositions, and dozens of third-party subpoenas; (iv) successfully obtained class certification; (v) defeated Defendants' Rule 23(f) petition for interlocutory review; (vi) completed expert discovery, which included 24 expert reports and 17 expert depositions; (vii) briefed and argued 11 *Daubert* motions and summary judgment; (viii) prepared and filed an appeal to the Ninth Circuit; and (ix) closely monitored actions related to TAVNEOS'® approval status, including the recent proceeding initiated by the Center for Drug Evaluation and Research ("CDER") to withdraw TAVNEOS' approval. ¶¶ 3, 9-87, 132. As a result of these efforts, Lead Plaintiff and Lead Counsel developed a thorough understanding of the strengths and weaknesses of the Class's claims.

The proposed Settlement provides the Class with a substantial, certain, and immediate recovery while avoiding the real risk that the Class would recover much less or nothing at all. On August 15, 2025, the Court granted Defendants' motion for summary judgment. Dkt. No. 345. Lead Plaintiff's success on its appeal of the Court's order was far from guaranteed and, even if successful, Lead Plaintiff would still need to prevail after remand and at trial. Even then, Defendants would inevitably appeal any jury verdict against them, introducing additional delay

and further litigation risk. The proposed Settlement eliminates these risks while providing the Class with a substantial and immediate benefit.

Lead Plaintiff—the type of institutional investor Congress envisioned serving in that role when passing the Private Securities Litigation Reform Act of 1995 ("PSLRA")—fully supports the Settlement. The Class's reaction to date similarly reflects approval. Notice was provided to over 77,000 potential Class Members pursuant to the Preliminary Approval Order. While the September 21, 2026 deadline to object to the Settlement and Plan of Allocation has not yet passed, no objections have been received to date.

Notably, in addition to securing a meaningful recovery for investors, Lead Plaintiff's litigation efforts were followed by regulatory actions around the world that specifically cited the allegations raised in this litigation. Among other things:

- In January 2026, the FDA "requested that ChemoCentryx voluntarily withdraw TAVNEOS from the U.S. market," citing "concerns about the process followed by ChemoCentryx to re-adjudicate primary endpoint results for 9 of the 331 patients in the ADVOCATE trial" and about the drug's hepatotoxicity risks.[1] *See* Dkt. No. 361 at 3.

- On April 27, 2026, the Center for Drug Evaluation and Research ("CDER") of the FDA proposed the withdrawal of TAVNEOS after determining that it "can no longer conclude that there is, or has ever been, a valid demonstration of substantial evidence of effectiveness for TAVNEOS" and that ChemoCentryx's "improper actions forever taint the [ADVOCATE] study results reported in the NDA and render them uninterpretable."[2] *See* Dkt. No. 366 at 2; Status Report, *Indiana Public Ret. Sys. v. ChemoCentryx, Inc.*, No. 25-5859 (9th Cir. May 8, 2026), Dkt. No. 20.

- On June 29, 2026, the *New England Journal of Medicine* announced the retraction of the 2021 article that published the results of the ADVOCATE study. The authors requested retraction because "according to an ongoing Food and Drug Administration investigation conducted after publication, and without the knowledge of these two authors, the primary end-point assessments in nine patients were readjudicated after database lock and trial unblinding."[3]

---

[1] Amgen Medical Affairs, *An Important Update Regarding TAVNEOS® (avacopan)*, Amgen (Feb. 4, 2026), https://web.archive.org/web/20260204183410/https://www.amgen.com/tavneos-prescribers.

[2] *See* Letter from Tracy B. Hoeg, Acting Dir. of Ctr. for Drug Evaluation and Rsch., to Dr. Nicole Cheung, Manager, Glob. Regul. Affs. of Amgen, Inc. at 17, 19 (Apr. 27, 2026), https://www.fda.gov/media/192160/download (on file with the FDA).

[3] *See* Eric J. Rubin, M.D., Ph.D., *Retraction: Jayne DRW et al. Avacopan for the Treatment of ANCA-Associated Vasculitis*, NEJM (June 29, 2026), https://www.nejm.org/doi/full/10.1056/NEJMe2608684.

- On August 4, 2026, the European Commission revoked TAVNEOS's marketing authorization, adopting the recommendation of the European Medicines Agency's Committee for Medicinal Products for Human Use ("CHMP").[4] The CHMP stated that "[o]n balance, considering that the pivotal study supporting the marketing authorisation is considered as not reliable due to the serious [good clinical practice] breach, it is concluded that there is no longer demonstration of benefit outweighing the risks of Tavneos, in particular the serious hepatic risks."[5]

Lead Plaintiff also requests approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation establishes how the Settlement proceeds will be distributed among Authorized Claimants. The Plan is based on the analysis of Lead Plaintiff's damages expert and applies the same formulas for calculating damages to all Class Members.

For these reasons and those discussed below, Lead Plaintiff submits that the Settlement and the Plan of Allocation are fair and reasonable and warrant final approval.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The initial complaint in this Action was filed on May 5, 2021. Dkt. No. 1. On January 28, 2022, the Court appointed Indiana Public Retirement System as Lead Plaintiff and Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel for the potential Class. Dkt. No. 32.

On March 28, 2022, Lead Plaintiff filed the Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws (the "Complaint"). Dkt. No. 47. In the Complaint, Lead Plaintiff alleged that Defendants ChemoCentryx and its former CEO, Dr. Thomas J. Schall, violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by making material misrepresentations from November 26, 2019 through May 6, 2021 (the "Class Period") regarding ChemoCentryx's ADVOCATE trial and concerning the Company's communications with the FDA related to the approval of avacopan, now known as TAVNEOS. Lead Plaintiff alleged that these misrepresentations caused the price of ChemoCentryx common stock to be artificially inflated during the Class Period and that the artificial inflation was removed

---

[4] *See Tavneos*, European Medicines Agency, https://www.ema.europa.eu/en/medicines/human/EPAR/tavneos (last visited Sept. 4, 2026).

[5] *See Annex: Scientific conclusions* at 3, European Medicines Agency, https://www.ema.europa.eu/en/documents/referral/tavneos-article-20-procedure-scientific-conclusions_en.pdf.

when the truth was revealed to the market in two corrective disclosures occurring on May 4, 2021, and May 6, 2021.

Defendants moved to dismiss the Complaint on May 19, 2022. Dkt. No. 50. On February 23, 2023, the Court issued an order granting in part and denying in part Defendants' motion to dismiss. Dkt. No. 61. Defendants filed their Answer on April 27, 2023. Dkt. No. 71.

On August 25, 2023, Lead Plaintiff filed a motion for class certification. Dkt. No. 74. After full briefing and a hearing, on March 6, 2024, the Court issued an Order granting the motion and certifying the Class, appointing Lead Plaintiff as Class Representative for the Class, and appointing Lead Counsel as Class Counsel. Dkt. No. 131. On March 22, 2024, Defendants filed a petition to take an immediate appeal of the Court's order certifying the Class pursuant to Rule 23(f) (Dkt. No. 141), which the Ninth Circuit denied after full briefing (Dkt. No. 153).

On October 17, 2024, the Court entered an Order approving the proposed form, content, and method for providing notice of the pendency of the class action to potential Class Members. Dkt. No. 179. In accordance with that Order, the Class Notice was mailed to 35,220 potential Class Members beginning on November 13, 2024. Dkt. No. 187, at ¶¶ 3-11. In response to the Class Notice, there were only two requested exclusions from the Class. Dkt. No. 187-5.

Lead Plaintiff conducted extensive fact and expert discovery in this case. Lead Plaintiff served multiple sets of document requests and interrogatories to Defendants and document subpoenas to dozens of third parties, including the FDA, Amgen, and ChemoCentryx's former employees. Collectively, Defendants and the subpoenaed non-parties produced a total of over eight million pages of documents. In addition, the Parties conducted 21 depositions of fact witnesses, took 17 depositions of expert witnesses, and prepared and exchanged 24 expert reports.

In early 2025, the Parties filed 11 *Daubert* motions, which the Court resolved on May 21, 2025 following oral argument on April 10, 2025. Dkt. Nos. 259, 275. The Court's decision noted that "testimony on the unblinded review [of ADVOCATE's efficacy results] does not assert a separate theory of liability." Dkt. No. 275 at 10. The Parties also filed competing motions for summary judgment (Dkt. Nos. 267, 279).

On August 15, 2025, the Court issued its Order granting Defendants' motion for summary judgment. Dkt. No. 345. In its Order, the Court held that "the challenged statements are opinions largely dealing with Defendants' interpretations of trial data or scientific methodology," which were "subject to the standard established in *Omnicare* for proving falsity." *Id.* at 8. The Court found that none of the alleged misstatements met that standard, stating that (a) Defendants' safety statements were "per se reasonable" given that the FDA "ultimately agreed that avacopan had an acceptable safety profile" and "Plaintiff's 'data manipulation' allegations do not affect the significance of the FDA's approval as to safety based on ADVOCATE's data" (*id.* at 13 n.7, 14); (b) there was no "omission that rendered Defendants' opinion statements about their secondary endpoints misleading" (*id.* at 15); (c) Defendants "accurately described how ADVOCATE achieved its primary endpoints" and the FDA's interim disagreement with trial methodology did not create an actionable omission (*id.* at 18); (d) "the full context of Defendants' various 'steroid statements' demonstrates that a reasonable investor would have understood Defendants' 'steroid statements' as far more limited opinion statements than as depicted by Plaintiff" (*id.* at 20); and (e) there was no "serious conflict between the FDA's interim, albeit repeated, concerns about methodology and Defendants' optimism about FDA approval," especially as the FDA ultimately approved the drug (*id.* at 25).

On September 12, 2025, Lead Plaintiff appealed the Court's Order granting Defendants' motion for summary judgment to the Ninth Circuit. Dkt. No. 354; *see Indiana Public Ret. Sys. v. ChemoCentryx, Inc.*, No. 25-5859 (9th Cir.). On January 5, 2026, Lead Plaintiff filed its opening brief in support of its appeal. Appellant's Opening Br., *The Indiana Public Ret. Sys. v. ChemoCentryx, Inc.*, No. 25-5859 (9th Cir. Jan. 5, 2026), Dkt. No. 12.

On January 26, 2026, while Lead Plaintiff's appeal was pending, the Parties reached an agreement to settle the claims asserted in this Action in return for a cash payment of $35,000,000 for the benefit of the Class (the "Original Settlement"). On March 13, 2026, Lead Plaintiff filed a motion for preliminary approval of the Original Settlement. Dkt. No. 361.

On April 27, 2026, the Center for Drug Evaluation and Research ("CDER") of the FDA announced its proposal to withdraw TAVNEOS. The Parties disputed the significance of CDER's

announcement. Defendants contended that CDER's statements in the announcement were neither accurate nor relevant to the Action. Dkt. No. 366 at 1. Lead Plaintiff contended that CDER's statements in the announcement warranted an increase in the amount of the Original Settlement, including because they may have improved Lead Plaintiff's possibility of success on the pending appeal of the Court's Summary Judgment Order or otherwise. *Id*. The Parties negotiated extensively and ultimately reached the Settlement, which voided and superseded the Original Settlement and reflected an agreed-upon increase of the Settlement Amount to $69 million. *Id*.

On May 15, 2026, the Parties entered into, and submitted to the Court, the Revised Stipulation and Agreement of Settlement (the "Stipulation"). Dkt. No. 366-1.

On June 12, 2026, the Court preliminarily approved the Settlement, authorized notice of the Settlement to be disseminated to potential Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval to the Settlement. Dkt. No. 368.

In accordance with the Preliminary Approval Order, Lead Plaintiff began disseminating notice of the Settlement of the Class on July 6, 2026. This included mailing copies of the Court-approved Postcard Notice to potential Class Members and nominees, publishing the Summary Settlement Notice, and updating the case website, www.ChemoCentryxSecuritiesLitigation.com, with copies of the Settlement Notice and Claim Form. Through September 9, 2026, the Claims Administrator had mailed a total of 77,834 copies of the Court-approved Postcard Notice and 1,551 copies of the Settlement Notice Packet to Class Members and nominees. *See* Marquez Decl. (Ex. 4) at ¶ 9. In addition, the Court-approved Summary Settlement Notice was published in the *Wall Street Journal* and over the *PR Newswire* on July 20, 2026.

## III. ARGUMENT

The Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). "'Settlement avoids the complexity, delay, risk and expense of continu[ed] with the litigation'" and allows "'a prompt, certain, and substantial recovery'" for the class. *See Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010).

Federal Rule of Civil Procedure 23(e) requires parties to obtain judicial approval for the settlement of class-action claims. A class-action settlement warrants approval if it is "fair, reasonable, and adequate." *Id.* at *8; Fed. R. Civ. P. 23. In making this determination, courts consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account [among other things,] the costs, risks, and delay of trial and appeal . . . ; and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition to the Rule 23(e)(2) considerations, courts in the Ninth Circuit consider the following factors in evaluating the fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

The Ninth Circuit has explained that a review of class-action settlements should be "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). Thus, a settlement hearing should "not to be turned into a trial or rehearsal for trial on the merits," *Officers for Justice v. Civil Service Commission of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982), and a court "need not 'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

### A. Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

Rule 23(e)(2) asks whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). In assessing their adequacy, courts consider whether the class representative and class counsel (1) have any conflicts of interest with class members and (2) prosecuted the action vigorously on the class's behalf. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Lead Plaintiff's and Lead Counsel's interests are not antagonistic to those of the Class Members. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d at 1020. Like all other Class Members, Lead Plaintiff purchased ChemoCentryx common stock during the Class Period at prices alleged to have been artificially inflated by Defendants' misstatements. Lead Plaintiff shares the Class's interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Lead Plaintiff actively supervised and participated in the litigation and retained highly qualified and experienced counsel. Lead Counsel is widely regarded as one of the most preeminent securities law firms in the country and has achieved many of the largest securities class action recoveries in history. *See* Ex. 10 (Lead Counsel's firm resume). The Settlement is the result of their diligent prosecution of this Action for five years, which included extensive motion practice and fact and expert discovery. Even after the Court dismissed all claims in the Action at summary judgment, and while Lead Plaintiff faced the real possibility of no recovery, Lead Plaintiff and Lead Counsel did not give up; to the contrary, they continued to advance the Class's interests and ultimately leveraged their efforts into a meaningful $69 million recovery for the Class.

### B. The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel

Rule 23(e)(2)(B) asks whether the settlement "was negotiated at arm's length." This includes consideration of (i) counsel's understanding of the strengths and weaknesses of the case, *Hanlon*, 150 F.3d at 1026; and (ii) the presence or absence of any indicia of collusion, *see In re*

*Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011). Both factors weigh strongly in favor of approval here.

***First***, counsel had a comprehensive understanding of the strengths and challenges of the case. The Parties reached a settlement after the completion of extensive fact and expert discovery, after rulings on class certification and summary judgment, and after lengthy negotiations between experienced counsel. These facts support a finding that the Settlement was negotiated at arm's length and is procedurally fair. *See Taylor v. Google LLC*, 2026 WL 628161, at *12-13 (N.D. Cal. Mar. 5, 2026) (finding that "the parties had a comprehensive understanding of the merits of their case" after years of litigation and "following the close of fact and expert discovery").

***Second***, the proposed Settlement has none of the indicia of collusion identified by the Ninth Circuit. *See Bluetooth*, 654 F.3d at 947. There is no "clear sailing" fee agreement and no provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation ¶ 15 ("Class Counsel's application for attorneys' fees and/or Litigation Expenses is not the subject of any agreement between Defendants and Class Representative other than what is set forth in this Stipulation."); Stipulation ¶ 13 ("The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, other Defendants' Releasee, or any other person or entity that paid any portion of the Settlement Amount, shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever . . ."). Indeed, the arm's-length nature of the negotiations is demonstrated by the fact that the Parties engaged in additional negotiations following CDER's April 27, 2026 proposal that the FDA withdraw TAVNEOS—resulting in a revised Settlement that nearly doubled the Settlement Amount.

### C. The Relief That the Settlement Provides for the Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation

Rule 23(e)(2)(C) asks whether the proposed settlement is "fair, reasonable, and adequate," including by "taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2). This analysis encompasses four of the seven factors of the traditional *Hanlon* analysis: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status

throughout the trial; and (4) the amount offered in settlement. *See Hanlon*, 150 F.3d at 1026. Here, each of these factors supports approval.

**1. The Amount of the Proposed Settlement**

The amount of a settlement "is generally considered the most important [factor], because the critical component of any settlement is the amount of relief obtained by the class." *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016). However, "'[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.'" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000). In assessing the recovery, a fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay, and expense. "'Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation.'" *Officers for Justice,* 688 F.2d at 624.

Here, the proposed Settlement Amount—$69 million in cash, plus interest—represents a highly favorable outcome. Even assuming success on the pending appeal and complete success after remand and at trial, the absolute maximum possible damages that could be established in the Action if investors were to prevail was $1.3 billion. ¶ 106. Meanwhile, if Lead Plaintiff recovered on the first corrective disclosure, but not the second—as Defendants vigorously argued—the maximum damages would be reduced to $513.6 million. *Id.* Accordingly, the $69 million Settlement represents a recovery of 5.3% to 13.4% of the absolute maximum damages that could be obtained at trial under these scenarios—both of which aggressively assume that Lead Plaintiff would prevail at trial on <u>all</u> categories of misstatements for the <u>entire</u> Class Period and successfully defeat Defendants' arguments for an "offset" based on ChemoCentryx's share price recovery following the FDA's approval of TAVNEOS in October 2021. *Id.*

Any assessment of the Settlement Amount must also account for the Summary Judgment Order and the likelihood of success on appeal. The Ninth Circuit's overall reversal rate in private

civil actions is 13.3%.[6] Applying this probability of success, the proposed Settlement represents a 40% recovery of the risk-adjusted maximum damages of $172.9 million. Notably, this risk-adjusted figure does not account for the various risks that investors would face on remand, including the risk of further summary judgment motions, trial, and any subsequent appeals.

Under any reasonable measure, the recovery in this case is favorable and consistent with other settlements approved in this Court and elsewhere. *See, e.g.*, *In re Lyft, Inc. Sec. Litig.*, 2022 WL 17740302, at *6 (N.D. Cal. Dec. 16, 2022) (finding the settlement equal to 3.2% to 4.7% of estimated maximum damages was "well within the range of possible approval"); *Vataj v. Johnson*, 2021 WL 1550478, at *9 (N.D. Cal. Apr. 20, 2021) (settlement amounting to 2% of damages was "consistent with the typical recovery in securities class action settlements"); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) (approving settlement representing between 5% and 9.5% of maximum potential damages); *Kendall v. Odonate Therapeutics, Inc.*, 2022 WL 1997530, at *5 (S.D. Cal. June 6, 2022) (approving settlement of "approximately 3.49% of the maximum estimate damages"); *Azar v. Blount Int'l, Inc.*, 2019 WL 7372658, at *7 (D. Or. Dec. 31, 2019) (approving settlement recovering 4.63% to 7.65% of the class's total estimated damages); *Int'l Bhd. of Elec. Workers Loc. 697 Pension Fund v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement representing "about 3.5% of the maximum damages that Plaintiffs believe[d] could be recovered" and finding it "within the median recovery in securities class actions settled in the last few years").

**2. The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation**

Courts evaluating proposed class action settlements also consider the strength of the plaintiff's case and the risks of further litigation. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). In doing so, courts "balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members,

[6] *See* U.S. Courts of Appeals—Decisions in Cases Terminated on the Merits, by Circuit and Nature of Proceeding, During the 12-Month Period Ending June 30, 2026, Table B-5, Statistical Tables for the Federal Judiciary (June 30, 2026), https://www.uscourts.gov/data-news/data-tables/2026/06/30/statistical-tables-federal-judiciary/b-5.

including the immediacy and certainty of recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017). The $69 million Settlement is a highly favorable outcome for the Class in light of the real possibility that Lead Plaintiff and the Class would obtain no recovery.

***First***, there was a significant risk that Lead Plaintiff might not prevail on its pending appeal. While Lead Plaintiff believed it had meritorious arguments for reversal, there was a substantial risk that the Court of Appeals might affirm—in full or part—the Court's order granting summary judgment. Lead Plaintiff recognizes the challenges of successfully appealing any summary judgment order, especially an opinion issued by this Court. ¶ 90. While Lead Plaintiff would point to recent developments related to TAVNEOS in support of its appeal, Defendants would argue that these post-Class Period facts did not have any bearing on the appeal. *Id.*

***Second***, even if Lead Plaintiff prevailed on the appeal, there was a possibility that the Court may still have granted Defendants' motion for summary judgment on grounds that the Court did not reach the first time. ¶ 93. The Court's Summary Judgment Order disposed of the case based on a finding that the statements were not actionable as a matter of law. If the case were remanded, the Court may still have granted summary judgment based on the myriad other grounds asserted by Defendants in their summary judgment motion—including an absence of scienter, loss causation, or damages. *Id.*

***Third***, even if Lead Plaintiff were able to overcome these challenges and present its claims to a jury, it would still face significant challenges in proving all of the elements of its claim. As to "falsity," Defendants would argue that ChemoCentryx disclosed the underlying trial results of ADVOCATE, and no further disclosures or commentary were needed. ¶¶ 95-98. As to "scienter," Defendants would argue that they genuinely believed their statements were accurate, and their optimism was justified by the FDA's approval of the drug. ¶ 99. As to "loss causation," ¶¶ 100-03. Defendants would argue that the alleged truth was fully revealed on May 4, 2021 (when the FDA issued its Ad Com briefing materials) and, accordingly, Lead Plaintiff was not entitled to any further stock price declines, and that information regarding the alleged data manipulation was not revealed on either of the corrective disclosure dates. ¶¶ 100-02. And, finally, as to "damages," Defendants would argue that—even if Lead Plaintiff prevailed—damages should be "offset" by

the amount by which ChemoCentryx's stock price increased following the FDA's approval of TAVNEOS shortly after the Class Period and disaggregated from other contributing factors. ¶ 103.

While Lead Plaintiff believes it had meritorious responses to each of Defendants' arguments, it recognized the risks presented by these arguments—some of which were highlighted by the Court's Order granting Defendants' motion for summary judgment.

**3. The Duration of Continued Litigation**

In evaluating the reasonableness of a proposed settlement, courts also consider the amount of additional litigation required. *See, e.g.*, *Torrisi*, 8 F.3d at 1376 (finding that "the cost, complexity and time of fully litigating the case" rendered the settlement fair). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). Due to the "notorious complexity" of securities class actions in particular, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (finding that securities class actions have a well-deserved reputation for complexity).

Absent the proposed Settlement, continued litigation in this case would have required: (i) completion of appellate litigation and resolution of Lead Plaintiff's pending appeal in favor of Lead Plaintiff and the Class; (ii) assuming success on the appeal, a remand including potential renewed motions for summary judgment; (iii) further extensive pre-trial motion practice, including motions *in limine*; (iv) a trial requiring a substantial amount of detailed factual and expert testimony; (v) post-verdict challenges, including to individual class members' damages; and (vi) further appeals from any verdict in Lead Plaintiff's favor. The continued litigation and appeals would have substantially delayed any recovery for Class Members, possibly for years. *See Zynga*, 2016 WL 537946, at *10; *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016) ("A trial of a complex, fact-intensive case [as here] could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation.").

Even if a favorable trial verdict were affirmed on a second appeal, the Class would have faced a potentially complex, lengthy, and contested claims-administration process. In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years. *See* Verdict Form, *Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill. May 7, 2009), Dkt. No. 1611; Final J. and Order of Dismissal with Prejudice, *Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill. Nov. 10, 2016), Dkt. No. 2267; *see also* Jury Verdict Form, *Vivendi Universal, S.A. Sec. Litig.*, No. 1:02-cv-5571 (S.D.N.Y. Feb. 2, 2010), Dkt. No. 998 (jury verdict issued on Jan. 29, 2010); Final J. Approving Class Action Settlement, *Vivendi Universal, S.A. Sec. Litig.*, No. 1:02-cv-5571 (S.D.N.Y. May 9, 2017), Dkt. No. 1317.

The present value of a certain and substantial recovery now—as opposed to the mere chance of a possibly greater one several years later—supports a settlement that eliminates the expense and delay of continued litigation and the risk that the Class could receive no recovery at all. *See Velazquez v. Int'l Marine & Indus. Applicators, LLC*, 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018) (holding that courts "shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation").

### 4. The Other Rule 23(e)(2)(C) Factors Support Final Approval

Rule 23(e)(2)(C) also asks whether the settlement is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the proposed Settlement.

***First***, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation. The proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, Kroll Settlement Administration ("Kroll"). Kroll, an independent

company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court. This type of claims processing is standard in securities class actions and has long been used and found to be effective. This claim procedure is necessary because neither Lead Plaintiff nor Defendants possess data regarding investors' transactions in ChemoCentryx common stock that would allow the Parties to create a claims-free process to distribute Settlement funds.

***Second***, the relief provided for the Class is also adequate when the terms and timing of the proposed award of attorneys' fees are taken into account. As discussed in the Fee Memorandum, the 22% fee requested is below the benchmark for percentage fee awards in the Ninth Circuit and is well within the range of percentage fees that courts within this Circuit award for similarly sized settlements. The fee percentage is also reasonable in light of Lead Counsel's extensive efforts, the recovery obtained, and the risks in the litigation. Moreover, neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 16.

***Finally***, Lead Plaintiff has complied with its obligation under Rule 23(e)(3) to disclose all relevant agreements. *See* Lead Plaintiff's Unopposed Motion for Preliminary Approval of Settlement at 6, 13-14, Dkt. No. 361. As described in its motion for preliminary approval, these included: (a) the Settlement Memorandum of Understanding; (b) the Stipulation; and (c) the Supplemental Agreement. *Id*. The Supplemental Agreement, which governed the Parties' rights in the event of exclusions exceeding a specified threshold, is now void and of no effect because there are no grounds for any Party to terminate the Settlement.

### D. The Settlement Treats Class Members Equitably

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether the Settlement "treats class members equitably relative to each other." *See* Fed. R. Civ. P. 23(e)(2)(D). The proposed Settlement satisfies this requirement. As

discussed below in Part II, each eligible claimant will receive a *pro rata* share of the recovery based on damages attributable to the alleged fraud. No Class Member receives special treatment, and Lead Plaintiff will recover on the same *pro rata* basis as all other Class Members based on its Recognized Claims under the Plan of Allocation.

### E. Additional Factors Considered by the Ninth Circuit Support Approval of the Settlement

In assessing settlements, the Ninth Circuit considers "the experience and views of counsel" and "the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575. Both factors weigh in favor of approval.

As courts in this Circuit have explained, "[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *Kirkorian v. Borelli*, 695 F. Supp. 446, 450-51 (N.D. Cal. 1988); *see Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel . . . . because '[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation'"). Here, Lead Counsel—based on a thorough understanding of the strengths and weaknesses of the Action, including the potential impact of recent regulatory developments—has concluded that the proposed Settlement represents a favorable outcome for Class Members given the risks of continued litigation and the range and probability of potential outcomes.

Likewise, the reaction of the Class to the proposed Settlement to date is another factor that supports approval of the Settlement. *See Amgen*, 2016 WL 10571773, at *4. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Kroll, has mailed a total of 77,834 copies of the Court-approved Postcard Notice and 1,551 copies of the Settlement Notice Packet to potential Class Members and nominees as of September 9, 2026. *See* Marquez Decl. (Ex. 4) at ¶ 9. In addition, the Court-approved Summary Settlement Notice was published in the *Wall Street Journal* and over the *PR Newswire* on July 20, 2026. *See id.* ¶ 10. The notices set out the essential terms of the Settlement and informed potential Class Members of, among other things, their right to request to object to any aspect of the proposed Settlement. Although the September 21, 2026 deadline for Class Members to object has not yet passed, to date, no objections to the

Settlement or the Plan of Allocation have been received. *See* Uslaner Decl. ¶¶ 115, 144. Lead Plaintiff will address any objections that may be received in its reply papers, to be filed by September 28, 2026.

**IV. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE**

Lead Plaintiff respectfully requests that the Court also approve the proposed Plan of Allocation, which is set forth at pages 16 to 24 of the Settlement Notice authorized by the Court's Preliminary Approval Order.

The standard for approval of a plan of allocation in a class action under Rule 23 is the same as the standard applicable to the settlement as a whole: the plan must be "fair, reasonable, and adequate." *Class Plaintiffs*, 955 F.2d at 1275, 1284-85; *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008). An allocation formula need only have a reasonable basis, particularly if recommended by experienced class counsel, as here. *See Heritage Bond*, 2005 WL 1594403, at *11. Courts hold that "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages expert. ¶ 117. The Plan provides for the distribution of the Net Settlement Fund to Class Members on a *pro rata* basis based on the extent of their injuries related to the alleged fraud. *Id*. The calculations under the Plan of Allocation are based generally on the calculations for Section 10(b) damages set forth in the Expert Report of Matthew D. Cain concerning damages dated September 25, 2024. Notice ¶ 82. The Plan reflects the assumption that Defendants' alleged false and misleading statements and material omissions proximately caused the price of ChemoCentryx common stock to be artificially inflated throughout the Class Period. *Id*.

In developing the Plan of Allocation, Lead Plaintiff's expert calculated the estimated amount of artificial inflation in ChemoCentryx common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements and omissions. *See* Settlement Notice ¶ 82. To calculate the estimated artificial inflation, Lead Plaintiff's damages expert considered the price changes in ChemoCentryx common stock in reaction to public

announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions on May 4, 2021 and May 6, 2021, adjusting for price changes attributable to market or industry factors on those days. *Id*. To determine the daily artificial inflation per share, the Plan utilizes the minimum of constant-percentage inflation and constant-dollar inflation. *Id*. ¶ 83. Specifically, for any given trading day during the Class Period, the artificial inflation is the lesser of (i) Constant-Percentage Inflation: 78.44% of ChemoCentryx's closing share price from November 26, 2019 through May 3, 2021, and 62.21% of the closing share price from May 4, 2021 through May 5, 2021; or, (ii) Constant-Dollar Inflation: a fixed amount of $38.07 per share from November 26, 2019 through May 3, 2021, and $17.10 per share from May 4, 2021 through May 5, 2021. *Id*.

The Plan of Allocation calculates a "Recognized Loss Amount" for each purchase of ChemoCentryx common stock during the Class Period that is listed in the Claim Form and for which adequate supporting documentation is provided. Settlement Notice ¶ 85. The calculation of Recognized Loss Amounts depends upon several factors, including when the claimant's stock was purchased and sold and the purchase or sale price. Claimants who purchased shares during the Class Period but did not hold those shares through the close of trading on May 3, 2021 will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by revelation of the alleged fraud. *Id*. ¶¶ 84, 86.A. For shares sold from May 4, 2021 through the close of trading on May 6, 2021, the Recognized Loss Amount will be *the lesser of*: (i) the amount of alleged artificial inflation on the purchase date *minus* the amount of artificial inflation on the sale date; or (ii) the purchase price *minus* the sale price. *Id*. ¶ 86.B. For shares sold during the 90-day period after the Class Period, Recognized Loss Amounts will be *the least of:* (i) the amount of alleged artificial inflation on the purchase date; (ii) the purchase price minus the sale price; or (iii) the purchase price minus the average closing price of ChemoCentryx common stock from May 7, 2021 through the date of sale. *Id*. ¶ 86.C. For shares held until the end of the 90-day period after the Class Period (August 4, 2021) or later, the Recognized Loss Amount is *the lesser of*: (i) the amount of alleged artificial inflation in ChemoCentryx common stock on the

purchase date, or (ii) the purchase price *minus* the average closing price of ChemoCentryx common stock during the 90-day period ($12.85 per share). *Id.* ¶ 86.D.

This method of measuring Claimants' Recognized Losses tracks the standard way such recognized losses are calculated in plans of allocation in virtually all actions under Section 10(b) of the Exchange Act and corresponds to how damages would be calculated at any trial.

The sum of a Claimant's Recognized Loss Amounts for all his or her Class Period purchases is the Claimant's "Recognized Claim." Settlement Notice ¶ 87. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in ChemoCentryx common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in ChemoCentryx common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id.* ¶¶ 94-95. The Net Settlement Fund will then be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id.* ¶ 96.

One hundred percent of the Net Settlement Fund will be distributed to Class Members who submit eligible claims. If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions will also be conducted. Settlement Notice ¶ 98.

In the event any residual funds remain after all cost-effective distributions of the Net Settlement Fund to eligible claimants have been completed, the Plan of Allocation identifies the Bluhm Legal Clinic Complex Civil Litigation and Investor Protection Center at the Northwestern Pritzker School of Law ("IPC") as the proposed *cy pres* recipient. *Id*. The IPC is a law school clinic that provides law students with the opportunity to represent clients with limited income in securities matters against stockbrokers, investment advisers, or securities firms. IPC also provides case-screening services to regulators, including FINRA, the SEC, and state regulators, as well as brokerage houses trying to identify legitimate claims.[7]

---

[7] *See Complex Civil Litigation and Investor Protection Center*, Nw Univ., https://www.law.northwestern.edu/legalclinic/investorprotection/.

Lead Plaintiff believes the IPC is an appropriate *cy pres* recipient because of the nature of the securities fraud claims at issue in this Action. *See, e.g.*, Order Approving Plan of Allocation at 4-5, *In re Plantronics, Inc. Sec. Litig.*, No. 4:19-cv-07481-JST (N.D. Cal. Mar. 10, 2026), Dkt. No. 263 (approving IPC as *cy pres* recipient in securities class action because the "organization has a sufficient nexus to the objectives of the securities laws . . . and the interests of class members because it (1) provides law students with opportunities to represent limited-income clients in securities matters; and (2) provides services to regulators, including the Securities and Exchange Commission"); *In re Lyft Inc. Sec. Litig.*, 2023 WL 5068504, at *7 (N.D. Cal. Aug. 7, 2023) (approving IPC as *cy pres* recipient in securities class action because IPC "does work that aligns with the objectives of the securities laws underlying this case and the class members' interest in protecting investors" and "there is a sufficient 'driving nexus' between the class and the *cy pres* recipient"). The Parties and their counsel have no relationship with the IPC. ¶ 126.

As noted, payment will be made to the IPC only if and when the residual amount following distributions to eligible claimants left for re-distribution to eligible claimants is so small that a further re-distribution would not be cost effective—for example, in the event the administrative costs of conducting an additional distribution would largely subsume the funds available.

As of September 9, 2026, more than 77,000 copies of the Postcard Notice—which advises Class Members of their right to object to the Plan of Allocation—have been mailed to potential Class Members. *See* Marquez Decl. ¶ 9. To date, no objections to the Plan of Allocation have been received. *See* Uslaner Decl. ¶ 115. The proposed Plan of Allocation is thus fair and reasonable and should be approved.

## V. NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

In accordance with the Court's Preliminary Approval Order, the Claims Administrator began mailing copies of the Postcard Notice to potential Class Members and nominees on July 6, 2026. *See* Marquez Decl. ¶¶ 3-6. As of September 9, 2026, the Claims Administrator mailed a total of 77,834 copies of the Postcard Notice and 1,551 copies of the Settlement Notice Packet by first-class mail to potential Class Members and nominees. *See id.* ¶ 9. In addition, Kroll arranged for

the Summary Settlement Notice to be published in the *Wall Street Journal* and transmitted over the *PR Newswire* on July 20, 2026. *See id.* ¶ 10. The Claims Administrator also updated the case website, www.ChemoCentryxSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to downloadable copies of the Settlement Notice, Claim Form, and Stipulation, among other documents, as well as the option to submit claims online through the website. *See id*. Copies of the Settlement Notice and Claim Form were also made available on Lead Counsel's website, www.blbglaw.com. *See* Uslaner Decl. ¶ 114.

The notices disseminated to the Class in accordance with the Court's Preliminary Approval Order satisfied the requirements of due process, Rule 23, and the PSLRA. The notices were directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). And the notices "'generally describe[d] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill*, 361 F.3d at 575; *see also Luna v. Marvell Tech. Grp.*, 2018 WL 1900150, at *2 (N.D. Cal. Apr. 20, 2018) (same); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016) (same).

The notice program's combination of individual first-class mail to all Class Members who could be identified with reasonable effort, supplemented by notice in widely circulated publications, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23 and due process. *See, e.g., Leventhal v. Chegg, Inc.*, 2025 WL 1481382, at *6 (N.D. Cal. May 21, 2025) (finding that similar notice process complied with "Federal Rule of Civil Procedure 23 and constitutional due process requirements"); *Yaron v. Intersect ENT, Inc.*, 2021 WL 5184290, at *2 (N.D. Cal. Nov. 5, 2021) (same).

## CONCLUSION

For all of the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated: September 10, 2026

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ *Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*-and-*

Salvatore J. Graziano (admitted *pro hac vice*)
(salvatore@blbglaw.com)
Katherine M. Sinderson (admitted *pro hac vice*)
(katiem@blbglaw.com)
Jorge G. Tenreiro (admitted *pro hac vice*)
(jorge.tenreiro@blbglaw.com)
Robert F. Kravetz (admitted *pro hac vice*)
(robert.kravetz@blbglaw.com)
John Esmay (admitted *pro hac vice*)
(john.esmay@blbglaw.com)
Shane Avidan (admitted *pro hac vice*)
(shane.avidan@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Indiana Public Retirement System and Lead Counsel for the Class*